## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF ILLINOIS

DOCKETED
FEB 3 - 2004

TEACHERS' RETIREMENT SYSTEM OF LOUISIANA,  )
on behalf of itself and all other similarly situated  )
shareholders,  )
)
          Plaintiff,  )
)
          v.  )
) No. _____
CONRAD N. BLACK, HOLLINGER INTERNATIONAL,  )
INC., HOLLINGER INC., RAVELSTON  ) JURY TRIAL DEMANDED
CORPORATION LIMITED, RAVELSTON  )
MANAGEMENT INC., ARGUS CORPORATION LTD,  )
DWAYNE O. ANDREAS, PETER Y. ATKINSON,  )
BARBARA A. BLACK, JACK A. BOULTBEE,  )
RICHARD R. BURT, RICHARD G. CHAMBERS,  )
DANIEL W. COLSON, MARK S. KIPNIS, HENRY A.  )
KISSINGER, MARIE-JOSEE KRAVIS, SHMUEL  )
MEITAR, GORDON A. PARIS, RICHARD N. PERLE, F.  )
DAVID RADLER, GRAHAM W. SAVAGE, RAYMOND  )
G. H. SEITZ, ROBERT S. STRAUSS, A. ALFRED  )
TAUBMAN, JAMES R. THOMPSON, LORD  )
WEIDENFELD, LESLIE H. WEXNER and KPMG LLP,  )
)
          Defendants.  )

04C

JUDGE PLUNKETT

MAGISTRATE JUDGE SCHENKIER

FILED FOR DOCKETING
04 FEB -2 PM 4:25
U.S. DISTRICT COURT
CLERK
ED-7

## CLASS ACTION COMPLAINT

Plaintiff, Teachers' Retirement System of Louisiana ("Teachers"), on behalf of itself and all

other purchasers of Hollinger International, Inc. ("Hollinger" or the "Company") securities (the

"Plaintiffs") between and including August 13, 1999 and March 31, 2003 (the "Class Period"),

alleges the following upon information and belief, except as to those allegations concerning

plaintiffs, which are based upon personal knowledge. Plaintiff's information and belief are based

upon, among other things: (a) an investigation conducted by and through their attorneys; (b) review

and analysis of filings made by Hollinger with the Securities and Exchange Commission ("SEC"),

/—/

(c) review and analysis of filings made by companies affiliated with Hollinger such as Hollinger Inc., among others; (d) the complaint filed by the SEC against Hollinger in the United States District Court for the Northern District of Illinois, docketed as No. 04C 0336; (e) the complaint filed in the United States District Court for the Southern District of New York by the Special Committee of the board of directors of Hollinger ("Board"), on Hollinger's behalf, against Lord Conrad M. Black ("Lord Black") and others, docketed as No. 04 Civ 00408 (the "Special Committee Complaint"); (f) the complaint filed by Cardinal Value Equity Partners, L.P. against Lord Black, Hollinger and others, in the Delaware Chancery Court, docketed as C.A. No. 20406 (the "Cardinal Complaint"); (g) press releases, public statements, news articles, securities analysts' reports and other publications disseminated by or concerning Hollinger; and (h) other publicly available information about Hollinger. Plaintiff believes that further substantial evidentiary support will exist for the allegations after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to defendants or are within their control.

## SUMMARY OF THE ACTION

1.      Throughout the Class Period, defendants failed to disclose the transfer of millions of dollars of Hollinger funds into their own pockets, falsified the Company's financial results, and materially misrepresented Hollinger's sales of Company assets and its dealings with related parties. Defendants compounded their fraud by falsely claiming that the Company's related-party transactions were approved by the Board and the Audit Committee of the Board, when they were not.

2.      The chief architect of this fraud is Lord Conrad N. Black ("Lord Black"), Hollinger's controlling shareholder and former Chief Executive, who raided the Company's coffers to finance his extravagant lifestyle but failed to disclose this piracy to shareholders. Lord Black and his acolytes surreptitiously pocketed millions of dollars generated from sales of Hollinger assets – money that belonged to Hollinger – without disclosure to the shareholders and without being challenged by Hollinger's Board or the Board's Audit Committee which knew or were reckless in not knowing that such theft was taking place. When some of these self-dealing transactions were called to the Board's attention, the directors simply rubber-stamped the transactions and failed to correct prior misrepresentations about the transactions which the Board and Audit Committee knew were false.

3.      Defendants accomplished their fraud by misrepresenting to the shareholders the terms of Hollinger's asset sales to third party publishers. During the Class Period, Hollinger reported proceeds from the sales of its newspaper assets, and a reduction of its debt and strengthening of its balance sheet through the use of proceeds from such sales. However, unbeknownst to investors, significant portions of those proceeds were diverted to Lord Black and his lieutenants under the guise

-3-

of "non-compete payments." The payments to Lord Black and his lieutenants were concealed from investors, and the Company's independent directors failed to review or negotiate the asset sale transactions or the non-compete payments or assess their fairness to the Company and its shareholders.

4.      Hollinger's shareholders were deceived in several ways. First, they were told that only Hollinger was profiting from the sales of its assets and that the independent directors had approved the Company's asset sales, when that was untrue. Investors who purchased Hollinger stock based upon the Company's ability to raise funds through divestitures and other transactions  were misled into believing that all the money obtained through the Company's sales of its own assets went into the Company's coffers, when in fact millions of dollars were transferred to Lord Black and his associates. Investors who purchased Hollinger stock based upon the Company's representations that its independent directors had approved the Company's asset sales and related party transactions were also deceived.

5.      The shareholders were also deceived by the Company's misrepresentations that it was receiving services pursuant to management services agreements with The Ravelston Corporation Limited ("Ravelston"), a Lord Black controlled company.  Through Ravelston, and through a complex system of intertwining ownerships and payments between various companies controlled by Lord Black, Lord Black surreptitiously funneled additional Hollinger funds to himself and his associates but concealed this from the shareholders.

6.      Toronto-based Hollinger Inc. owns 30% of Hollinger's shares but controls 73% of its voting shares.  Lord Black controls the Toronto parent through Ravelston and other holding companies owned by Black which are paid to manage Hollinger. From 1995 to 2003, Lord Black

and his cronies have used this byzantine corporate network to divert additional hundreds of millions of dollars from Hollinger to themselves, this time under the guise of purported "advisory and consulting fees" provided by Ravelston pursuant to management services agreements. However, unbeknownst to the shareholders, no such management, advisory or consulting services were provided by Ravelston to Hollinger – the management services agreements were simply a ruse to funnel monies to Lord Black. These facts were concealed from the shareholders. Additionally, defendants falsely represented that the service agreements were negotiated at arms' length and approved by the Board and Audit Committee, when they were not.

7.     Lord Black also misrepresented the Company's dealings with related parties. Hollinger sold numerous newspaper assets to third parties that were secretly controlled by Lord Black in deals structured to prevent competing bids from emerging. While this prevented Hollinger from receiving higher values for its assets, it enabled the Black-owned and controlled parties to purchase Hollinger assets at fire-sale prices. Hollinger did not disclose that the deals precluded competitive bids and that the purchasers of Hollinger's assets were companies owned and controlled by Lord Black and his first lieutenant at Hollinger. Hollinger also failed to disclose that these deals were consummated only because Hollinger provided the financing needed by the Black-owned companies to close the deals with Hollinger.

8.     Lord Black never disclosed the diversion of Company funds to himself, his acolytes and the companies he controlled . The reason is that he had utter disdain for shareholders who he considered lacking any right to basic information about how he "compensated" himself and paid for his personal expenses out of Company funds. Lord Black considered himself the "proprietor" of Hollinger who could take Company funds without the disclosure which would arouse what he

characterized as the "agitations of shareholders." Although Lord Black was previously found by the SEC to have violated federal securities laws through misrepresentations to shareholders, Lord Black continued to treat outsiders with contempt, referring to activist investors as "corporate governance zealots" and "terrorists."

9.      When Hollinger finally dribbled out to the shareholders some information about the self-dealing transactions and non-compete payments, it misrepresented the amount of the non-compete payments, it falsely stated that those payments were "required" to close the Company's asset sales, and it falsely claimed that the Company's independent directors had approved the payments. These misrepresentations were contained in a Form 10-K filed for fiscal year 2002 (the "2002 10-K"). In addition to misrepresenting the amounts and circumstances surrounding the non-compete payments, the 2002 10-K failed to disclose that, although Hollinger was paying Ravelston millions of dollars each year pursuant to management services agreements, Ravelston was not providing any services to the Company. The 2002 10-K also failed to disclose the terms of its prior asset sales which were designed to favor companies controlled by Lord Black and his cronies. On the 2002 10-K, Lord Black signed his certification (required under the Sarbanes-Oxley Act of 2002) "that to the best of [his] knowledge . . . the Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act . . . and . . . the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." As Lord Black knew, this certification was false.

10.      Hollinger's misrepresentations and fraud began at least as early as its 10-Q filed on August 13, 1999. On August 13, 1999, at the beginning of the Class Period, Hollinger's stock traded at $10.08 per share. By March 28, 2002 it traded at $13.11 per share, as a result of the artificial

inflation of Hollinger stock resulting from the fraud of Lord Black and the other defendants. Beginning in April 2002, isolated information about Lord Blacks' improper dealings began to dribble into the marketplace. As the marketplace reacted to the news of Lord Black's self-dealing, Hollinger's stock began to drop in price. However, not until March 31, 2003, under pressure from its institutional investors, did Hollinger begin to disclose the improprieties by Lord Black and his accomplices, and the price of the Company's stock dropped that day to $7.90 per share. This action therefore is brought on behalf of a class of individuals who purchased Hollinger securities from August 13, 1999 through March 31, 2003 (the "Class Period"). Investors lost millions as a result of defendants' fraud, and seek compensation in this action.

**THE PARTIES**

11.     Plaintiff Teachers, a Louisiana public trust fund, is a public employee pension plan. Teachers is charged with the investment and reinvestment of the trust fund of the Teachers' Retirement System of Louisiana, a public employee welfare and pension benefit plan, and certain other funds.    Teachers maintains its office and principal place of business at 8401 United Plaza Boulevard, Baton Rouge, Louisiana.    At all times alleged herein, Teachers has been a holder of common stock of Hollinger.

12.     Hollinger, is a global newspaper publisher with English-language newspapers in the United States, Great Britain, and Israel. Its assets include the Daily Telegraph, the Sunday Telegraph and The Spectator magazine in Great Britain, the Chicago Sun-Times and a large number of community newspapers in the Chicago area, the Jerusalem Post and the International Jerusalem Post, in Israel, a portfolio of "new media investments," and a variety of other assets. The Company's daily newspapers have a worldwide combined circulation of approximately 2 million readers per

-7-

day. Hollinger is a Delaware Corporation with its primary place of business at 401 North Wabash Avenue, Suite 740, Chicago, Illinois 60611. It has 71,700,453 shares of Class A Common Stock and 14,990,000 shares of Class B Common Stock outstanding as of November 7, 2003. Hollinger trades on the New York Stock Exchange ("NYSE") under the symbol HLR.

13.     Hollinger is controlled by its parent company, Hollinger Inc., a Canadian corporation which owns 30.3% of Hollinger's shares. Because a majority of the Hollinger shares owned by Hollinger Inc. are Class B common shares that have a 10-to-1 voting preference over the Class A shares held by Hollinger's public shareholders, Hollinger Inc. controls 73% of Hollinger's overall voting power despite owning only a minority interest in Hollinger's equity. Lord Black controls Hollinger Inc. through Ravelston, Lord Black's private holding company, which directly and indirectly through its subsidiaries, controls approximately 78% of the shares of Hollinger Inc. Ravelston's subsidiaries include Ravelston Management Inc., Argus Corporation Ltd. ("Argus"), Moffat Management and Black-Amiel Management.

14.     Defendant Hollinger, Inc. is a Canadian corporation with its principal office located in Toronto, Canada. It is a mutual fund company that trades on the Toronto Stock Exchange under the symbol HLG.

15.     Defendant Ravelston is an Ontario, Canada corporation with its principal office located in Toronto, Canada. According to the action commenced by the Hollinger Special Committee, Ravelston beneficially owns 78% of Hollinger, Inc.'s stock. Ravelston is a privately-held entity, with 98.5% of its equity owned by officers and directors of Hollinger and Hollinger, Inc. and 1.5% of its equity owned by the estate of a former Hollinger, Inc. director.

16.     Defendant Ravelston Management Inc. ("RMI") is a Canadian corporation with its principal office located in Toronto, Canada. According to the action commenced by the Hollinger Special Committee, RMI is a wholly owned subsidiary of Ravelston. Ravelston and RMI are hereinafter referred to collectively herein as "Ravelston."

17.     Defendant Argus is a public Canadian corporation traded on the Toronto Stock Exchange under the symbol "AR" whose major investment is a 62% interest in the retractable shares of Hollinger Inc. and whose parent is Ravelston.

18.     Defendant Lord Conrad N. Black of Crossharbour ("Lord Black"), is Chairman of the Board, and until November 19, 2003 was the Chief Executive Officer of Hollinger. He remains CEO of Hollinger Inc. and Argus Corporation Ltd. Lord Black has held these positions since 1978. Lord Black owns (through Conrad Black Capital Corporation) 65.1% of Ravelston and therefore controls Ravelston and Hollinger Inc. During the Class Period, Lord Black signed many of the Company's false and misleading SEC filings. Lord Black owns, directly or indirectly, equity securities of Hollinger Inc. or has the right to acquire equity securities of Hollinger Inc. through Hollinger Inc.'s Executive Share Option Plan.

19.     Defendant Dwayne O. Andreas ("Andreas") was a member of the Board from February 1996 until his resignation in May 2002. During the Class Period, Andreas signed many of the Company's false and misleading SEC filings. Andreas owns, directly or indirectly, equity securities of Hollinger Inc. or has the right to acquire equity securities of Hollinger Inc. through Hollinger Inc.'s Executive Share Option Plan.

20.     Defendant Peter Y. Atkinson ("Atkinson"), is Executive Vice President of the Company and was a member of the Board from early 2002 until his resignation in November 2003.

He served as Vice President of the Company from 1997 to 2002. Atkinson also holds or has held various positions in entities affiliated with Hollinger or Lord Black, including the following: Atkinson is an owner of Ravelston and an officer and director of Argus, Hollinger Inc., and Hollinger Canadian Newspapers G.P. Inc. During the Class Period, Atkinson signed many of the Company's false and misleading SEC filings. Atkinson owns, directly or indirectly, equity securities of Hollinger Inc. or has the right to acquire equity securities of Hollinger Inc. through Hollinger Inc.'s Executive Share Option Plan.

21.     Defendant Barbara Amiel Black ("Lady Black"), is the Vice President, Editorial (since September 1995) of Hollinger and a member of the Board (since February 1996). Lady Black is the wife of Defendant Lord Black. Lady Black is also a director of Hollinger Inc. and the Jerusalem Post. Lady Black is the direct owner of 391,000 shares and indirect owner, through her spouse, Lord Black, of an additional 2,105,000 shares of Class A common stock. During the Class Period, Lady Black signed many of the Company's false and misleading SEC filings. Lady Black owns, directly or indirectly, equity securities of Hollinger Inc. or has the right to acquire equity securities of Hollinger Inc. through Hollinger Inc.'s Executive Share Option Plan.

22.     Defendant Jack A. Boultbee ("Boultbee") was an Executive Vice President of the Company from 1996 until his termination in November 2003. He was a member of the Board from 1990 to 2001. In addition, he served as Chief Financial Officer from 1995 to 1999. Boultbee is an owner of Ravelston. Boultbee has also held positions at the following entities affiliated with Lord Black and Hollinger: Hollinger Canadian Publishing Holdings Inc. (Executive Vice President, Chief Financial Officer and Director) and Argus (Director). Boultbee owns at least 603,000 shares of the Company's Class A common stock. During the Class Period, Boultbee signed many of the

Company's false and misleading SEC filings. Boultbee owns, directly or indirectly, equity securities of Hollinger Inc. or has the right to acquire equity securities of Hollinger Inc. through Hollinger Inc.'s Executive Share Option Plan.

23. Defendant Richard R. Burt ("Burt") has been a member of the Board since September 1994 and was on the Board's audit and compensation committees during the period in question. Burt is also Chairman of IEP Advisors L.L.P., an emerging markets investment banking and advisory services firm. During the Class Period, Burt signed many of the Company's false and misleading SEC filings.

24. Defendant Richard G. Chambers ("Chambers") was a member of the Board from February 1996 until his resignation in May 2002. During the Class Period, Chambers signed many of the Company's false and misleading SEC filings.

25. Defendant Daniel W. Colson ("Colson"), is Vice Chairman and a Director of the Company and Deputy Chairman, Chief Executive Officer and Director of The Telegraph, an affiliated company of which Lord Black is the Chairman. Colson is also Chairman and a Director of Hollinger Telegraph New Media Ltd., Vice Chairman and a Director of Hollinger Digital Inc., Vice Chairman and a Director of Hollinger Inc., and a Director of Argus. During the Class Period, Colson signed many of the Company's false and misleading SEC filings. Colson owns, directly or indirectly, equity securities of Hollinger Inc. or has the right to acquire equity securities of Hollinger Inc. through Hollinger Inc.'s Executive Share Option Plan.

26. Defendant, Mark S. Kipnis ("Kipnis") is an attorney who serves as Vice President, Corporate Counsel and Secretary of Hollinger. During the Class Period, Kipnis signed certain of the Company's false and misleading SEC filings.

27.     Defendant, Dr. Henry A. Kissinger ("Kissinger"), has been a member of the Board since February 1996. The Wall Street Journal recently reported that Hollinger has given $200,000 a year to the National Interest, a conservative publication that includes Kissinger and Lord Black as advisers. Kissinger, until earlier this year, sat with Lord Black on the strategic advisory board of Trireme Partners LP (a company in which Hollinger made a $2.5 million investment). During the Class Period, Kissinger signed many of the Company's false and misleading SEC filings.

28.     Defendant Marie-Josee Kravis, O.C. ("Kravis") was a member of the Board from February 1996 until October 2003 and was on the Board's audit committee during the Class Period. In the past, Kravis sat on the Board of Directors of Canadian Imperial Bank of Commerce with Lord Black. During the Class Period, Kravis signed many of the Company's false and misleading SEC filings.

29.     Defendant Shmuel Meitar ("Meitar") has been a member of the Board since February 1996. Meitar was from 1992 to 2002 a Director of Jerusalem Post, a newspaper owned by Hollinger. During the Class Period, Meitar signed many of the Company's false and misleading SEC filings.

30.     Defendant Gordon A. Paris ("Paris") was named interim President and Chief Executive Officer of the Company in mid-November 2003, and he has been a member of the Board since May 2003. He is a Managing Director and Head of the Media and Telecommunications and Restructuring Groups at Berenson & Company, a private investment bank. Paris has long been Hollinger's investment banker and adviser. Despite his long-standing relationship with Hollinger, Paris was appointed to head the Special Committee as a purportedly "independent" Director.

31.     Defendant Richard N. Perle ("Perle") has been a member of the Board since June 1994. Perle is a shareholder and Co-Chairman of Hollinger Digital Inc., a subsidiary of the

Company, and receives a salary from Hollinger Digital Inc. to help find investments. He is also a Director of the Jerusalem Post. According to the Wall Street Journal, Hollinger made a $2.5 million investment in Trireme Associates LLC, which is the general partner of Trireme Partners LP, a venture capital fund that is co-managed by Perle. Perle is also a 5% owner of Trireme Associates LLC. Lord Black sits on the strategic advisory board of Trireme Partners LP. The Wall Street Journal also reported that Hollinger has given $200,000 a year to the National Interest, a conservative publication that includes Perle and Lord Black as advisers. During the Class Period, Perle signed many of the Company's false and misleading SEC filings.

32.     Defendant F. David Radler ("Radler") was the Deputy Chairman, President, Chief Operating Officer and a member of the Board of Hollinger until his November 2003 resignation. Additionally, Radler has served as President and Chief Operating Officer since October 25, 1995, as Deputy Chairman since May 1998, as a Director since 1990, and was Chairman of the Board from 1990 to October 25, 1995. He has also held numerous high level positions at Hollinger Inc. and has been a Director of the following Hollinger affiliates: Argus, The Telegraph and Jerusalem Post. Radler is an owner of Ravelston. Radler, along with Lord Black, is also an owner of Horizon Publications, Inc., a company that, as described below, acquired newspapers from Hollinger at bargain prices, while failing to disclose some of the transactions. During the Class Period, Radler signed many of the Company's false and misleading SEC filings. Radler owns, directly or indirectly, equity securities of Hollinger Inc. or has the right to acquire equity securities of Hollinger Inc. through Hollinger Inc.'s Executive Share Option Plan.

:

-13-

33.     Defendant Graham W. Savage ("Savage") was elected to the Board on July 24, 2003 and serves on the Special Committee. Savage sits on the board of Canadian Tire Corp. with Atkinson.

34.     Defendant Raymond G. H. Seitz ("Seitz") was elected to the Board on July 24, 2003. He is the chairman of the Executive Committee and also serves on the Special Committee of the Board. Despite his appointment to the Special Committee, Seitz is far from independent. Until recently, Seitz was a member of the Telegraph Group's advisory body, of which Lord Black is the Chairman and Colson is Chief Executive.

35.     Defendant Robert S. Strauss ("Strauss") was a member of the Board from February 1996 until his resignation in May 2002. During the Class Period, Andreas signed many of the Company's false and misleading SEC filings.

