**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

IN RE HOLLINGER INTERNATIONAL,    )
INC. SECURITIES LITIGATION    )
   )
   )
   )    **No. 04C-0834**
   )
   )    **HONORABLE DAVID H. COAR**
   )
   )
   )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Teachers' Retirement System of Louisiana ("Teachers"), Washington Area

Carpenters Pension and Retirement Fund ("Carpenters") and E. Dean Carlson ("Carlson") bring

suit on behalf of themselves and all other purchasers of Hollinger International, Inc. ("Hollinger"

or "the Company") securities between and including August 13, 1999 and December 11, 2002.

Plaintiffs allege that the Company and a slew of other corporate and individual defendants

violated both state and federal law in their efforts to benefit at the expense of shareholders.

In the Second Amended Complaint, Plaintiffs raise claims against Hollinger and various

companies related to Hollinger such as Hollinger Inc. ("Hollinger Inc."), Ravelston, Ravelston

Management Incorporated (RMI), and Argus. Plaintiffs also bring suit against the following

individuals connected with Hollinger: Conrad Black ("Black"), Dwayne Andreas ("Andreas),

Peter Atkinson ("Atkinson"), Barbara Amiel Black ("Amiel Black"), Jack Boultbee

("Boultbee"), Richard Burt ("Burt"), Raymond Chambers ("Chambers"), Daniel Colson

("Colson"), Mark Kipnis ("Kipnis"), Henry Kissinger ("Kissinger), Marie-Josee Kravis

(Kravis"), Shmuel Meiter ("Meiter"), Richard Perle ("Perle"), F. David Radler ("Radler"), Robert Strauss ("Strauss"), A. Alfred Taubman ("Taubman"), James Thompson ("Thompson"), Lord Weidenfeld of Chelsea ("Weidenfeld"), and Leslie Wexner ("Wexner"). In addition, Plaintiffs bring suit against Hollinger's audit firm, KPMG LLP ("KPMG").

Plaintiffs filed an eight-count second consolidated amended class action complaint in this Court on November 19, 2004. Count I alleges a violation of Section 10b of the Securities Exchange Act of 1934 (the "1934 Act") and Rule 10b-5 regulations related to the concealment of adverse material information about Hollinger by all individual defendants, Hollinger, and KPMG. Count II alleges a violation of Section 10b of the 1934 Act and Rule 10b-5 regulations related to the reporting of false circulation figures by Hollinger and Radler. Count III alleges a violation of Section 18 of the 1934 Act for making or causing to be made false or misleading statements that were included in Hollinger's 10-K forms. Count IV is another Section 18 claim, this time against Hollinger and Radler for false statements in connection with circulation figures. Count V alleges a violation of Section 20(a) of the 1934 Act by Hollinger Inc., individual defendants, Ravelston, and Argus. Count VI alleges a state law breach of fiduciary duty for inducing retention of Hollinger stock and is brought against Hollinger and all individual defendants. Count VII alleges a violation of Sections 12(F), (G), and (I) of the Illinois Securities Law of 1953 against all defendants. Count VIII alleges aiding and abetting breach of fiduciary duty which induced the retention of Hollinger stock and is brought against Hollinger Inc., KPMG, Ravelston, RMI, and Argus.

Below is a discussion of the joint motion to dismiss filed by Hollinger, Ravelston, RMI, Black, Amiel Black, Boultbee, Colson, and Radler (the "Hollinger Defendants") and the joint

motion filed by the Independent Directors.  For the reasons stated below, Counts II, III, IV, VI, VII, and VIII of the complaint are DISMISSED with respect to the Hollinger Defendants.  The portions of Count V that rely on Counts II, III, or IV are also DISMISSED as to the Hollinger Defendants.  Counts III, VI, VII, and VIII are DISMISSED as to the Independent Directors.  The portion of Count V that relies on Count III is also DISMISSED as to the Independent Directors.

Plaintiffs may replead as to the named plaintiffs in this case by July 12, 2006.  If Plaintiffs do not replead by that time, this Court will address Counts I and Count V as they relate to statements made on or before June 29, 2001.

<u>Background</u>[1]

This case stems from allegations that the executives and directors of one of the world's largest media companies, among others, worked in concert to loot the company for their own benefit.  According to Plaintiffs, Black, Radler, and others orchestrated a series of schemes that allowed them to line their own pockets with money that rightfully belonged to the Company. If Plaintiffs are correct, Black, Radler, and others essentially treated the public corporation of Hollinger as their private treasure chest.  They did so by a combination of chicanery and recklessness.  Those who did not actively orchestrate the malfeasance were apparently so willing to function as "yes-men" for Black and Radler that they failed to pay any attention to what was happening to the Company's finances, despite being responsible for overseeing precisely that issue as members of the Company's Audit Committee and/or its Board of Directors. Black and

---

[1]  For the purposes of a motion to dismiss, this Court accepts all well-pleaded allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff. *See Travel All Over the World, Inc. v. Kingdom of Saudi Arabia,* 73 F.3d 1423, 1429 (7th Cir.1996).

others apparently worked out deals that obviously benefitted them at the company's expense, made false or incomplete public disclosures about the deals, and eventually presented them to the Board of Directors and the Audit Committee of the Board of Directors for "ratification." Neither the Audit Committee nor the Board paid any attention to the details of the deals, and they were ratified with no difficulty even though the disclosures contained inaccuracies.

Black, Radler, Boultbee and Atkinson all allegedly misrepresented and concealed material facts from shareholders so that they could pay themselves millions in gratuitous non-compete payments as part of the Company's newspaper sales, and then collect additional millions through Ravelston, a company they owned, for management services which Ravelston never provided. These defendants, by virtue of their positions at Hollinger, had access to undisclosed information about the terms of the Company's asset sales and management agreements. Radler also knew that the Company was artificially inflating its circulation figures.

The other defendants–Andreas, Amiel Black, Burt, Chambers, Colson, Kipnis, Kissinger, Kravis, Meitar, Perle, Strauss, Taubman, Thompson, Weidenfeld and Wexner–had access to undisclosed information about the Company's asset sales and management service agreements. They had access to the Company's internal documents; they had conversations with other Hollinger officers and directors; they attended management, board and committee meetings; they were provided with reports. They did not, however, review any of the terms of the asset sales and service agreements. They were involved in drafting, producing, reviewing, approving, and/or disseminating statements such as SEC filings, press releases, and other public documents. For example, they signed public documents stating that the Board had approved or ratified certain transactions. Thompson, Burt, and Kravis–the three members of the Audit

Committee–all signed the company's public filings, representing that certain transactions and non-compete payments had been approved or reviewed by the Audit Committee when they had not.

Several of the Independent Directors had ties with Black and/or Hollinger. Meiter served as a director of the Jerusalem Post, a newspaper owned by Hollinger. Kravis sat on the board of directors of the Canadian Imperial Bank of Commerce with Black. Kissinger served with Black as advisers to the National Interest, a publication that received $200,000 yearly donations from Hollinger. He also served with Black on the board of Trireme Partners LP, a company in which Hollinger made a $2.5 million investment. Black had at one point contributed to Thompson's political campaign. Both Perle and Kissinger were connected with Trireme Associates LLC, an investment company whose board also included Black and whose owners included Hollinger.

Plaintiffs offer a variety of specific instances in their voluminous complaint where they allege that Defendants violated the law. While these transactions have much in common, they are separate deals that are explained in detail below.

Non-Competition Agreements

Plaintiffs first contend that Black and Radler, among others, received non-competition payments as a result of the sale of Hollinger's U.S. community newspapers, the sale of certain Hollinger assets to CanWest Global Communications Corp., and the sale of certain Canadian newspapers to Osprey Media Group Inc.

U.S. Community Newspaper Sales

Between 1999 and 2001, Hollinger sold most of its U.S. newspaper properties, and publicly disclosed what it claimed were the entire proceeds of the transactions. These

transactions were meant to raise capital, pay down debt, and enable the company to focus on its "core" metropolitan daily newspapers. Hollinger failed to inform shareholders at the time of the transactions that some of the funds from the sales of various assets went to Black, Radler, Atkinson and Boultbee instead of into the company coffers. Plaintiffs allege that in total, Black, Radler, Atkinson, and Boultbee diverted to themselves approximately $90.25 million, all paid in unnecessary and improper non-competition agreements. The payments were "straight carve-outs of the sale price" that would have otherwise been paid to the company.