36.     Defendant A. Alfred Taubman ("Taubman") was a member of the Board from February 1996 until his resignation in May 2002. In December 2001, Taubman, who was then the majority owner of Sotheby's Holdings Inc., was convicted of colluding to fix prices with rival auctioneer Christie's International Plc. Despite having a high-powered legal team, which included former Whitewater special prosecutor Robert Fiske Jr., in April 2002 Taubman was sentenced to one year in prison and fined $7.5 million. Incredibly, Taubman remained on the Hollinger Board for six months after his criminal conviction. During the Class Period, Taubman signed many of the Company's false and misleading SEC filings. Taubman owns, directly or indirectly, equity securities of Hollinger Inc. or has the right to acquire equity securities of Hollinger Inc. through Hollinger Inc.'s Executive Share Option Plan.

37.    Defendant James R. Thompson ("Thompson") has been a member of the Board since June 1994 and was the chairman of the Board's Audit Committee and sat on the Compensation Committee during the Class Period.  Thompson is a resident of Illinois.  In the past, Thompson received substantial political contributions from Lord Black.  During the Class Period, Thompson signed many of the Company's false and misleading SEC filings.

38.    Defendant Lord Weidenfeld of Chelsea ("Weidenfeld") was a member of the Board from February 1996 until his resignation in May 2002. During the Class Period, Weidenfeld signed many of the Company's false and misleading SEC filings.

39.    Defendant Leslie H. Wexner ("Wexner") was a member of the Board from February 1996 until his resignation in May 2002.  During the Class Period, Wexner signed many of the Company's false and misleading SEC filings.

40.    Lord Black, Andreas, Atkinson, Lady Black, Boultbee, Burt, Chambers, Colson, Kissinger, Kravis, Meitar, Paris, Perle, Radler, Savage, Seitz, Strauss, Taubman, Thompson, Weidenfeld and Wexner are referred to collectively herein as the "Individual Defendants."

41.    Defendant KPMG LLP ("KPMG") is a "Big Four" accounting firm with partners that are residents of, and offices that are located in, every state, including New York and Illinois, where KPMG's office located at 303 East Wacker Drive, Chicago, Illinois handled the outside audits of Hollinger.  At all times relevant to this action, KPMG was Hollinger's independent auditor.  KPMG certified certain of Hollinger's false and misleading financial statements that are the subject of this action.  During the Class Period, KPMG also served as the independent auditor of Hollinger Inc., with the outside audits handled by KPMG's offices located at Suite 500, 4120 Younge Street, North York, Ontario, Canada M2P 2B8.

## NATURE OF ACTION
## AND JURISDICTION

42.     This is a class action brought on behalf of Teachers and similarly situated shareholders of Hollinger, who purchased securities of Hollinger from August 13, 1999 through March 31, 2003 (the "Class Period").

43.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1337 and 1367, and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa.

44.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b), and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

45.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391 (b) and (c), because Hollinger maintains an office in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

46.     In connection with the acts alleged in this Complaint, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications and the facilities of the national securities markets.

## FACTUAL BACKGROUND

A.     **Lord Black The King**

47.     To understand this case, it is necessary to understand Lord Black. For Lord Black, wealth and extravagance are a birthright to be continued in the fashion of Citizen Kane, that is, before the mythical figure's downfall. Not even Dennis Kozlowski, the disgraced former head of

Tyco Ltd. who became famous for spending $6,000 on a shower curtain (on Tyco's tab), can match Black when it comes to a taste for the finer things. Lord Black has palatial homes: a 21,000 square foot beachfront mansion in Palm Beach, Florida; a four-story home in London's exclusive Kensington enclave bought from Australian financier Alan Bond; a stunning Toronto mansion complete with a domed roof modeled on St. Peter's Basilica in Rome with a chapel consecrated by Toronto's Roman Catholic archbishop and a 12-acre estate; and the obligatory multimillion dollar Park Avenue apartment. All these abodes are stuffed with works of art, historical curios and busts of great military leaders – Caesar and Napoleon being his favorites. These various residences are used by Lord Black but maintained (in part) by Hollinger – Hollinger pays the cost of maintaining Lord Black's Park Avenue apartment (over $100,000 last year), and pays a portion of the salaries of the staff (butler, chef, and maid) at his London residence.

48.    Hollinger also pays for Lord Black's travel to and from his various residences, whether by air or ground transportation. Lord Black has a vintage 1954 Rolls Royce Silver Wraith to squire him around London, with upkeep and insurance paid by Hollinger. He is the primary user of a Gulfstream IV jet -- leased by Hollinger and refurbished (with an exotic wood table, luxury sofa with fold-out bed, and Christofle silverware) at a cost of $3 million. Lord Black also has at his disposal the Company's Challenger jet. Running both planes reportedly costs Hollinger over $8 million a year. The Company also foots Lord Black's monthly tab at the notoriously expensive Le Cirque 2000 restaurant in New York.

49.    For Lord Black, social status is extremely important. Black surrounds himself with famous people -- businessmen, politicians and power brokers -- whom he entertains lavishly. His Board includes a former U.S. Secretary of State (Kissinger), a former Assistant Secretary of Defense

-17-

(Perle), a former Governor of Illinois (Thompson), and the wife of corporate raider Henry Kravis (Kravis). His second wedding to Barbara Amiel was held at the posh Annabel's nightclub in London, where Black was seated between Margaret Thatcher and the Duchess of York. Status and title are so important to Black that he renounced his Canadian citizenship so that he could obtain a seat in England's House of Lords and the "Lord Black of Crossharbour" title that went with it.

50.     For Lord Black, there is no distinction between what is Hollinger's (and Hollinger's shareholders') and what is his. Rather, Hollinger and the rest of his media empire are personal piggy-banks to be raided when necessary to fund his extravagant lifestyle. He considers himself (and his fellow Ravelston shareholders) to be "proprietors" who can without shareholder review or challenge use the Company's funds to cover personal expenses. As Lord Black stated in an August 5, 2003 e-mail to Atkinson:

> There has not been an occasion for many months when I got on our plane without wondering whether it was really affordable. But I'm not prepared to reenact the French Revolutionary renunciation of the rights of nobility. We have to find a balance between an unfair taxation on the company and a reasonable treatment of the founder-builders-managers. We are proprietors, after all, beleaguered though we may be.

51.     Viewing himself as "proprietor" or king, Lord Black believed he could pay himself out of the Company's coffers without any disclosure to the shareholders or even to the Company's independent directors. After giving himself millions of dollars of Company money in the form of purported "non-compete" payments, Lord Black gloated in a September 6, 2002 memorandum that he had "pretty well won the great battle over the non-competition agreements and a decent interval has passed," and that the actions of "controlling shareholders [such as himself] . . . to ensure their

comfortable enjoyment of the position they (we, in fact), have created for themselves" should not be hindered by "the agitations of shareholders."

52.    Lord Black's contempt for the public shareholder majority was apparent in his August 3, 2002 e-mail to Atkinson and Boultbee, where he stated:

> We have said for some time that [Hollinger] served no purpose as a listed company other than relatively cheap use of other people's capital, and privatization noises have been audible for a long time. We now have an unsatisfactory situation where a number of the shareholders think we are deliberately suppressing the stock price, some others think we are running a gravy train and a gerrymandered share structure, and we think they are a bunch of self-righteous hypocrites and ingrates, who give us no credit for what has been a skillful job of building and pruning a company in difficult circumstances just ahead of seismic financial events.

53.    Lord Black rebuked the Company's shareholders who he called "corporate governance zealots" and "terrorists" who in his view had no basis or right to challenge his personal use of the Company's money and assets. At last year's annual meeting, Lord Black reportedly responded to shareholders' criticisms by saying, "You're entitled to what you think but you don't know what you're talking about."

54.    Lord Black's disdain for shareholders has resulted in his outright violation of federal securities laws designed to require disclosure to shareholders. On July 20, 1982, Lord Black entered into a settlement with the SEC enjoining further violations of Sections 10(b) and 14(e) of the Exchange Act for making misrepresentations in SEC filings related to the acquisition by Norcen Energy Resources, Ltd. (a company that Lord Black chaired) of 8.8% of Hanna Mining Co.'s outstanding stock. The SEC found that Lord Black and Norcen failed to disclose that Norcen's

primary intention was to acquire a controlling interest in Hanna Mining Co. and the substantial steps Norcen had taken to increase the amount of Hanna common stock which it owned.

55. Lord Black has not learned his lesson. Before the Special Committee dethroned the "king" (just over a week ago) by removing Lord Black from his remaining title at the Company (as non-executive Chairman), Lord Black and his accomplices had concealed their theft of Company money, misrepresented the Board's review and approval of their actions, and materially misrepresented the Company's financial condition. Plaintiffs seek compensation for the damages they have suffered as a result of Lord Black's and the defendants' misrepresentations and fraud.

## B.   PAYMENTS RECEIVED FROM NON-COMPETITION AGREEMENTS

56. From 1998 through 2000, Hollinger sold various newspaper assets to third parties, but a significant portion of the proceeds of these sales secretly went directly into the pockets of Lord Black and his lieutenants. In these transactions, the third party purchasers bought not only the trade name of Hollinger's newspapers, but also the subscriber lists and advertising contracts. In accordance with standard practice in the industry, the publishers negotiated as part of the transactions an agreement by Hollinger not to launch any new newspaper in the same market occupied by the newspaper sold by Hollinger. While Hollinger sold its corporate newspaper assets in these transactions, and Hollinger, and not any Hollinger executives, was a signatory to the non-compete agreements, Lord Black and his cohorts received all of the money paid pursuant to the non-compete agreements, while Hollinger received nothing. In total, Lord Black, Radler, Atkinson and Boultbee have diverted to themselves approximately $90.25 million paid under the non-compete agreements. Hollinger failed to inform its shareholders at the time of those transactions that some of the proceeds from its asset sales went to Lord Black and his cronies and not Hollinger. When Hollinger was

-20-

finally forced to admit that non-compete payments had been made, it falsely claimed that the Board had approved those payments, when it had not.

### 1.    Sales of U.S. Community Newspapers

57.    In 1999, 2000 and 2001, Hollinger sold most of its U.S. community newspaper properties, and publicly disclosed the proceeds of those transactions. However, the disclosures were all materially false and misleading, as they failed to identify those portions of the sale proceeds which were paid directly to Lord Black, his associates, and Hollinger Inc., which Lord Black controls. The disclosures were materially false and misleading for additional reasons -- they failed to disclose that the Company's independent directors had never approved, in advance of those transactions, the payments of any non-compete payments (or other proceeds from the sales) to Lord Black, his associates, or Hollinger Inc.

58.    On or about August 13, 1999, Hollinger filed its Form 10-Q ("August 1999 10-Q") where it described its sales of U.S. community newspapers as follows:

> In February 1999, the Company sold approximately 45 community newspapers for gross cash proceeds of approximately $441.0 million. The proceeds were used to pay down outstanding debt on the Bank Credit Facility.

The Company described its pending sale of assets to Horizon Publications Inc.:

> During the second quarter 1999, the Company entered into an agreement with Horizon Publications Inc. to sell 33 U.S. community newspapers for $43.7 million.

59.    On or about March 22, 2000, Hollinger filed its Proxy Statement (the "1999 Proxy Statement") which made the following disclosure relating to the sale of community newspapers:

> Effective April 1, 1999, the Company sold approximately 18 properties of the Company's U.S. community newspaper group for an aggregate consideration of approximately $47 million....

60.     On or about November 15, 1999, the Company filed is Form 10-Q ("November 1999 10-Q") where it again disclosed its February 1999 sale of "approximately 45 community newspapers for gross cash proceeds of approximately $441.0 million."

61.     The statements in the August 1999 10-Q and the 1999 Proxy Statement were materially false and misleading because there was no disclosure that any proceeds of the asset sales discussed in those filings went (or would go) to Lord Black and other Hollinger executives, rather than Hollinger, under the guise of non-compete payments. Lord Black, Radler, Boultbee and Atkinson kept concealed from the Company's shareholders their plans to intercept millions of dollars generated from the Company's sales of its U.S. community newspapers, money that would be represented as being paid to Hollinger, when it was not. Thus, the disclosures of the amounts the Company would receive in pending asset sales (in the August 1999 10-Q) and the amounts the Company did receive in completed sales (in the 1999 Proxy Statement) were materially false, as the Company received less money than was disclosed in those filings, due to the non-compete payments.

62.     On or about March 30, 2000, Hollinger repeated its misrepresentations when it filed its Form 10-K for its fiscal year 1999 (the "1999 10-K"). The 1999 10-K stated:

> In January 1998, the Company completed the sale of 80 community newspapers for proceeds of $310.0 million. In February 1999, the Company sold 45 community newspapers for approximately $460.0 million, of which $441.0 million was cash. On a pre-tax basis, the sales generated capital gains of approximately $201.2 million in 1998 and approximately $249.2 million in 1999.

*     *     *

-22-

> During 1999, the Company sold to Horizon Publications Inc. 33 U.S.
> community newspapers for $43.7 million resulting in a pre-tax gain
> of approximately $20.7 million.

The 1999 10-K was signed by Lord Black, Radler, Colson, Lady Black, Andreas, Burt, Chambers, Kissinger, Kravis, Meitar, Perle, Strauss, Taubman, Thompson, Weidenfeld and Wexner.

63. The Company's Form 10-Q filed on or about May 15, 2000 (the "May 2000 10-Q") contained general references to the Company's asset sales in 1999. However, as with the 1999 10-K, there was no mention of any non-compete payments being made to any individuals pursuant to those transactions, and so the 1999 10-K and the May 2000 10-Q were materially false and misleading both in their failure to disclose the non-compete payments and in their false representation of the amounts the Company received in its asset sales.

64. On or about August 2, 2000, the Company announced the sale of its remaining U.S. community newspapers for approximately $215 million to Bradford Publications Company ("Bradford"), Newspaper Holdings, Inc. of Alabama ("NHIA"), Paxton Media Group, Inc. ("PMG") and Forum Communications Company ("Forum").

65. The Company repeated this disclosure in its Form 10-Q filed on or about August 14, 2000 (the "August 2000 10-Q"). These representations were false and misleading because they failed to disclose the Company's plans to have the purchasers of Hollinger's assets pay Lord Black and others pursuant to purported non-compete agreements, and because they falsely represented the amount the Company would receive in the sale transactions. The specific amounts of the non-compete payments would be disclosed years later by the Special Committee when it filed its complaint against Lord Black.

-23-

66.     On or about November 14, 2000, the Company disclosed in its Form 10-Q filed that day (the "November 2000 10-Q") that the $215 million asset sale to four buyers was completed by October 31, 2000. As with prior filings, there was no disclosure in the November 2000 10-Q of any non-compete payments being made as part of the asset sales, and the representation that the Company would receive $215 million was false, because non-compete payments to parties other than Hollinger would be made out of the sale proceeds.

67.     On or about March 27, 2001, the Company filed is Proxy Statement (the "2001 Proxy") where the Company stated that "[e]ffective July 20, 2000, the Company sold four properties of the Company's U.S. community newspaper group for an aggregate consideration of approximately $38 million to Bradford." Hollinger also described its transactions with Horizon which the Company stated were "unanimously approved by the Audit Committee and the independent Directors of the Company as market value transactions."

68.     Similarly, on or about April 2, 2001, Hollinger filed in its Form 10-K for its 2000 fiscal year (ending December 31, 2000) (the "2000 10-K") where it stated that "[d]uring 2000 the Company sold virtually all of its remaining United States community newspapers for proceeds of approximately $215.0 million." The Company also repeated the disclosures made in previous filings regarding its asset sales in 1998 and 1999:

> In February 1999, the Company completed the sale of 45 U.S. community newspapers properties for approximately $460.0 million, of which approximately $441.0 million was cash. . . . During 1999, the Company sold to Horizon Publications Inc. 33 U.S. community newspapers for $43.7 million resulting in a pre-tax gain of approximately $20.7 million. . . . In January 1998, the Company completed a sale of approximately 80 community newspapers for aggregate case consideration of approximately $310.0 million.

-24-

However, as with its previous filings, the Company failed to disclose in its 2000 10-K that proceeds of the asset sales included payments to Lord Black and others purportedly for their agreement to be bound by non-compete agreements. Therefore, the disclosures of the amounts the Company received in the sale transactions were false. Additionally, the Company's representations (in the 2001 Proxy Statement) that the transactions with Horizon were approved by the independent investors and Audit Committee were false, as those transactions never received such approvals. The 2000 10-K was signed by Lord Black, Boultbee, Radler, Colson, Lady Black, Andreas, Burt, Chambers, Kissinger, Kravis, Meitar, Perle, Strauss, Taubman, Thompson, Weidenfeld and Wexner.

69.     The Company's Form 10-Qs filed on or about May 15, 2001 (the "May 2001 10-Q"), August 14, 2001 (the "August 2001 10-Q"), and November 14, 2001 (the "November 2001 10-Q"), while describing the Company's sales of its U.S. community newspapers, also fail to disclose that portions of the price paid in the transactions were allocated to non-compete agreements and paid directly to parties other than Hollinger.

70.     The Company's disclosures beginning with its August 1999 10-Q through its November 2000 10-Q were false and misleading in their failure to disclose the non-compete payments made in connection with the Company's sales of U.S. community newspapers discussed in those SEC filings, and in their false representation of the amounts the Company received (or stood to receive) in those transactions. In total, approximately $26 million in non-compete payments were made to parties other than Hollinger, even though it was Hollinger that was the seller of the assets in those transactions.

71.    While the Company in those filings did not disclose the non-compete payments, or break down each of its asset sales, the Special Committee in its Complaint describes the following non-compete payments that were made in connection with the Company's asset sales:

(a)    Hollinger paid Hollinger Inc. $2 million in non-compete payments in connection with the Company's May 11, 1998 asset sale to Internec Publishing Company ("Internec") for $75 million, plus the $2 million in non-compete payments;

(b)    In connection with Hollinger's February 1, 1999 asset sale to Community Newspaper Holdings, Inc. ("CNHI") for $433.8 million, $50 million of which was allocated to non-compete payments, Hollinger instructed CNHI to wire $12 million of the non-compete allocation to Hollinger, Inc.;

(c)    Hollinger paid Hollinger Inc. $1.2 million in non-compete payments in connection with the Company's asset sales to Horizon;

(d)    In connection with the Company's asset sales to Forum in September 2000 for $14 million, $400,000 of which was allocated to a non-compete agreement, Hollinger paid Hollinger Inc. $100,000 in non-compete payments;

(e)    Hollinger paid Hollinger Inc. $500,000 in non-competes in connection with its October 2, 2000 asset sale to PMG; and

(f)    In connection with Hollinger's November 1, 2000 asset sale to CNHI for approximately $90 million, CNHI wired $750,000 of the transaction proceeds to Hollinger, Inc. (at Hollinger's instruction), and Hollinger paid $4.3 million each to Black and Radler, and $450,000 each to Boultbee and Atkinson, for their entry into non-competition agreements, and paid a $100,000 "bonus" to Mark Kipnis, Hollinger's General Counsel, for arranging the non-compete payments.

72.    Additionally, as explained in the Special Committee Complaint, Hollinger made additional non-compete payments to Hollinger Inc. in connection with the Company's $310 million

asset sale in January 1998 to Community Newspaper Group ("CNG"), in which CNG agreed to pay $30,915,000, plus interest, for a non-competition agreement.

73.    None of the non-compete payments discussed above were disclosed in the Company's public filings from the August 1999 10-Q through the November 2000 10-Q . All of those filings materially misrepresented the Company's asset sales and the proceeds that the Company would receive in those transactions. Thus, beginning with the August 1999 10-Q, Hollinger reported sales of its U.S. community newspapers, and resulting improvements to the Company's financial condition, which were materially false and misleading. However, the investing community was unaware of the fraud, and so it reacted favorably, and the Company's stock climbed in response, going from $10.08 per share on August 13, 1999 to $13.11 per share on Friday, March 28, 2002.

74.    It was not until April 1, 2002, when the Company filed its Form 10-K for fiscal year 2001 ("2001 10-K"), that Hollinger disclosed that any payments relating to the sales of community newspapers were made directly to Lord Black and others, not Hollinger, pursuant to non-competition agreements. Specifically, the Company stated:

> During 2000, the Company sold most of its remaining U.S. community newspaper properties, for total proceeds of approximately $215 million. In connection with the sales of United States newspaper properties in 2000, to satisfy a closing condition, the Company, Lord Black and three senior executives entered into non-competition agreements with the purchasers to which each agreed not to compete directly or indirectly in the United States with the United States businesses sold to purchasers for a fixed period, subject to certain limited exceptions, for aggregate consideration paid in 2001 of $0.6 million. These amounts were in addition to the aggregate consideration paid in respect of these non-competition agreements in 2000 of $15 million. Such amounts were paid to Lord Black and the three senior executives. The Company's independent directors have approved the terms of these payments.

The 2001 10-K was signed by Black, Boultbee, Radler, Colson, Lady Black, Andreas, Burt, Chambers, Kissinger, Kravis, Meitar, Perle, Strauss, Taubman, Thompson, Lord Weidenfeld and Wexner.

75.     Even with this disclosure, the Company did not tell the whole story regarding the non-competition payments, and the disclosures that were made were patently false. The Company's disclosure that $15.6 million in non-competition payments were made to four individuals was false because approximately $26 million in total non-compete payments were made, of which $16.75 million was paid to Hollinger Inc. Concealed from the shareholders were the Company's payments to Hollinger Inc., which is controlled by Lord Black and serves as the corporate parent of Hollinger.