Beginning with its first set of sales, the Company failed to disclose that the actual figure it received from its asset sales was inaccurate because the figure was calculated without taking the non-compete payments into account. Its August and November 1999 10-Qs, 1999 proxy statement, and 1999 10-K did not discuss the fact that some of the disclosed proceeds from the sales at issue would never reach the company, because they would take the form of undisclosed non-compete payments. The 10-K was signed by Black, Radler, Amiel-Black, Andreas, Burt, Chambers, Kissinger, Kravis, Meiter, Perle, Strauss, Taubman, Thompson, Weidenfeld, and Wexner. The company also failed to mention the non-compete payments in its May 2000 10-Q.

With the next set of sales in August 2000, the same pattern emerged: the company stated in its public filings that it would receive a certain profit figure from the sales, while failing to disclose that the actual profit realized would be less than that figure because of undisclosed non-compete payments. Black, Radler, and Boultbee did not disclose those payments in questionnaires they completed regarding their year 2000 compensation; those questionnaires were intended to be used in the preparation of the company's 2001 proxy statement and 2000 10-K. The 2000 10-K, which did not include information about the non-compete payments, was

signed by Black, Boultbee, Radler, Colson, Lady Black, Andreas, Burt, Chambers, Kissinger, Kravis, Meitar, Perle, Strauss, Taubman, Thompson, Weidenfeld, and Wexner.

The first time the company disclosed the non-compete agreements was in April 2002, when it filed its 2001 10-K. While the company did admit that the non-compete payments had been made, it also claimed that the Board had approved the payments when in fact it had not. The 2001 10-K stated that $15.6 million in non-competition payments were made to Black and three company executives in consideration for their agreement, pursuant to a closing condition instigated by the purchaser, and that the independent directors had approved of the payments. The information disclosed was false: no buyer had requested the non-competition agreements as a closing condition, the amount stated was incorrect, and the independent directors had not approved of the payments. The falsity did not keep Black from telling shareholders in May 2002, at a shareholder meeting, that the non-compete payments were not unusual and that the buyers wanted them.

On or about November 15, 2003, Black signed an acknowledgment that stated that Black, Radler, Atkinson, and Boultbee had been paid $16.5 million in payments that were not properly authorized on behalf of the company.

CanWest Transaction

The problem of undisclosed non-compete agreements recurred with the sale of certain Hollinger assets to CanWest Global Communications Corporation ("CanWest") in 2000. The disclosures in the company's public filings and press releases did not reveal that $52.9 million of the proceeds would go to Black, Ravelston, Boultbee, Atkinson and Radler rather than to the company. As a result of the non-compete payments, the revenues received by Hollinger were

substantially less than the amount disclosed in the public filings. The company failed to disclose the payments in the 2001 proxy statement, a year when shareholders voted to elect Black and others to the Board.

In May 2001, Black and Radler obtained an "after-the-fact" ratification of the non-compete agreements associated with the CanWest transaction, although neither Black nor Radler disclosed to either the Audit Committee or the Board the amount of payments or how it was determined who would receive the payments. They also did not reveal that Colson was to be paid a $1 million "bonus" payment. The Audit Committee met on or about September 11, 2000, to review the transaction. The Committee failed to conduct any review of the terms of the transaction or its fairness to Hollinger. At that meeting, the Committee purportedly approved of $32.4 million in non-compete payments and a $19.4 million "management agreement break-up fee" for Ravelston. In actuality, a total of $52.9 million was wired from the Company to Black, Ravelston, Boultbee, Atkinson and Radler as a result of the CanWest transaction.

In fact, the Committee never learned that CanWest did not require that any non-competition payments be made, that Black and Radler inserted the provision dealing with non-competition payments three days before closing, that Ravelston had not consented to early termination of any management agreement such that a break-up fee was justified, that Black and Radler increased the amount of the non-compete payment from $37.7 million to $51.8 million solely for their own benefit, that Black, Radler, Boultbee, and Atkinson would receive an additional $1.1 million as a percentage of the interest allocation that the company was supposed to receive, that CanWest originally proposed a post-closing management services agreement with Hollinger but Black unilaterally decided that the agreement would be with Ravelston, that

CanWest rejected the proposed Ravelston proposal for the management fee–an amount that Hollinger had been paying Ravelston prior to the deal–and agreed to pay roughly a third of that amount, that Colson would be getting a bonus of over $1 million for the CanWest transaction, and that Black and Radler negotiated for themselves an annual management and termination fee paid by CanWest if either it or Ravelston terminated the deal.

The company's public filings did not disclose these facts. Ravelston did not actually provide any management services to CanWest, but Black and others planned on collecting funds pursuant to the agreement.

Immediately after the Audit Committee meeting, the full Board met to approve the CanWest transaction. The Board gave its approval without receiving any fairness opinion on the payments or further investigating them.

When the CanWest non-compete agreements first disclosed in the May 2001 10-Q, the information about them did not accurately state the payment amount, failed to disclose that $1.1 million was paid in interest, did not explain that the agreements led to a reduction of $51.8 million in the purchase price, and did not disclose that the agreements were conceived of by Hollinger executives who then determined exactly how much they were to be paid.

In its 2001 10-K, the Company again alleged that CanWest required the non-competition payments as a condition of the transaction and that the independent directors had approved. That filing was the first time the company made a disclosure about the terms of the Ravelston management agreement, stating that the independent directors had approved a the terms of the payments to Ravelston, a "holding company controlled by Lord Black...".

At the May 2002 shareholders meeting, Black was questioned about the non-compete agreements with CanWest. Just as he stated that the non-competes in the community newspaper sales were not unusual, he emphasized that the CanWest payments were standard industry payments that were demanded by the buyers and approved by the independent directors. Black also stated that the non-competition payments did not reduce Hollinger's sale proceeds from the CanWest transaction. Atkinson claimed that he warned Black before the meeting to speak truthfully, and Black ignored him.

Osprey Media Group Transaction

In July and November of 2001, Hollinger and Hollinger LP sold Canadian newspapers to Osprey Media Group, Inc. ("Osprey") for approximately $166 million. Again, Black, Radler, Boultbee, and Atkinson received payments pursuant to non-compete agreements.

The payments for the July transaction were not disclosed in the Company's first public disclosure of the sale, the August 2001 10-Q. The payments for the November transaction were not disclosed in the Company's first public disclosure of the sale, the November 2001 10-Q. In fact, the non-compete agreements were not disclosed until the Company filed its 2001 10-K on or about April 1, 2002; the exact amount of the payment to particular individuals was disclosed in the 2002 proxy statement filed on or about April 2, 2002. Both those statements indicated that the terms of the transactions and the non-compete payments were approved by the Company's independent directors, when in fact they had not been approved prior to the completion of the transaction.

Black and Radler did not present the first set of payments to the Audit Committee until September 2001, at which point they requested that the Audit Committee "ratify" the

-10-

transactions.  They told the Audit Committee that Osprey insisted on the same non-competition agreements that CanWest had obtained.  The Audit Committee did not seek or obtain any independent legal, financial or accounting advice regarding the payments, and ratified the payments in a twenty minute telephone meeting.  A similar pattern emerged with the second Osprey transaction–again, Black, Radler, Boultbee and Atkinson each received non-compete payments without Audit Committee approval.  Again, the payments were ratified after the fact.

Undisclosed Compensation and other Benefits

Black and others received a significant amount of compensation and other benefits from the Company that were never disclosed.  The Company's proxy statements did not accurately reflect the compensation in the form of "management fees" totaling roughly $226 million that Black, Radler, and other Ravelston executives were paid throughout the Class Period.  The proxy statements disclosed roughly 4% of the actual amount that Black and others were paid as compensation (including non-competition payments) each year.  That amount disclosed did not include accurate figures for the incentive payments in 2000 that Black received from Hollinger Digital LLC, a Hollinger subsidiary, and failed to include any figure for the compensation that Perle received in 2000 from Hollinger Digital.  Neither Black nor Perle accurately disclosed these payments in their 2001 proxy statement questionnaire response.