76.     Hollinger's 2001 10-K was also materially false because the payments were never authorized by any independent Hollinger directors and were not made "to satisfy a closing condition," as represented in the 2001 10-K. As revealed almost two years later in the Special Committee Complaint:

> (a)     There was no independent director authorization of any non-compete payments made in the January 1998 CNG transaction;
>
> (b)     There was no non-competition agreement in the Internec transaction, nor any Hollinger Board resolution authorizing any non-compete payment to Hollinger Inc.;
>
> (c)     Neither Lord Black, Radler nor anyone else disclosed to Hollinger's independent directors or its Board prior to its approval of the February 1999 CMHI transaction that any amount (including the $12 million wired by CMHI to Hollinger Inc.) would be paid to Hollinger Inc.;
>
> (d)     Neither Lord Black, nor Radler, nor anyone else informed Hollinger's Board at the time the Board reviewed the Horizon

transaction that $1.2 million of the proceeds would be transferred to Hollinger Inc.;

(e) In the sale to Forum, Hollinger Inc. was added as a party to the non-competition agreement, which was signed by Hollinger's General Counsel, Mark Kipnis ("Kipnis"), on behalf of both Hollinger and Hollinger Inc.;

(f) In the sale to PMG, Hollinger Inc. was added as a party to the non-competition agreement which, as with the Forum transaction, was signed by Kipnis on behalf of Hollinger and Hollinger Inc.; and

(g) In the November 2000 asset sale to CNHI, Kipnis again signed on behalf of Hollinger and Hollinger Inc., and none of the non-compete payments made in that transaction were ever reviewed, negotiated or approved by the Company's independent directors.

77. Even after the investor uproar following the Company's disclosure in its 2001 10-K that it had been secretly paying part of the proceeds of its asset sales to Lord Black, Radler, Boultbee, Atkinson and Black-controlled Hollinger, Inc., the Company continued to give away its money under the guise of "non-compete payments." As explained by the Special Committee in its federal court action against Hollinger, on or about February 2001, Lord Black and Radler caused the Company to pay $5.5 million to Black and Radler ($2,612,500 each) and Boultbee and Atkinson ($137,500 each), and then these individuals caused Hollinger employees to fabricate a documentary record to make the payments appear to be compensation for non-competition agreements. The payments were made in checks issued in February 2001 but back-dated to December 31, 2000, purportedly in connection with a sale of U.S. community newspapers owned by Hollinger's American Publishing Company subsidiary. However, as the Special Committee stated in its complaint, at the time the sham non-compete agreements were signed, American Publishing

Company had sold substantially all of its assets and did not employ Black, Radler, Boultbee or Atkinson. Moreover, the sham payments were never reviewed, negotiated or approved by the Company's independent directors.

78.     The Special Committee also alleged that Lord Black and Radler caused Hollinger to pay on or about April 9, 2001 an additional $600,000 in "non-compete" styled payments: $285,000 to Black and Radler each, and $15,000 to Boultbee and Atkinson each. While these payments were purportedly made in connection with the October PMG and the September 2000 Forum transactions, none of the individual recipients of the payments signed any non-competition agreements in connection with those transactions, nor did PMG or Forum request their signatures.

79.     Lord Black has admitted that the non-compete payments were made without proper Board authorization and the Company has admitted that its SEC filings were materially false and misleading. On or about November 15, 2003, Lord Black signed an acknowledgment as part of a written agreement (the "November Agreement") with the Company which stated:

> ... the term "Payments" shall mean the aggregate US $16,550,000 paid to Hollinger Inc. ("HLG"), the aggregate US $7,197,500 paid to each of Messrs. Black and Radler, and the aggregate US $602,500 paid to each of Messrs. Atkinson and Boultbee from 1999 to 2001. The payments were not properly authorized on behalf of the Company.

Thus, the Company's prior statement (in its 2001 10-K) that the independent directors had approved the non-compete payments was false, and the independent directors knew, or were reckless in not knowing, that such statement was false.

80.     As the Company later admitted in its press release on November 17, 2003, contained in a Form 8-K filed with the SEC on or about that date (the "November 2003 Press Release"), and

in a Form 10-Q filed on November 21, 2003 (the "November 2003 10-Q"), "[p]rior to November

17, 2003, the Company's public disclosure relating to these [non-competition payments] had been

incomplete or inaccurate." The Company explained in its November 2003 10-Q that the Special

Committee and Audit Committee determined, through their investigation of allegations regarding

related party transactions, that:

> a total of $32.15 million in payments styled as "non-competition
> payments" were made to Lord Black, Messrs. Radler, Boultbee and
> Atkinson, and [Hollinger Inc.] that were not authorized or approved
> by either the audit committee or the full board of directors of the
> company. Of the total unauthorized payments, $16.55 million was
> paid to [Hollinger Inc.] in 1999 and 2000, approximately $7.2 million
> each was paid to Lord Black and Mr. Radler in 2000 and 2001, and
> $602,500 was paid to each Mr. Boultbee and Mr. Atkinson in 2000
> and 2001.
>
> *   *   *
>
> Before November 17, 2003, the $16.55 million in payments to
> [Hollinger Inc.] had not been publicly disclosed in the notes to the
> Company's financial statements or in filings with the U.S. Securities
> and Exchange Commission (the "SEC"). The $15.6 million in
> payments to the four individuals were disclosed in the Company's
> Form 10-K filed in March 2002. As the Company disclosed on
> November 17, 2003, however, this disclosure was inaccurate because
> it stated that the payments in question had been authorized by the
> independent directors of the board, which did not occur, and that the
> payments were made "to satisfy a closing condition," which was not
> accurate. In addition, as disclosed on November 17, 2003, $5.5
> million of such payments had previously been reported to have
> occurred in 2000 rather than in 2001, when such payments were
> actually made.

81.     Hollinger also admitted that its financial statements in prior SEC filings were

materially false. Specifically, Hollinger admitted that the unauthorized non-compete payments had

a material impact on the Company's financial condition. The Company stated in its November 2003

Press Release:

> In light of the fact that steps to authorize the payments in question were not completed as required, each of Lord Black, Mr. Radler and Mr. Atkinson have agreed to repay Hollinger the full amount of the unauthorized payments received by them, together with interest dating from the date of receipt of these funds, not later than June 1, 2004. In addition, Lord Black has agreed to seek repayment in full by [Hollinger Inc.] of the amounts received by it, with interests, by no later than June 1, 2004. Upon receipt of such restitution, Hollinger's cash position and net worth will be increased compared with previously reported amounts.

82.     The November 2003 Press Release also announced that Lord Black would retire as CEO effective November 21, 2003, and that effective immediately, Mr. Radler had resigned as President and COO, Messrs. Radler and Atkinson had resigned from the Board, Mr. Boultbee's employment had been terminated, and Mark Kipnis, Vice President and Corporate Counsel, had also resigned.   Later, on January 17, 2003, after the SEC and the Special Committee filed their complaints against Lord Black and Hollinger, Lord Black was forced to resign from his position as non-executive chairman.  The circumstances under which these executives resigned and/or were terminated suggest that these actions were required or precipitated by the executives' complicity in fraudulently directing Company money to themselves and fraudulently concealing their theft from the shareholders.

### 2.     Sales to CanWest Global Communications Corp.

83.     In the Company's sales of assets to CanWest Global Communications Corp. ("CanWest"), Lord Black and his cohorts repeated their pattern of stealing from the Company under the guise of "non-competition payments" and hiding their theft from the shareholders.

84.     On July 31, 2000, the Company announced that it had entered into an agreement to sell certain assets to CanWest.  The Company's Form 10-Q filed with the SEC on August 14, 2000

stated that the purchase price would be $2.35 billion, subject to adjustments, and that the "cash proceeds [would be used] to eliminate bank debt and possibly to cancel debentures and shares and create a substantial reserve of liquid assets."

85.    In a Form 8-K filed with the SEC on August 16, 2000, Hollinger again stated that it (along with its affiliates Hollinger Inc., Southam Inc. and Hollinger Canadian Newspapers) had reached agreement to sell certain assets to CanWest. The press release attached as an exhibit to the 8-K quotes Lord Black as saying:

> Hollinger International expects to emerge from this process with a drastically reduced debt level and smaller number of outstanding shares, a stronger strategic position in relation to other media (and especially new media), appreciably higher earnings per share, and a larger cash reserve with which to take the company forward to the next stage of its development.

86.    The Company's Form 10-Q filed with the SEC on November 14, 2000 again discussed the pending sale to CanWest for $2.35 billion, which was expected to be completed the next day.

87.    The Company provided additional details of the CanWest transaction in its press release attached as an exhibit to its Form 8-K filed with the SEC on December 1, 2000. That press release announced the completion of the CanWest sale for $2.1 billion, "plus interest and subject to adjustment." Hollinger stated that as a result of that transaction and other asset sales, Hollinger was able to "repay all of its back debt and certain other debt" and "dramatically strengthen its balance sheet."

88.    The disclosures in these press releases and 10-Qs were materially false and misleading because they did not reveal that part of the proceeds from the sales to CanWest would

go directly to Lord Black and other senior Hollinger executives, rather than Hollinger itself. While the shareholders were informed that the entire proceeds of the CanWest transaction would be used to pay corporate debt and strengthen the Company's balance sheet, a significant portion of the sale proceeds were improperly diverted to Lord Black and his cronies. The revenues received by Hollinger were substantially less than what was represented in the Company's public filings, and the amount of its debt paid off as a result of the sale to CanWest would have been greater absent the undisclosed misappropriation of corporate money by Lord Black and his associates.

89.    As disclosed in the Special Committee Complaint, the CanWest transaction agreement allocated $51.76 million of the purchase price to non-competition agreements. Although Hollinger was the seller of the assets, the Company paid the entire non-competition agreement plus interest ($52.86 million in total) to Ravelston ($26.44 million), Black and Radler ($11.9 million each) and Boultbee and Atkinson ($1.32 million each).

90.    The Company repeated its fraud in its 2000 10-K, where the Company stated that its "Canadian operations were significantly reduced on completion of the sale to CanWest of a significant number of Canadian newspapers and Internet properties for a total sale proceeds of $1.8 billion including both cash and CanWest equity shares." The Company's representation that the sale was completed "at fair value" was false because, unbeknownst to the shareholders, much of that value went to Lord Black and other executives, and so Hollinger received less than $1.8 billion in the transaction, but could have received more had the unauthorized, undisclosed non-compete payments not been made. The Company listed the CanWest transaction as among other "sources of revenue" for the Company which were used "to pay down the Company's Back Credit Facility,"

without telling shareholders that even more debt would have been paid off had a portion of the proceeds of the CanWest transaction not been diverted to Lord Black and other Hollinger executives.

91.    The Company likewise failed in its 2001 Proxy Statement to disclose that proceeds from the CanWest transaction were diverted directly to Lord Black and other Hollinger executives. Thus, Hollinger's shareholders did not know when they voted to elect Lord Black and others to the Board that those same executives had misappropriated Company funds generated from the sales to CanWest.

92.    The Company did not disclose that any non-competition payments had been made by CanWest until the Company filed its Form 10-Q with the SEC on May 15, 2001 ("May 2001 10-Q"). And when the non-compete payments were disclosed, the disclosure was utterly fraudulent.

93.    The Company stated in its May 2001 10-Q:

> Also, as required by CanWest as a condition to the transaction, Ravelston, Hollinger Inc. and Messrs. Black, Radler, Boultbee and Atkinson, entered into non-competition agreements with CanWest pursuant to which each agreed not to compete directly or indirectly in Canada with the Canadian businesses sold to CanWest for a five year period, subject to certain limited exceptions, for aggregate consideration received by Ravelston and the executives of Cdn.$80 million ($53 million) paid by CanWest in addition to the purchase price referred to above, consisting of Cdn.$38 million paid to Ravelston, Cdn.$19 million paid to Mr. Black, Cdn.$19 million paid to Mr. Radler, Cdn.$2 million paid to Mr. Boultbee and Cdn.$2 million paid to Mr. Atkinson.

94.    The May 2001 10-Q was materially false and misleading because: (i) it stated that the $53 million in non-compete payments were in addition to the purchase price paid by CanWest for the Hollinger assets, when in fact the non-compete payments reduced the purchase price; (ii) it falsely stated that CanWest required that Boultbee and Atkinson enter the non-competition

agreements; (iii) it falsely stated that CanWest determined the amount of the payments to each of the individuals, when in fact the allocation of those payments was determined solely by Hollinger's executive officers, including Lord Black and Radler.

95.     As explained in the Special Committee Complaint, Lord Black denied in the Company's May 23, 2002 annual shareholders meeting in New York, in response to a question from a shareholder regarding the non-competes, that Lord Black or the other interested directors had any role in allocating the non-compete payments, stating:

> Mr. Asper demanded that there be a non-compete arrangement and effectively the independent directors of this company determined that since he wished -- that it was something that he was paying valuable consideration for and some of that should come to us and not to this company. *And that was not a matter negotiated directly by us.* (Emphasis supplied.)

> [CanWest] attached significant commercial value to a non-compete agreement with us. Not with Hollinger International. . . . And, I accept that there's a conundrum as to the division between the company's interest and our thing like that, so we effectively handed it to the independent directors to determine, stayed above the 10 times multiple, shrunk our own incomes, undoubtedly saved all of the shareholders a tremendous inconvenience by doing these deals that have enabled this company to sail relatively painlessly through a difficult time. . . .

> And in all the circumstances, the independent directors felt this was the fair thing to do and I must say, I agree. . . .

> You're dealing with a best efforts attempt to accommodate to industry practice and do what's equitable as determined by independent directors who are a group -- quite a distinguished group.

> . . . we leave the determination of these matters in the hands of disinterested people, who do, as I said in my remarks, conduct whatever analysis they think is appropriate. It's not for us to tell them what to do. . . .

96.     Lord Black's statement that the payments were negotiated by the independent
directors (on the Audit Committee) is false (and the independent directors knew or should have
known that the statement was false), as those payments were set by Lord Black, Radler, Boultbee
and Atkinson. Additionally, Lord Black's representation that the payments were made directly by
CanWest is false, as Hollinger made the payments out of the transaction proceeds, with CanWest
having no input as to the specific amounts paid to Lord Black and the other Hollinger executives and
Ravelston.

97.     According to the Special Committee, Lord Black also stated at the May 2002
shareholders meeting that the non-competition payments did not reduce Hollinger's sales proceeds:

> The answer is that it was in our opinion not technically speaking a
> reduction of the compensation paid to the company. The
> consideration was not reduced there by the acquirer in the principle
> case that you're referring to, the CanWest deal.

98.     This is false, as Lord Black and Radler caused the $53 million in non-compete
payments to be removed from the agreed-upon transaction proceeds into the non-competition
agreement allocation, and then ultimately into the bank accounts of Ravelston and its shareholders
– Lord Black, Radler, Boultbee and Atkinson.

99.     Even after the Company disclosed the existence of the non-compete payments, it
continued the fraud by falsely stating that the payments were required as part of the CanWest
transaction. The Company stated in its 2001 10-K, that:

> Also, as required by CanWest as a condition to the transaction, the
> Company, Ravelston, Hollinger Inc., Lord Black and three senior
> executives entered into non-competition agreements with CanWest
> pursuant to which each agreed not to compete directly or indirectly
> in Canada with the Canadian business sold to CanWest for a five-year
> period, subject to certain limited exceptions, for aggregate

-37-

consideration of Cdn.$80 million ($53 million) paid by CanWest in addition to the purchase price referred to above of which Cdn.$38 million ($25.2 million) was paid to Ravelston and Cdn.$42 million ($27.8 million) was paid to Lord Black and the three senior executives. The Company's independent directors have approved the terms of these payments.

100.    In similar language, Hollinger again stated in its 2002 10-K that the non-competition agreements were entered by "the Company, Ravelston, Hollinger Inc., Lord Black and three senior executives," that the agreements were "required as a condition to the transaction," and that Hollinger's "independent directors approved the terms of these payments." All these disclosures were false.

101.    The 2002 10-K was signed by Lord Black, Radler, Colson, Boultbee, Atkinson, Lady Black, Burt, Kissinger, Kravis, Meitar, Perle, Taubman and Thompson.

102.    The Company's disclosures prior to May 2001 were fraudulent because they failed to disclose the non-compete payments at all. The Company's disclosures in its May 2001 10-Q and subsequent filings were fraudulent because, *inter alia*, they falsely claimed that the non-competition payments were required by CanWest "as a condition to the transaction."

103.    CanWest has emphatically denied ever allocating any amount of the purchase price to any non-competition agreement. As the Wall Street Journal reported on November 21, 2003:

CanWest spokesman Geoffrey Elliot said his company agreed only on an overall price to acquire the newspapers and receive the non-competition agreement from Hollinger and didn't negotiate a separate amount allocated for the non-competition clause. That clause was "a part of the overall transaction," and the $53 million amount was "established by Hollinger," Mr. Elliot said. CanWest paid the acquisition price to Hollinger and not to any individuals, he added.

104.    Additionally, the Special Committee stated in its complaint that no one from or on behalf of CanWest ever requested or demanded that any part of the purchase price for Hollinger's assets be paid to anyone other than the Company.

105.    Finally, the disclosures in the May 2001 10-Q and 2001 and 2002 10-Ks were false and misleading because the payments were not approved by "independent directors"; in fact, after the May 2001 10-Q and the 2001 10-K were filed, the Audit Committee attempted to "ratify" the payments that had already been made.

106.    As explained by the Special Committee in its complaint, Hollinger's Audit Committee originally met on or about September 11, 2000 to review the CanWest transaction. However, the committee completely failed to conduct any review of the terms of that transaction or their fairness to Hollinger. The Audit Committee failed to discuss or conduct any inquiry into the negotiation and circumstances surrounding the terms of the CanWest sales agreement, or attempt to determine how the amount and recipients of the non-compete payments were determined. Had the Audit Committee conducted any inquiry, it would have learned that: (i) CanWest did not require that any non-competition payments be made to any individual, but Lord Black and Radler inserted only three days before closing a provision allocating portions of the purchase price to the non-competition agreements; (ii) Lord Black and Radler actually increased the original non-compete allocation upward exclusively for their own benefit; (iii) CanWest originally proposed that the post-closing management services agreement would be with Hollinger, but Lord Black unilaterally decided that the agreement would be with Ravelston; (iv) CanWest rejected as unreasonable and excessive the proposed Ravelston post-closing annual management services fee that Lord Black originally proposed, and only agreed to pay approximately 32% of that proposal; (v) the proposed

-39-

management fee that CanWest rejected as unreasonable and excessive was approximately the amount that Ravelston had been charging Hollinger to manage those assets; and (vi) Lord Black and Radler negotiated for themselves an annual management fee and a termination fee paid by CanWest if it were to terminate the management services agreement ($30.3 million) or even if Ravelston were to terminate ($15.1 million).

107.    As a result of the complete recklessness and lack of inquiry or discussion of even the basic terms and circumstances surrounding the CanWest transaction, Hollinger's Audit Committee completely abdicated its fiduciary duties and failed to make an informed review of the transaction and its fairness to Hollinger's shareholders.

108.    As alleged in the Special Committee complaint, as a result of the lack of any inquiry or discussion by the Board or Audit Committee, the Board and committee failed to inquire: (i) whether Ravelston, Black, Radler, Boultbee and Atkinson would be receiving an interest allocation on top of the non-compete payments; (ii) whether Hollinger's subsidiary Hollinger Canadian Newspapers Limited Partnership ("HCNLP"), which was owned 87% by Hollinger and 13% by public limited partners, and was selling one-third of the assets in the CanWest transaction, was being charged for any portion of the non-compete payments; (iii) whether Ravelston had any role in extracting the agreement from CanWest to pay Ravelston an annual management services fee to manage the assets; and (iv) whether CanWest would have to pay Ravelston if CanWest or Ravelston were to terminate the services agreement.

109.    The Special Committee Complaint further explains that in or about May 2001, Lord Black and Radler sought to obtain from the Audit Committee and Board an after-the-fact "ratification" of the November 2000 CanWest non-compete payments. Even with this "second

chance" to conduct an adequate review of the CanWest deal and the non-compete payments, the Audit Committee and Board still abdicated their duties to review the fairness of that deal and those payments. This is particularly surprising as Lord Black and Radler told the Audit Committee and Board that CanWest did not require that any particular amounts of the total non-compete payment allocation be paid to any individual or entity. Thus, the Board and Audit Committee knew, or were reckless in not knowing, that it was Lord Black and his associates, rather than CanWest, that decided that the non-compete payments would be made to these individuals, rather than to Hollinger. Nevertheless, neither the Audit Committee nor the Board even asked how the amounts of the payments or the recipients were determined. Unbeknownst to investors, neither the Board nor the Audit Committee nor any of the independent directors fully and fairly reviewed, approved or "ratified" the non-compete payments and corporate opportunities present in the CanWest transaction.

### 3. Sales to Osprey Media Group Inc.

110. In July and November 2001, in two separate transactions, Hollinger and Hollinger L.P. sold Canadian newspapers to Osprey Media Group, Inc. ("Osprey") for approximately $166 million. As with the Company's sales of U.S. community newspapers, a portion of the sale proceeds went directly into the pockets of Lord Black and his cronies, but that was not disclosed to the shareholders. While Hollinger apparently agreed not to compete in the markets occupied by the Canadian newspapers it sold, Lord Black and other Hollinger executives, not Hollinger, received payments pursuant to the non-competition agreements. In connection with this sale, Osprey paid a total of $5,100,000 in non-compete payments which were allocated as follows: $2,300,000 was paid to Lord Black; $2,300,000 was paid to Radler; $243,000 was paid to Atkinson, and $243,000

was paid to Boultbee. However, Hollinger kept these non-competition payments a secret from the Company's shareholders until well after those payments had been made.