The company did not disclose the amount of travel, housing, and staffing costs that it paid for Black until its 2003 proxy statement.  It did not disclose that Black, Radler, and Colson were granted a taxable benefit for their car benefit, medical insurance, fuel benefit charge, and mobile telephone.  It failed to disclose that it paid for items such a $42,870 birthday party for Lady Black or a $890,000 Chicago apartment for Radler.  The 2002 proxy statement failed to mention

dividends that Black was paid by Hollinger subsidiaries, including the $93 million he received in dividends from the Telegraph Group. Black was the sole party who determined when and if dividends were declared by Hollinger or its subsidiaries; shareholders, however, were told that the full Board decided when to declare dividends.

There was also "little, if any" disclosure of Radler and Black's personal use of the corporate jets. For example, the 2003 proxy statement valued Black's "other compensation" for the cost of a New York apartment, house staff, car, drive, and airplane use at $248,580, which is $25,000 less than a conservative estimate of his personal use of the only the jet.

Black also used at least $8.9 million in Hollinger funds to acquire the presidential papers and other memorabilia of President Franklin Roosevelt, a collection he then kept in his New York home. Black did not seek Audit Committee or Board approval prior to the purchases. He obtained a ratification from the executive committee–a committee that was comprised of Perle, Radler, and Black himself–in October 2002, nearly two years after the acquisition and one year before Black's biography on FDR was published.

Inflation of Circulation Figures

Hollinger artificially inflated its reported circulation figures by 25% or more for various newspapers which allowed it to charge higher advertising rates which in turn allowed it to report growing revenues. The company's employees would secretly dispose of unsold newspapers so they could not be counted by the Audit Bureau of Circulations, an organization which monitors circulation figures. The false figures appeared in Hollinger's public statements, such as its 1999 10-K, 2000 10-K, and 2001 10-K and its quarterly statements. In particular, Hollinger overstated the circulation figures for the Chicago Sun-Times. The Company set up fake accounts at

distributors that it controlled. Hollinger sent its delivery drivers to the distributors, who would then dispose of the papers rather than selling them. Each of the over 100 distributors disposed of approximately 200-300 papers daily, which enabled the company to overstate the Sun-Times circulation figures by 200,000 to 300,000 newspapers daily. Radler maintained control over the circulations department.

On June 15, 2004, Hollinger announced that its Audit Committee was conducting a review of practices that had resulted in an overstatement of circulation figures by the Sun-Times for several years.

Ravelston Management Service Agreements

Ravelston is, and was during the Class Period, owned by Black, Radler, Colson, Boultbee, Atkinson, and others who either are or were officers and/or directors of Hollinger Inc. and the Company. Since at least March 1999, the Company and its subsidiaries had signed a series of management services agreements with Ravelston and its affiliates. As part of these agreements, Black, Radler, Atkinson, Boultbee, and Colson were paid for their management services. The company did not disclose the amounts that they were paid; it assured investors that the management services agreements with Ravelston were fair and that the Audit Committee had reviewed and approved the fees as reasonable.

In actuality, Hollinger and its subsidiaries entered into a series of sham management agreements with Ravelston and its affiliates, beginning in 1995. The resulting payments totaled approximately $202 million. Each year Radler, on behalf of Ravelston, proposed a management fee to the Audit Committee. The head of the Audit Committee, Thompson, would agree to the figure after cursory discussion. Thompson never asked for documentary support for the fees.

The other members of the Audit Committee never questioned the rationale behind the management agreement. The agreements were sent to the full Board, where records suggest the fees were never discussed.

At the 2002 annual shareholders meeting, Black characterized the management fees structure as "at the conservative end of the range of practice." Ravelston was paid roughly 29 times its cost in 2002, and 30 times its cost in 2003. In its 2002 10-K, the company stated that the payments may not have been reasonable because the Audit Committee and the Board had undisclosed conflicts of interest and lacked independence.

The specific amounts of management fees paid to Black, Radler, Atkinson, Boultbee and Colson were not disclosed to shareholders until the 2003 proxy statement. Moreover, the amounts stated in those disclosures were inaccurate.

Ravelston also entered into a management agreement with CanWest, and National Post in connection with Hollinger's sale of assets to CanWest. According to the agreement, as consideration for its purchase from Hollinger, CanWest was required to pay Ravelston an annual fee of $4 million, and a termination fee of $45 million if it chose to terminate the agreement or $22.5 million if Ravelston chose to terminate the agreement. Ravelston also received $25 million in non-competition fees as a result of the CanWest transaction. Soon after the sale, on August 14, 2000, the Company filed a 10-Q which described the management services agreement as an agreement between CanWest, Black, and Black's associates. The 10-Q did not disclose Ravelston as the primary beneficiary of the agreement. The first time the Company disclosed the agreement was on April 1, 2002, when it filed its 2001 10-K. In that filing, the Company claimed that the agreement was approved by independent directors. The Company never

indicated that Ravelston would not provide any actual services to CanWest, but would be paid according to the agreement. Prior to approval of the agreement, neither the Audit Committee nor the Board asked how the management fees were negotiated or determined or asked about the fairness of the fees.

Asset Sales

The company also engaged in a series of transactions with entities owned and/or controlled by Black and others connected with Black, without proper Board approval or oversight. For example, Black and Radler used their private company Horizon Publications, Inc. to buy Hollinger's newspaper assets at below-market rates–including a purchase of a newspaper for one dollar–and used it to swap a group of newspapers that were losing money for a series of profitable Hollinger newspapers. They told the Board that they were "passive investors" at Horizon, while Black wrote to potential Horizon investors that "We have bought and sold hundreds of these little American newspapers in public companies...We sold them a few year ago to clear the debt of our public company and are buying them back now for our own account, knowing their profit potential intimately." The purchases from Hollinger were financed by Hollinger in deals that were structured to benefit Horizon. It was not until the 2002 proxy statement that the company first disclosed that the company was controlled by certain Hollinger board members and executives. Even then, however, it did not disclose that Black and Radler were the individuals that controlled Horizon.

Horizon

Horizon acquired 33 US community newspapers from Hollinger for $43.7 million by an asset exchange agreement on March 31, 1999. Horizon was able to complete the sale because

Hollinger and Hollinger Inc. loaned it the money it needed to finance the purchases. The Board approved the sale without being aware of Black and Radler's controlling interest in Horizon.

The company did not disclose Black and Radler's affiliation with Horizon in its 1999 10-K, instead noting only that Horizon was owned by "current and former Hollinger International Inc. executives." The company also did not disclose how Black and Radler were a key part of Horizon in its 2001 and 2002 proxy statements. The company's 2001 and 2002 proxy statements stated that the sales to Horizon had been approved by the Audit Committee and the independent directors on the Board as market value transactions. Members of the Board had undisclosed conflicts of interest that prevented them from exercising independent business judgment.

In or about March and April 2000, Black and Radler arranged for Horizon to swap three of its unprofitable newspapers for a group of profitable papers from Hollinger. The asset exchange was reported in the company's 2001 proxy statement, which stated that the transactions were unanimously approved by the Audit Committee and the independent directors of the company as market value transactions. The statement also said that the transaction was approved by the independent directors and the Audit Committee, but did not reveal that they were ratified only after they had been carried out. At the time of ratification, the Board knew that Black and Radler owned and controlled Horizon, but did not conduct any investigation into the transaction.