111. The Company first disclosed the July 2001 sale to Osprey in the Company's Form 10-Q, which was signed by Boultbee and filed with the SEC on August 14, 2001 (the "August 2001 10-Q"). The Company stated:

> On July 31, 2001, the Company announced the sale of most of its remaining Canadian newspapers for approximately Cdn.$220 million, subject to adjustments. Included in this sale were community newspapers in Ontario such as The Kingston Whig- Standard , The Sault Star and the Peterborough Examiner. The consideration for this sale was paid in cash at closing.

There was no mention of any non-competition payments in this filing.

112. Similar disclosures of the sales to Osprey were made in Hollinger's Form 10-Q filed with the SEC on November 14, 2001, its Registration Statements on Forms S-3 filed with the SEC on December 20, 2001 and March 25, 2002, and its Prospectuses on Forms 424 B3 filed on December 31, 2001 and April 4, 2002. None of these filings mentioned any non-competition payments as being part of the Osprey transaction.

113. In the Company's 2001 10-K (filed on April 2, 2002 ), the Company again disclosed the sales to Osprey, stating under the heading "Related Party Transactions," that:

> In two separate transactions in July and November 2001, the Company and Hollinger L.P. completed the sale of most of its remaining Canadian newspapers to Osprey . . . for total sale proceeds of approximately Cdn.$255.0 million ($166.0 million) plus closing adjustments primarily for working capital. . . . Pre-tax gains of approximately $0.8 million were recognized on these sales.

114.    The Company also disclosed for the first time that as part of the Osprey transactions non-competition payments were made to Lord Black and other senior Hollinger executives. The Company stated in its 2001 10-K:

> The Company's independent directors have approved the terms of these transactions.
>
> In connection with the two above sales of Canadian newspaper properties to Osprey, to satisfy a closing condition, the Company, Hollinger Inc., and Lord Black and three senior executives entered into non-competition agreements with Osprey pursuant to which each agreed not to compete directly or indirectly in Canada with the Canadian businesses sold to Osprey for a five-year period, subject to certain limited exceptions, for aggregate consideration of Cdn. $7.9 million ($5.1 million). Such consideration was paid to Lord Black and the three senior executives and has been approved by the Company's independent directors.

115.    The Company broke down the non-compete payments for the first time in its 2002 Proxy Statement, filed on April 3, 2002, as follows:

> In connection with the two sales of Canadian newspaper properties to Osprey Media Group Inc. ("Osprey") in 2001, to satisfy a closing condition, Hollinger Inc., the Company, Lord Black and Messrs. Radler, Atkinson and Boultbee entered into non-competition agreements with Osprey pursuant to which each agreed not to compete directly or indirectly in Canada with the Canadian businesses sold to Osprey for a five year period, subject to certain limited exceptions, for aggregate consideration of Cdn.$7,940,000, consisting of Cdn.$3,591,995 paid to Lord Black, Cdn.$3,591.905 paid to Mr. Radler, Cdn.$378,095 paid to Mr. Atkinson and Cdn.$378,095 paid to Mr. Boultbee.

116.    Hollinger's shareholders learned from the 2001 10-K and the 2002 Proxy Statement (filed on consecutive days) that Hollinger did not obtain all of the benefits of its sales to Osprey, as portions of the sale proceeds were directed to Lord Black and other Hollinger executives.

-43-

117.    However, Hollinger's attempts to "come clean" in its 2001 10-K and 2002 Proxy Statement were unsuccessful, as the Company falsely stated in those filings that the terms of the Osprey transactions and the non-competition payments were approved by the Company's "independent directors," when that did not occur.

118.    As explained in the Special Committee's action, in the first Osprey transaction (completed on or about July 31, 2001), Hollinger paid Lord Black and Radler $2 million each in non-compete payments, while Boultbee and Atkinson received $223,429 each, without obtaining prior approval from the Audit Committee or the independent directors. Rather, months later, in or about September 2001, Lord Black and Radler presented the payments to the Audit Committee for after-the-fact "ratification." According to the Special Committee:

> The rationale provided to the Audit Committee was that Osprey insisted on the same non-competition agreements that CanWest had obtained and wanted to avoid competition from Defendants Black's and Radler's "private interests in other newspaper operations." The latter was a reference to Horizon, which the Audit Committee had also allowed Defendants Black and Radler to own and run without adequate fairness analysis.

119.    Once again, the Audit Committee and Board failed to conduct any review or inquiry necessary to approve or "ratify" the payments. The Audit Committee and the Board failed to ask whether the HCNLP public limited partners were paying (or being asked to pay) any part of the non-competition allocation, whether Lord Black, Radler, Boultbee and Atkinson had become parties to the non-compete agreements at their request or on the request of HCNLP, or whether those executives had previously received non-compete payments in connection with Hollinger's sales of its U.S. community newspapers. The Audit Committee simply rubber-stamped the non-compete payments even though it knew that it had completely failed to become fully and properly informed

as required to analyze the fairness of the Osprey transaction and the non-compete payments to Hollinger and its shareholders.

120. In the second Osprey transaction (completed on or about November 30, 2001), Lord Black and Radler each received $314,844, and Boultbee and Atkinson each received $33,141, in non-compete payments, though once again, without Audit Committee or independent director approval. Again, these individual defendants presented the non-compete payments to the Audit Committee for "ratification," but the Audit Committee and Board failed to conduct any due diligence or other inquiry, and consequently lacked basic information required to be fully informed and able to analyze the fairness of the payments to Hollinger and its shareholders. The Company did not inform the shareholders of the complete lack of care and inquiry by the Audit Committee and Board in their review, approval or purported ratification of the Osprey transactions.

## C.   RAVELSTON MANAGEMENT SERVICES AGREEMENTS

121. Since at least 1995, Hollinger and its subsidiaries entered into management service agreements with Ravelston and its subsidiaries. Ravelston is owned by Lord Black, Radler, Colson, Boultbee and Atkinson, and non-defendants, Peter White, the Estate of Dixon Chant and Charles Cowan (all of whom are current or former officers and/or Directors of Hollinger Inc. and the Company). According to the Company's Proxy Statement filed with the SEC on March 27, 2001 (the "2001 Proxy Statement"), Ravelston is paid by Hollinger for the following services under the management service agreements:

> Pursuant to the Service Agreements, Ravelston provides advisory, consultative, procurement and administrative services to the Company and its respective subsidiaries including, among other things, strategic advice, planning and financial services (including advice and assistance with respect to acquisitions, divestitures or joint

> venture arrangements); consulting services regarding risk
> management and insurance coverage; and assistance in operational
> matters.

The Company provided a similar description of the services provided by Ravelston in the 2003

Proxy Statement (the 2003 Proxy was signed by Mark S. Kipnis, Vice President-Law and Secretary,

in Chicago, Illinois on or March 26, 2003).

122.    Since at least March 1999, the Company has fraudulently assured investors that the

management services agreements were properly negotiated by the Company so that the fees paid

pursuant to those agreements were a fair value for the cost to Ravelston of providing the

management services. The Company further assured investors that the Board's Audit Committee

had reviewed and approved the fees as reasonable. However, these representations were false. The

Company admitted in its 2002 10-K that the payments may not be reasonable, because the Board,

and the Audit Committee in particular, had undisclosed conflicts of interest and lacked

independence. But that was not the full story. In fact, Ravelston was not providing any services

pursuant to the management services agreements, so the payments could not possibly be reasonable

or a fair value for the services provided. In fact, the management services agreements were just

another part of defendants' fraud orchestrated by Lord Black and Radler to funnel Hollinger's money

into their pockets (and the pockets of Boultbee and Atkinson).

123.    Misrepresentations regarding the management services agreements were made in the

1999 Proxy Statement, where the Company stated:

> Pursuant to the Management Agreement, the Company has paid
> Ravelston (whose affiliates include Messrs. Black, Radler, Colson,
> Atkinson, Boultbee and Creasey and Mrs. Black, who are officers
> and/or directors of both Hollinger Inc. and the Company and who,
> with the exception of Mrs. Black, do not receive compensation

directly from the Company in their capacities as executive officers of the Company or Hollinger Inc.) approximately $32 million in 1998 and paid Hollinger Inc. pursuant to the Services Agreement approximately $26 million in 1997. The amount of the management fees was approved by the Audit Committee as reasonable for the services rendered to the Company.

124.    The 2000 Proxy Statement described the services provided by Ravelston to Hollinger,

Southam and their respective subsidiaries pursuant to the management services agreements, and also

stated:

In 1999 and 1998 in the aggregate approximately $38 million and $32 million, respectively, was paid in fees pursuant to the Services Agreements. The fees paid by the Company were approved by the Audit Committee as reasonable for the services rendered . . . . Additionally, $2.3 million was paid to Ravelston's affiliate, Moffat Management, for services provided to the Company's Community Newspaper Group.

125.    The 2001 Proxy Statement again described the services provided under the Ravelston

management services agreements, and provided the following information regarding payments to

Ravelston and its affiliates:

In 2000 and 1999 in the aggregate approximately $24 million plus Cdn.$18.5 million and $38 million, respectively, was paid in fees pursuant to the Services Agreements. The fees paid by the Company were approved by the Audit Committee as reasonable for the services rendered. . . . Additionally, $1.56 million was paid to Ravelston's affiliate, Moffat Management, for services provided to the Company's Community Newspaper Group.

126.    The 2002 Proxy Statement disclosed the following payments pursuant to the

Ravelston management services agreements, stating:

In 2001 approximately $25.8 million plus Cdn.$7.6 million was paid in fees pursuant to the Services Agreements. The fees paid by the Company were approved by the Audit Committee as reasonable for the services rendered. . . . Of the aforementioned Services

-47-

> Agreements fees, approximately $770,000 and $230,000, respectively, were paid to Ravelston's affiliates, Moffat Management and Black-Amiel Management, for services provided.

127. The 2003 Proxy Statement disclosed little more than that information contained in preceding Proxy Statements with respect to the Ravelston management services agreements:

> In 2002 approximately $21.4 million plus Cdn.$3.6 million was paid in fees to Ravelston and RMI pursuant to the Services Agreements and approximately $1,176,000 in the aggregate was paid to Moffat Management and Black-Amiel Management pursuant to separate service agreements. In addition to the services provided under the Services Agreements and separate services agreements, in 2002 Lord Black and Mr. Colson received $719,000 in the aggregate from The Telegraph in respect of executive services provided.

128. Hollinger also described in its 10-Q filed on May 15, 2001 and in its 2001 10-K the management services agreement with CanWest and National Post. In those filings, the Company did not identify the total amount paid to Ravelston from all the service agreements involving Hollinger and its various newspaper properties and subsidiaries, but did disclose that the agreements with CanWest required CanWest to make annual payments of $4 million to Ravelston.

129. In all, Hollinger disclosed payments from the Company and its subsidiaries to Ravelston and its subsidiaries and affiliates that totaled approximately $202 million from 1995 through 2002.

130. Each of the above statements (in the 1999-2003 Proxy Statements) regarding the Ravelston management services agreements was materially false and misleading when made. Contrary to the Company's earlier statements, on March 31, 2003, Hollinger suddenly admitted in its 2002 10-K that the terms of Ravelston services agreements may have been drafted in favor of

-48-

Ravelston and thus may be unfair to Hollinger, and that the amounts paid under the agreements may have been unreasonable and therefore excessive. The Company conceded in its 2002 10-K that:

> All of the Service Agreements were negotiated in the context of a parent-subsidiary relationship and, therefore, were not the result of arm's length negotiations between independent parties. The terms of the Service Agreements may therefore not be as favorable to the Company and its subsidiaries as the terms that might be reached through negotiations with non-affiliated third parties.

131. The Company also disclosed that certain management services agreements were assigned by Ravelston to RMI, and that RMI as well as Ravelston had been paid by Hollinger for management services pursuant to these agreements. The 2002 10-K stated:

> The Company and its subsidiaries have entered into a services agreement with The Ravelston Corporation Limited ("Ravelston"), whereby Ravelston acts as manager of the Company and carries out head office and executive responsibilities. This services agreement was assigned on July 5, 2002 to Ravelston Management Inc. ("RMI"), a wholly-owned subsidiary of Ravelston. Ravelston and RMI billed to the Company and its subsidiaries fees totalling $23,731,000, $28,956,000 and $33,618,000 for 2002, 2001 and 2000, respectively, pursuant to this agreement. Certain executives of Ravelston and Moffat Management and Black-Amiel Management, affiliates of Ravelston and RMI, have separate services agreements with certain subsidiaries of the Company. Amounts paid directly by subsidiaries of the Company pursuant to such agreements were $1,895,000, $1,697,000 and $3,659,000 for 2002, 2001 and 2000, respectively. The fees under Ravelston's and RMI's services agreement and the fees paid directly to executives and affiliates of Ravelston, in aggregate, are negotiated with and approved by the Company's independent directors.

132. Through the 2002 10-K filing, Hollinger's shareholders learned for the first time that the Board and Audit Committee review and approval, which the Company had previously represented as resulting in agreements fair to the Company, instead meant nothing. The Company stated that it could no longer stand behind the payments that it had previously represented as being reasonable. Individuals who had invested believing, based upon Company representations, that the

-49-

Company was paying a fair and reasonable price for various consulting and management services, were now warned that the Company may, in fact, be overpaying for those services. Significantly, the recipient of these apparent overpayments was Ravelston, an entity controlled by Lord Black, who also ran Hollinger.

133.    The 2002 10-K did not tell the whole story regarding the management services agreements. In fact, those agreements were simply a mechanism to funnel additional Hollinger money to Lord Black and his associates through payments to Ravelston and RMI. Also concealed was the fact that Ravelston did not provide any services whatsoever to earn the fees it received from Hollinger. Rather, Hollinger remained managed by Lord Black, Radler and the other senior Hollinger executives, but payments were made to Ravelston for purported management services which were never provided by Ravelston.

134.    Also not disclosed in the 2002 10-K was the manner in which the management fees were determined. As explained in the Special Committee Complaint, the management services agreements did not establish specific fee amounts to be paid to Ravelston, as the fee was to be negotiated every year between Ravelston and the independent members of Hollinger's board. While the Company's Board delegated this responsibility to the Audit Committee, the Audit Committee did not discharge this duty, as each year it was Radler who proposed a management fee to the Audit Committee. Radler knew that the fee he proposed had nothing to do with Ravelston's costs of providing services to Hollinger, because no such services were provided. The Special Committee stated in its complaint that Radler consulted with Black and Boultbee in determining a fee to propose, using as a starting point not the cost of providing such services, but the amounts Ravelston "needed" to support its activities and service its debt, as well as to satisfy Lord Black's appetite for

additional compensation. Radler has stated that the proposed fee was based roughly on an estimate of Ravelston's salaries, bonuses, benefits, pensions and overhead, plus 20% for Ravelston's "profits", and 2 ½ times Ravelston's salaries and bonuses.

135.     These "standards" were not disclosed to Hollinger's shareholders. As Hollinger used its own senior management team to provide management services to Hollinger, there was no reason to pay Ravelston for any management services, and indeed, none were provided by Ravelston.

136.     Not disclosed in the 2002 10-K, or in any previous Company filings, was the fact that the Audit Committee approval of the management services fees was a sham, because: (i) the Audit Committee never requested any documentation or support for the proposed annual fees or Ravelston's costs of providing management services to Hollinger; and (ii) the Audit Committee never considered any performance-based criteria (such as percentages of revenues, net income or EBITDA) in evaluating the fee proposal, basing its approval instead upon reference only to the prior year's fee and the Company's size (in relation to the previous year). Thus, the Audit Committee recklessly failed to conduct any meaningful review, analysis, or valuation of the proposed fee amounts or the work Ravelston would purportedly perform under the management services agreements, and so lacked basic information required to approve those agreements. These facts were concealed from investors.

137.     Also concealed from investors was Hollinger Inc.'s role in helping Ravelston extract the exorbitant fees from Hollinger. Hollinger Inc. used those fees to pay its own debt obligations to the Company.

**D.**    **ASSET SALES TO AFFILIATED ENTITIES**

138.    Unbeknownst to Hollinger's shareholders, the Company engaged in transactions with entities owned and/or controlled by Lord Black and his cronies. While Hollinger represented that it was improving its financial condition through sales of its assets to third parties, Hollinger failed to disclose that Lord Black owned those third parties, and that the purchases from Hollinger were financed with Hollinger's own money.

**1.**    **Horizon Publications Inc.**

139.    During 1999, Horizon Publications Inc. ("Horizon"), a company which is owned and controlled by Lord Black and Radler, acquired 33 U.S. community newspapers from Hollinger for $43.7 million. Horizon was able to complete this acquisition because Hollinger loaned it at least $8 million to finance the purchase. The terms of this loan favored Horizon -- the loan was unsecured and Horizon was given until 2007 to repay Hollinger. The reason the transaction was skewed in favor of Horizon was that Lord Black and Radler owned and controlled Horizon and stood to benefit personally in the transaction. However, Hollinger's shareholders were not informed of these facts until the Special Committee and the SEC filed their complaints against Lord Black and the Company.

140.    When the Company first disclosed its sale of assets to Horizon, it did not disclose Horizon's affiliations with Black and Radler. In the 1999 10-K the Company stated only that:

> During 1999, the Company sold to Horizon Publications Inc. 33 U.S. community newspapers for $43.7 million resulting in a pre-tax gain of approximately $20.7 million. Horizon Publications Inc. is managed by former Community Group executives and owned by current and former Hollinger International Inc. executives.

The Company made this identical disclosure in its 2000 10-K.

141.    Hollinger's 2001 10-K contained similar language, adding that Horizon is "controlled by certain members of the Board of Directors" and that "[t]he terms of these transactions [with Horizon] were approved by the independent directors of the Company." None of the Company's 10-Ks named Lord Black or Radler as having any ownership stake in Horizon or that they controlled this closely held company. The Company's Proxy Statements also stated that the Horizon transactions had been approved by the Company's independent directors. In the 2000 Proxy Statement, the Company stated:

> Effective April 1, 1999, the Company sold approximately 18 properties of the Company's U.S. community newspaper group for an aggregate consideration of approximately $47 million to a company formed by a former Vice President of American Publishing. Certain members of the Board of Directors and senior management of the Company are shareholders of such company. The transaction received an independent fairness opinion and was unanimously approved by the independent Directors of the Company as a market value transaction.

The 2000 Proxy contained absolutely no mention of Horizon.

142.    The Company's 2001 and 2002 Proxy Statements both reported that the Company had consummated transactions with Horizon which were "unanimously approved by the Audit Committee and the independent Directors of the Company as market value transactions." Like the Company's 10-Ks, these Proxy Statements failed to identify Lord Black's and Mr. Radler's ownership stake in and control of Horizon.

143.    The Company's 2001 Proxy Statement reported additional sales of U.S. properties to Horizon and misleadingly assured investors that those transactions had been approved by independent directors, when in fact the members of the Board had undisclosed conflicts of interest

that prevented them from exercising independent business judgment. The 2001 Proxy Statement reported:

> The Company consummated three transactions with Horizon Publications Inc., a company formed by a former Vice President of American Publishing and having certain members of the Board of Directors and senior management of the Company as shareholders. Effective April 1, 2000, in two transactions valued at approximately $2.5 million and unanimously approved by the Audit Committee and the independent Directors of the Company as market value transactions, American Publishing transferred properties in North Dakota and Washington in exchange for properties in Illinois, and XSTM sold the stock of Westbourne Investments Inc. to Horizon. Effective November 1, 2000, Horizon acquired two properties in California and Idaho in a transaction valued at approximately $4.1 million. The Company had previously contracted to sell such properties to Newspaper Holdings, Inc. as part of a larger transaction, but conveyed title to those two properties directly to Horizon pursuant to an assignment to Horizon from Newspaper Holdings, Inc.

144. The Company's 2002 Proxy Statement also falsely represented that the sales to Horizon had been approved by the Audit Committee and independent directors:

> The Company consummated two transactions with Horizon Publications, Inc., a company formed by a former Vice President of American Publishing Company and controlled by certain members of the Board of Directors and senior management of the Company as shareholders, which were unanimously approved by the Audit Committee and the independent Directors of the Company as market value transactions. American Publishing Company transferred assets in Saagot Valley and San Juan Islands, Washington and Mammoth Lakes, California in exchange for net working capital.

145. The Company's representations in its 2001 10-K and 2001-2002 Proxy Statements that the Horizon transactions had been approved by the Company's independent directors were all false. As explained in a January 30, 2004 Wall Street Journal article, the Board did not approve the

-54-

deals, but after they had been consummated the Board attempted to "retroactively" approve them. Additionally, the Board never approved the $8 million loan to Horizon to finance its purchase.

146.    According to a November 18, 2003 Wall Street Journal article, Horizon has continued to quietly buy small newspapers from Hollinger without any disclosure in the Company's SEC filings. In fact, the Wall Street Journal reported that Radler assumed the role of the president and chief operating officer of Horizon nine months ago (though he reportedly stepped down from those positions in late November 2003) and that he has continued the buying spree. An article in the November 19, 2003 Globe and Mail reports that Hollinger is in the process of concluding yet another asset sale to Horizon, and that Horizon now owns about 70 papers across North America. In fact, the majority of Horizon's newspapers were purchased from Hollinger.

147.    Lord Black and Hollinger structured the sales to benefit Horizon. First, as stated in the Special Committee Complaint and the Cardinal Delaware Chancery Court Complaint, Hollinger provided the financing Horizon needed to close the transactions. A Journey 30, 2004 article in the Wall Street Journal entitled "Behind Paper Sales, Lord Black Played A Double Role," reported that, although Lord Black was "on both sides of the transaction" due to the equity stake he had in Radler had in Horizon, Hollinger loaned Horizon $8 million to help finance the deal, and the loan was not approved by the Board.