Hollinger also paid Horizon approximately $162,100 to take its Squeegeed Valley Argus and Journal of San Juan Islands properties, because the terms of the agreement specified a purchase price of $1 "plus or minus a working capital adjustment (current assets minus current liabilities)." Hollinger's 2001 proxy statement, however, stated that the company had completed two transactions valued at approximately $2.5 million–including a sale to Horizon at market

value. Before the transaction closed, another company faxed Radler an offer to buy one of the newspapers for $750,000; the company instead chose to sell to Horizon for $1. The Audit Committee did not ratify the transaction until its February 2001 meeting. At that time, it was not informed that Horizon had already sold one of the properties it acquired for $400,000. The other property was sold for $280,000 in September, 2001. In the 2002 proxy statement, the company characterized the transaction as at market value, stated that the transactions were approved by the Board and the Audit Committee, and did not disclose that Black and Radler controlled Horizon.

Black and Radler also caused Hollinger to sell its properties in Bishop, California and Blackfoot, Idaho, to Horizon for $4.1 million, substantially below market price. The 2001 proxy statement characterized the transaction as that between Horizon and a third-party purchaser, and did not disclose that Radler had pre-arranged the assignment of the properties to Horizon from the third-party purchaser even before the Company had agreed to sell them. The proxy statement also failed to disclose that the transactions were not approved by the Audit Committee or the Board. When the Board ratified the transaction during it December 4, 2004 meeting, it was not informed of the controlling stake in Horizon held by Black and Radler, or that the properties had already been assigned to Horizon by the purchaser. The statement also valued the properties at $4.1 million, despite the fact that the company had not engaged in any valuation of the properties.

Morgan Stanley had advised Hollinger to sell the Bishop assets with another set of properties, its Mammoth Lake properties, in order to maximize their value. Black and Radler, however, caused Hollinger to sell its Mammoth Lakes property separately; they then convinced the audit company to sell the Mammoth Lakes property to Horizon for one dollar because they

claimed it was essentially worthless.  By selling the properties separately, Black and Radler made them less attractive to prospective buyers like Target Media that offered $3 million plus $1 million in post-consideration closing for both properties together.  Rather than taking that option, Black and Radler sold the papers in separate transactions for their own benefit and to the detriment of Hollinger stockholders.  Target Media lost interest after a Hollinger executive sent a memorandum to Mammoth Times instructing its onsite executive not to provide the information Target media was requesting as part of due diligence and Hollinger refused to sign a non-compete agreement.  Months later, after Hollinger failed to market the paper to any prospective buyers, Horizon bought Mammoth Times, a profitable newspaper, from Hollinger for $1.00. Shareholders did not know that Hollinger rejected a $1.25 million offer for the paper.  In the 2001 10-K, the company reported that it sold its last remaining U.S. newspaper.  In its 2002 proxy statement (incorporated by reference into the 2001 10-K), it falsely stated that the sale was for net working capital and did not disclose that Horizon was formed and controlled by Black and Radler or that the sale had been approved retroactively.

Bradford

On July 20, 2000, Hollinger also sold four newspapers to Bradford Publishing Company–another company controlled by Black and Radler–for approximately $38 million.  As part of the Audit Committee approval process, Radler advised the committee of the impending sale to Bradford, a company in which "certain members of the Board of Directors and senior management of ...[Hollinger] would be stockholders."  Radler stated that the Hollinger had not shopped its newspaper properties to any third party and that the price had been established by Black.  Black, Radler, and Perle signed a consent that authorized Hollinger to enter into a

subordination agreement with Bradford and its bank, restricting Bradford's ability to pay Hollinger and requiring Hollinger to guaranty Bradford's $22 million Bank One loan. Hollinger also provided a vehicle for interest-free financing via a non-compete agreement that represented 16% of the purchase price and was not fully due for 10 years. The Audit Committee approved the sale without inquiring who the directors and managers were that were Bradford stockholders, why it was in the company's interest to sell its assets to Bradford, or how the purchase price was negotiated. The 2001 proxy statement did not specifically state that Radler and Black controlled to company and owned 50% of its shares or that Hollinger gave Bradford a financing deal that included a unsecured note due in 2010. The 2003 proxy statement was the first time that the Company suggested that Bradford owed Hollinger $5.9 million. The actual financing scheme was not disclosed until the company's 2002 10-K was filed on March 31, 2003. In that disclosure, however, the Company did not state that Black and Radler owned Bradford, that by that time Bradford was in arrears on its payment note, or that Hollinger had guaranteed Bradford's debt to a bank.

Disclosure:

The first hints of Defendant's wrongdoing, according to Plaintiffs, were disseminated to the market via the May 2001 10-Q. Other pieces of information were selectively disclosed at later times. The 2001 10-k, for example, revealed the self-dealing involved in the CanWest and Osprey transactions. The company later announced, in December 2002, that its debt notes were being downgraded. The first disclosure regarding the falsity of circulation figures occurred on June 15, 2004.

Plaintiffs contend that the Company's disclosure of its wrongdoing occurred at a slow and unpredictable pace and that additional information continues to come to light.

*Standard of Review*

The purpose of a motion to dismiss under Rule 12(b)(6) is to "test the sufficiency of the complaint, not to decide the merits" of the case. *Triad Assocs., Inc. v. Chicago Housing Auth.,* 892 F.2d 583, 586 (7th Cir.1989). When considering a motion to dismiss, a court must construe all allegations in the complaint in the light most favorable to the plaintiff and accept all well-pleaded facts as true. *Bontkowski v. First Nat'l Bank of Cicero,* 998 F.2d 459, 461 (7th Cir.1993). A complaint should be dismissed only when "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). If a complaint conforms to the requirements of the Federal Rules of Civil Procedure, it cannot be dismissed "on the ground that it is conclusory or fails to allege facts." *See Higgs v. Carver,* 286 F.3d 437, 439 (7th Cir.2002).

To prevail on a claim brought pursuant to Rule 10b-5, "the plaintiff must establish that (1) the defendant made a misstatement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied (6) and that the false statement or omission proximately caused the plaintiff's damages." *Otto v. Variable Annuity Life Inc. Co.,* 134 F.3d 841, 851 (7th Cir.1998)

"[P]leading fraud with specificity is both an element of the SEC Rule 10b-5 cause of action and a pleading requirement of the Federal Rules." *In re HealthCare Compare Corp. Secs. Litig.,* 75 F.3d 276, 280-81 (7th Cir.1996); *see also* Fed.R.Civ.P. 9(b). To satisfy the particularity requirement, the plaintiff must allege "the who, what, when, where, and how: the first paragraph

of any newspaper story." *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990). *726 In addition, the complaint must comply with the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), which requires the complaint to specify each allegedly misleading statement and the reasons why it is misleading, and to "state with particularity the facts giving rise to strong inference that the defendant acted with" scienter.

<u>*Analysis*</u>

*Hollinger Defendants' Motion to Dismiss*

The motion filed by the Hollinger Defendants attacks all eight counts of the complaint. The motion states that Plaintiffs' securities claims in Counts I and III are "impermissibly bootstrapped" fiduciary claims that should not be addressed via securities law, that the Section 18 claims are time-barred, that Plaintiffs fail to plead actual damages and loss causation with respect to Counts I, II, III, and IV[2], that Plaintiffs have no standing to assert any claim on statements made after June 29, 2001, that the Section 20(a) claims based on Counts I-IV fail because of a lack of any predicate securities law violation, and that Plaintiffs' state law claims fail as a matter of law.

<u>Are Plaintiffs' Securities Claims in Counts I and III barred by *Santa Fe*?</u>

Defendants argue that Plaintiffs' securities claims in Counts I and III are barred by *Santa Fe Indus. v. Green*, 430 U.S. 462 (1977). In *Santa Fe*, the Supreme Court determined that conduct that involved neither manipulation nor deception did not violate §10b of the Act or Rule

---

[2]  The isolated references to Count V with respect to this argument appears to be clerical error.  Defendants do not make any argument with respect to Count V on these grounds.

10b-5.  See *Santa Fe*, 430 U.S. at 473-474.  The Supreme Court declined to consider the conduct in *Santa Fe* a violation of federal securities law rather than merely a breach of fiduciary duty.