148.    Additionally, as reported in the July 20, 2003 Chicago Tribune, Hollinger "put individual papers up for sale, rather than selling regional publishing clusters, which would be more attractive to buyers. Such a tactic would help deter other bidders and ensure that Horizon got the Hollinger papers it sought without a messy bidding war . . . ." The January 30, 2004 Wall Street Journal article explained that:

-55-

> Shipping the two papers together would have made them more attractive to potential buyers, since they dominated the local market. Hollinger, however, split them up, making them less attractive to buyers.

However, these facts were not disclosed to the shareholders.

149.    In addition to not shopping its assets so as to obtain the highest and best price in any sale, Hollinger actually rebuffed offers for its newspapers in order to sell them to Lord Black-controlled Horizon at fire-sale prices. For example, in 1999 Hollinger purchased the Mammoth Times newspaper for $1.75 million. According to the January 30, 2004 Wall Street Journal article exposing the give-aways to Horizon, in October 2000, California publisher Jack Humphreville signed a letter of intent with Hollinger to buy the Mammoth Times in Mammoth Lakes, California for $1.25 million. Mr. Humphreville also told Hollinger that he was interested in buying another paper in nearby Bishop, California but Hollinger sold that paper to Horizon without giving Humphreville a chance to make an offer.

150.    Then Hollinger effectively killed the negotiations with Humphreville. On or about January 30, 2001, Jerry Stradler ("Stradler"), then president of Hollinger's community newspaper division and a Horizon shareholder, sent a memorandum to the Mammoth Times instructing its onsite executive not to provide all the information that Humphreville was requesting in his due diligence, causing Humphreville to withdraw his offer. Hollinger subsequently sold the Mammoth Times (on or about August 2, 2001) to Horizon for $1, even though that newspaper was, and remains, a profitable enterprise. As reported by the Wall Street Journal, Wally Hofmann, the onsite executive for the Mammoth Times, stated that the paper showed a profit in the seven months before the sale; it earned $119,700 in the month before the deal closed, and it is still profitable.

151.    However, Hollinger's shareholders did not know (until the January 30, 2004 Wall Street Journal article) that Hollinger had rejected a $1.25 million offer in order to sell its profitable newspaper to a company owned and controlled by Lord Black and Radler for a grand total of one dollar, because Hollinger never disclosed these facts. The Wall Street Journal reported that in at least two other deals, Horizon paid $1 for Hollinger newspapers.

152.    All of the Company's prior disclosures of its transactions with Horizon were materially false and misleading in their failure to disclose the Company's sales of assets to Horizon for one dollar. By completely failing to disclose these gift transfers to Horizon, or by lumping these transactions with other asset sales to Horizon and disclosing only a total sale price for all the transactions together, the Company concealed from investors its outright transfer of assets to Lord Black (through his ownership and control of Horizon) for essentially no consideration.

153.    The Company's disclosures were materially false and misleading also because they concealed the complete failure of the Audit Committee and Board to engage in any review or discussion of the terms of the Horizon transactions which deterred other bidders and thus precluded the possibility of Hollinger receiving higher prices for its assets. The Audit Committee and Board failed to engage in the inquiry required to assess the fairness of the transactions, and were thus in no position to approve them as "market value transactions," as represented in the 2000-2002 Proxy Statements. Rather, the Audit Committee and Board rubber-stamped these deals which were negotiated and structured by Lord Black and Radler to benefit themselves and Horizon, which they controlled. In fact, as the Wall Street Journal reported on January 30, 2004, the Board did not approve the sale of the Mammoth Times for $1; rather, the directors approved the deal "retroactively" after it was consummated.

-57-

154.    Shareholders were not told that Lord Black and Radler owned and controlled Horizon. These individuals steadfastly refused to define their stakes in Horizon, and Hollinger's filings contain only opaque references to "certain current and former Hollinger directors" who have stakes in Horizon. The Audit Committee failed to engage in any investigation to determine who these unnamed Hollinger directors were, or whether their affiliation with Horizon had any effect on the terms of the transactions.

155.    Lord Black was finally forced to define his ownership and control of Horizon in defense of a lawsuit brought by Paul Winkler, who was wrongly terminated as publisher of a paper owned by Hollinger Inc. Winkler worked for the Kelowna Capital News, a paper owned by Hollinger Inc. that was in a fierce fight for subscribers and advertising dollars with archrival Darby Courier, a paper purchased from Hollinger by Horizon. Winkler alleged in his wrongful termination suit that Radler and other Hollinger Inc. executives directed business to and supported the Darby Courier to the detriment of the Capital News, and then fired Winkler.

156.    Winkler prevailed and won $160,000. He also was able to get Black to concede that he and Radler each owned 24% of Horizon with the remainder held by others connected to Hollinger. As reported in the November 19, 2003 issue of the Globe and Mail, Radler currently owns 50% and Lord Black owns 24% of Horizon. However, these facts were not disclosed to the Company's shareholders in its SEC filings touting the sales of newspaper assets to Horizon.

   **2.    Bradford Publishing Company**

157.    Hollinger also sold newspapers to another company – Bradford Publishing Company ("Bradford") – which had affiliations with Lord Black which were not disclosed to Hollinger's

shareholders. In 2000, Hollinger sold four newspapers to Bradford for $38 million. The 2001 Proxy

Statement disclosed only the following with respect to this transaction:

> Effective July 20, 2000, the Company sold four properties of the
> Company's U.S. community newspaper group for an aggregate
> consideration of approximately $38 million to Bradford Publishing
> Company, a company formed by a former Director and Vice
> President of American Publishing. Certain members of the Board of
> Directors of the Company are shareholders of such company. The
> transaction was unanimously approved by the Audit Committee and
> the independent Directors of the Company as a market value
> transaction.

158.    The 2001 10-K provided even less information, stating that:

> the Company sold four U.S. Community Newspapers for an
> aggregate consideration of $38 million to Bradford Publishing
> Company, a company formed by a former U.S. Community Group
> executive and in which some of the Company's directors are
> shareholders. The terms of this transactions were approved by the
> independent directors of the Company.

159.    The 2002 10-K contained almost identical language regarding the asset sales to

Bradford.

160.    Unbeknownst to Hollinger's shareholders, these representations were false and

incomplete, as they did not disclose that Bradford was able to purchase Hollinger's newspapers only

because it received financial assistance from Hollinger. The reason Hollinger provided the financing

– Lord Black and Radler owned and controlled Bradford – was also concealed.

161.    It was not until Hollinger filed its 2003 Proxy Statement on March 31, 2003 that the

Company even suggested that the July 20, 2000 transaction with Bradford was at least partially

financed by Hollinger. In that filing, Hollinger stated that "[a]s reflected in the Company's financial

statements, as of December 3,1 2002, there is due and owing to the Company from Horizon and

-59-

Bradford, respectively, $4.9 million plus accrued interest and $5.9 million." The shareholders were left to guess why Bradford owed Hollinger anything.

162. Recent news articles provided shareholders with additional information about the nature of the financing provided to Bradford and about Lord Black's connection to Bradford. The Wall Street Journal reported on October 3 and November 18, 2003 that Hollinger gave Bradford a sweetheart financing deal in the form of an unsecured note due in 2010. These articles also state that Lord Black and Radler actually control Bradford.

163. In addition, the 2001 Proxy Statement misleadingly assured investors that these transactions had been approved by independent directors, when in fact the members of the Board had undisclosed conflicts of interest that prevented them from exercising independent business judgment.

164. According to the Cardinal Complaint filed in Delaware Chancery Court, Radler presented this transaction to the Audit Committee on May 11, 2000. During this meeting, Radler advised the committee of the impending sale of certain community newspapers to Bradford, a company in which "certain members of the Board of Directors and senior management of the Company would be stockholders." Radler revealed that the Company had not shopped its newspaper properties to any third party and that the price had already been established by Lord Black.

165. As stated in the Cardinal Complaint, Radler distributed to the members of the Audit Committee a memorandum drafted by Stradler, a Hollinger employee, which stated that Stradler "believe[d] [that Radler] promised John Satterwhite (the son of the person from whom the newspapers were purchased) that the properties would never be sold or split," that "if serious due diligence was performed by a third party, we would be forced to pay off John in a handsome manner," and that attempting to sell "these properties to an 'outsider' would greatly reduce the value

-60-

Hollinger would receive." Neither Radler nor anyone else provided any support for the claims in Stradler's memorandum, nor did the Audit Committee ever ask for such substantiation.

166. The Audit Committee also failed to engage in any inquiry or analysis of the fairness of the purchase price for the newspaper properties to be sold to Bradford. The purchase price had already been negotiated by Black with himself (as shareholder of Bradford). The purchase price included a $6 million non-compete agreement with Hollinger, though the minutes of that meeting do not reflect any discussion of who would receive the non-compete payments. Unlike other transactions, where Lord Black and his associates received their non-compete payments up front, Hollinger instead received a non-interest-bearing ten-year note for the payments which was subordinated to Bradford's lenders. Thus, Hollinger itself was financing Bradford's purchase of the Company's assets, and the non-compete payment, which represented 16% of the purchase price and would not be fully paid until ten years later, significantly reduced the effective price paid by Bradford.

167. Notwithstanding the inherent conflicts of interest in the Company selling its assets to an entity owned and controlled by Lord Black and other Hollinger executives, the Audit Committee unanimously approved the sale of Hollinger's assets to Bradford without further inquiry. The Audit Committee did not attempt to verify the claims made by Stradler and Radler, or discuss how the purchase price was negotiated or whether it was fair. The committee did not even inquire as to who were the "certain members of management and the Board of Directors" who had ownership stakes in Bradford, or ask why it was in the Company's interest to sell its assets, and why they should be sold to Bradford.

-61-

168. The Company did not inform the shareholders of the complete lack of care and inquiry by the Audit Committee in its review and approval of the Bradford transaction. The shareholders were not aware that Lord Black, and not the Audit Committee, had negotiated the transaction, and that the committee simply rubber-stamped the deal to sell properties to a company in which Lord Black and other Hollinger officers and directors owned shares. These facts would not be revealed to the shareholders until the Cardinal Complaint was filed against Lord Black and others years later.

## E. CANWEST'S MANAGEMENT SERVICES AGREEMENT WITH RAVELSTON

169. In connection with Hollinger's sale of certain newspapers and related assets to CanWest for $2.1 billion, Ravelston entered into a management services agreement with CanWest and National Post pursuant to which it agreed to continue to provide management services to the Canadian businesses sold to CanWest in consideration for an annual fee of $4 million payable by CanWest. Furthermore, CanWest agreed to pay Ravelston a termination fee of Cdn. $45 million in the event that CanWest chose to terminate the management services agreement or Cdn. $22.5 million in the event that Ravelston chose to terminate the agreement. Incredibly, all of these payments were in addition to the $25,200,000 non-competition fee received by Ravelston in the CanWest transaction (of the total $53,000,000 non-competition fees paid). As explained below, the terms of this agreement were not disclosed by the Company until April 2002 when Hollinger filed its 2001 10-K. Even then, the disclosure was misleading and incomplete.

170. In a press release first announcing the CanWest transaction dated July 31, 2000, Hollinger stated the following:

> Through its [Hollinger's] 15% shareholding in CanWest, its 50%
> direct interest in the National Post and as continuing manager of these
> assets, Hollinger will continue to participate in the future growth and
> exploitation of the franchise value of the assets in conjunction with
> CanWest's television, cable channel, radio and other Canadian and
> international media assets.

This is an absolute falsehood as the management services contract was for the benefit of Ravelston,

not Hollinger, even though Hollinger was the owner of the assets sold to CanWest. Additionally,

Ravelston would not provide any services to CanWest, but would be paid by CanWest pursuant to

the management services agreement.

171. On August 14, 2000, the Company filed with the SEC a Form 10-Q which described

the CanWest management services agreement as a temporary arrangement to facilitate the change

in ownership and control of the newspapers sold by Hollinger. The August 14, 2000 10-Q stated

only the following with respect to this agreement:

> With respect to the other newspaper assets being sold to CanWest,
> Mr. Black and his associates will enter into a management services
> agreement for at least 17 months in order to ensure operating
> continuity and to facilitate a smooth transition to the new
> arrangements.

This was untrue. Contrary to the Company's public representations, Lord Black and his cronies

intended to benefit from the CanWest management services payments for the indefinite future.

Indeed, as reported in the December 19, 2003 issue of the Financial Times, CanWest remains

obligated under an existing management services agreement to make payments to Ravelston.

Furthermore, the August 14, 10-Q failed to disclose Ravelston as a principal beneficiary of this

agreement.

172.   On December 1, 2000, the Company filed with the SEC a Form 8-K which incorporated as exhibits the asset sales agreements for the CanWest transaction. Although the asset sales agreements reference the Ravelston management services agreement, the Ravelston agreement itself was not incorporated in this document and has not been publicly disclosed. The assets sales agreement reproduced in the December 1, 2000 8-K states the following regarding related-party transactions:

> 4.36 INTER-AFFILIATE ARRANGEMENTS
>
> Schedule 4.36 sets forth a complete list of all Contracts between and among Ravelston, Hollinger Inc., Hollinger, any Affiliate or subsidiary of Hollinger and the Excluded Businesses relating to the Purchased Businesses and the National Post Business. Except as disclosed on Schedule 4.36, all such Contracts are on reasonable commercial terms that are not less advantageous to any party than if such Contract had been obtained from a Person or company dealing at arm's length with such party. All such Contracts may be terminated by CanWest upon not more than 30 days prior notice without bonus or penalty.

The Schedule 4.36 referenced in the asset sales agreement was not attached to the 8-K or to any other public filings by the Company.

173.   The December 1, 2000 8-K, as well as the Company's prior disclosures regarding the CanWest transaction (beginning with the July 31, 2000 announcement), are all materially false in their failure to disclose that Ravelston would not, in fact, provide any services to CanWest pursuant to the management services agreements but would nevertheless be paid for such services. Additionally, the following information regarding the management services agreements were not disclosed to the shareholders: (i) CanWest originally proposed that the post-closing management services agreement would be with Hollinger, but Lord Black unilaterally decided that the agreement

-64-

would be with Ravelston; (ii) CanWest rejected as unreasonable and excessive the proposed Ravelston post-closing annual management services fee that Lord Black originally proposed, and only agreed to pay approximately 32% of that proposal; (iii) the proposed management fee that CanWest rejected as unreasonable and excessive was approximately the amount that Ravelston had been charging Hollinger to manage those assets; and (vi) Lord Black and Radler negotiated for themselves an annual management fee and a termination fee paid by CanWest if it were to terminate the management services agreement ($30.3 million) or even if Ravelston were to terminate ($15.1 million). These filings are also misleading in their failure to disclose that the agreements benefitted Lord Black and the other owners of Ravelston.

174. The same material information omitted from the December 1, 2000 8-K was also omitted from the Company's 2000 10-K; indeed, the 2000 10-K does not even mention the Ravelston management services agreement. The 10-K stated only the following with respect to the CanWest deal:

> On November 16, 2000, the Company and its affiliates, Southam and Hollinger L.P. ("Hollinger Group") completed the sale of most of its Canadian newspapers and related assets to CanWest. Included in the sale were the following assets of the Hollinger Group:
>
> * a 50% interest in National Post, with the Company continuing as managing partner;
>
> * the metropolitan and a large number of community newspapers in Canada (including the Ottawa Citizen, The Vancouver Sun, The Province (Vancouver), the Calgary Herald, the Edmonton Journal, The Gazette ( Montreal), The Windsor Star, the Regina Leader Post, the Star Phoenix and the Times-Colonist (Victoria); and
>
> * the operating Canadian Internet properties, including canada.com.

> The sale resulted in the Hollinger Group receiving approximately Cdn. $1.7 billion ($1.1 billion) cash, approximately Cdn. $425 million ($277 million) in voting and non-voting shares of CanWest at fair value (representing an approximate 15.6% equity interest and 5.7% voting interest) and subordinated non-convertible debentures of a holding company in the CanWest group at fair value of approximately Cdn. $697 million ($456 million). The aggregate sale price of these properties at fair value was approximately Cdn. $2.8 billion ($1.8 billion), plus closing adjustments for working capital at August 31, 2000 and cash flow and interest for the period September 1 to November 16, 2000 which in total approximates an additional $40.7 million. $972 million of the cash proceeds from this sale were used to pay down the Company's Bank Credit Facility.

The 10-K is materially false and misleading in its failure to provide to the shareholders the information contained in the immediately preceding paragraph regarding the management services agreement with CanWest.

175.   It was not until April 1, 2002, when the Company filed its 2001 10-K, that Hollinger made any disclosure about the terms of the Ravelston management services agreement. The 2001 10-K stated:

> In connection with the sale to CanWest, Ravelston, a holding company controlled by Lord Black through which most of his interest in the company is ultimately controlled, entered into a management services agreement with CanWest and National Post pursuant to which it agreed to continue to provide management services to the Canadian businesses sold to CanWest in consideration for an annual fee of Cdn. $6 million ($4 million) payable by CanWest. In addition, CanWest will be obligated to pay Ravelston a termination fee of Cdn. $45 million, in the event that CanWest chooses to terminate the management services agreement or Cdn. $22.5 million, in the event that Ravelston chooses to terminate the agreement (which cannot occur before December 31, 2002). . . . The Company's independent directors have approved the terms of these payments.

176.   The above disclosure is false and misleading because Hollinger failed to disclose that the management services contract was for the benefit of Ravelston, not Hollinger, even though

-66-

Hollinger was the owner of the assets sold to CanWest, and that Ravelston would not even provide any services, but would be paid under the management services agreement. The 2001 10-K also falsely represents that this agreement was approved by "independent directors," when that was not the case, as the directors' conflicts of interest and divided loyalties precluded them from exercising independent business judgment.

177.    Additionally, as explained herein, the Audit Committee and Board completely failed to conduct any due diligence or inquiry regarding the CanWest management services agreements prior to reviewing and purportedly approving of these agreements. The Audit Committee and the Board never asked how the management fees were negotiated or determined, nor did they require or obtain any opinion on the fairness of these fees. Hollinger's independent directors did not have the information necessary for them to make an informed review of the CanWest management services agreement or its fairness to Hollinger's shareholders. Accordingly, the "independent directors" were in no position to "approve" the agreement, as represented in the 2001 10-K.

**F.    THE TELEGRAPH GROUP AND OTHER SELF-DEALING TRANSACTIONS**

178.    Hollinger's shareholders for years were told that the full Board controlled all decisions regarding the declaration of dividends. The 2001 10-K states that dividends are discretionary, are declared "by the Board," and that the ability of Hollinger's subsidiaries to pay dividends "are subject to statutory restrictions and restrictions in debt agreements." However, this statement is false as, unbeknownst to investors, Lord Black, and not the entire Board, determines when and if dividends are declared by Hollinger and/or its subsidiaries.

179.    Hollinger's 2002 and 2003 Proxy Statements contain disclosures about Lord Black's compensation but fail to contain any mention of any dividends being paid to Lord Black by Hollinger subsidiaries.

180.    Hollinger's 2002 Proxy Statement reported that Lord Black was paid a salary of $443,283, a bonus of $250,000, options on 400,000 shares of Hollinger stock and paid $123,302 in "other compensation" associated with his service on the boards of various Hollinger affiliated companies.

181.    Hollinger's 2003 Proxy Statement, filed with the SEC on March 31, 2003, reported that Lord Black's annual compensation was $462,460 plus options on 375,000 shares of Hollinger stock and $248,000 in "other compensation" (based upon Lord Black's service on the Boards of Hollinger-owned newspapers). The 2003 Proxy statement also states that Lord Black receives salaries paid by the Telegraph Group (a wholly-owned indirect subsidiary of Hollinger incorporated in England that publishes the Daily and Sunday Telegraph newspapers) and Ravelston under management services agreements. The Company did not disclose the amount paid to Lord Black by the Telegraph Group, but characterized that payment as "salar[y]." There is no mention whatsoever in the 2002 or 2003 Proxy Statements of Lord Black being paid any dividends by the Telegraph Group.

182.    The Company's disclosure of the compensation paid to Lord Black was false in that it failed to disclose millions of dollars paid to Lord Black in the form of extraordinary dividends by the Telegraph Group.

183.    On November 29, 2003, the Financial Times reported that Lord Black had received more than £53 million ($93 million) in dividends in 2002 from the Telegraph Group. These

dividend payments stand in stark contrast to the modest £600,000 in dividends paid in the preceding year. Moreover, the Financial Times reported that this payout exceeded the Telegraph's pre-tax profits by 37 percent. The Financial Times reported that, during the past three years, the Telegraph Group has paid more than £4 million in management services fees to entities owned by or affiliated with Lord Black – in other words, fees that are similar to the Ravelston management services agreement fees paid by Hollinger.

184.    The reason the Telegraph Group suddenly paid such enormous dividends to Lord Black is now clear – Lord Black needed the cash, and he dictated that a check be made out to him in the form of dividends.

## G.    KPMG'S PARTICIPATION IN THE FRAUD

185.    KPMG participated in the fraud perpetrated by Lord Black, Radler and the other defendants. In fact, KPMG had a significant role in defendants' fraud and the maintenance of Hollinger stock at artificially inflated prices.