Defendants claim that the conduct at issue in this case similarly involves a mere breach of fiduciary duty.  In doing so, they ignore that the conduct alleged here involves numerous material misrepresentations and participation in a deceptive scheme.  Plaintiffs allege that there were misrepresentations and omissions in the flow of material information in this case.  They claim that defendants were aware of the mismanagement that had occurred.  They also claim that at least some defendants made materially misleading statements or failed to disclose mismanagement.  Such pleading is sufficient to avoid preclusion on the basis of Santa Fe.  *See Fry v. UAL Corp.*, 895 F.Supp. 1018, 1045 (N.D.Ill. August 11, 1995)(finding that *Santa Fe* does not bar Section 10(b) claims where (1) the fiduciary misconduct itself involves an element of deception, or (2) the defendant is aware of corporate mismanagement and makes a material public statement inconsistent with the state of corporate affairs.).

Defendants also make much of the fact that Plaintiffs' complaint includes many of the same fiduciary duty allegations asserted in Hollinger Inc.'s fiduciary duty action.  How another party characterizes the conduct in another action does not resolve whether in this action Plaintiffs have alleged securities claims.  Plaintiffs' claims are not barred by *Santa Fe.*

Do Plaintiffs fail to plead actual damages and loss causation?

The parties disagree as to how this Court should apply the PSLRA's section titled "Limitation on Damages," 15 U.S.C.A. § 78u-4(e).  That section states that as a general rule, in the covered actions, "the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject

security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market."

Defendants take issue with Plaintiffs' decision to characterize certain statements as corrective disclosures that trigger the 90-day look back period and disagree with Plaintiffs' contention that the stock price decreased after the aforementioned disclosures.

Defendants argue that Plaintiffs cannot plead damages arising out of any securities claim. According the Defendants, Plaintiffs are attempting a "run around" of the damages provision of the PSLRA by suggesting that the misrepresentations were corrected in December 2002, at the end of the Class Period.[3] Defendants insist that the look-back period should only begin when there is full and compete disclosure such that all of the information correcting the misstatement or omission is disseminated to the market. According to Defendants, the corrective disclosures as to Counts I and III were made on January 16, 2004, the date that the SEC and the Special Committee filed their respective complaints in court.

Plaintiffs counter that while the 2004 disclosures may have been the most forthcoming disclosures up until that point, they are not the correct set to consider when evaluating damages under the PSLRA. Instead, they direct this Court to consider several partial disclosures that were made during the Class Period.

Plaintiffs claim that their stock price dropped in response to certain corrective disclosures that occurred within the Class Period and point to three discrete moments of price fluctuation

---

[3] Plaintiffs do not allege that the corrective statements in relation to the circulation figures were made by the end of the Class Period.

based on partially true corrective statements. The first concerns the May 2001 announcement of the non-compete agreements. While the announcement was riddled with inaccuracies, according to Plaintiffs, it did at least bring the issue of the non-compete agreements to light. As a result of those disclosures in the May 2001 10-Q, the initial disclosure of some of the non-compete payments, Plaintiffs allege that the stock dropped in price from $15.66 on the day of the disclosure to $12.86 on the date of the filing of the August 2001 10-Q.

The second drop related to corrective disclosures occurred after the 2001 10-k revealed the self-dealing involved in the CanWest and Osprey transactions. According to Plaintiffs, Hollinger made misrepresentations and omissions regarding the non-compete and management services fees, false circulation figures, and misleading statements in the November 2001 10-Q regarding the sale of two Canadian newspapers to the Osprey media group, causing the stock to climb to the high value of $13.75. When corrective information was released on April 1, 2002, it led to a fall in the stock price. The stock price fell from $13.40 on April 2, 2002 to $11.77 on May 23, 2002.

The third drop in price related to corrective disclosures, according to Plaintiffs, occurred when the company announced that it seniors notes were downgraded on December 11, 2002. The stock price dropped to $9.85.

The question of whether a disclosure may be labeled "corrective" is not properly before this Court in a motion to dismiss. The fact that the disclosures contained false information does not mean that they were entirely false, nor does it prevent Plaintiffs from claiming that what truth was in them did affect stock price. Whether the statements Plaintiffs classify as corrective

statements were truly corrective such that they fall under 15 U.S.C.A. § 78u-4(e) is an issue that cannot be decided at this stage of the proceedings.

Moreover, Defendants fail to cite adequate legal support for the proposition that Congress intended for the ninety-day look back provision to apply only after the violation in question had been completely disclosed.  Precedent from this district suggests the opposite.  *See, e.g., Greater Pennsylvania Carpenters Pension Fund v. Whitehall Jewellers*, No. 04 C 1107, 2005 WL 61480 (N.D.Ill. Jan. 10, 2005)(plaintiff adequately pled loss causation in light of decreases in stock price related to partial disclosures); *Danis v. USN Communications*, 73 F.Supp.2d 923, 943 (N.D.Ill. Oct. 8, 1999)(plaintiffs adequately pled loss causation where they pled that "the market responded to and 'corrected' the price of USN stock over the better part of a year as bits and pieces of negative information became available and it became apparent that USN was not capable of performing as originally represented."); *Retsky Family Ltd. P'Ship v. Price Waterhouse LLP*, No. 97 C 7694, 1998 WL 774678, *14-15 (N.D.Ill. Oct. 21, 1998).

At this stage in the proceedings, plaintiffs are not required to prove that it was the disclosures they alleged and not others that are covered under the PSLRA.  As the Seventh Circuit has noted, loss causation "ought not place unrealistic burdens on the plaintiff at the initial pleading stage."  *Caremark Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649.[4]  Moreover, it is important to note that Defendants' argument relies on finding that any disclosures they made

---

[4] Defendants also argue that Plaintiffs cannot prevail because the dates of any corrective disclosures must necessarily be the same as the dates of inquiry notice.  Defendants have not provided this Court with adequate legal authority for this proposition, nor can this Court determine as a factual matter that Defendants' choice of date for the corrective disclosure and inquiry notice is correct.

before the filing of the SEC complaint were lies, and therefore they should not be held accountable for any drop in stock price because of those lies.

Defendants also argue that within the Class Period, the price of Hollinger stock did not decline as pled. For example, Defendants argue that information about the debt downgrade was really disseminated to the market when the Company released information indicating that it planned a new debt offering and planned additional borrowing under an existing credit facility. Defendants argue that because the downgrade was related to the additional borrowing, the downgrade was effectively disclosed on December 9, 2002. Plaintiffs counter that the relevant disclosure was December 11, 2002, when Hollinger announced that it would "draw down significantly from its secured bank facility to refinance existing debt." At the motion to dismiss stage, this Court will not resolve factual disputes regarding the nature or timing of the disclosures, or their effect on the market.

While a portion of Plaintiffs' claims do survive the motion to dismiss, Plaintiffs' 10b-5 claim regarding the alleged inflation of circulation figures does not. Plaintiffs state in the complaint that the first disclosure related to the circulation figures occurred on June 15, 2004. The appropriate 90-day period, then, could not have occurred before June 15, 2004. In their response brief, Plaintiffs do not dispute Defendant's statement that the PSLRA price of Hollinger stock after the initial June 15, 2004 disclosure was higher than the purchase price of the stock–they concur with that conclusion–or take issue with Defendant's method of calculating stock price. Count II is DISMISSED.

Similar reasoning applies to Count IV, a Section 18 claim against Hollinger and Radler for public statements made regarding the Company's circulation figures. Plaintiffs states, as

noted in the preceding paragraph, that the that the first disclosure related to the circulation figures occurred on June 15, 2004. As noted earlier, the appropriate 90-day period could not have occurred before June 15, 2004. In their response brief, once again Plaintiffs do not dispute Defendant's statement that the PSLRA price of Hollinger stock after the initial disclosure was higher than the purchase price of the stock or take issue with Defendant's method of calculating stock price. Count IV is therefore DISMISSED.

On the issue of loss, Defendants also submitted the *Dura* decision to this Court. *See Dura Pharm. Inc. v. Brad*, 544 U.S. 336 (2005). In *Dura*, decided after Plaintiffs had filed their second consolidated amended complaint, the Supreme Court held plaintiffs did not satisfy the economic loss requirement of the PSLRA on the basis of allegations that they bought the stock at artificially inflated prices. To the extent that Plaintiffs plead that they suffered a loss on the basis of artificially inflated purchase price alone, they fail to allege a relevant economic loss; such claims are dismissed.