186.    During the Class Period in which Lord Black, Ravelston and other Hollinger insiders helped themselves to hundreds of millions of dollars in improper payments at the Company's expense, KPMG purportedly audited Hollinger's books and records (as well as the books and records of Hollinger Inc.). Rather than doing so, KPMG helped Lord Black and his associates raid the Company's coffers and then conceal this theft from the shareholders.

187.    From at least August 13, 1999, KPMG has served as purportedly independent auditors for Hollinger and had, since that time, certified the Company's financial statements as fairly and accurately reflecting the financial condition of the Company.

-69-

188. KPMG assisted in the preparation of Hollinger's annual and quarterly statements, reviewed the quarterly financial statements and the text that accompanied them in the Company's Form 10-Qs, and audited the Company's annual financial statements and the text that accompanied them in the Company's Form 10-Ks.

189. KPMG was required to perform its audit services according to generally accepted auditing standards ("GAAS"), and to issue an unqualified opinion only if the Company's annual financial statements were fairly presented in accordance with generally accepted accounting principles ("GAAP").

190. KPMG issued unqualified audit opinions on Hollinger's annual financial statements from at least 1999 through 2003, stating that it had "conducted [its] audits with generally accepted auditing standards," and that Hollinger's "consolidated financial statements . . . present fairly, in all material respects, the financial position of Hollinger International Inc. and its subsidiaries . . . in conformity with generally accepted accounting principles."

191. However, KPMG's audit opinions were materially false and misleading, and KPMG's audits represent an extreme departure from GAAS. In addition, the manner in which the Company's financial results were reported in Hollinger's financial statements represent an extreme departure from GAAP and applicable SEC regulations.

192. KPMG purportedly conducted audit examinations and participated in investigations of the business, operations, financial, accounting and management control systems of Hollinger. However, had KPMG conducted its audits in accordance with GAAS, it would have discovered the massive fraud being perpetrated by Lord Black, Radler and the other defendants and discovered that the Company's financial statements were not prepared in accordance with GAAP.

193.    GAAS provides that an audit is to be adequately planned. Audit planning involves developing an overall strategy for the expected conduct and the scope of the audit. In planning an audit, the auditor must obtain knowledge of the matters which relate to the nature of the entity's business, its organization, and operating characteristics (AU 311). The auditor is required to design the audit with professional skepticism in order to provide reasonable assurance of detecting errors and irregularities (AU 316), material misstatements (AU 312) or fraud (AU 316).

194.    KPMG failed to comply with GAAS because it failed to design its audit plan to provide reasonable assurance of detecting material error as required by Statement of Auditing Standards No. 82, *The Auditor's Responsibility to Detect and Report Errors and Irregularities* (AU 316).

195.    In particular, KPMG also failed to observe the following provisions of GAAS:

(a)    AICPA Audit Risk Alert - 1998/99, which provides that auditors should be alert for significant unusual or complex transactions;

(b)    AU 316, Consideration of Fraud in a Financial Statement Audit, which requires an auditor to specifically assess the risk of material misstatement of the financial statements due to fraud and consider that assessment in designing the audit procedures to be performed;

(c)    AU 326, Evidential Matter, which requires an auditor to obtain sufficient evidence to provide reasonable assurances that the financial statements are free from material misstatements;

(d)    AU 220.01, which provides that in all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors; and

(e)    AU 220.03, which requires that auditors maintain the utmost professionalism, and to remain independent, intellectually honest, and free from any obligation or interest in the client, its management or its owners.

196. KPMG also violated GAAS by failing to recognize or investigate "red flags" or warnings or other possibilities that Hollinger's financial statements were materially false and misleading. GAAS sets out a list of such red flags that auditors should look out for in determining audit risk relating to misstatements arising from fraudulent financial reporting. (AU Section 316.16-17). One such "red flag" involves related party transactions.

197. KPMG knew or was reckless in not knowing of the possibility of fraud due to Hollinger's dealings with related entities, and/or entities owned, controlled by or affiliated with Lord Black, but KPMG failed to investigate Hollinger's related party transactions to determine whether they were accurately represented by the Company.

198. In deliberately or recklessly ignoring numerous red flags, KPMG violated the following provisions of GAAS:

(a) KPMG violated the first general standard, which provides that the audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor. Given the pervasiveness and complexity of Hollinger's related-party transactions and risk of self-dealing, it was incumbent upon KPMG to ensure that the individuals who performed the audit had the requisite technical proficiency in those areas and had familiarity with the those transactions so that any improper self-dealing by Lord Black and other senior executives would be detected. KPMG failed to do so.

(b) KPMG violated the third general standard, which provides that due professional care is to be exercised in the planning and performance of the audit and the preparation of the report. Due professional care concerns what the independent auditor does and how well he or she does it. KPMG violated this standard by not recognizing the questionable nature of the sales

of Hollinger assets to entities owned and/or controlled by Lord Black and Radler (and the non-compete payments), and the management services agreements with Ravelston, all of which required audit procedures sufficient to confirm the full nature and intent of the transactions.

(c)     KPMG violated the first standard of field work, which provides that the work is to be adequately planned and assistants, if any, are to be properly supervised. This standard requires the nature, timing and extent of planning to be based in part on the auditor's experience with the entity and his or her knowledge of the entity's business. KPMG violated this standard, because had KPMG adequately planned and supervised its audit efforts, it would have investigated the related party transactions and discovered that the Company's disclosures regarding the non-compete payments, the sales of its assets, and the management services agreements were all false and misleading.

(d)     KPMG violated the second standard of field work, which provides that a sufficient understanding of internal control is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed. This standard requires the auditor to make a proper study of existing internal controls, including accounting, financial and managerial controls, to determine whether reliance thereon was justified, and if such controls are not reliable, to expand the nature and scope of the auditing procedures to be applied. In the course of auditing Hollinger's financial statements, KPMG either knew or recklessly disregarded facts that evidenced that KPMG failed to sufficiently understand Hollinger's internal control structure and/or it disregarded weaknesses and deficiencies in Hollinger's internal control structure, and failed to adequately plan its audit or expand its auditing procedures.

(e)    KPMG violated the third standard of field work, which provides that sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit. Given the widespread use of inappropriate non-compete payments and transactions with related parties, it is apparent that KPMG failed to require proper evidentiary support for Hollinger's financial statements.

(f)    KPMG violated SAS No. 82, which provides that an auditor must have considered the following factors in assessing audit risk: (a) whether management compensation creates a motivation to engage in fraudulent financial reporting; (b) domination of management by a small group; (c) actions which are not supported by proper documentation or are not appropriately authorized; (d) reporting records or files that should be, but are not, readily available and are not promptly produced when requested; and (e) lack of timely inappropriate documentation for transactions.

(g)    KPMG violated SAS No. 55 , which provides that the auditor's understanding of internal controls may sometimes raise doubts about the auditability of an entity's financial statements, either by failing to adequately understand Hollinger's internal controls (and lack thereof) and/or by failing to acknowledge and report to the audit committee that Hollinger's lack of internal controls made an appropriate and thorough audit impossible.

199.    KPMG failed to exercise due professional care in the performance of its audits of Hollinger's financial statements. Had KPMG bothered to even do the math to calculate whether Hollinger received the entire selling price for its assets, it would have learned that Lord Black and others were taking part of the sale proceeds themselves, and that the Company was being shorted

by tens of millions of dollars in its sales of its newspaper assets. KPMG would also have discovered that Hollinger was orchestrating sales of its assets to Black and Radler-controlled entities at fire sale prices in transactions designed to thwart any competing bids from being made for Hollinger's assets. In brief, KPMG ignored numerous "red flags" arising from the related party transactions that are the subject of this action, all to the detriment of Hollinger shareholders and the investing public.

200.    KPMG's certification of Hollinger financial statements which KPMG knew, or was reckless in not knowing, were materially false and misleading, assisted or allowed the Individual Defendants to succeed in their fraudulent scheme, and the price of Hollinger stock continued to trade at artificially inflated prices. As the long-time auditor of Hollinger and Hollinger Inc., KMPG was aware not only of the Company's financial condition, but also of the byzantine corporate network through which money flowed to Lord Black and/or Black-owned and controlled entities. Thus, KPMG was aware, or was reckless in not knowing, of each instance in which Hollinger engaged in business, or transferred money or assets, to Black-owned entities. As KPMG assisted in the preparation of Hollinger's annual and quarterly financial statements and public filings, KPMG knew or was reckless in not knowing that those documents did not disclose Black's involvement, either personally or through entities he owned and controlled, in the related party transactions.

201.    KPMG knew, or was reckless in not knowing, that the Company's financial statements and public filings contained material misrepresentations and omissions regarding the Company's related party transactions and Black's outright misappropriation of Company monies. However, KPMG knowingly (or recklessly) participated, and aided and abetted in, the Individual Defendants' failure to completely and accurately disclose these facts. As a result, Plaintiff and other Class Members were deliberately misled and misinformed regarding the nature and scope of Black's

theft of Company money and the Company's related party transactions, and Class members made investment decisions and cast votes on the election of directors, including Lord Black, Radler and other Individual Defendants, based on the Company's false and misleading public filings.

## H. THE TRUTH BEGINS TO EMERGE AND THE SPECIAL COMMITTEE AND THE SEC COMMENCE THEIR INVESTIGATIONS.

202.    The Company's disclosures regarding self-dealing and misappropriation of Company money by Lord Black and his accomplices in March 2003 shocked the investment community. Institutional shareholders were outraged to learn that Lord Black had operated Hollinger as if it were his own piggy bank. Investors demanded an investigation and finally forced the Board to act like the public watchdog it was supposed to be.

203.    The Company's debt was subsequently downgraded (it bordered on being "junk") as was the debt of Hollinger Inc. The long term credit rating of Hollinger Inc. was lowered to SD by Standard & Poors on May 22, 2003. Later, on June 26, 2003, Dominion Bond Rating Service Limited ("DBRS"), a credit rating agency, announced that the debt rating on Hollinger's Senior Unsecured notes would be held at "DB low."

204.    On or about June 17, 2003, the Board established a Special Committee to conduct an investigation into the allegations of self-dealing. The Company announced that Paris was appointed Chairman of the Special Committee and initially as its sole member. Richard Breeden, former Chairman of the SEC, was retained by the committee to head the investigation.

205.    On or about July 24, 2003, the Company announced that Savage and Seitz were named to the Board of Directors and both were appointed as purported independent Directors as members of the Special Committee of the Board. However, Seitz has been a member of the

-76-

Telegraph Group's advisory body, of which Lord Black is the chairman and defendant Colson is chief executive. Savage sits on the board of Canadian Tire Corp. with defendant Atkinson. Atkinson is also one of the executives alleged to have received improper payments from Hollinger.

206. In mid-November 2003, Colson publicly admitted that Hollinger was the subject of an SEC investigation. The Ontario Securities Commission and the Federal Bureau of Investigation also at that time began investigating Hollinger.

207. On or about November 19, 2003, the SEC issued subpoenas to Hollinger, Hollinger Inc. and KPMG for documents.

208. On November 21, 2003, the members of audit committee of Hollinger's parent company, Hollinger Inc., Maureen Sabia, Fredrik Eaton, Allan Gotlieb and Douglas Bassett, each recommended that Black, Radler, Boultbee and Atkinson resign from Hollinger Inc. However, when that proposal was rejected, all of these independent directors on Hollinger Inc. resigned from the board of that company, putting Hollinger Inc. in violation of Canadian securities laws requiring Canadian companies to maintain an audit committee comprised only of independent directors.

209. Lord Black and Radler have resigned their executive posts; however, Lord Black remained at that time as the Chairman of the Company and its controlling shareholder. Boultbee was fired. The Company named Paris interim President and CEO. Although Lord Black and Radler have each agreed to repay Hollinger a portion of the non-competition payments they received at Hollinger's expense, the amount of restitution they intend to pay is far less than the hundreds of millions that Lord Black, Ravelston and Radler siphoned off from the Company. Additionally, Lord Black has reneged on his original promise and now refuses to repay any of the amounts he stole from the Company.

## I. THE SEC AND SPECIAL COMMITTEE FILE COMPLAINTS AGAINST THE COMPANY AND LORD BLACK.

210.    On December 22, 2003, Lord Black appeared in response to an SEC subpoena for his testimony. Rather than providing any explanation for his actions, Lord Black refused to testify, invoking his right, under the Fifth Amendment of the U.S. Constitution.

211.    On Friday, January 16, 2004, the SEC filed an action against Hollinger and Lord Black in the United States District Court for the Northern District of Illinois alleging that the Company issued filings in 1999 through 2001 that contained "misstatements and omitted to state material facts regarding transfers of corporate assets to certain of Hollinger International's insiders and related entities." The SEC also alleged that corporate insiders had tied "to thwart and obstruct the efforts" of the Board's Special Committee which was investigating the conduct of and payments to Lord Black and others. In that action, the SEC obtained an order preserving Hollinger's assets and barring any interference with Hollinger's internal investigation. Hollinger consented to the entry of the order, which also permanently enjoins the Company from violating the reporting and internal control provisions of the federal securities laws.

212.    Under the order, Hollinger is required to maintain its Special Committee to continue its investigation of alleged misconduct and to recover and maintain corporate assets. If that committee's authority is impaired in any way, including through a change of control in the Company, Richard Breeden, the current counsel to the Special Committee, would serve as a court-ordered Special Monitor to protect the interests of Hollinger's shareholders.

213.    Also on January 16, 2004, the Special Committee filed its complaint in the U.S. District Court for the Southern District of New York to recover damages and disgorgement of over

-78-

$200 million, plus prejudgment interest, costs and fees, against Lord Black, Radler, Ravelston and others. The Special Committee Complaint charges that the defendants (including Lord Black, Radler, Ravelston and Hollinger Inc.) directed and usurped the Company's assets and opportunities through systematic breaches of fiduciary duties owed to the Company. The Special Committee Complaint describes in detail the payments made to Lord Black and others purportedly pursuant to "non-competition agreements" and the excessive management fees through which the Company was damaged.

214. The next day, Hollinger announced that Lord Black "has been removed as non-executive chairman of the company, effective immediately."

215. As reported in a January 19, 2004 article in the FT Investor, in a letter to Hollinger's Board Sunday night, January 18, 2004, Lord Black said that he did not accept the validity of his removal. Also on Sunday, Lord Black agreed to sell a controlling interest in Hollinger to a company owned by David and Frederick Barclay, two British brothers, for about $178 million. As reported in a January 19, 2004 issue of the New York Times:

> The sale amounted to an end run around Hollinger's board orchestrated by Lord Black. The deal with the Barclays was negotiated in secret from the board, furhter enraging members of the company's special committee, which sued Lord Black on Friday, and of the executive committee, which removed him as nonexecutive chairman on Saturday, according to executives close to the company. Those same executives said that Hollinger's lawyers, who had suspected that such a deal might be made, were exploring ways to block it on Sunday evening.

216. On Monday, January 19, 2004, Lord Black issued a preemptive strike against any effort to stop his attempt to sell the Company. Lord Black filed suit in the Superior Court of Justice in Ontario, Canada seeking an injunction to prevent the Hollinger Board from blocking his sale of

the Company and seeking a declaration that the deal he reached with the Barclays was "effective, valid and binding." Additionally, as reported in the January 27, 2004 issue of the Chicago Tribune, Lord Black had the Board change its bylaws to reduce the power of the Board's Special Committee constituted of purportedly outside directors. The change substantially limits the power of directors lined up against Black by invoking a rule that all transactions must be approved by the full Board.

217.    On January 23, 2004, the New York Post reported that Hollinger and its investment bank began a formal auction process for the Company's major properties, a move designed to block Lord Black from selling his controlling stake in the Company. According to that article, Hollinger's bankers denied the Barclay brothers a book detailing Hollinger's finances.

218.    On January 26, 2004, Hollinger filed suit in Delaware Chancery Court to block Lord Black's planned sale of his voting control of the Company. Hollinger contends in that suit that Lord Black's sale of the Company to the Barclays impairs the Company's ability to seek higher bids for some of its individual newspaper assets. Hollinger is asking the court to undo Black's changes to the bylaws. The suit seeks the implementation of a poison pill and the eradication of special voting shares that would enable the Barclays to control Hollinger (as does Black) while owning only 30% of the Company's equity.

## HOLLINGER'S FRAUDULENT ACCOUNTING PRACTICES

### Generally Accepted Accounting Principles (GAAP)

219.    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice. Those principles are the official standards adopted by the American Institute of Certified Public Accountants (the "AICPA"), a private professional association, through three successor groups it

established: the Committee on Accounting Procedure, the Accounting Principles Board (the "APB"), and the Financial Accounting Standards Board (the "FASB"). GAAP includes the following authoritative literature and pronouncements: Statements of Financial Accounting Standards ("FAS"), APB Opinions, FASB Interpretations ("FIN"), AICPA Accounting Research Bulletins ("ARB"), AICPA Statements of Position ("SOP"), FASB Technical Bulletins ("FTB"), Consensus Positions of the FASB Emerging Issues Task Force ("EITF"), Statements of Financial Accounting Concepts ("CON") and Staff Accounting Bulletins ("SAB").

220. SEC Regulation S-X requires that financial statements filed with the SEC conform with GAAP. As set forth in SEC Rule 4-01 (a) of SEC Regulation S-X, "financial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a) (1).

221. Management is responsible for preparing financial statements that conform to GAAP. As noted by the AICPA Auditing Standards ("AU"), Section 110.03:

> Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management . . . Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

222. The SEC regulates statements by companies "that can reasonably be expected to reach investors and the trading markets, whoever the intended primary audience." SEC Release No. 33-6504, 3 Fed. Sec. L. Rep. (CCH) ¶ 23,120, at 17,095-3, 17 C.F.R. § 241.20560 (Jan. 13, 1984).

In addition to the periodic reports required under the Exchange Act, management of a public company has a duty promptly "to make full and prompt announcements of material facts regarding the company's financial condition." SEC Release No. 34-8995, 3 Fed. Sec. L. Rep. (CCH) ¶ 23,120A, at 17,095, 17 C.F.R. § 241.8995 (October. 15, 1970). The SEC has emphasized that "[i]nvestors have legitimate expectations that public companies are making, and will continue to make, prompt disclosure of significant corporate developments." SEC Release No. 18271, [1981-1982 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 83,049, at 84,618 (November. 19, 1981).

223.    In Securities Act Release No. 6349 (September 8, 1981), the SEC stated:

> [I]t is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company.

224.    In Accounting Series Release 173, the SEC reiterated the duty of management to present a true representation of a company's operations:

> [I]t is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations.

225.    Under Item 303 of Regulation S-K, promulgated by the SEC under the Exchange Act, there is a duty to disclose in periodic reports filed with the SEC "known trends or any known demands, commitments, events or uncertainties" that are reasonably likely to have a material impact on a company's sales revenues, income or liquidity, or cause previously reported financial information not to be indicative of future operating results. 17 C.F.R. § 229.303(a)(l)-(3) and Instruction 3.

226.    Hollinger's financial statements for the fiscal years 2000 through 2003 (including the related quarterly periods) violated SEC Regulations and GAAP, in that they failed to (i) disclose facts necessary to present a fair and truthful representation of the Company's asset sales, management services agreements, financial position and operations, (ii) provide those disclosures which were required by GAAP, and (iii) identify and address those key variables and other qualitative and quantitative factors which were peculiar to and necessary for an understanding and evaluation of the Company.    Consequently, the overall impression created by the financial statements was not consistent with the business realities of the Company's reported financial position and operations.

227.    The financial statements that were issued by Hollinger during the Class Period did not fairly and accurately represent the Company's financial position and operations.  Among other reasons, they violated the following principles of GAAP:

        a)        that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (CON No. 1, Objectives of Financial Reporting by Business Enterprises, ¶ 40);

        b)        that financial reporting should provide information that is useful to present and potential investors and creditors in making rational investment, credit and similar decisions (CON No. 1, Objectives of Financial Reporting by Business Enterprises, ¶ 34);

        c)        that financial reporting should disclose material related party transactions, such as transactions between a company "and its principal owners, management, or members of their immediate families," and including guarantees  (FAS No. 57, "Related Party Disclosures");

        d)        that the costs of services be matched with, *i.e.*, recognized contemporaneously with, the recognition of revenues that resulted from the same transactions (CON No. 6, Elements of Financial Statements, ¶ 145);

-83-

e) that financial reporting should provide accurate information about an enterprise's financial performance during a certain time period (CON No. 1, Objectives of Financial Reporting by Business Enterprises, ¶ 42);

f) that financial reporting should be reliable in that it represents what it purports to represent -- that information should be reliable as well as relevant is a central principle of accounting (CON No. 2, Qualitative Characteristics of Accounting Information, ¶¶ 58-59);

g) that information is complete and nothing is left out that may be necessary to insure that it validly represents underlying events and conditions (CON No. 2, Qualitative Characteristics of Accounting Information, ¶ 80);

h) that Management's Discussion and Analysis (MD&A) requires a discussion of liquidity, capital resources, results of operations and other information necessary to gain an understanding of a registrant's financial condition, changes in financial condition and results of operations. This includes unusual or infrequent transactions, known trends or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue, operating income or net income and the relationship between revenue and the costs of the revenue. . . . The Commission stated in Financial Reporting Release (FRR) 36 that MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future" (SAB No. 101, Revenue Recognition in Financial Statements, Section B(1)); and

i) that the meaning of Present Fairly in Conformity with GAAP recognizes the importance of reporting transactions in accordance with their substance and the substance of a reported transaction should not differ materially from its form (AU Section 411.06).