Are Plaintiffs' Section 18 claims time-barred?

This action was filed on February 2, 2004. As stated in 15 U.S.C. 78r©, Section 18 claims must be brought "within one year after discovery of the facts constituting the cause of action and within three years after such a cause of action accrued." The Section 18 statute of limitations begins to run when the Plaintiffs have inquiry notice, or, in other words, "when the victim of the alleged fraud became aware of facts that would have led a reasonable person to investigate whether he might have a claim." *Tregenza v. Great Am. Comm'ns Co.,* 12 F.3d 717, 718-19 (7th Cir.1993), *cert. denied,* 511 U.S. 1085 (1994) ( *quoted in Whirlpool Fin'l Corp. v. GN Holdings, Inc.,* 67 F.3d 605, 609 (7th Cir.1995)). More specifically, the limitation period

begins to run "when (often between the date of occurrence and the date of discovery of the fraud) the plaintiff learns, or should have learned through the exercise of ordinary diligence in the protection of one's legal rights, enough facts to enable him by such further investigation as the facts would induce in a reasonable person to sue within a year." *Fujisawa Pharm. Co., Ltd. v. Kapoor,* 115 F.3d 1332, 1334 (7th Cir.1997) (quoting *Law v. Medco Research, Inc.,* 113 F.3d 781, 785 (7th Cir.1997)).  In this case, Plaintiffs must have discovered such facts with respect to Count III and Count IV no earlier than February 2, 2003.

More than "merely suspicious circumstances" must exist to put a potential plaintiff on inquiry notice; he "must learn of a circumstance that places him 'in possession of, or with ready access to, the essential facts that he needs in order to be able to sue.' " *Kauther SON BAD v. Sternberg,* 149 F.3d 659, 670 (7th Cir.1998) (quoting *Fujisawa,* 115 F.3d at 1337).

Plaintiffs state in their complaint that with respect to the Section 18 claim in Count III, "[w]hen the market had assimilated the truth about defendants' fraud (that was dribbled out to the market beginning in May 2002), and the effect of those disclosures was reflected in the stock price (by December 11, 2002), Plaintiffs and other Class members were significantly damaged by the resulting drop in the value of the Company's stock."  Plaintiffs say in Count III that the effect of the disclosures about Defendants' fraud was reflected in the stock price of December 11, 2002. If the effect was indeed reflected by then, as Plaintiffs contend, it is reasonable to assume that Plaintiffs were on inquiry notice as of that time.  Presumably a reasonable person, upon noting that the market has assimilated the truth about Defendants' fraud, would carry out further investigation.  Without any persuasive argument from Plaintiffs as to why they have not pled

themselves out of court on the Section 18 claim by stating that they had notice before February 2, 2003, the Section 18 claim may not proceed.

It is true that this Court refrained from determining whether the market incorporated the effect of corrective disclosures with respect to Plaintiff's 10b-5 claim in Count I. The difference, however, is that Plaintiffs did not specifically state when the market incorporated the information contained in the corrective disclosures and to what extent that information was incorporated. With respect to Section 18 claim, Plaintiffs specifically state in the complaint that the disclosures were made and the effect was felt by December 11, 2002. The Seventh Circuit has stated that if a "plaintiff pleads facts that show its suit [is] barred by a statute of limitations, it may plead itself out of court under a Rule 12(b)(6) analysis." *See Whirlpool*, 67 F.3d at 608.

Plaintiffs argue that this Court should apply Section 804 of the Sarbanes-Oxley Act to Section 18 claims, thereby extending the limitations period such that suit must be brought not later than the earlier of two years after the discovery of the facts constituting the violation or five years after the violation. Plaintiffs cite no persuasive authority for this point. Instead, they cite dicta in a case that does not address Section 18 or Section 804.

This Court is not convinced that it should apply Section 804 to Section 18 claims. In order to bring suit under Section 18, Plaintiffs are required to allege 1) a false or misleading statement by a defendant; (2) of material fact; (3) contained in a filing with the SEC; and (4) upon which the Plaintiffs relied when purchasing a security. *See Fujisawa,* 814 F.Supp. at 730, n. 11. Plaintiffs are not required to prove scienter under Section 18. As the district court noted in *WorldCom, Inc. Sec. Litig.*, 294 F.Supp.2d at 444 (S.D.N.Y. November 21,2003) "[t]here are advantages to bringing solely strict liability and negligence claims: the pleading and proof

thresholds are far lower than for claims asserting securities fraud, and liability is 'extensive'. One of the disadvantages of bringing negligence claims, however, is a more narrow window of time in which to sue." Given the difference between the two sections, and lack of any persuasive argument on the congressional history of the provisions or precedent, this Court rejects the argument that Section 804 enlarges the statute of limitations period for Section 18 claims. Count III is DISMISSED.

As for Count IV, the issue of whether it is time-barred need not be decided since this Court previously held that it is dismissed on other grounds.

<u>Do Plaintiffs have standing to assert any claims based on statements made after June 29, 2001?</u>

In *Roots Partnership v. Lands' End, Inc.*, 965 F.2d 1411, 1420 (7th Cir. 1992), the Seventh Circuit held that false statements allegedly made after the named plaintiff purchased stock could not "form the basis for Rule 10b-5 liability, because the statements could not have affected the price at which plaintiff actually purchased." *See also In re Discovery Zone Sec. Litig.*, 943 F.Supp. 924, 944 (N.D.Ill. September 27, 1996)(rejecting reliance on statements made by defendants after the last named plaintiff had purchased his stock); *Anderson v. Abbott Labs.*, 140 F.Supp.2d 894, 908 (N.D.Ill. January 25, 2001)("Statements made after named plaintiffs purchased their stocks cannot form the basis for §10(b) liability.").

Presumably the Plaintiffs in this case will have little difficulty finding named plaintiffs who purchased stock after June 29, 2001. While there is some case law suggesting that lead plaintiffs under Rule 23 need not have standing so long as named Plaintiffs do, this Court need not decide the issue at this time given that Plaintiffs have not yet included a named plaintiff who purchased stock after June 29, 2001. *See Greater PA Carpenters Pension Fund v. Whitehall*

*Jewellers, Inc.*, WL 61480, *7 -8 (N.D.Ill. Jan. 10, 2005)(collecting cases). *See also Tanne v. Autobytel, Inc.*, 226 F.R.D. 659, 669 (C.D.Cal. March 15, 2005)("Irrespective of the lead plaintiff's standing to pursue a section 11 claim, the class may pursue any claim that at least one named plaintiff has standing to pursue.")(citation omitted).

This approach is undeniably awkward because the issues are best dealt with during the class certification process rather than when briefing a motion to dismiss. Be that as it may, this Court finds it a more efficient use of resources to proceed by assuming that Plaintiffs will indeed produce the requisite named plaintiffs by July 14, 2006. If they fail to do so, this Court will address Plaintiffs' remaining claims as they relate to statements made on or before June 29, 2001. *See Roots*, 965 F.2d 1411, 1420.

Plaintiffs argue that *Roots* is different from this case, because in *Roots* the named plaintiff had no individual claim as the only actionable misrepresentation was made after plaintiff had purchased stock. *See Roots*, 965 F.2d at 1419. Plaintiffs may, if they so desire, proceed with their case based on only statements that were made prior to June 29, 2001, thereby avoiding the *Roots* problem. Plaintiffs also argue that this case deals with an on-going scheme to defraud investors and cites other examples where courts have permitted lead plaintiffs alleging a common scheme to represent the entire class. As defendants note, however, those cases are inapposite in a securities fraud case where no named plaintiff has been injured by the challenged misstatements.

Does Count III fail because of a lack of any predicate securities law violation?

Given that Count I does in part survive this motion to dismiss, this Court will not dismiss in toto Plaintiffs' Section 20(a) claim on the grounds that there is no predicate securities

violation.  Those portions of Count III that are dependent on dismissed predicate claims, however, are dismissed.