228. Hollinger violated the foregoing GAAP pronouncements by failing to disclose the existence of the non-compete payments at the time it announced pending sales of its assets or the consummation of such sales, by misrepresenting the amount of such payments when they were ultimately disclosed, by failing to disclose that Ravelston was not providing any services to Hollinger pursuant to the managements services agreements, and by falsely stating that the Board

and Audit Committee had approved the terms of the asset sale transactions, the non-compete

payments and the management services agreements.

229.    Hollinger also violated Accounting Principles Board Statements ("APS") No. 4, Basic

Concepts and Accounting Principles Underlying Financial Statements of Business Enterprises,

paragraph 106, which states:

> Financial information that meets the qualitative objectives of
> financial accounting also meets the reporting standard of adequate
> disclosure. Adequate disclosure relates particularly to objectives of
> relevance, neutrality, completeness, and understandability.
> Information should be presented in a way that facilitates
> understanding and avoids erroneous implications. The headings,
> captions, and amounts must be supplemented by enough additional
> data so that their meaning is clear but no by so much information that
> important matters are buried in a mass of trivia.

Additionally paragraph 199 of APS No. 4 states:

> In addition to informative classifications and segregation of data,
> financial statements should disclose all additional information that is
> necessary for fair presentation in conformity with generally accepted
> accounting principles.    Notes that are necessary for adequate
> disclosure are an integral part of the financial statements.

230.    By failing to disclose the non-compete payments, by later misrepresenting the

amounts of those payments, by failing to disclose that the management services fees were paid for

services which were never provided, and by falsely stating that the non-compete payments and

management services agreements were approved by the Board and Audit Committee, Hollinger

violated paragraphs 106 and 199 of APS No. 4.

## INDIVIDUAL DEFENDANTS' SCIENTER

231.    The Individual Defendants personally and directly or indirectly (through their

ownership of Ravelston and other companies affiliated with or doing business with Hollinger)

profited from the fraud alleged herein, or are liable as a result of their complicity and/or reckless disregard of numerous instances of improper conduct which were rubber-stamped by the Board and Audit Committee without inquiry or evaluation.

232. Lord Black, Radler, Boultbee and Atkinson were motivated to misrepresent and conceal material facts from the shareholders so that these defendants could successfully pay themselves millions of dollars in purported non-compete payments as part of the Company's sales of its newspaper assets, and pay themselves additional millions of dollars through the Company's payments to Ravelston (which they owned) for purported management services which Ravelston never provided.

233. By virtue of these defendants' positions within the Hollinger, they not only had access to undisclosed information about the terms of the Company's asset sale transactions and the management services agreements, and the circumstances surrounding those agreements, these defendants actually orchestrated the asset sales, structured the management service agreements, and knew that those transactions and agreements were misrepresented in the Company's public filings. Lord Black, Radler, Boultbee and Atkinson knew that they were (a) diverting significant portions of the proceeds from the sales of certain Hollinger assets by causing the payment of purported non-compete payments to themselves and/or entities with which they were affiliated, owned and/or controlled; (b) causing Hollinger to sell certain of its assets to entities, including Bradford and Horizon, that they owned and/or controlled at below market prices for purposes of unjustly enriching themselves; and (c) causing Hollinger to enter into certain management services agreements that required Hollinger to pay purported management services fees to themselves and/or entities they owned or with which they were affiliated, owned and/or controlled without having those entities

provide any services to Hollinger. These defendants knew and had access to information concerning these self-dealing and related-party transactions through Hollinger's internal corporate documents, conversations with other corporate officers and directors, and affiliated companies, attendance at management and Board meetings and committees thereof, and through reports and other information provided to them in connection with their roles and duties as Hollinger executives and/or directors.

234. Because of their knowledge of such information, Lord Black, Radler, Boultbee and Atkinson knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

235. The other individual defendants (Andreas, Lady Black, Burt, Chambers, Colson, Kipnis, Kissinger, Kravis, Meitar, Paris, Perle, Savage, Savage, Seitz, Strauss, Taubman, Thompson, Weidenfeld and Wexner) likewise knew or recklessly disregarded the facts regarding the self-dealing and related party transactions described herein, through Hollinger's internal corporate documents, conversations with other Hollinger officers and directors, attendance at management, Board and committee meetings, and through reports and other information provided to them in connection with their roles and duties as Hollinger executives and/or directors. These defendants had access to undisclosed information about the terms of the Company's asset sales (including the non-compete payments) and the management services agreements described herein, and the circumstances surrounding those agreements. However, rather than conducting any review of the terms of the asset sales and management service agreements, or the fairness of those deals and agreements to Hollinger, these defendants simply rubber-stamped, often after-the-fact, these deals and agreements in a complete failure to exercise any independent review or oversight of the actions of Lord Black, Radler, Boultbee or Atkinson.

236.    Additionally, to the extent any of these individual defendants considered or deemed themselves to be "independent directors," they knew, or were reckless in not knowing, that the Company's representations (described herein) that certain transactions had been approved by the independent directors were false. These purportedly independent directors knew, or were reckless in not knowing, that no such approvals had been given, or that the independent directors' complete failure to conduct any inquiry or investigation into the facts of the transactions or their fairness to Hollinger prevented those directors from being sufficiently informed to "approve" the transactions.

237.    Defendant Perle was motivated to assist in the defendants' fraud because he served as head of a Hollinger subsidiary, Hollinger Digital, for which he was paid approximately $300,000 per year. Additionally, Perle serves as a Board member of Trireme Partner L.P. and is managing partner of an investment company known as Trireme Associates ("Trireme") in which Hollinger last year invested $2.5 million. Hollinger has invested over $14 million with other venture capital companies operated by other partners of Trireme. Hollinger has a 25% ownership stake in Trireme and is entitled to 20% of the Trireme Partner L.P.'s profits.

238.    Kissinger was motivated to assist in defendants' fraud because he serves on the Trireme Strategic Advisory Board.

239.    Paris was motivated to assist in the fraud because he is managing director of Berenson & Company which, with Paris, acted as financial advisor to Hollinger in 2002 and received a fee of over $1 million in connection with the placement of $200 million of Hollinger's Senior Notes.

240.    Thompson was motivated to assist in th fraud because he received substantial political contributions from Lord Black.

241.    It is appropriate to treat all the Individual Defendants as a group for pleading purposes and to presume that the materially false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of all of the Individual Defendants in this action. The Individual Defendants, by virtue of their high-level positions within Hollinger, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential information concerning the Company and its business, operations, finances, asset sales (including the sales of Hollinger assets to related-parties), significant contracts (including the management services agreements),and self-deal transactions (including the illicit non-compete payments), as alleged herein.

242.    The Individual Defendants were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein, including SEC filings, press releases, and other public documents, were aware of or recklessly disregarded the fact that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

243.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the and was traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition, operations, financial statements, business, management, proceeds from asset sales, significant contracts, related-party transactions and to correct any

previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common stock would be based upon truthful and accurate information. The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

244. The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. The Individual Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein.

245. The Individual Defendants are liable as participants in a scheme to defraud or deceive purchasers of Hollinger common stock by disseminating materially false and misleading statements and/or concealing material adverse facts regarding Hollinger's asset sales and the management services agreements, and the Company's financial condition, operations, financial statements, business, earnings, proceeds from asset sales, significant contracts, related-party transactions and the intrinsic value of Hollinger common stock.

## THE INDIVIDUAL DEFENDANTS' RESPONSIBILITY FOR INTERNAL CONTROLS AND FINANCIAL REPORTING

246. Hollinger had the responsibility to maintain sufficient controls to accurately report its results. The representations made by a company in its financial statements and in other financial disclosures to the public are the representations of that company's management.

247. According to SEC rules, to accomplish the objectives of accurately recording, processing, summarizing and reporting financial data, a company must establish an internal control structure. Pursuant to Section 13 (b)(2) of the Exchange Act, Hollinger was required to:

> [M]ake and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and
>> (A) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that
>>> (1) - transactions are executed in accordance with management's general or specific authorization;
>>>> (ii) transactions are recorded as necessary
>>>>> (I) to permit preparation of financial statements in conformity with generally accepted accounting principles....

248. To accomplish the objectives of accurately recording, processing, summarizing and reporting data, a company must establish an internal control structure. In the structure, according to Appendix D to Statement on Auditing Standards No. 55, Consideration of the Internal Control Structure in a Financial Statement Audit ("SAS 55"), management should consider, among other things, such objectives as (i) making certain that "[transactions are recorded as necessary ... to permit presentation of financial statements in conformity with generally accepted accounting principles. . . and to maintain accountability for assets," and (ii) making certain that "[t]he recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

249. According to SAS 55 (AU § 319 A.37 & 38):

> Establishing and maintaining an internal control structure is an important management responsibility. To provide reasonable

> assurance that an entity's objectives will be achieved, the internal
> control structure should be under ongoing supervision by
> management to determine that it is operating as intended and that it
> is modified as appropriate for changes in conditions.

250.    Hollinger and the Individual Defendants had repeatedly represented to investors the

adequacy and strength of its internal control systems. In each of the Company's 10-Ks during the

Class Period, the Company represented that Lord Black and the Company's CFO had "reviewed

[Hollinger's] disclosure controls and procedures" and therefore "believe that [Hollinger's] disclosure

controls and procedures are effective in ensuring that material information related to the Company

is made known to [Lord Black and the CFO] by others within the Company."

251.    Contrary to the requirements of GAAP and SEC rules, Hollinger and the Individual

Defendants failed to implement and maintain an adequate internal accounting control system.

Hollinger management knowingly tolerated the existence of inadequate internal controls and/or

recklessly disregarded its obligation to implement adequate controls to ensure that proceeds from

its asset sales were properly represented and disclosed, to ensure that Hollinger received the

management services for which it was paying, and to ensure that the asset sales and management

services agreements were properly presented to the Board and Audit Committee; and reviewed and

approved by the Board and Audit Committee..

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

252.    As alleged herein, the Individual Defendants acted with scienter in that the Individual

Defendants knew at the time they issued them that the public documents and statements issued or

disseminated in the name of the Company were materially false and misleading or omitted material

facts; knew that such statements or documents would be issued or disseminated to the investing

public; knew that persons were likely to reasonably rely on those misrepresentations and omissions; and knowingly and substantially participated or were involved in the issuance or dissemination of such statements or documents as primary violations of the federal securities law. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Hollinger, their control over, and/or receipt of Hollinger's allegedly materially misleading misstatements and/or their association with the Company which made them privy to confidential proprietary information concerning Hollinger which were used to inflate financial results and which defendants caused or were informed of, participated in and knew of the fraudulent scheme alleged herein. With respect to non-forward-looking statements and/or omissions, defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.

253. Defendants' false and misleading statements and omissions do not constitute forward-looking statements protected by any statutory safe harbor. The statements alleged to be false and misleading herein all relate to facts and conditions existing at the time the statements were made. No statutory safe harbor applies to any of Hollinger's material false or misleading statements.

254. Alternatively, to the extent that any statutory safe harbor is intended to apply to any forward-looking statement pled herein, the Individual Defendants are liable for the false forward-looking statement pled because, at the time each forward-looking statement was made, the speaker knew or had actual knowledge that the forward-looking statement was materially false or misleading, and the forward-looking statement was authorized and/or approved by a director and/or executive officer of Hollinger who knew that the forward-looking statement was false or misleading. None of the historic or present tense statements made by defendants was an assumption underlying or

relating to any plan, projection or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any projection or statement of future economic performance when made nor were any of the projections or forecasts made by the Individual Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

255.    At all relevant times, the market for Hollinger's stock was an open, well-developed and efficient market at all relevant times for the following reasons, among others:

(a)    Hollinger common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Hollinger was required to file and did file periodic reports with the SEC;

(c)    Hollinger regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national and international circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)    Hollinger was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms, which reports were each publicly available and entered the public marketplace; and

(e)    the trading volume of Hollinger stock was substantial during the Class Period.

256.    As a result, the market for Hollinger stock promptly digested current information regarding Hollinger from all publicly available sources and reflected such information in Hollinger's stock price. Under these circumstances, all persons in the Class who purchased Hollinger common

stock during the Class Period based on defendants' false and misleading statements suffered similar injury through their purchase of shares of such stock at artificially inflated prices and a presumption of reliance applies.

## CLASS ACTION ALLEGATIONS

257.    Plaintiff brings Counts I and III-VI of this action as a class action pursuant to Rule 23 of the Federal Rule of Civil Procedure on behalf of itself and all persons who purchased, acquired or owned common stock in Hollinger (the "Class") between August 13, 1999, when Hollinger filed its August 10-Q containing various false and misleading statements described herein, and March 31, 2003, and who were damaged thereby. Plaintiff brings Count VI on behalf of itself and members of a class comprised solely of other States, political subdivisions or State pension plans, as defined in 15 U.S.C. § 77p, that have authorized participation in this action.

258.    Excluded from the Class are defendants, their subsidiaries and affiliates, and the officers and directors of Hollinger, members of their immediate families and their legal representations, heirs, successors or assigns or any entity in which any of the foregoing has a controlling interest.

259.    Counts I and III-VI are properly maintainable as a class action counts.

260.    The Class is so numerous that joinder of all members is impractical. Throughout the Class Period, Hollinger common shares were actively traded on the NYSE. As of November 7, 2003, Hollinger had outstanding over 86 million shares of its common stock. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members of the proposed class, including individuals and entities too numerous to bring separate actions. It is reasonable to assume that

holders of Hollinger common stock are geographically dispersed throughout the United States of America.

261.    Record owners and other members of the Class may be identified from records maintained by Hollinger or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

262.    There are questions of law and fact that are common to the Class which predominate over any questions affecting only individual Class members. The common questions include:

(a)    Whether the defendants publicly disseminated or caused the Company to publicly disseminate press releases, earnings pronouncements, regulatory filings and other public statements during the Class Period which contained material misrepresentations or omitted to state material facts necessary to make such statements not misleading in violation of the federal securities laws as alleged herein;

(b)    Whether defendants participated in a fraudulent scheme to artificially inflate and misrepresent the proceeds from Hollinger's asset sales and thereby artificially inflate Hollinger's stock price;

(c)    Whether the defendants acted intentionally with direct knowledge of the falsity of such statements, or at least recklessly, in making such statements;

(d)    Whether the Individual Defendants, Hollinger Inc. and Ravelston are "controlling persons" as that term is defined in Section 20(a) of the Exchange Act;

(e)    Whether the market prices of Hollinger's common stock during the Class Period were artificially inflated due to material misstatements and omissions complained of herein;

(f)    Whether the Individual Defendants concealed their breaches of fiduciary duties in causing, directing and/or approving, or allowing or permitting, material misrepresentations and omissions in the Company's public statements and filings relating to certain related party transactions and the Company's financial condition;

(g)     Whether the individual Class members were improperly induced to hold their Hollinger shares;

(h)     Whether the individual Class members were improperly induced to purchase their Hollinger shares; and

(i)     Whether the members of the Class have sustained damages and, if so, what the appropriate measure of damages should be.

263.    Plaintiff is committed to prosecuting the Class claims and has retained competent counsel experienced in litigating claims of this nature. Plaintiff's claims are typical of the claims of other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

264.    Plaintiff anticipates that there will be no difficulty in maintaining Counts I and III-VI as class action Counts.

265.    The class action is an appropriate method for the fair and efficient adjudication of those Counts.

266.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

267.    The prosecution of separate actions would create the risk of:

a.      Inconsistent or varying adjudications which would establish incompatible standards for conduct for the defendants; and/or

b.      Adjudications which would as a practical matter be dispositive of the interests of other members of the Class.

Accordingly, a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Additionally, because the damages suffered by individual members

-97-

of the Class may in some circumstances be relatively small, the expense and burden of individual litigation make it impossible for such class members individually redress the wrongs done to them.

**COUNT I**
**VIOLATION OF SECTION 10(b) OF THE EXCHANGE AND**
**AND RULE 10b-5 PROMULGATED THEREUNDER**

**(Individual And Class Claim Against All Individual Defendants, Hollinger and KPMG)**

268.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

269.    This Count is asserted by Plaintiff on behalf of itself and the Class against all Individual Defendants, Hollinger and KPMG and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, §240.10b-5, promulgated thereunder.

270.    During the Class Period, these defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of Hollinger's stock; and (c) caused Plaintiff and other members of the Class to purchase or otherwise acquire Hollinger's stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the defendants took the actions set forth herein.

271.    In addition to the duties of full disclosure imposed on these defendants as a result of their making affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they had a duty to promptly disseminate truthful information that would be material to investors, in compliance with GAAP and the integrated disclosure provisions of the SEC as embodied in SEC Regulations S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.01 et seq.) and other SEC regulations, including truthful, complete and

accurate information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

272. The defendants named in this Count, individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial results, businesses, operations, asset sales, material contracts and business prospects as specified herein. These defendants employed devices, schemes, and artifices to defraud, while in possession of material, adverse, non-public information, and engaged in acts, practices, and a course of conduct as alleged herein, in an effort to assure investors of Hollinger's earnings, assets, revenues, expenses, proceeds from asset sales and the accuracy of the Company's financial reporting of performance, which included the making of, or the participation in the making of, untrue statements of material facts and omissions, or to state the material facts necessary in order to make the statements made about the Company's financial and business operations in light of the circumstances under which they were made, not misleading, as set forth particularly herein.

273. Specifically, as part of their scheme, the Individual Defendants, Hollinger and KPMG failed to disclose or disclosed in a manner that was knowingly false and misleading, information regarding certain self-dealing and related party transactions including: (a) the diversion of significant portions of the proceeds from the sales of Hollinger's assets to Hollinger, Lord Black, Radler, Boultbee and Atkinson under the guise of non-compete payments; (b) Hollinger's asset sales to entities, including Bradford and Horizon, that were owned and/or controlled by certain of the defendants (including Lord Black and Radler) on terms unfavorable to Hollinger and at below

market prices for purposes of unjustly enriching themselves; and (c) Hollinger's entry into certain

management services agreements that required Hollinger to pay purported management services fees

to defendants and/or entities they owned or controlled or with which they were affiliated, when no

such management services were provided. As a result of this unlawful scheme, plan and course of

conduct, Plaintiff and other members of the Class were caused to purchase or otherwise acquire

Hollinger securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and

course of conduct, these defendants, and each of them, engaged in the actions set forth herein.

274.    The Individual Defendants' primary liability arises from the following facts: (i) they

were high-level executives and directors of the Company during the Class Period and were members

of the Company's management team; (ii) by virtue of their responsibilities and activities as senior

officers of the Company, they were privy to and participated in the drafting, reviewing, and/or

approving the misleading statements, omissions, releases, reports, and other public representations

of and about Hollinger and/or signed the Company's public SEC filings, which public filings

contained the allegedly material misleading statements and omissions; (iii) they knew or had access

to the material adverse non-public information about the financial results of Hollinger which were

not disclosed; and (iv) they were aware of the Company's dissemination of information to the

investing public which they knew or recklessly disregarded was materially false and misleading.

275.    Each of the defendants named in this Court I had actual knowledge of the

misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard

for the truth in that they failed to ascertain and to disclose such facts, even though such facts were

available to them. These defendants' material misrepresentations and/or omissions were done

knowingly or recklessly and for the purpose and effect of concealing the following from the

investing public and supporting the artificially inflated price of its securities: (i) payments of non-compete payments and management service fees (where no management services were provided); (ii) the failure of the Board and Audit Committee to properly review and approve these agreements and the Company's related party transactions; and (iii) the Company's accounting irregularities and the fraudulent use of other companies as participants in Hollinger's fraudulent schemes. As demonstrated by these defendants' statements throughout the Class Period, if they did not have actual knowledge of the misrepresentations and omissions alleged, they were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

276. As a result of the dissemination of the materially false and misleading information and/or defendants' failure to disclose material facts, as set forth herein, the market price of Hollinger's securities was at all times during the Class Period artificially inflated. In ignorance of the fact that the market price of Hollinger's publicly-traded securities was artificially inflated, and relying directly or indirectly on the materially false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and the truth of any representations made to appropriate agencies as to the investing public, at the times at which any statements were made, and/or on the absence of material adverse information that was known to or recklessly disregarded by these defendants but not disclosed in public statements by such defendants during the Class Period, Plaintiff and the Class purchased or otherwise acquired for value Hollinger stock during the Class Period at artificially high prices and were damaged thereby. But for these defendants' materially false and misleading statements and omissions alleged herein, Plaintiff and

the Class would not have purchased or otherwise acquired for value Hollinger stock during the Class Period at artificially high prices.

277.    At the time of such misstatements and omissions, Plaintiff and the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff, the Class and the marketplace known of the non-compete payments, the payments for management services which were not provided, the failure of the Board and Audit Committee to properly review and approve these payments, the true financial condition of the Company, and the other facts described herein which were not disclosed by defendants, Plaintiff and the Class would not have purchased or otherwise acquired Hollinger stock during the Class Period, or, if they had purchased or otherwise acquired such securities during the Class Period, they would not have done so at artificially inflated prices.

278.    The market price of Hollinger securities declined materially upon the public disclosure of the true facts which had been misrepresented or concealed as alleged herein.

279.    As a direct and proximate cause of the wrongful conduct of the Individual Defendants, Hollinger and KPMG, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of Hollinger securities during the Class Period.

280.    Therefore, by virtue of the foregoing, these defendants have violated Section 10(b) of the 1934 Act, and Rule 10b-5 promulgated thereunder.

281.    As a result of the defendants' conduct, Plaintiffs were damaged in an amount to be proved at trial.

## COUNT II
## VIOLATION OF SECTION 18 OF THE EXCHANGE ACT

### (Individual Claim Against Hollinger, KPMG And The Individual Defendants)

282.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

283.    This claim is brought pursuant to Section 18 of the Exchange Act against Hollinger, KPMG and each of the Individual Defendants.