Does SLUSA preempt Plaintiffs' state law claims?

Defendants argue that Counts VI through VIII, all state law claims, are preempted by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA").  SLUSA provides that "[n]o covered class action based upon the statutory common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging...a misrepresentation or omission of material fact in connection with the purchase or sale of a covered security."  15 U.S.C. § 78bb(f)(1)(A).

Count VI of the complaint asserts a claim for breach of fiduciary duty for inducing retention of Hollinger International Stock.  Count VIII asserts a claim for aiding and abetting breach of fiduciary duty which induced retention of Hollinger stock.

Plaintiffs argue that Defendants cannot show that the requirements of SLUSA are not met because Counts VI and VIII fall within the Delaware law carve-out exceptions to SLUSA and because Counts VI and VIII are holder claims that are not based at all on any purchase or sale of Hollinger shares.  The latter argument can be disposed of on the basis of the Supreme Court's decision in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 126 S.Ct. 1503 (2006).  In that case, the Supreme Court held that SLUSA preempts holder claims as well as claims based on the purchase or sale of securities.

As for the former argument, it also fails.  The carve-out exception consists of cases where claims are based on the statutory or common law of the issuer's state that involve either "the purchase or sale of securities by the issuer or an affiliate of the issuer exclusively from or to

holders of equity securities of the issuer" or any communication with respect to the sale of securities of an issuer that "is made by or on behalf of the issuer or an affiliate of the issuer to holders of equity securities of the issuer" and "concerns decisions of such equity holders with respect to voting their securities, acting in response to a tender or exchange offer, or exercising dissenters' or appraisal rights." 15 U.S.C. § 78bb(f)(3)(A)(ii). Plaintiffs do not provide any basis for concluding that either type of claim is at issue in this case. The only case they cite in support of their argument that the carve-out exception applies–*Alessi v. Beracha*, 244 F.Supp.2d 354, 359 (D.Del. January 21, 2003)–is factually inapposite. That case focused on whether a corporate stock buyout program entered into in contemplation of an undisclosed merger could be considered a "tender or exchange offer" under SLUSA.

As for Count VII, Defendants argue that the complaint fails to establish that any of the named plaintiffs falls within the statutory definition of a state pension plan. This Court disagrees, as the complaint fairly alleges that Teachers and Washington Carpenters are state pension plans. Defendants suggest that the count can be dismissed insofar as it purports to be a claim for compensatory damages. As Plaintiffs are not seeking compensatory damages, that argument is without merit.

Regardless, Plaintiffs fail to state a claim under Section 13 of the ISL. Section 13 provides a remedy only against "the issuer, controlling person, underwriter, dealer or other person by or on behalf of whom the same said sale was made" and certain participants in the sale. See 815 ILCS §5/13. Plaintiffs do not allege that any defendants sold or assisted in the sale of securities to any plaintiff. Section 13's provisions for rescission only apply to sales that bear

-33-

some nexus to Illinois. *See Johnson v. Mut. Sav. Bank*, 1996 WL 79414, at *3 (N.D.Ill. Feb. 21, 1996). As they have not alleged a sale, they do not allege a nexus based on a sale.

Plaintiffs' state law claims, Counts VI-VIII, are DISMISSED.[5]


*Independent Directors' Motion to Dismiss*

The Independent Directors adopt the Hollinger Defendants' motion, and make three additional arguments. They claim that the fraud claims fail because the complaint does not properly allege scienter, the fraud and Section 18 claims fail because the complaint does not properly plead that the Independent Directors were responsible for the allegedly false statements or omissions, and that the Section 20(a) claim fails because the complaint does not allege facts showing that the Independent Directors were "control persons."

<u>Do Plaintiffs adequately allege scienter with respect to Count I?</u>

In Count I, Plaintiffs allege that the Independent Directors committed securities fraud. According to the facts alleged in the complaint, all the Independent Directors either knew or were reckless in not knowing that inaccurate information was being disseminated to the public on the topics of (a) the diversion of a significant portion of the proceeds from the sale of Hollinger's assets to Hollinger, Lord Black, Radler, Boultbee, and Atkinson in the form of "non-compete" payments (b) Hollinger's asset sales, on unfavorable terms, to entities owned and/or by certain

---

[5] Defendants also argue that the "State pension plan" exception to SLUSA does not apply because Plaintiffs include an individual as a plaintiff in that count. Plaintiffs counter that they did not intend to treat any individual plaintiff as a state pension plan and should be permitted at the a minimum to amend the count to exclude any plaintiffs who are not state pension plans. Presumably, any attempt by Plaintiffs to refile a Section 13 claim would exclude any plaintiffs who are not state pension plans.

defendants and (c)Hollinger's entry into certain management services agreements that required it to pay defendants and/or connected entities fees for services that were never provided. As a result of defendants' actions to conceal adverse information, they allegedly deceived the general investing public, including Plaintiffs and other class members; artificially inflated and maintained market prices of Hollinger stock; and caused Plaintiffs and class members to purchase Hollinger stock at artificially inflated prices.

Plaintiffs contend that part of the reason that Black and others were able to loot Hollinger in such an egregious manner is because the Independent Directors failed to provide any check on corporate malfeasance. Not only did the Independent Directors completely fail to scrutinize the transactions, they led investors to believe that the transactions had been properly scrutinized.

The Seventh Circuit recently clarified what is required of plaintiffs bringing a securities fraud suit, in light of the heightened pleading requirements of the PSLRA. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588 (7th Cir. 2006). First, "the PSLRA essentially returns the class of cases it covers to a very specific version of fact pleading–one that exceeds even the particularity requirement of the Federal Rule of Civil Procedure 9(b)." *Id.* at 594. In order to survive dismissal, "a securities fraud complaint must (1) 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed' and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id., see also* 15 U.S.C. § 78u4(b)(1),(2). The same scienter standard applies now that applied before the passage of the PSLRA: plaintiffs must allege " 'an extreme departure from the standards of ordinary care, []which presents a danger of

misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Id*. at 600 (citations omitted).

Although the same standard applies after the PSLRA, the Seventh Circuit has noted that a PSLRA "did unequivocally raise the bar for pleading scienter." *Id*. at 601. Now, "[n]ot only must plaintiffs meet a particularity requirement; they must also meet a substantive requirement pleading sufficient facts to create 'a strong inference' of scienter." *Id*. When determining whether there is a strong inference of scienter, the Seventh Circuit has stated that the best approach is "for courts to examine all of the allegations in the complaint and then to decide whether collectively they establish such an inference." *Id*.

The PSLRA must not be interpreted in a manner that keeps plaintiffs from bringing legitimate securities fraud claims in federal court. For example, when referring to the degree of imagination a court may use when determining whether a complaint creates a strong inference, "[i]nstead of accepting only the most plausible of competing inferences as sufficient at the pleading stage, [courts] will allow the complaint to survive if it alleges facts from which, if true, a reasonable person could infer that the defendant acted with required intent." *Id*. at 602. If a reasonable person could not, based on the facts, draw an inference of scienter, the defendant is entitled to dismissal; otherwise, plaintiffs are permitted to proceed. While reviewing courts will "aggregate the allegations in the complaint to determine whether it creates a strong inference of scienter, plaintiffs must create this inference with respect to *each* individual defendant in multiple defendant cases." *Id.* at 602-603 (emphasis added).

The Independent Directors contend that Plaintiffs have failed to state a claim against them for securities fraud because Plaintiffs do not adequately allege scienter. Undoubtedly certain

allegations in Plaintiffs' complaint, in isolation, do not give rise to the inference that each

Independent Director acted with scienter. But as the Seventh Circuit noted, this Court looks at

the allegations in the complaint in the aggregate. Here, Plaintiffs allege that the Independent

Directors not only failed to scrutinize anything they were told by Black and others during the

brief moments when they actually discussed Hollinger business, they also signed public filings

that contained misrepresentations about their own behavior that they either knew or should have

known were false.[6]

Plaintiffs' allegations with respect to the 2001 10-k are particularly startling. The 10-K

included statements about the Independent Directors' role in approving a variety of transactions.