284.    As set forth above, Hollinger, KPMG and the Individual Defendants made or caused to be made statements which were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, in documents filed with the SEC. Specifically, the Company's audited financial statements for the fiscal years 2000, 2001 and 2002 were included in the Company's Forms 10-K that were filed with the SEC. The Company has already admitted that those financial statements are materially false and misleading and so they must be withdrawn and restated which, by way of definition makes them false and misleading. Additionally, the financial statements (and Hollinger's 2000-2003 10-Ks) were false and misleading because, as stated in SEC Rule 4-01(a) of Regulation S-X, "financial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

285.    KPMG falsely certified in Hollinger's 2000-2003 10-Ks that Hollinger's financial statements complied with GAAP and that KPMG had performed its audits in accordance with GAAS.

286.     Plaintiff read and relied upon each of the Forms 10-K, and the financial statements contained therein, not knowing that they were false and misleading.

287.     The Individual Defendants each signed the Company's 2000, 2001 and 2002 Forms 10-K and KPMG signed its certifications in those filings.

288.     In connection with its purchases of Hollinger stock, Plaintiff specifically read and relied on the false and misleading statements regarding the sales of Hollinger assets to related parties, including Bradford and Horizon, the reported proceeds of those asset sales (which improperly included non-compete payments made to Lord Black, Radler, Atkinson, Boultbee, Ravelston and Hollinger Inc.), and the Ravelston management services agreements in the Company's Forms 10-K, filed with the SEC. Plaintiff's reliance was reasonable, particularly given the clean opinions from the Company's auditor, KPMG.

289.     When the truth began to emerge on or after March 31, 2003 about the false and misleading statements in the Company's documents and reports filed with the SEC, Plaintiff and other Class members were significantly damaged by the resulting drop in the value of the Company's stock.

290.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff suffered damage in connection with its purchases of Hollinger stock.

291.     By virtue of the foregoing, Hollinger, KPMG and the Individual Defendants have violated Section 18 of the Exchange Act.

292.   As a result of the Individual Defendants' conduct described herein, Plaintiff and other Class members were damaged in amounts to be proved at trial.

**COUNT III**
**VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT**

**(Individual And Class Claim Against The Individual Defendants,**
**Hollinger Inc., Ravelston And Argus)**

293.   Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

294.   This Count is asserted by Plaintiff on behalf of itself and the Class against all the Individual Defendants, Hollinger Inc., Ravelston and Argus under Section 20(a) of the Exchange Act.

295.   Each of these defendants acted as controlling persons of Hollinger within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of the Individual Defendants' executive positions, Board membership and/or stock ownership, as alleged above, these defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff and other Class members contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's internal reports, press releases, public filings and other statements alleged by Plaintiff and other Class members to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

296.   In particular, Lord Black, Radler, Atkinson and Boultbee had direct involvement in the day-to-day operations of the Company and therefore, are presumed to have had the power to

control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

297.   As set forth above, the Individual Defendants committed primary violations of Section 10(b) and Rule 10b-5 and Section 18 of the Exchange Act by the acts and omissions alleged in this Complaint. By virtue of their positions as controlling persons of Hollinger, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

298.   Hollinger Inc., Ravelston and Argus also controlled Hollinger within the meaning of Section 20(a) of the Exchange Act. Hollinger Inc. controlled Hollinger through its ownership of 30.3% of Hollinger's shares and control of 73% of Hollinger's overall voting power. Ravelston and Argus controlled Hollinger because they controlled 78% of the shares of Hollinger Inc. which, in turn, controls Hollinger.

299.   As a direct and proximate result of the wrongful conduct of the Individual Defendants, Hollinger Inc., Ravelston and Argus, Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Hollinger securities.

300.   As a result of the conduct of the Individual Defendants, Hollinger Inc., Ravelston and Argus, Plaintiff and other Class members were damaged in amounts to be proved at trial.

## COUNT IV
## BREACH OF FIDUCIARY DUTY FOR
## INDUCING RETENTION OF HOLLINGER STOCK

### (Individual And Class Claim Against Hollinger And All Individual Defendants)

301.   Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

302. This claim is brought against Hollinger and all Individual Defendants for breach of fiduciary duty.

303. As alleged herein, Hollinger and the Individual Defendants employed a fraudulent scheme, and made material misrepresentations or omitted to disclose material facts to Plaintiff and the investing public regarding Hollinger's asset sales, management services agreements and the Company's financial condition.

304. Hollinger and the Individual Defendants were required to present Hollinger's business and financial condition in a fair and accurate manner in, among other documents, reports that it was required to file with the SEC and in press releases.

305. As described in greater detail above, the Individual Defendants, by virtue of their positions at the Company, knew or were reckless in not knowing that the Company's public filings and statements materially misrepresented the Company's asset sales (and the proceeds received from such sales), the management services agreements, and the Board's and Audit Committee's review and approval of the asset sales and management services agreements. Each of the Individual Defendants knew or had access to material, adverse non-public information about Hollinger's financial results and then- existing business condition which was not disclosed. Each of the Individual Defendants participated in drafting, renewing and/or approving the misleading statements, releases, reports and other public representations about Hollinger, and was responsible for Hollinger's financial accounting system, internal controls, and the preparation and review of the audited and unaudited financial statements prepared and published in the name of the Company and contained in reports and other documents, including those filed with the SEC.

306. As alleged herein, the Company's documents contained untrue statements of material facts and/or omitted material facts required to be stated therein to make the statements therein not misleading. The Company has admitted that its financial statements for the fiscal years 1999-2002 were all materially false when issued.

307. The Individual Defendants, as present or former directors and/or officers of Hollinger, at all times relevant to this Count, were fiduciaries of the Company's public shareholders. As such, they owed Hollinger's shareholders the highest duties of good faith, due care, fair dealing and loyalty.

308. The Individual Defendants breached their fiduciary duties of care and loyalty by causing, directing and/or approving, or allowing or permitting, and/or failing to properly and fully review, investigate and evaluate the terms and fairness to Hollinger of the self-dealing transactions described herein, and by causing, directing or approving, or allowing or permitting the materially misleading statements and omissions in the Company's public statements and SEC filings described herein.

309. The Individual Defendants' breaches of fiduciary duty and their materially false and misleading statements were made in connection with the financial statements and public filings upon which Plaintiff relied in retaining its holdings of Hollinger stock.

310. The Individual Defendants acted with scienter in making, or causing to be made, the materially false and misleading statements and omissions alleged herein.

311. The materially false and misleading statements by the defendants named in this Count were made in connection with the public filings and financial statements upon which Plaintiff relied in retaining its holdings of Hollinger stock.

312.    At the time Plaintiff and other members of the Class held Hollinger stock, they did not know of any of the false and/or misleading statements and omissions and breaches of fiduciary duty, and justifiably relied upon the representations made by defendants in retaining such stock.

313.    The aforesaid misrepresentations and omissions by these defendants induced Plaintiff and other members of the Class to retain their holdings of Hollinger stock.

314.    As a direct and proximate result of the breaches of fiduciary duty, Plaintiff in reasonable reliance on these defendants' misrepresentations and in ignorance of the material omitted facts, suffered damages in connection with retaining its holdings of Hollinger stock.

<u>**COUNT V**</u>
**§ 12(F), (G) & (I) OF THE ILLINOIS SECURITIES LAW OF 1953, 815 ILCS § 5/12**

**(On Behalf Of Plaintiff And Members Of A Class Comprised Solely Of States, Political Subdivisions Or State Pension Plans Against All Defendants)**

315.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein, except to the extent such allegations charge the defendants with intentional misconduct as it relates to this claim.

316.    This Count is asserted by Plaintiff on behalf of itself and members of a class comprised solely of other States, political subdivisions or State pension plans, as defined in 15 U.S.C. § 77p, that have authorized participation in this action (the "§ 12 Plaintiffs").

317.    By filing this action, the § 12 Plaintiffs hereby elect to avoid sales of Hollinger securities and avail themselves of the remedy of recision, as provided in 815 ILCS § 5/13. The § 12 Plaintiffs aver that less than six months have elapsed between time they obtained knowledge that sales were voidable and filing of this action.

318. During the Class Period, defendants engaged in the transactions, practices and/or a course of business in connection with the sale of Hollinger securities which worked or tended to work a fraud or deceit upon the purchasers of Hollinger securities.

319. The defendants made or caused to be made statements which were false and/or misleading with respect to material facts concerning Hollinger's business (including its asset sales, the management services agreements, and the Board's and Audit Committee's review and approval of the asset sales and management services agreements), financial condition and related party transactions.

320. The defendants employed devices, schemes and/or artifices to defraud directly and indirectly in connection with the sale of Hollinger securities.

321. The defendants signed and circulated statements pertaining to Hollinger securities knowing or having reasonable grounds to know that such statements contained material misrepresentations and omissions, including but not limited to statements regarding related party transactions, compensation and other payments received by Hollinger officers and directors and other false or misleading statements and omissions concerning the transactions described above.

322. As result of the defendants' fraudulent activity, the § 12 Plaintiffs purchased Hollinger securities that the § 12 Plaintiffs would not have purchased but for defendants' fraud.

323. As a direct and proximate cause of defendants' wrongful conduct, the § 12 Plaintiffs suffered damages in connection with their respective purchases of Hollinger securities during the Class Period.

## COUNT VI
## AIDING AND ABETTING BREACH OF FIDUCIARY
## DUTY WHICH INDUCED RETENTION OF HOLLINGER STOCK

### (Individual And Class Claim For Aiding And Abetting
### Against KPMG, Hollinger Inc., Ravelston, RMI And Argus)

324.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

325.    Plaintiffs bring this Count against KPMG, Hollinger Inc., Ravelston, RMI and Argus for aiding and abetting the breaches of fiduciary duty by the Individual Defendants.

326.    As alleged herein, KPMG knew of the self-dealing transactions perpetrated at Hollinger by Lord Black and the Individual Defendants, and knew, or was reckless in not knowing, that Lord Black and other Individual Defendants were diverting part of the proceeds of the Company's asset sales to themselves, that the Company was paying for management services which were never provided, and that the Company was materially misrepresenting the proceeds it received from its asset sales, and other facts, in the Company's public filings and public statements. Hollinger Inc. and Ravelston also knew these facts due to their control over Hollinger, and because Lord Black owned and controlled Hollinger Inc. and Ravelston as well as Hollinger.

327.    KPMG, Hollinger Inc., Ravelston, RMI and Argus knew of the Company's material misrepresentations and omissions of material facts in its public filings.

328.    KPMG failed to properly alert the investing public that Hollinger and the Individual Defendants were making material misrepresentations and/or omissions when KPMG issued clean audits of Hollinger.

329.    KPMG, Hollinger Inc., Ravelston, RMI and Argus were aware of their role as part of Hollinger's and the Individual Defendants' fraudulent scheme to conceal from the investing public these improper self-dealing transactions at the time when KPMG was assisting Hollinger and the Individual Defendants' in perpetrating this scheme.

330.    As a result of KPMG's professional negligence, and its certification of Hollinger's financial statements which KPMG knew were materially false and misleading, and as a result of the participation of Hollinger Inc. and Ravelston in the fraudulent scheme described herein, the Individual Defendants succeeded in their fraudulent scheme, to the detriment of Hollinger shareholders. Accordingly, Lord Black and the Individual Defendants were able to enter into the transactions in which Hollinger sold assets to third parties, as described above, and divested millions of dollars of the proceeds from such asset sales to themselves when these payments should have gone to Hollinger. The Individual Defendants were also able to cause the Company to pay to entities affiliated with the Individual Defendants for management services which were never provided to Hollinger.

331.    Additionally, as a result of KPMG's knowing and substantial assistance in preparing Hollinger's public filings which KPMG knew were materially false, misleading and incomplete in their descriptions of the asset sales, management services agreements and related party transactions, and as a result of Hollinger Inc.'s and Ravelston's knowing and substantial assistance in preparing the management services agreements, Plaintiff and other members of the Class were improperly induced to retain their Hollinger shares based upon materially false and misleading statements and omissions.

332.    By their actions, KPMG, Hollinger Inc., Ravelston, RMI and Argus knowingly participated in, and aided and abetted, the Individual Defendants' breaches of fiduciary duty and their divestiture of hundreds of millions of dollars of the purchase prices from the sales of Hollinger assets.

333.    As a result of these defendants' aiding and abetting the improper actions of the Individual Defendants, Hollinger and its shareholders have been and continue to be irreparably damaged.

334.    At the time Plaintiff and other members of the Class held Hollinger stock, they did not know of any of the false and/or misleading statements and omissions and breaches of fiduciary duty, and justifiably relied upon the representations made by defendants in retaining such stock.

335.    As a result of these defendants' knowing participation and substantial assistance in aiding and abetting the Individual Defendants' breaches of fiduciary duty, Plaintiff and the Class have suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action, and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and all other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

      (c)     Awarding extraordinary, equitable and/or injunctive relief as permitted by law including but not limited to an order permanently enjoining the defendants from future violations of the federal securities laws;

      (d)     Awarding Plaintiff and all Class members their costs and disbursements of this suit, including reasonable attorneys' fees, accountants' fees and experts' fees; and

      (e)     Awarding recision and such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all claims so triable.


DATED:  February 2, 2004

                               Carol V. Gilden
                               MUCH SHELIST FREED DENENBERG
                               AMENT & RUBENSTEIN, P.C.
                               191 North Wacker Drive - Suite 1800
                               Chicago, Illinois 60606-1615
                               Telephone:  (312) 521-2000
                               Facsimile:  (312) 521-2100


Of Counsel:

Jay W. Eisenhofer
John C. Kairis
Eric Lechtzin
GRANT & EISENHOFER, P.A.
1201 N. Market Street, Suite 2100
Wilmington, Delaware 19801
(302) 622-7000
(302) 622-7100 (facsimile)

Attorneys for Plaintiff
Teachers' Retirement System of Louisiana

-114-

## CERTIFICATION OF REPRESENTATIVE PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, William T. Reeves, Jr., ("Plaintiff") duly swear and say, as to the claims asserted under the federal securities laws, that:

1. I am general counsel to Teachers' Retirement System of Louisiana ("TRSL") and am authorized to make this Certification on behalf of TRSL.

2. I have reviewed and authorize the filing of the complaint styled *Teachers' Retirement System of Louisiana v. Conrad N. Black, et al.*

3. TRSL did not purchase the securities, exercise options or enter into any agreement that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

4. TRSL invested in Hollinger International, Inc. ("Hollinger") solely for its own business purposes.

5. TRSL is willing to serve as a representative party on behalf of the class, including providing testimony at the deposition and trial, if necessary. TRSL intends to pursue this litigation for the best interests of all class members.

6. I have reviewed the records of the TRSL transactions in the stock of Hollinger for the time period August 13, 1999 through March 31, 2003 (the "Class Period"). Those transactions are as follows:

| Date of Purchase | Number of Shares | Price per Share |
|---|---|---|
| 05/03/2001 | 40,000 | $15.96 |
| 05/08/2001 | 30,000 | $15.98 |
| 05/14/2001 | 2,000 | $15.72 |
| 05/15/2001 | 30,000 | $15.80 |
| 05/16/2001 | 11,500 | $15.59 |
| 05/17/2001 | 20,000 | $15.90 |
| 06/29/2001 | 3,900 | $13.73 |
| 06/29/2001 | 2,400 | $13.73 |

| Date Sold | Number of Shares | Price per Share |
|---|---|---|
| 12/03/2001 | 40,000 | $10.95 |
| 12/13/2001 | 6,000 | $11.08 |
| 12/17/2001 | 9,200 | $10.90 |
| 12/20/2001 | 30,700 | $10.90 |
| 12/26/2001 | 23,800 | $11.20 |
| 12/27/2001 | 23,800 | $ 0.0733 |
| 06/28/2002 | 3,900 | $12.00 |
| 06/28/2002 | 2,400 | $12.00 |

7.  During the three-year period preceding the date of this Declaration and Certification, TRSL has served as lead plaintiff in following securities fraud class actions:

> In re Dollar General Securities Litigation
> In re Network Associates (II) Securities Litigation
> In re Suprema Specialities Securities Litigation
> In re A.C.L.N. Ltd. Securities Litigation
> In re Bristol-Myers Squibb Co. Securities Litigation
> In re Gemstar-TV Guide Int'l, Inc. Securities Litigation
> In re Tyco Int'l Securities Litigation
> In re Smartforce/Skillsoft Securities Litigation
> In re King Pharmaceuticals, Inc. Securities Litigation
> In re Cree, Inc. Securities Litigation

8.  TRSL has sought to serve as a representative party on behalf of a class in the following actions filed during the three years preceding the date of this Declaration and Certification:

> In re Rambus Securities Litigation
> In re UnumProvident Securities Litigation
> Accredo Health Securities Litigation
> In re PurchasePro, Inc. Securities Litigation
> In re Dynegy Inc. Securities Litigation
> In re Peregrine Systems Securities Litigation
> In re Tenet Healthcare Corp. Securities Litigation
> In re i2 Technologies, Inc. Securities Litigation

9.  TRSL will not accept any payment for serving as representative party on behalf of the class beyond the plaintiffs' pro rata share of any recovery, except as ordered and approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: _1/30/04_

_William T. Reeves, Jr._
William T. Reeves, Jr.

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Teachers' Retirement System
of Louisiana

## DEFENDANTS

Conrad N. Black, Hollinger International
Inc., et al.

04C 0834

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF East Baton
(EXCEPT IN U.S. PLAINTIFF CASES) Rouge Parish

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
            TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Carol V. Gilden
Much Shelist Freed Denenberg
    Ament & Rubenstein, P.C.
191 N. Wacker Drive, Suite 1800
Chicago, IL 60606 (312) 521-2403

DOCKETED

FEB 3 – 2004

ATTORNEYS (IF KNOWN)

JUDGE PLUNKETT

MAGISTRATE JUDGE SCHENKIER

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government
        Plaintiff

☒ 3 Federal Question
        (U.S. Government Not a Party)

☐ 2 U.S. Government
        Defendant

☐ 4 Diversity
        (Indicate Citizenship of Parties
        in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original
        Proceeding

☐ 2 Removed from
        State Court

☐ 3 Remanded from
        Appellate Court

☐ 4 Reinstated or
        Reopened

☐ 5 Transferred from
        another district
        (specify)

☐ 6 Multidistrict
        Litigation

☐ 7 Appeal to District
        Judge from
        Magistrate
        Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury – | of Property 21 USC 881 | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product Liability | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | **PERSONAL PROPERTY** | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | ☐ 370 Other Fraud | Safety/Health | | ☒ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 371 Truth in Lending | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 380 Other Personal | | **SOCIAL SECURITY** | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 385 Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | Product Liability | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motion to Vacate | & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 900 Appeal of Fee Determination |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | ☐ 790 Other Labor Litigation | or Defendant) | Under Equal Access to Justice |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS – Third Party | ☐ 950 Constitutionality of |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | Security Act | 26 USC 7609 | State Statutes |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

15 U.S.C. Sec. 78(j)(b) Action for Securities Fraud

## VII. REQUESTED IN COMPLAINT

☒ CHECK IF THIS IS A CLASS ACTION
     UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint
JURY DEMAND:    ☒ YES    ☐ NO

## VIII. This case

☒ is not a refiling of a previously dismissed action.

☐ is a refiling of case number _____, previously dismissed by Judge _____

DATE

2-2-04

SIGNATURE OF ATTORNEY OF RECORD

Carol V Gilden

UNITED STATES DISTRICT COURT

1-2

**DOCKETED**
FEB 3 - 2004

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

**EASTERN DIVISION**

In the Matter of

Teachers' Retirement System of Louisiana vs. Conrad N. Black, Hollinger International, Inc., et al.

Case Number: **04C 0834**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Teachers' Retirement System of Louisiana

~~JUDGE PLUNKETT~~

~~MAGISTRATE~~ JUDGE SCHENKIER

| (A) | (B) |
|---|---|
| SIGNATURE *Carol V. Gilden* | SIGNATURE |
| NAME Carol V. Gilden | NAME |
| FIRM Much Shelist Freed Denenberg Ament & Rubenstein, P.C. | FIRM |
| STREET ADDRESS 191 N. Wacker Drive, Suite 1800 | STREET ADDRESS |
| CITY/STATE/ZIP Chicago, IL 60606 | CITY/STATE/ZIP |
| TELEPHONE NUMBER (312) 521-2403   FAX NUMBER (312) 521-2100 | TELEPHONE NUMBER   FAX NUMBER |
| E-MAIL ADDRESS cgilden@muchshelist.com | E-MAIL ADDRESS |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06185530 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?   YES ☐   NO ☒ | MEMBER OF TRIAL BAR?   YES ☐   NO ☐ |
| TRIAL ATTORNEY?   YES ☒   NO ☐ | TRIAL ATTORNEY?   YES ☐   NO ☐ |
|  | DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☐ |
| **(C)** | **(D)** |
| SIGNATURE | SIGNATURE |
| NAME | NAME |
| FIRM | FIRM |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER   FAX NUMBER | TELEPHONE NUMBER   FAX NUMBER |
| E-MAIL ADDRESS | E-MAIL ADDRESS |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?   YES ☐   NO ☐ | MEMBER OF TRIAL BAR?   YES ☐   NO ☐ |
| TRIAL ATTORNEY?   YES ☐   NO ☐ | TRIAL ATTORNEY?   YES ☐   NO ☐ |
| DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☐ | DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☐ |

U.S. DISTRICT COURT   04 FEB -2   PM 4: 24   CLERK   FILED FOR DOCKETING   ED17

1-3