For example, the 10-K states that the Independent Directors had approved of the terms of certain

non-competition agreements that Hollinger, Black, and three others had entered in connection

with the U.S. community newspaper sale. The 10-k indicated that non-competition payments

were entered into in order to satisfy a closing condition. According to Plaintiffs, the Independent

Directors signed the 10-k despite the fact that they had not approved the transaction. The 2001

10-k also stated that the directors had approved the July and November 2001 sale of Canadian

newspapers to Osprey and the accompanying non-competition agreements when in fact neither

the Audit Committee nor the full Board knew anything about the transactions until Black and

Radler requested that the Audit Committee ratify the payments after they had occurred. Again,

the Independent Directors signed the form without contesting the statement that they approved

the sales.

---

[6] Defendants state that Raymond Chambers did not sign the Company's SEC filings. At this stage in the proceedings, this Court will defer to Plaintiff's iteration of the facts.

In that same 10-k, which incorporated by reference the Company's 2002 proxy statement, the company misrepresented the terms of its transactions with Horizon Publications. Plaintiffs claim that the transactions were actually gift transfers designed to benefit Black and Radler rather than legitimate asset sales  Although the 10-k stated that the Board and Audit Committee had approved the transactions as market value transaction, Plaintiffs claim that neither had. The 2001 10-k also misrepresented the management agreement between CanWest and Ravelston. According to Plaintiffs, investors were misled into believing that the Board had properly approved the agreement when in fact it gave its approval without undertaking any evaluation of the fairness of the payments.[7]

The recklessness with which the Board and the Audit Committee approached their review of Hollinger's financial decisions is evident in their treatment of the sham management services agreements between Hollinger and Ravelston, according to the Plaintiffs. Every year, Radler proposed a fee on behalf of Ravelston. After a cursory discussion, Thompson always agreed to that figure without asking for any documentary support. The Audit Committee never questioned the rationale behind the agreements, did not develop a method for assessing the fees, nor did they ask what the fees covered or why they were so high. The full Board never discussed the fees. The company assured investors that the management services fees were fair and that the Audit Committee had reviewed and approved the fees as reasonable. Plaintiffs allege the fees were

---

[7] Plaintiffs also claim that the 2001 10-k misrepresented the terms of the Bradford Publishing transaction. In order to make this argument, they rely almost entirely on other complaints. Consequently this transaction will not factor into this Court's determination of whether Plaintiffs have significantly alleged recklessness such that they state a claim under the PSLRA.

anything but reasonable–Ravelston was paid roughly 29 times its cost in 2002 and 30 times its cost in 2003–and that both the Board and the Audit Committee never questioned the agreements.

The Independent Directors counter that they did scrutinize the transactions. Whether the Independent Directors actually paid any attention to the dealings of Hollinger is a question of fact and as such is not a basis for a dismissal of Plaintiffs' complaint. Whether a director is reckless because she fails to conduct even the most perfunctory review of a statement that misrepresents her own behavior–a statement she knows will be disseminated to the public with her accompanying signature–is a question of law.

The Independent Directors devote a significant amount of time arguing that they should not be required to know everything about Hollinger, especially given that Black and other purportedly sought to hide information from them. It is certainly true that they were not required to find a proverbial needle in the Hollinger haystacks. But it is also true that no one was in a better position to know whether the Board had approved of certain transactions than the members of the Board themselves. The Independent Directors should have known that they did not approve certain transactions because they had never been presented the transactions for their approval. They should have been aware of the fact that they were signing filings which would lead investors to believe that they had approved other transactions without ratifying them. They should have presumed that when investors read signed public filings indicating that the Board had approved of transactions, the investors would assume that the Board had undertaken some kind of inquiry into the nature of the transaction.

Demanding that directors accurately represent matters of which they should have intimate knowledge by virtue of their board membership is hardly placing an undue burden on individuals

that are chosen for their business acumen and experience. The investing public rightly relies on the public filings of corporations like Hollinger that carry out complex transactions in specialized markets. Investors reasonably assume that the public statements signed by the Board of Directors represent, to the best of the Board's knowledge, what the directors consider an accurate depiction of the company's fiscal health. If investors cannot even assume that the director's signature on a form that details the Board's decisions is an accurate reflection of what happened, the filing has no value.

This Court is not stating that liability ensues for every independent director who signs a public filing that is later discovered to contain a falsehood. In this particular case, however, a fiar reading of the complaint suggests that the Board behaved in a reckless manner by refusing to participate in any critical evaluation of the machinations of Black and his compatriots and signing public filings that contained statements that it would have or should have known to be false. Based on the facts in Plaintiffs' complaint, the Board completely abdicated any responsibility related to the running of a very large public corporation. While it is true that Board members are not expected to know everything about a company on whose board they are a member, they are expected to have more knowledge than this board had. Based on the complaint, the board members did not take the time or effort to learn critical pieces of information about the company. If the Board did indeed act in the manner that Plaintiffs allege, the Board served no purpose other than to collect fees.

<u>Do Plaintiffs adequately plead that the Independent Directors were responsible for allegedly false statements and omissions?</u>

Defendants contend that Plaintiffs rely on group pleading as a methods of showing that the Independent Directors are liable for violations of Rule 10b-5 and Section 18. The Seventh Circuit held that while courts will aggregate the allegations in a complaint to determine whether it creates a strong inference of scienter, plaintiffs must create this inference with respect to each individual defendant in multiple defendant cases. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 603 (7th Cir. 2006).

The key false statements linked to the Independent Defendants stem from their signing of public filings that contained information they knew or should have known was incorrect. While Defendants are correct that some courts will not find defendants who sign filings liable for violations, they fail to acknowledge that the Independent Directors in this case should have known that the statements about their own conduct were incorrect.

Were the Independent Directors control persons?

The Independent Directors also argue that Plaintiffs have failed to state a claim for control person, or secondary, liability for securities fraud. 15 U.S.C. § 78t (§ 20(a) of the 1934 Act). They argue that because the Plaintiffs failed to state a claim for § 10(b) liability, their control person liability claim necessarily fails. Given that Plaintiffs successfully pled a § 10(b) claim against all Independent Directors, this argument falls of its own weight. *See Chu v. Sabratek Corp.*, 100 F.Supp.2d 827, 842 -843 (N.D.Ill. June 13, 2000). Defendants also argue that even if some primary federal securities claims do exist, Plaintiffs will be unable to prove that any of the Independent Directors could be considered a "control person" within the meaning of the statute.

To qualify as control persons, the individual defendants must (1) have exercised actual control over the general operations and (2) have had the ability and power to direct (or prevent) the fraudulent statements at issue. *See Chu*, 100 F.Supp.2d at 842 -843 (citations omitted). The complaint supports an inference that the Independent Directors could satisfy those criteria. Consequently, the question of whether particular individuals are "controlling persons" under § 20(a) is a question of fact that cannot, in this case, be determined at the pleading stage. *See In re Sears, Roebuck and Co. Securities Litigation,* 291 F.Supp.2d 722, 727 (N.D.Ill.,2003)(citations omitted).

## Conclusion

The motion to dismiss filed by Hollinger, Ravelston, Ravelston Management Incorporated, Black, Amiel Black, Boultbee, Colson, and Radler is GRANTED IN PART. Counts II, III, IV, VI, VII, and VIII are all DISMISSED. Count V is DISMISSED insofar as it relies on any of the dismissed counts.

The motion to dismiss filed by the Independent Directors Burt, Chambers, Kissinger, Kravis, Meitar, Strauss, Taubman, Thompson, Weidenfeld, and Wexner is GRANTED IN PART. Counts III, VI, VII, and VIII are DISMISSED. The portion of Count V that relies on Count III is DISMISSED.

Plaintiffs may replead as to the named plaintiffs in this case by July 12, 2006.  If Plaintiffs do not replead by that time, this Court will address Counts I and Count V as they relate to statements made on or before June 29, 2001.

Enter:


/s/ David H. Coar _____
David H. Coar
United States District Judge

Dated: June 28, 2006