# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re HOLLINGER INTERNATIONAL, INC. SECURITIES LITIGATION, | ) ) ) ) | Cons. Civil Action No. 04-C-0834 JUDGE DAVID H. COAR |
| This Document Relates To: ALL ACTIONS. | ) ) ) ) | CLASS ACTION |

## REFILING OF PREVIOUSLY FILED PLAINTIFFS' OMNIBUS ANSWERING BRIEF [D.I. 212] IN OPPOSITION TO THE MOTIONS TO DISMISS THE THIRD AMENDED COMPLAINT FILED BY DEFENDANTS ARGUS CORPORATION INC., KPMG LLP AND RICHARD N. PERLE

GRANT & EISENHOFER P.A.
Jay W. Eisenhofer
John C. Kairis
Chase Manhattan Centre
1201 North Market Street
Wilmington, DE 19801
Telephone: (302) 622-7000
Facsimile: (302) 622-7100
*Attorneys for Lead Plaintiff
Teachers' Retirement System of Louisiana,
Class Representative Cardinal Mid-Cap Value
Equity Partners, L.P. and Co-Lead Counsel for
the Plaintiff Class*

LERACH COUGHLIN STOIA GELLER
RUDMAN& ROBBINS LLP
Darren J. Robbins
Travis E. Downs, III
Scott H. Sahan
401 B. Street, Suite 1700
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423

*Attorneys for Plaintiff Washington Area
Carpenters Pension and Retirement Fund, Class
Representative Cardinal Mid-Cap Value Equity
Partners, L.P. and Co-Lead Counsel for the
Plaintiff Class*

Dated: January 9, 2007

Of Counsel:

Richard S. Schiffrin
Richard A. Maniskas
SCHIFFRIN & BARROWAY, LLP
Three Bala Plaza East, Suite 400
Bala Cynwyd, PA  19004
Telephone:  (610) 667-7706
Facsimile:  (610) 667-7056

John T. DeCarlo
DeCARLO, CONNOR & SELVO
533 South Fremont Avenue, 9th Floor
Los Angeles, CA  90071-1706
Telephone:  (213) 488-4100
Facsimile:  (213) 488-4180


Liaison Counsel for the Plaintiff Class:

MUCH SHELIST FREED DENENBERG
AMENT & RUBENSTEIN, P.C.
Carol V. Gilden
Katrina Blumenkrants
191 North Wacker Drive - Suite 1800
Chicago, Illinois 60606-1615
Telephone:  (312) 521-2000
Facsimile:   (312) 521-2100

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | | |
|---|---|---|
| In re HOLLINGER INTERNATIONAL, INC. SECURITIES LITIGATION, | ) ) ) | Cons. Civil Action No. 04-C-0834 |
| | ) | JUDGE DAVID H. COAR |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) ) | CLASS ACTION |

### PLAINTIFFS' OMNIBUS ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

**FILED**

MAR 3 1 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

GRANT & EISENHOFER P.A.
Jay W. Eisenhofer
John C. Kairis
Chase Manhattan Centre
1201 North Market Street
Wilmington, DE 19801
Telephone: (302) 622-7000
Facsimile: (302) 622-7100
*Attorneys for Lead Plaintiff
Teachers' Retirement System of Louisiana and
Co-Lead Counsel for the Plaintiff Class*

LERACH COUGHLIN STOIA & ROBBINS LLP
Darren J. Robbins
Travis E. Downs, III
Scott H. Sahan
401 B. Street, Suite 1700
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423
*Attorneys for Plaintiff Washington Area
Carpenters Pension and Retirement Fund and
Co-Lead Counsel for the Plaintiff Class*

MUCH SHELIST FREED DENENBERG
AMENT & RUBENSTEIN, P.C.
Carol V. Gilden
191 North Wacker Drive - Suite 1800
Chicago, Illinois 60606-1615
Telephone: (312) 521-2000
Facsimile: (312) 521-2100
*Liaison Counsel for the Plaintiff Class*

Dated: March 29, 2005

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................iv

PRELIMINARY STATEMENT ........................................................................................2

STATEMENT OF FACTS.................................................................................................7

   A.   HOLLINGER AND ITS BOARD WERE CONTROLLED BY LORD BLACK ...................7
   B.   NON-COMPETE PAYMENTS.................................................................................8
   C.   MANAGEMENT SERVICES AGREEMENTS.............................................................9
   D.   ASSET SALES TO AFFILIATED ENTITIES...........................................................12
   E.   UNDISCLOSED COMPENSATION AND PERQUISITES............................................15
   F.   CIRCULATION INFLATION ................................................................................15
   G.   THE TRUTH EMERGES......................................................................................16

ARGUMENT....................................................................................................................17

   A.   STANDARDS ON A MOTION TO DISMISS ..........................................................17
   B.   PLAINTIFFS PLEAD WITH SUFFICIENT PARTICULARITY THAT DEFENDANTS'
       STATEMENTS CONCERNING THE COMPANY'S FINANCIAL RESULTS AND
       CONDITIONS WERE FALSE AND MISLEADING WHEN MADE ...............................18
       1.  Defendants' Disclosures About Hollinger's Asset Sales, Management
          Services Agreements and Circulation Figures Were False and
          Misleading. .......................................................................................18
       2.  Hollinger's Financial Statements Were False and Misleading.....................21
   C.   PLAINTIFFS ADEQUATELY ALLEGE A STRONG INFERENCE OF DEFENDANTS'
       SCIENTER..........................................................................................................23
       1.  Plaintiffs' Allegations Taken as a Whole Constitute Strong Evidence
          Of Each Individual Defendant's Scienter .............................................24
       2.  The Individual Defendants' Knowledge is Further Inferred from Their
          Positions at the Company and the Nature of the Fraud. ...........................25
       3.  Plaintiffs' Allegations of "Motive and Opportunity" Are Additional
          Compelling Evidence of Defendants' Scienter ......................................27
       4.  Hollinger's Corporate Scienter Is Adequately Pleaded............................28
       5.  Plaintiffs Properly Plead That Each of the Individual Defendants Is
          Liable Under the Group-Published Presumption.....................................29
       6.  KPMG.................................................................................................32
          a.  Recklessness Standard.................................................................34
          b.  Red Flags and GAAP and GAAS Violations .................................35
          c.  Non-Audit Fees...........................................................................40
          d.  Auditor For Related Party.............................................................42
          e.  KPMG Had Access to Hollinger, The Individual Defendants, And
             Parties On Both Sides Of The Improper Transactions .......................43
   D.   PLAINTIFFS ADEQUATELY ALLEGED DAMAGES ..............................................45
   E.   *CENTRAL BANK* DOES NOT ABSOLVE DEFENDANTS FROM THEIR PRIMARY
       PARTICIPATION IN THE FRAUDULENT SCHEME ................................................49
   F.   PLAINTIFFS' CLAIMS ARE NOT PRECLUDED BY *SANTA FE* ...............................50

G.   PLAINTIFFS ADEQUATELY STATE A CLAIM FOR CONTROL PERSON
     LIABILITY ........................................................................................53
H.   PLAINTIFFS HAVE ADEQUATELY ALLEGED A SECTION 18 CLAIM ........................55
     1.   The Standard For Moving For Dismissal On Limitations Grounds ............55
     2.   The Two Year Limitations Period Applies To Plaintiffs' Section 18
          Claims Under The Sarbanes-Oxley Act .................................................56
     3.   Plaintiffs' Section 18 Claims Are Timely .............................................58
     4.   Plaintiffs Have Adequately Alleged Each Element Of Their Section 18
          Claims...........................................................................................64
          a.   Plaintiffs Adequately Alleged Reliance .........................................65
          b.   Plaintiffs Adequately Alleged a False and Misleading Statement by
               Defendants..............................................................................67
I.   PLAINTIFFS HAVE ADEQUATELY PLED LOSS CAUSATION ................................68
     1.   The Standards for Pleading Loss Causation ..........................................68
     2.   Loss Causation Is Adequately Pled ....................................................69
          a.   Hollinger's Stock Price Declined  Following the Corrective
               Disclosures..............................................................................69
          b.   Even If the Price Increased On Subsequent Days,  That Fact Does
               Not Warrant Dismissal At This  Stage Of The Case .........................72
               i.    The So-Called Corrective Disclosures Were Themselves False
                     and Misleading and Could Not Reasonably Be Expected to
                     Cause a Decline in the Price of Hollinger Stock ........................73
               ii.   The Precise Day On Which Market Forces Received, Digested,
                     And Reflected The Bad News Is A Question Of Fact....................74
               iii.  In the Absence of the So-Called Corrective Disclosures,
                     Hollinger Stock May Have Increased Even More.........................76
J.   PLAINTIFFS' CLAIM UNDER THE ILLINOIS SECURITIES LAW (COUNT VII) IS
     LEGALLY SUFFICIENT AND IS NOT BARRED BY FEDERAL LAW .......................77
     1.   The SLUSA Exception for State Pension Plans Applies to Count VII .......78
          a.   The SLUSA Exception Applies Despite the Breadth of the "Sub-
               Class"....................................................................................78
          b.   The Complaint Alleges the Pertinent Facts Adequately......................79
     2.   Count VII States a Claim Under the ISL ..............................................80
          a.   No Compensatory Damages Are Requested ...................................80
          b.   There Is No Statutory Requirement of Direct Involvement in the
               Sale .......................................................................................80
K.   PLAINTIFFS HAVE ADEQUATELY ALLEGED CLAIMS FOR BREACH OF
     FIDUCIARY DUTY AND AIDING AND ABETTING SUCH BREACH .........................83
     1.   Plaintiffs' Claims For Breach of Fiduciary Duty And Aiding and
          Abetting Such Breach (Counts VI and VIII) Are Direct Claims................83
     2.   Plaintiffs Adequately Allege A Claim For Breach Of Fiduciary Duty .......87
     3.   Plaintiffs Adequately Allege A Claim For Aiding And Abetting A
          Breach of Fiduciary Duty .................................................................88
     4.   Plaintiffs' Delaware State Law Claims Are Not Preempted By SLUSA......92
L.   PLAINTIFFS HAVE STANDING TO RAISE EACH OF THE CLAIMS ON BEHALF
     OF THE CLASS ...................................................................................94

-ii-

M.   THE COMPLAINT ALLEGES A SUFFICIENT BASIS TO ASSERT PERSONAL
     JURISDICTION OVER ARGUS ........................................................................................100
     1.   Pleading Standard for Personal Jurisdiction..............................................................100
     2.   The Two-Part Jurisdictional Analysis ........................................................................101
          a.   The Minimum Contacts Test Is Satisfied ............................................................102
          b.   The Reasonableness Inquiry Is Satisfied ............................................................109

CONCLUSION ............................................................................................................................112

# I.    TABLE OF AUTHORITIES

## CASES                                                                                      PAGE

*766347 Ontario Ltd. v. Zurich Capital Mkts., Inc.,*
     274 F. Supp. 2d 926 (N.D. Ill. 2003)................................................................55

*In re AFC Enters., Inc. Sec. Litig.,*
     348 F. Supp. 2d 1363 (N.D.Ga. 2004)..............................................................40

*In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.,*
     No. 02-5575, 2004 WL 992991 (S.D.N.Y. May 5, 2004)................................37

*Abrams v. Van Kampen Funds, Inc.,*
     No. 01-7538, 2002 U.S. Dist. LEXIS 16022 (N.D. Ill. 2002)..........................98

*Ackerman v. Schwartz,*
     947 F.2d 841 (7th Cir. 1991).............................................................................18

*In re Aetna Inc. Sec. Litig.,*
     34 F. Supp. 2d 935 (E.D. Pa. 1999)..................................................................27

*Aiena v. Olsen,*
     69 F. Supp. 2d 521 (S.D.N.Y. 1999).................................................................68

*Aldridge v. A.T. Cross Corp.,*
     284 F.3d 72 (1st Cir. 2002)................................................................................25

*Alessi v. Beracha,*
     244 F. Supp. 2d 354 (D. Del. 2003)..............................................................92-93

*Alfus v. Pyramid Tech. Corp.,*
     764 F. Supp. 598 (N.D. Ill. 1991)......................................................................97

*Alicea v. Lasar Mfg. Co.,*
     No. 91-3929, 1992 WL 230203 (S.D.N.Y. Aug. 31, 1992)............................101

*Alley v. Miramon,*
     614 F.2d 1372, 1380 (5th Cir. 1980).................................................................51

*In re American Bank Note Holographics, Inc.,*
     127 F. Supp. 2d 418 (S.D.N.Y. 2001)...............................................................68

*In re American Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.,*
     794 F. Supp. 1424 (D. Ariz. 1992)....................................................................66

*In re Anchor Communications, Inc., Sec. Litig.,*
  22 F. Supp. 2d 999 (D. Minn. 1998)..................................................................27

*Angell Invs., L.L.C. v. Purizer Corp.,*
  No. 01 C 6359, 2002 WL 23822 (N.D. Ill. Jan. 7, 2002)..................................50

*Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l Fund, L.P.,*
  829 A.2d 143 (Del. Ch. 2003) ...........................................................................89

*Aristech Chem. Int'l v. Acrylic Fabricators,*
  138 F.3d 624 (6th Cir. 1998)............................................................................111

*Asahi Metal Indus. Co. v. Superior Ct. of Cal.,*
  480 U.S. 102 (1987) ..........................................................................................110

*Asher v. Baxter Int'l, Inc.,*
  No. 02-5608, 2005 WL 331572 (N.D. Ill. Feb. 3, 2005)............................30, 67

*Atchley v. Qonaar Corp.,*
  704 F.2d 355, 359 (7th Cir. 1983) .....................................................................51

*Avery Dennison Corp. v. UCB SA and UCB Films PLC,*
  No. 95-6351, 1997 U.S. Dist. LEXIS 2931 (N.D. Ill. Mar. 14, 1997) ............108

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988) ...........................................................................................17

*Benjamin v. Cablevision Programming Investors,*
  114 Ill. 2d 150, 499 N.E.2d 1309 (1986)...........................................................82

*Blaz v. Belfer,*
  368 F.3d 501 (5th Cir. 2004) .........................................................................56-57

*Blue Chip Stamps v. Manor Drug Stores,*
  421 U.S. 723 (1975) ......................................................................................84, 95

*Bourjaily v. United States,*
  483 U.S. 171 (1987) ...........................................................................................24

*Broudo v. Dura Pharms., Inc.,*
  339 F.3d 933 (9th Cir. 2003) .............................................................................76

*Brown v. Computerized Thermal Imaging Inc.,*
  2002 WL 31109563 (D. Or. Sept. 24, 2002).....................................................45

*Brown-Wales Co. v. Barber,*
    184 A. 855 (N.H. 1936) ....................................................................................... 86

*Burger King Corp. v. Rudzewicz,*
    471 U.S. 462 (1985) ......................................................................................... 102

*Burzynski v. Aetna Life Ins. Co.,*
    No. H-89-3976, 1992 U.S. Dist. LEXIS 21300
    (S.D. Tex. Mar. 31, 1992) ................................................................................. 28

*Butler v. Watkins,*
    80 U.S. 456 (1871) ............................................................................................ 86

*In re CMS Energy Sec. Litig.,*
    No. 02-72004, 2005 U.S. Dist. LEXIS 439 (E.D. Mich. Jan. 7, 2005) ............................. 69

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,*
    343 F.3d 189 (2d Cir. 2003) ............................................................................. 68

*Caremark, Inc. v. Coram Healthcare Corp.,*
    113 F.3d 645 (7th Cir. 1997) ................................................................ 18, 67, 69

*Carley Capital Group v. Deloitte & Touche, LLP,*
    27 F. Supp. 2d 1324 (N.D. Ga. 1998) .................................................................. 41

*Carlson v. Bear, Stearns & Co., Inc.,*
    906 F.2d 315 (7th Cir. 1990) ............................................................................ 81

*In re Cendant Corp. Sec. Litig.,*
    264 F.3d 201 (3d Cir. 2001) ............................................................................. 68

*Central Cmty. Church of God v. Ent & Imler CPA Group, PC,*
    No. 1:03-0678, 2004 U.S. Dist. LEXIS 24339 (S.D. Ind., Nov. 24, 2004) ........... 23, 25, 26

*Central States, Southeast & Southwest Areas Pension Fund v.*
*Reimer Express World Corp.,*
    230 F.3d 934 (7th Cir. 2000) ........................................................................... 101

*In re Century Bus. Servs., Sec. Litig.,*
    No. 99-02200, 2002 WL 32254513
    (N.D. Ohio June 27, 2002) ............................................................................... 66

*Chan v. Society Expeditions, Inc.,*
    39 F.3d 1398 (9th Cir. 1994) .......................................................................... 108

*Chill v. General Elec. Co.*,
   101 F.3d 263 (2d Cir. 1996) ................................................................... 26

*Chill v. Green Tree Fin. Corp.*,
   181 F.R.D. 398 (D. Minn. 1998) ............................................................. 45

*Chinn v. Belfer*,
   No. 02-00131, 2002 WL 31474189
   (D. Or. June 19, 2002) ........................................................................... 86

*Chu v. Sabratek Corp.*,
   100 F. Supp. 2d 815 (N.D. Ill. 2000) ................................................ 34, 40

*Chu v. Sabratek Corp.*,
   100 F. Supp. 2d 827 (N.D. Ill. 2000) ...................................................... 39

*Clearclad Coatings, Inc. v. Xontal Ltd.*,
   1999 U.S. Dist. LEXIS 13173 (N.D. Ill. 1999) ..................................... 103

*In re Complete Mgmt. Inc. Sec. Litig.*,
   153 F. Supp. 2d 314 (S.D.N.Y. 2001) ......................................... 36, 37, 40

*Conley v. Gibson*,
   355 U.S. 41 (1957) ........................................................................... 18, 78

*Continental Bank N.A. v. Everett*,
   742 F. Supp. 508 (N.D. Ill. 1990), *aff'd*, 964 F.2d 701 (7th Cir. 1992) ............. 104

*Continental Ins. Co. v. Mercadante*,
   222 A.D. 181, 183 (N.Y. App. Div. 1927) .............................................. 86

*Crowell v. Ionics, Inc.*,
   343 F. Supp. 2d 1 (D. Mass. 2004) .................................................... 97, 98

*In re Cylink Sec. Litig.*,
   178 F. Supp. 2d 1077 (N.D. Cal. 2001) ................................................... 29

*Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   395 F.3d 25 (2d Cir. 2005) ..................................................................... 93

*Dacey v. Morgan Stanley Dean Witter & Co.*,
   263 F. Supp. 2d 706 (S.D.N.Y. 2003) ..................................................... 94

*In re DaimlerChrysler AG Sec. Litig.*,
   269 F. Supp. 2d 505 (D. Del. 2003) .................................................. 61-2, 74

*Danis v. USN Communications, Inc.,*
   73 F. Supp. 2d 923 (N.D. Ill. 1999) ............................................................................*passim*

*Dardick v. Zimmerman,*
   149 F. Supp. 2d 986 (N.D. Ill. 2001) ................................................................................. 32

*In re Daou Systems, Inc. Sec. Litig.,*
   397 F.3d 704, 715 (9th Cir. 2005) ..................................................................................... 22

*David v. Belmont,*
   197 N.E. 83 (Mass. 1935) ................................................................................................. 86

*Derensis v. Coopers & Lybrand Chartered Accountants,*
   930 F. Supp. 1003 (D. N.J. 1996) ................................................................................... 109

*DiLeo v. Ernst & Young,*
   901 F.2d 624 (7th Cir. 1990) ..................................................................................... 37, 41

*In re Dynegy, Inc. Sec. Litig.,*
   226 F.R.D 263 (S.D. Tex. 2005) ...................................................................................... 74

*Edward Gray Corp. v. National Union Fire Ins. Co. of Pittsburgh,*
   94 F.3d 363 (7th Cir. 1996) .............................................................................................. 72

*Elliott v. ITT Corp.,*
   150 F.R.D. 569 (N.D. Ill. 1992) ....................................................................................... 66

*Elster v. Alexander,*
   76 F.R.D. 440 (N.D. Ga. 1977) ........................................................................................ 66

*In re Enron Corp. Sec., Deriv. & "ERISA" Litig.,*
   310 F. Supp. 2d 819, 86 (S.D. Tex. 2004) ....................................................................... 69

*In re Enron Corp. Sec., Deriv. & "ERISA" Litig.,*
   258 F. Supp. 2d 576 (S.D. Tex. 2003) ........................................................................ 30, 67

*In re Enron Corp. Sec., Deriv. & "ERISA" Litig.,*
   235 F. Supp. 2d 549 (S.D. Tex. 2002) ............................................................................. 41

*F.N. Wolf & Co., Inc. v. Estate of Neal,*
   No. 89-1223, 1991 U.S. Dist. LEXIS 2428 (S.D.N.Y. Feb. 25, 1991) ............................ 67

*Falkowski v. Imation Corp.,*
   309 F.3d 1123 (9th Cir. 2002) .......................................................................................... 93

*Feldman v. Motorola, Inc.,*
    No. 90-5887, 1993 U.S. Dist. LEXIS 14631 (N.D. Ill. Oct. 14, 1993) ...........................95-6

*Fidel v. Farley,*
    392 F.3d 220 (6th Cir 2004) .................................................................................................43

*In re First Merch. Acceptance Corp. Sec. Litig.,*
    1998 WL 781118 (N.D. Ill. Nov. 9, 1998) ...........................................................................34

*Fitzsimmons v. Barton,*
    589 F.2d 330 (7th Cir. 1979) .............................................................................................102

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
    308 F. Supp. 2d 249, 257 (S.D.N.Y. 2004) .........................................................................96

*Flecker v. Hollywood Entm't Corp.,*
    1997 WL 269488 (D.Or. Feb. 12, 1997) .............................................................................68

*In re Fleming Cos. Inc. Sec. & Deriv. Litig.,*
    No. 5-03-MD-1530, 2004 U.S. Dist. LEXIS 26488
    (S.D. Tex. June 10, 2004) ....................................................................................................69

*Fottler v. Moseley,*
    60 N.E. 788 (Mass. 1901)....................................................................................................86

*Froelich v. Matz,*
    93 Ill. App. 3d 398, 417 N.E.2d 183 (3d Dist. 1981) ..........................................................81

*Fry v. UAL Corp.,*
    895 F. Supp. 1018 (N.D. Ill. 1995)..............................................................................6, 51, 52

*Fujisawa Pharm. Co. v. Kapoor,*
    115 F.3d 1332 (7th Cir. 1997) ......................................................................................59, 60

*Fujisawa Pharm. Co. v. Kapoor,*
    814 F. Supp. 720 (N.D. Ill. 1993).......................................................................................64

*Gaffin v Teledyne, Inc.,*
    No. 5786, 1987 WL 18430 (Del. Ch. Oct. 9, 1987) .............................................................88

*GE Capital Corp. v. Lease Resolution Corp.,*
    128 F.3d 1074 (7th Cir. 1997) .............................................................................................17

*Gebhardt v. Conagra Foods, Inc.,*
    335 F.3d 824 (8th Cir. 2003) ...............................................................................................45

*Gee v. UnumProvident Corp.*,
    2005 WL 534873 (E.D. Tenn. Jan. 13, 2005) ................................................................... 67

*In re GlenFed, Inc. Sec. Litig.*,
    60 F.3d 591 (9th Cir. 1995) .......................................................................................... 31

*In re Global Crossing, Ltd. Sec. Litig.*,
    322 F. Supp. 2d 319 (S.D.N.Y. 2004) ..................................................................... 40, 49

*In re Global Crossing Sec. Litig.*,
    313 F. Supp. 2d 189 (S.D.N.Y. 2003) ..................................................................... 58, 99

*Goldberg v. Meridor*,
    567 F.2d 209, 217-18 (2d Cir. 1977) ...................................................................... 51-52

*Gordon v. Buntrock*,
    No. 00 CV 303, 2000 WL 556763 (N.D. Ill. Apr. 28, 2000) ................................ 85, 92, 93

*Gray v. Seaboard Sec., Inc.*,
    241 F. Supp. 2d 213 (N.D.N.Y. 2003) ........................................................................ 94

*Greater Pa. Carpenters Pension Fund v. Whitehall Jewellers, Inc.*,
    Civ. No. 04-1107, 2005 WL 61480 (N.D. Ill. Jan. 7, 2005) ................................ 70, 96, 99

*Green v., Ameritrade, Inc.*,
    279 F.3d 590 (8th Cir. 2002) ............................................................................... 93, 94

*Grimes v. Navigant Consulting, Inc.*,
    185 F. Supp. 2d 906 (N.D. Ill. 2002) .......................................................................... 75

*Grossman v. Novell, Inc.*,
    120 F.3d 1112, 1118 (10th Cir. 1997) ........................................................................ 17

*Gruber v. Price Waterhouse*,
    117 F.R.D. 75 (E.D. Pa.1987) ................................................................................... 66

*In re Guidant Corp. Sec. Litig.*,
    2004 U.S. Dist. LEXIS 22809 (D. Ind., 2004) ......................................................... 17, 18

*Gutman v. Howard Sav. Bank*,
    748 F. Supp.254 (D.N.J. 1990) .................................................................................. 86

*In re Hamilton Bankcorp, Inc. Sec. Litig.*,
    194 F. Supp. 2d 1353 (S.D. Fla. 2002) ........................................................................ 38

*In re Hayes Lemmerz Int'l, Inc. Equity Sec. Litig.,*
   271 F. Supp. 2d 1007 (E.D. Mich.2003) ...................................................................40, 64, 66

*In re Health Mgt., Inc. Sec. Litig.,*
   970 F. Supp. 192 (E.D.N.Y. 1997)............................................................................36, 37

*Hedge Assocs. v. Ferraz Corp.,*
   1996 U.S. Dist. LEXIS 859 (N.D. Ill. 1996) .....................................................104

*Helfand v. Cenco, Inc.,*
   80 F.R.D. 1 (N.D. Ill. 1977) .............................................................................65-6

*Helicopteros Nacionales de Colombia S.A. v. Hall,*
   466 U.S. 408 (1984) .......................................................................................102

*Hennessy v. Penril Datacomm Networks, Inc.,*
   69 F.3d 1344 (7th Cir. 1995) ..........................................................................72-3

*Hicks v. Morgan Stanley & Co.,*
   No. 01-10071, 2003 U.S. Dist. LEXIS 11972
   (S.D.N.Y. July 16, 2003) ..................................................................................98

*In re High Strength Steel, Inc.,*
   269 B.R. 560 (Bankr. D. Del. 2001)....................................................................88

*Hines v. ESC Strategic Funds, Inc.*
   1999 WL 1705503 (M.D. Tenn. 1999)................................................................93

*Hoffman v. Sucher,*
   No. 95-0126, 1995 U.S. Dist. LEXIS 16371,
   (N.D. Ill. Nov. 6, 1995)...................................................................................104

*Hevesi v. Citigroup, Inc.,*
   366 F.3d 70 (2d Cir. 2004) ...............................................................................96

*Hollinger Int'l Inc. v. Black,*
   844 A.2d 1022, 1030 (Del. 2004).........................................................................7

*Hollinger Int'l, Inc. v. Hollinger, Inc.,*
   No. 04 C 0698, 2005 WL 589000 (N.D. Ill. Mar. 11, 2005)...................................4

*In re Homestore.com Inc. Sec. Litig.,*
   252 F. Supp. 2d 1018 (C.D. Cal. 2003) ...............................................................37

*Houbigant, Inc. v. Deloitte & Touche LLP*,
    303 A.D.2d 92 (1st Dep't 2003) ..................................................................... 41

*Howard v. Everex, System, Inc.*,
    228 F.3d 1057 (9th Cir. 2000) .......................................................... 29, 49-50

*Howell v. Motorola, Inc.*,
    337 F. Supp. 2d 1079 (N.D. Ill. 2004) ........................................................ 87

*Hurley v. FDIC*, 719 F. Supp. 27, 30 (D. Mass. 1989) ................................... 52

*In re Ikon Solutions, Inc. Sec. Litig.*,
    131 F. Supp. 2d 680 (E.D. Pa. 2001) ........................................................... 75

*In re Initial Public Offering Sec. Litig.*,
    214 F.R.D. 117 (S.D.N.Y. 2002) ................................................................. 99

*Integrated Bus. Info. Serv. Ltd. v. Dun & Bradstreet Corp.*,
    714 F. Supp. 296 (N.D. Ill. 1989) ............................................................. 108

*Iosello v. Lexington Law Firm*,
    No. 03 C 0987, 2003 WL 21696991 (N.D. Ill. July 21, 2003) ............... 100, 103

*Itoba Ltd. v. LEP Group PLC*,
    930 F. Supp. 36 (D. Conn. 1996) .............................................................. 109

*In re JDN Realty Corp. Sec. Litig.*,
    182 F. Supp. 2d 1230, 1242 (N.D. Ga. 2002) ............................................. 21

*Jacobs/Kahan & Co. v. Marsh*,
    740 F.2d 587 (7th Cir. 1984) .................................................................... 104

*Jacobs v. Coopers & Lybrand, LLP*,
    No. 97-3374, 1999 WL 101772 (S.D.N.Y. Mar. 1, 1999) ............................. 38

*Jacobson v. Peat, Marwick, Mitchell & Co.*,
    445 F. Supp. 518 (S.D.N.Y. 1977) .............................................................. 65

*Johnson v. Tellabs, Inc.*,
    262 F. Supp. 2d 937 (N.D. Ill. 2003) ........................................................... 30

*Johnson v. Tellabs, Inc.*,
    303 F. Supp. 2d 941 (N.D. Ill. 2004) ........................................................... 53

*Kafenbaum v. GTECH Holdings Corp.*,
    217 F. Supp. 2d 238, 246 (D. R.I. 2002) ..................................................... 52

*Kaufman v. Motorola, Inc.*,
   No. 95-1069, 1999 U.S. Dist. LEXIS 6303
   (N.D. Ill. Apr. 16, 1999) .................................................................................... 19

*Kauthar SDN BHD v. Sternberg*,
   149 F.3d 659 (7th Cir. 1998) ............................................................................ 17

*Kennedy v. National Juvenile Det. Assoc.*,
   187 F.3d 690 (7th Cir. 1999) ............................................................................ 18

*Kenneth Rothschild Trust v. Morgan Stanley Dean Witter*,
   9 F. Supp. 2d 993 (C.D. Cal. 2002) .................................................................. 92

*Kleban v. S.Y.S. Rest. Mgmt., Inc.*,
   No. 95 C 2920, 1996 WL 596450, 95 C 2920 (N.D. Ill. Oct. 9, 1996) ......... 80-81

*Korsinsky v. Salomon Smith Barney, Inc.*,
   Civ. No. 01-6085, 2002 WL 27775 (S.D.N.Y. Jan. 10, 2002) ......................... 92

*Lalondriz v. USA Networks, Inc.*,
   68 F. Supp. 2d 285 (S.D.N.Y. 1999) ................................................................. 93

*Landry v. Price Waterhouse Chartered Accountants*,
   715 F. Supp. 98 (S.D.N.Y. 1989) ..................................................................... 109

*LaSalle v. Medco Research, Inc.*,
   54 F.3d 443 (7th Cir. 1995) .............................................................................. 59

*Law v. Medco Research, Inc.*,
   113 F.3d 781 (7th Cir. 1997) ............................................................................ 60

*Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*,
   No. 02-5893, 2004 WL 574665 (N.D. Ill. Mar. 19, 2004) ................................ 57

*Lentell v. Merrill Lynch and Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005) ............................................................................. 68

*Levine v. NL Indus., Inc.*,
   926 F.2d 199 (2d Cir. 1991) ............................................................................. 63

*Lindelow v. Hill*,
   2001 WL 830956 (N.D. Ill. 2001) ..................................................................... 27

*Lisak v. Mercantile Bancorp, Inc.*,
   834 F.2d 668 (7th Cir. 1987) ............................................................................ 101

*Loeb Indust. v. Sumitomo Corp.,*
 306 F.3d 469 (7th Cir. 2002) ................................................................. 72

*Lorillard, Div. of Loew's Theatres, Inc. v. Pons,*
 434 U.S. 575 (1978) ......................................................................... 31

*MBI Acquisition Partners, L.P. v. Chronicle Publ'g Co.,*
 301 F. Supp. 2d 873 (W.D. Wis. 2002) ....................................................... 50

*In re MDC Holdings Sec. Litig.,*
 754 F. Supp. 785 (S.D. Cal. 1990) ......................................................... 66

*MTC Elec. Tech. Co. v. Leung,*
 889 F. Supp. 296 (C.D. Cal. 1995) ....................................................... 106

*Madigan, Inc. v. Goodman,*
 357 F. Supp. 1331 (N.D. Ill. 1973) ........................................................ 48

*Madigan, Inc. v. Goodman,*
 498 F.2d 233 (7th Cir. 1974) ............................................................... 48

*Malone v. Brincat,*
 722 A.2d 5 (Del. 1998) .............................................................. 83, 85

*Manhattan Life Ins. Co. v. A.J. Stratton Syndicate (No. 782),*
 731 F. Supp. 587 (S.D.N.Y. 1990) ........................................................ 101

*Manzo v. Rite Aid Corp.,*
 Civ. No. 18541, 2002 WL 31926606 (Del. Ch. Dec. 19, 2002) ................................ 86

*Mariash v. Morrill,*
 496 F.2d 1138 (2d Cir. 1974) ............................................................. 102

*Marks v. CDW Computer Ctrs., Inc.,*
 122 F.3d 363 (7th Cir. 1997) ....................................................... 55, 56, 59

*McNamara v. Bre-X Minerals, Ltd.,*
 46 F. Supp. 2d 628 (E.D. Tex. 1999) ..................................................... 109

*In re Merrill Lynch & Co., Inc.,*
 273 F. Supp. 2d 351 (S.D.N.Y. 2003) ...................................................... 63

*In re MicroStrategy, Inc. Sec. Litig.,*
 115 F. Supp. 2d 620 (E.D. Va. 2000) ................................................... 38, 39

*In re MicroStrategy, Inc. Sec. Litig.*,
   148 F. Supp. 2d 654 (E.D. Va. 2001) ............................................................................45

*Miller v. Material Sciences Corp.*,
   9 F. Supp. 2d 925 (N.D. Ill. 1998).......................................................................26, 36

*Morris Material Handling, Inc. v. KCI Konecranes PLC*,
   334 F. Supp. 2d 1118 (E.D. Wis. 2004) .......................................................................111

*Morse v. Abbott Labs.*,
   1991 U.S. Dist. LEXIS 6278
   (N.D. Ill. May 8, 1991) ..................................................................................................5

*In re Motorola Sec. Litig.*,
   No. 03 C 287, 2004 U.S. Dist. LEXIS 18250 (N.D. Ill. Sept. 9, 2004) ....................50, 53

*Musick, Peeler & Garret v. Employers Ins. of Wausau*,
   508 U.S. 286 (1993) ...................................................................................................57

*In re Musicmaker.com Sec. Litig.*,
   No. 00-2018, 2001 U.S. Dist. LEXIS 25118 (C.D. Cal. June, 4 2001)...........................108

*Nathenson v. Zonagen Inc.*,
   267 F.3d 400 (5th Cir. 2001) .......................................................................................45

*In re NeoPharm, Inc.*,
   2003 U.S. Dist. LEXIS 1862 (N.D. Ill. Feb. 7, 2003) .....................................................32

*Newbro v. Freed*,
   No. 03-10308, 2004 WL 691392 (S.D.N.Y. Mar. 31, 2004)...........................................101

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v.
America W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ......................................................................................27

*Nordstrom, Inc. v. Chubb & Son, Inc.*,
   54 F.3d 1424 (9th Cir. 1995) ......................................................................................29

*Norman v. Salomon Smith Barney, Inc.*,
   350 F. Supp. 2d 382 (S.D.N.Y. 2004) ..........................................................................93

*Northern Contracting, Inc. v. State of Illinois*,
   No. 00-C-4515, 2004 WL 422704 (N.D. Ill. Mar. 3, 2004) .............................................73

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) .......................................................................................51

*In re Nuko Information Sys., Inc. Sec. Litig.,*
    199 F.R.D. 338 (N.D. Cal. 2000) ................................................................... 44

*Old Republic Ins. Co. v. Ness, Motley, Loadholt, Richardson & Poole, P.A.,*
    No. 03- 5238, 2004 U.S. Dist. LEXIS 5731 (N.D. Ill. Apr. 5, 2004) ...................... 100, 102

*Oran v. Stafford,*
    226 F.3d 275 (3d Cir. 2000) .................................................................... 72, 75

*In re Orbital Sciences Corp. Sec. Litig.,*
    58 F. Supp. 2d 682 (E.D. Va. 1999) ........................................................... 22, 23

*In re Oxford Health Plans, Inc.,*
    191 F.R.D. 369 (S.D.N.Y. 2000) ............................................................... 34, 74

*Paraschos v. YBM Magnex, Int'l, Inc.,*
    No. 98-6444, 2000 WL 325945 (E.D. Pa. Mar. 29, 2000) ................................ 44

*Payton v. County of Kane,*
    308 F.3d 673 (7th Cir. 2002) ................................................................... 97-98

*Perez-Rubio v. Wyckoff,*
    718 F. Supp. 271 (S.D.N.Y. 1989) .............................................................. 105

*In re Peritus Software Servs., Inc. Sec. Litig.,*
    52 F. Supp. 2d 211, 223 (D. Mass. 1999) .................................................. 22, 23

*In re Philip Servs. Corp. Sec. Litig.,*
    No. 98-0835 (MBM), 2004 WL 1152501 (S.D.N.Y. May 24, 2004) ...................... 37

*Platt Saco Lowell, Ltd. v. Spindelfabrik Suessen-Schurr, Stahlecker & Gill GmbH,*
    No. 75 0051W, 1980 U.S. Dist. LEXIS 16399 (N.D. Ill. Oct. 9, 1980) ................. 103

*Ploog v. HomeSide Lending, Inc.,*
    209 F. Supp. 2d 863 (N.D. Ill 2002) ........................................................... 82

*Ponce v. SEC,*
    345 F.3d 722 (9th Cir. 2003) ................................................................... 37

*In re Qwest Communications Int'l, Inc. Sec. Litig.,*
    No. 01-1451, 2004 U.S. Dist. LEXIS 584 (D. Colo. Jan. 13, 2004) .................... 44

*Randall v. Loftsgaarden,*
    478 U.S. 647 (1986) ............................................................................ 57

*Rehm v. Eagle Fin. Corp.,*
     954 F. Supp. 1246 (N.D. Ill. 1997)...........................................................................39

*Reiger v. Price Waterhouse Coopers LLP,*
     117 F. Supp. 2d 1003 (S.D. Cal. 2000) ...................................................................39

*Retsky Family Ltd. P'shp. v. Price Waterhouse LLP,*
     Civ. No. 97-769, 41998 U.S. Dist. LEXIS 17459 (N.D. Ill. Oct. 21, 1998) ..............69, 70

*Riley v. Merrill lynch, Pierce Fenner & Smith, Inc.,*
     292 F.3d 1334 (11th Cir. 2002) ...............................................................................93

*Retirement Sys. Of Ala. V. Merrill Lynch & Co.,*
     209 F. Supp. 2d 1257, 1269 (M.D. Ala. 2002)..........................................................78

*Rizika v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
     Civ. No. 80-1418, 1981 WL 1619 (D. Md. Jan. 28, 1981)..........................................66

*Robin v. Arthur Young & Co.,*
     915 F.2d 1120 (7th Cir. 1990) ............................................................................41, 42

*The Roots P'ship v. Land's End, Inc.,*
     965 F.2d 1411 (7th Cir. 1992).............................................................................75, 95

*Rothmiller v. Stein,*
     38 N.E. 718 (N.Y. 1894) .........................................................................................86

*In re Rural Cellular Corp. Sec. Litig.,*
     No. Civ.02-4893, 2004 WL 1278725
     (D. Minn. June 6, 2004)...........................................................................................41

*In re SCB Computer Tech., Inc. Sec. Litig.,*
     149 F. Supp. 2d 334 (W.D. Tenn. 2001) ...................................................................39

*SEC v. Foundation Hai,*
     736 F. Supp. 465 (S.D.N.Y. 1990) .........................................................................105

*SEC v. Jakabowski,*
     150 F.3d 625 (7th Cir. 1998) ..............................................................................23-24

*SEC v. Ogle,*
     No. 99 C 609, 1999 U.S. Dist. LEXIS 9955 (N.D. Ill. June 14, 1999) ....................*passim*

*SEC v. Softpoint Inc.,*
     No. 95 Civ. 2951, 2001 WL 43611 (S.D.N.Y. Jan. 18, 2001) .....................................101

*SEC v. Unifund SAL,*
    910 F.2d 1028 (2d Cir. 1990) ................................................................ 101, 103

*San Mateo County Transit District v. Dearman, Fitzgerald and Roberts, Inc.,*
    979 F.2d 1356 (9th Cir. 1992) ................................................................ 108-109

*Santa Fe Indust., Inc. v. Green,*
    430 U.S. 462, 51 L. Ed. 2d 480, 97 S. Ct. 1292 (1977)............................*passim*

*Scheuer v. Rhodes,*
    416 U.S. 232 (1974) .............................................................................. 18

*Scholes v. Stone, McGuire and Benjamin,*
    143 F.R.D. 181, 185. Ill. 1992) ................................................................ 98

*In re Scott Paper Co. Sec. Litig.,*
    142 F.R.D. 611 (E.D. Pa. 1992) .............................................................. 97

*Schuler v. Beers,*
    157 Ill. App. 3d 97, 510 N.E.2d 48 (Ill. App. 1st Dist. 1987)..................... 82

*Sculptchair, Inc. v. Century Arts, Ltd.,*
    94 F.3d 623 (11th Cir. 1996) .................................................................. 111

*In re Sears, Roebuck and Co. Sec. Litig.,*
    291 F. Supp. 2d 722 (N.D. Ill. 2003)...................................................... 53, 67

*In re Sears, Roebuck & Co. ERISA Litig.,*
    No. 02-C-8324, 2004 WL 407007 (N.D. Ill. Mar. 3, 2004)........................ 72

*In re Sec. Litig. BMC Software Inc.,*
    183 F. Supp. 2d 860 (S.D. Tex. 2001)..................................................... 49

*Seideman v. Sheboygan Loan & Trust Co.,*
    223 N.W. 430 (Wis. 1929) ..................................................................... 86

*Serabian v. Amoskeag Bank Shares, Inc.,*
    24 F.3d 357 (1st Cir. 1994)..................................................................... 52

*Shaev v Claflin,*
    2001 WL 548567 (N.D. Cal. May 17, 2001).............................................. 93

*Shanahan v. Vallat,*
    No. 03 Civ. 3496, 2004 WL 2937805 (S.D.N.Y. Dec. 19, 2004) ................. 105

*Sierakowski v. Ryan,*
223 F.3d 440 (7th Cir. 2000) ........................................................................................95

*Simpson v. Specialty Retail Concepts,*
149 F.R.D. 94 (M.D.N.C. 1993)....................................................................................66

*Small v. Fritz Cos., Inc.*
65 P.3d 1255 (Cal. 2003)...............................................................................................86

*In re Software Toolworks Sec. Litig.,*
50 F.3d 615 (9th Cir. 1994) ...........................................................................................50

*Solomon v. Pathe Communications Corp.,*
672 A.2d 35 (Del. 1996)................................................................................................88

*Sonnenberg v. Prospect Park Fin. Corp.,*
1991 WL 329755 (D.N.J. Aug. 20, 1991) ....................................................................52

*In re Spiegel, Inc. Sec. Litig.,*
No. 02-C-8946, 2004 WL 1535844
(N.D. Ill. July 8, 2004)............................................................................................*passim*

*Standard Oil Co. of Texas v. United States,*
307 F.2d 120 (5th Cir. 1962) .........................................................................................28

*State of Wisc. Inv. Bd. v. Ruttenberg,*
Nos. CV-99-BU-3097-S and CV-99-BU-3129-S, (N.D. Ala. July 3, 2001).....................66

*Sterlin v. Biomune Sys.,*
154 F.3d 1191 (10th Cir. 1998) .....................................................................................60

*Stratagem Dev. Corp. v. Hereon Int'l N.V.,*
153 F.R.D. 535 (S.D.N.Y. 1994)..................................................................................101

*In re Suprema Specialties Inc. Sec. Litig.,*
334 F. Supp. 2d 637 (D.N.J. 2004)................................................................................65

*Sutton v. Bernard,*
2001 WL 897593 (N.D. Ill. Aug. 9, 2001)...............................................................22, 32

*Teachers' Ret. Sys. of Louisiana v. A.C.L.N., Ltd.,*
2003 WL 21058090 (S.D.N.Y. 2003) .........................................................................105

*In re Telxon Corp. Sec. Litig.,*
133 F. Supp. 2d 1010, 1027 (N.D. Ohio 2000) ........................................................22, 23

*In re Terayon Communication Sys., Inc.,*
    2003 WL 21383824 (N.D. Cal. Feb. 24, 2003) ................................................................. 46

*Thornton v. Evans,*
    692 F.2d 1064 (7th Cir. 1982) ................................................................................. 87-88

*Tomera v. Galt,*
    511 F.2d 504 (7th Cir. 1975) ......................................................................................... 56

*Tooley v Donaldson, Lufkin & Jenrette, Inc.,*
    845 A.2d 1031 (Del. 2004) .............................................................................. 83, 84, 86

*Trepanier v. Ryan,*
    No. 00-2393, 2003 WL 21209832 (N.D. Ill. May 21, 2003) ........................................ 55

*In re Tyco Int'l, Ltd. Multidistrict Litig.,*
    2004 U.S. Dist. LEXIS 20733 (D.N.H. Oct. 14, 2004) ..................................................... 52

*U.S. v. Arthur Young & Co.,*
    465 U.S. 805, 808 104 S.Ct. 1495, 1504 (1984) ............................................................. 34

*United States v. Bank of New England, N.A.,*
    821 F.2d 844 (1st Cir. 1987) ........................................................................................... 29

*Wachovia Sec., LLC v. Neuhauser,*
    No. 04-3082 (N.D. Ill. Nov. 4, 2004) .............................................................. 58, 59, 62

*Wafra Leasing Corp. v. Prime Capital Corp.,*
    192 F. Supp. 2d 852 (N.D. Ill. 2002) .............................................................................. 56

*Wafra Leasing Corp. v. Prime Capital Corp.,*
    247 F. Supp. 2d 987 (N.D. Del. 2002) ...................................................................... passim

*Walsh v. Chittenden Corp.,*
    798 F. Supp. 1043 (D. Vt. 1992) .................................................................................... 97

*Weiss v. Winner's Circle,*
    No. 91-2780, 1995 U.S. Dist. LEXIS 18713 (N.D. III. Dec. 13, 1995) ......................... 98

*Westell Techs. Inc. Sec. Litig.,*
    No. 00-6735, 2001 U.S. Dist. LEXIS 17867
    (N.D. Ill. Oct. 30, 2001) ...................................................................................... 19, 27, 32

*In re Wheelabrator Tech, Inc. S'holders Litig.,*
    Civ. No. 11495, 1992 WL 212595 (Del. Ch. Sept. 1, 1992) ......................................... 88

*Whirlpool Fin. Corp. v. GN Holdings, Inc.*,
    67 F.3d 605 (7th Cir. 1995) ................................................................................18

*In re Williams Sec. Litig.*,
    339 F. Supp. 2d 1206 (N.D. Okla. 2003) .................................................41, 42

*In re Williams Sec. Litig.*,
    2002 WL 32153476 (N.D. Okla. July 8, 2002) ..............................................45

*Witzman v, Lehrman, Lehrman & Flom*,
    601 N.W.3d 179 (Minn. 1999) ........................................................................89

*Wool v. Tunden Computers, Inc.*,
    818 F.2d 1433 (9th Cir. 1987) ........................................................................31

*In re WorldCom Inc. Sec. Litig.*,
    294 F. Supp. 2d 431 (S.D.N.Y. 2003) ......................................................58, 74

*In re Worldcom, Inc. Sec. Litig.*,
    352 F. Supp. 2d 472 (S.D.N.Y. 2005) ............................................................36

*Zirn v. VLI Corp.*,
    No. 9488, 1989 WL 79963 (Del. Ch. July 17, 1989) ..............................88, 89

*Zurich Capital Mkts., Inc. v. Coglianese*,
    No. 03 C 7960, 2004 WL 2191596 (N.D. Ill. Sept. 23, 2004) ..........53, 100, 102, 110

*Zurich Capital Mkts., Inc. v. Coglianese*,
    332 F. Supp. 2d 1087 (N.D. Ill., 2004) ....................................................54, 88

## RULES/STATUTES

Fed. R. Civ. P. 9(b) .............................................................................................10

Fed. R. Civ. P. 12(b)(6) ........................................................................................9

815 Ill. Comp. Stat. 5/12-13(A) (West 2003) ..........................................4, 77, 81

15 U.S.C. § 78bb(f)(1)(A)-(3)(B)(i) ....................................................76, 77, 78, 92

15 U.S.C. § 78j(b) ..............................................................................................4, 5

15 U.S.C. § 78r(a)-(c) .....................................................................................51, 56

15 U.S.C. §78t(a) ................................................................................................48

15 U.S.C. § 78u-4(a)(2)(A)(iv)-(e)(1) .............................................................45, 46, 94

15 U.S.C. § 78u-4(b)(1).............................................................................................11, 13

28 U.S.C. § 1658(b) (2003) .......................................................................................51, 52

17 C.F.R. §210.10-01(D)................................................................................................16

### MISCELLANEOUS

John C. Coffee, Jr., *Understanding Enron: It's About The Gatekeepers, Stupid,*
 57 Bus Law 1403 (August, 2002)...........................................................................41

William E. Knepper & Dan A. Bailey, *Liability of Corporate Officers and Directors,*
 § 1.02 (4th ed. 1988 & Supp. 1992) ......................................................................29

*Judicial Action in Retrograde: The Case For Applying Section 804*
 *of the Sarbanes-Oxley Act To All Fraud Actions Under The Sec. Laws,*
 72 U. Cin. L. Rev. 1043, 1063-64 (2004).............................................................57

William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations,*
 § 790, at 24 (Perm. ed. 2002) ................................................................................29

Lead Plaintiff, Teachers' Retirement System of Louisiana ("Teachers"), and plaintiffs Washington Area Carpenters Pension and Retirement Fund ("Washington Carpenters") and E. Dean Carlson ("Carlson") on behalf of themselves and all other purchasers of Hollinger International, Inc. ("Hollinger" or the "Company") securities (hereinafter, collectively, the "Plaintiffs") between and including August 13, 1999 and December 11, 2002 (the "Class Period"), respectfully submit this Omnibus brief in opposition to ten motions to dismiss the Second Consolidated Amended Class Action Complaint ("Complaint") filed by the Defendants in this action. This brief is submitted in opposition to the motions and briefs filed by:

- Hollinger Int'l, Inc. ("Hollinger" or the "Company") (brief referred to as "Hollinger Br.");

- Hollinger Inc., the Ravelston Corporation Limited ("Ravelston"), Ravelston Management Inc. ("RMI"), Lord Conrad M. Black ("Lord Black"), Barbara Amiel Black ("Amiel Black"), Jack A. Boultbee ("Boultbee"), Daniel W. Colson ("Colson") and F. David Radler ("Radler") (collectively, the "Black Group" ("Black Group Br.");

- Dwayne O. Andreas ("Andreas"), Richard R. Burt ("Burt"), Raymond O. Chambers ("Chambers"), Henry A. Kissinger ("Kissinger"), Marie-Josee Kravis ("Kravis"), Shmuel Meitar ("Meitar"), Robert S. Strauss ("Strauss"), A. Alfred Taubman ("Taubman"), James R. Thompson ("Thompson"), Lord Weidenfeld of Chelsea ("Weidenfeld") and Leslie Wexner ("Wexner") (collectively, the "Director Group") ("Director Group Br.");

- KPMG LLP ("KPMG") ("KPMG Br.");

- Mark S. Kipnis ("Kipnis") ("Kipnis Br.");

- Richard N. Perle ("Perle") ("Perle Br. ");

- Barbara Amiel Black (separate supplemental brief joining in the Black Group Brief) ("Amiel Black Joinder");

- Peter Y. Atkinson ("Atkinson") ("Atkinson Br.");

- Argus Corporation ("Argus") ("Argus Br."); and

- F. David Radler (a separate supplemental brief joining in the Black Group Brief) ("Radler Joinder").

Black, Amiel Black, Boultbee, Colson, Radler, and the defendants in the Director Group are referred to collectively herein as the "Individual Defendants." All of the defendants are referred to collectively herein as "Defendants." For all of the following reasons, each of the Defendants' motions is without merit and should be denied.

## PRELIMINARY STATEMENT

In the months following the commencement of this action, a Special Committee of Hollinger's Board of Directors ("Board") completed an investigation of the fraud and other misconduct at Hollinger by Lord Black and others. The Special Committee Report, filed with the Securities and Exchange Commission ("SEC") and the court in the SEC's Illinois action against Hollinger (on or about August 31, 2004), describes (in 511 pages) numerous instances where the Company misrepresented the terms of significant corporate transactions, including sales of Hollinger's newspaper assets, by concealing payments of non-compete fees to Lord Black and other Hollinger executives, concealing that the asset sales were made to entities owned and controlled by Lord Black and other insiders, and falsely stating that the transfers had been reviewed and approved by the Board and its Audit Committee, when that was not true. The Special Committee further reported that Hollinger had misrepresented the terms of its management services agreements with Ravelston and other affiliates, by falsely claiming that those agreements had been negotiated and were at market value (when they were not) and by concealing that Ravelston and its affiliates had done absolutely nothing to earn the fees; in fact, the management fees were paid directly to Radler, Amiel Black and others even though they provided absolutely no services to Hollinger to earn those fees. Based upon its review of nearly 750,000 pages of documents and the fraudulent transactions from 1997 through 2003, and over

60 witness interviews, the Special Committee concluded that "[t]he record of Hollinger's disclosures under Black's and Radler's leadership shows repeated instances of incomplete/inaccurate or nonexistent disclosures."

The Ontario Securities Commission commenced enforcement actions against Hollinger, Hollinger Inc. and related Hollinger entities in May 2004 alleging that those entities made a series of false and misleading statements concerning transactions with Hollinger (such as the failure to disclose the non-compete payments and Black and Radler's ownership of companies purchasing Hollinger's assets), and announced this week that it will on May 18 consider allegations that Lord Black and his fellow executives improperly "directed money to their holding company and lied to investors in financial statements." On November 15, 2004, the SEC filed an enforcement action alleging that Black, Radler and Hollinger Inc. "engaged in a fraudulent and deceptive scheme to divert cash and assets from Hollinger International" through secret non-compete payments and sales of assets to related parties at "below market prices" while "concealing their self-dealing from Hollinger International's public shareholders." The Justice Department confirmed this week in a filing in the SEC's enforcement action that it is investigating whether Lord Black and others "fraudulently diverted corporate assets and opportunities owned by Hollinger International to themselves and other companies that they controlled" and "whether fraud occurred" through misrepresentations of various transactions. Hollinger's own suit in Delaware alleged that none of the non-compete payments had been approved by the Audit Committee or Board, though Hollinger had represented that they were so approved, and that neither Ravelston nor any of its affiliates had done anything to earn the management services fees, though that fact was concealed from investors. The Delaware Chancery Court found after a trial that the Company's disclosures were false because, for

example, secret non-compete agreements signed by Black, Radler and others were not part of Hollinger's asset sale agreements, nor was there any evidence that the Board ever even saw the non-compete agreements or approved them, although Hollinger falsely said that this was the case. ¶ 85. Indeed, the Company itself has admitted that its Class Period disclosures were false and misleading, as on November 17, 2003, Hollinger admitted that its prior disclosures regarding non-compete payments were "incomplete" and "inaccurate" and that such payments had not been authorized or approved by the Audit Committee or the full Board, as previously represented. Just this past month, Judge Manning denied certain defendants' motions to dismiss similar claims against them charging them with looting the Company. *Hollinger Int'l, Inc. v. Hollinger, Inc.*, No. 04 C 0698, 2005 WL 589000 (N.D. Ill. Mar. 11, 2005).

Based upon the Special Committee's Report and the numerous charges filed against the Company and its executives by governmental authorities in the United States and Canada, and the Company's own admissions of wrongdoing, Plaintiffs filed this class action on behalf of purchasers of Hollinger securities during the Class Period (between and including August 13, 1999 and December 11, 2002), asserting claims against Hollinger and the Individual Defendants and KPMG (Hollinger's auditors during the Class Period) under Sections 10(b), 18 and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5, 15 U.S.C. §§ 78j(b), 784 and 78t(a), and 17 C.F.R. § 240.10b-5, Sections 12(F), (G) and (I) of the Illinois Securities Law of 1953, 815 ILA § 5/12, and state common law for breach of fiduciary duty and aiding and abetting such breach which induced Plaintiffs and other class members to retain their Hollinger stock.

Notwithstanding the Special Committee's own findings of fraud, the Company's own admissions, the findings by the SEC and courts in this district and in Delaware, the recent

-4-

investigations and charges against Hollinger and its executives, and the detailed descriptions in

the Complaint of the improper transactions and accounting practices, including numerous

citations to internal corporate documents such as emails and the non-compete agreements

themselves, Defendants make the ridiculous assertion[1] that Plaintiffs have not adequately alleged

their claims, particularly, Defendants' participation in the fraud and their scienter. This is a

complete waste of the Court's time. As set forth below, Plaintiffs' claims under Section 10(b) of

the Securities Exchange Act of 1933 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17

C.F.R. § 240.10b-5, for Defendants' making materially false and misleading statements and their

participation in a fraudulent scheme to deceive the investing public and artificially inflate and

maintain the market price of Hollinger's stock, are well-founded and adequately pled, and show

that each of the Defendants knew about and participated in the fraud, or recklessly allowed it to

occur.

Lord Black, Radler, Boultbee and Atkinson were directly involved in the fraud, as they

structured the improper deals and/or were direct recipients of the funds looted from Hollinger.

The rest of the Individual Defendants[2] directly participated in the fraud, by approving or

recklessly allowing the publication of statements they knew were false.

The Director Group, and Atkinson, Kipnis, Perle, Radler and Amiel Black also seek to

dismiss the case because certain of them did not directly make a false or misleading statement.

However, each of these Defendants made a statement by signing a public filing (Black, Radler,

Colson, Amiel Black, Andreas, Burt, Chambers, Kissinger, Kravis, Meitar, Perle, Strauss,

---

[1] Also ridiculous is Atkinson's contention (at 3, 2) that Plaintiffs violated Rule 11 for having "expropriated" allegations in other actions. *See Morse v. Abbott Labs.*, No. 90-1982, 1991 U.S. Dist. LEXIS 6278, at *4 (N.D. Ill. May 8, 1991) (plaintiff's complaint had sufficient factual basis as it relied on news articles and SEC filings).

[2] The other Individual Defendants include Amiel Black, Colson, Andreas, Burt, Chambers, Kissinger, Kravis, Meitar, Perle, Strauss, Taubman, Thompson, Weidenfeld and Wexner.

Taubman, Thompson, Weidenfeld and Wexner) or are presumed to have signed one as they were top executives at the Company involved in its day-to-day operations. Additionally, primary liability may be imposed on those who had knowledge of and participated in the fraud, and Plaintiffs have adequately alleged each Defendants' scienter and role in the fraud. Defendants also contend that Plaintiffs' claims only challenge the improper internal management of Hollinger, and so the claims are barred by *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977). However, *Santa Fe* and the many cases interpreting that decision have consistently ruled that the same facts that give rise to a breach of fiduciary duty claim can support a federal securities claim where "there was a misrepresentation or omission in the flow of material information." *Fry v. UAL Corp.*, 895 F. Supp. 1018, 1043 (N.D. Ill. 1995). As the Complaint describes numerous material misrepresentations and omissions by Defendants, the federal securities claims are not precluded by *Santa Fe*.

Nor is there any basis to dismiss Plaintiffs' Section 18 claim. As explained below, that claim (based on the same facts as the Section 10(b) claim) is adequately pled and is timely, as it was brought within two years (and even one year) of the date when Plaintiffs were first put on notice of fraud at Hollinger. Moreover, notice is a factual issue that should not be resolved on a motion to dismiss.

Plaintiffs have also adequately alleged loss causation, as the price of Hollinger's stock dropped following each of the corrective disclosures and for several days thereafter. Defendants contend that Hollinger's stock went up on the day following the filing of the corrective disclosures, but for this argument, Defendants dispute without any factual basis the claims in the Complaint regarding the timing of these disclosures. At a minimum, there is a factual dispute about when the disclosures were made, but at this stage of the litigation, and without any

evidentiary showing whatsoever by Defendants, the Court must accept as true the allegations in the Complaint and construe them in Plaintiffs' favor.

Moreover, each of the corrective disclosures were themselves false and misleading, and were accompanied by "words of comfort" designed to reassure investors, and so the disclosures could not be expected to cause a decline in Hollinger's stock price (though they did). Finally, even if Hollinger's stock price went up on a single day after the disclosures, the stock may have gone up even more in the absence of the disclosures, and so Plaintiffs were still harmed by the fraud. However, this, too, is a factual matter inappropriate for resolution on a motion to dismiss.

The remainder of Defendants' arguments are equally specious for the reasons discussed below. Therefore, each of the Defendants' motions should be denied.

## STATEMENT OF FACTS

### A. Hollinger And Its Board Were Controlled By Lord Black

Hollinger is a Delaware corporation headquartered in Illinois. ¶ 18. Beginning prior to and throughout the Class Period, Lord Black was the Chief Executive Officer of Hollinger and controlled the Company and dominated its Board. ¶ 24.[3] Lord Black exercised his control over Hollinger to direct hundreds of millions of dollars from the Company to himself and his close associates, including Radler, Boultbee and Atkinson, in the form of purported non-compete payments and management and advisory fees provided by Ravelston and its affiliates, including Argus, to Hollinger. When some of these self-dealing transactions were called to the Board's

---

[3] Lord Black controlled Hollinger through his 65% ownership of Ravelston, which, in turn (through its subsidiaries and affiliates including Argus) controls 72% of Hollinger Inc. which, in turn, controls 73% of Hollinger's overall voting power. ¶¶ 19, 24. As found by the Delaware Chancery Court, Lord Black "was the creator of this group of companies, has personally dominated their affairs, and put in place boards to his liking." *Hollinger Int'l Inc. v. Black*, 844 A.2d 1022, 1030 (Del. Ch. 2004). That Court also found that throughout the Class Period, the boards of these companies "have comported themselves in a supine manner that confirmed Black's confidence in his power." *Id.* The Special Committee likewise found that Hollinger's directors knew that they could be replaced at any time by Black, so they did not "make waves." ¶ 24.

attention, the directors simply rubber-stamped the deals and failed to correct prior representations about the transactions which the Board and Audit Committee knew were false. ¶¶ 4, 131, 208, 224, 430, 434, 475, 477, 528 and 531. As the Special Committee reported, Hollinger's Board "functioned more like a social club or public policy organization than as the board of a major corporation, enjoying extremely short meetings followed by a good lunch and discussion of world affairs . . . . Actual operating results or corporate performance were rarely discussed." ¶ 25.

### B.    Non-Compete Payments

From 1998 through 2000, Hollinger sold various newspaper assets to other companies, and publicly disclosed the amount of those sales.[4] In response to the disclosures of the asset sales and the Company's resulting payoff of debt, the Company's stock climbed, going from $10.08 per share on August 13, 1999 to $13.11 per share on March 28, 2002. However, unbeknownst to investors, a significant portion of the sales proceeds went directly into the pockets of Lord Black, Radler, Atkinson and Boultbee (or indirectly to them through payments to Ravelston or Hollinger Inc.) in the form of purported non-compete payments which were "straight carve-outs of the sales price that were paid at closing directly to the individuals." ¶ 61; *see generally* ¶¶ 64-132 (detailing the non-compete payments and the related false and misleading statements). In total, these Defendants improperly diverted to themselves over $90 million. ¶¶ 61, 80. All of these payments were improper, as they were not approved by the

---

[4] The Company's disclosures of these sales were contained in press releases and Forms 8-K on July 21, 2000 and August 16, 2000 and December 1, 2000; the August and November 1999 and May, August and November 2000 and May, August and November 2001 10-Qs; the 2000 and 2001 Proxy Statements and the 1999 and 2000 10-Ks (cosigned by Lord Black, Radler, Colson, Amiel Black, Andreas, Burt, Chambers, Kissinger, Kravis, Meitar, Perle, Strauss, Taubman, Thompson, Weidenfeld, and Wexner) (all as defined in the Complaint).

Audit Committee or the Board nor were they required by the buyers at closing. ¶¶ 4, 10, 61, 91, 115, 118, 147-57.[5]

In addition to being improper, these non-compete payments were not disclosed to the shareholders, and when Hollinger finally admitted in May 2001 and April 2002 (with respect to some of the sales transactions) that non-compete payments had been made, it falsely claimed that the payments were required by the buyers at closing[6] and that the Audit Committee and the full Board had approved those payments, when they had not. ¶¶ 62-63, 82-84, 105-15, 129-32.[7] Additionally, Hollinger did not disclose the full amount of the payments nor that any payments had been made to Hollinger Inc., also controlled by Lord Black. ¶¶ 116-17. It was not until November 17, 2003 (in a Form 8-K and subsequent Form 10-Q) that the Company properly identified the amount of the non-compete payments and admitted that its prior disclosures were "incomplete or inaccurate" as the payments had not been authorized or approved by either the Audit Committee or the full Board. ¶ 91.

### C.    Management Services Agreements

From 1995 to 2003, Lord Black, Boultbee, Radler and Atkinson surreptitiously funneled additional Hollinger funds to themselves through payments pursuant to management services

---

[5] Buyers of Hollinger's assets have emphatically denied ever having requested the non-competes and stated that those agreements were requested by Hollinger. ¶¶ 112-13.

[6] In fact, as explained by the Special Committee, the buyers did not need non-competes from Black, Radler, Atkinson or Boultbee, as they were all Hollinger officers and so "Hollinger had the ability to require them to honor the terms of any non-compete signed by Hollinger." ¶ 61.

[7] The Delaware Chancery Committee ruled that there was no "evidence in the corporate minute book, or . . . other sources, that any of the non-competition payments had been the subject of specific approval by either [Hollinger] International's audit committee or its board of directors" and the Board's later purported "ratification" of the payments through exercise of written consents never occurred either. *Hollinger Int'l*, 844 S.2d at 1037, 1068; ¶¶ 85-87. Thus, the directors knew, or were reckless in not knowing, that the representations about the asset sales transactions, as well as the purported approvals of the non-compete agreements, were false. The Special Committee further found that the Company had falsely identified the payment amounts and falsely left the impression that the payments were in addition to the purchase price when in fact they reduced the purchase price. ¶¶ 105, 109.

agreements to Ravelston, RMI, Argus, Moffat Management ("Moffat"), and Black-Amiel

Management ("Black Amiel"). ¶¶ 7, 133. The Company falsely disclosed prior to and during

the Class Period (*e.g.*, in its 2001 Proxy Statement) that Ravelston provided "advisory,

consulting, procurement and administrative services to the Company and its respective

subsidiaries" and "assist[ed] in operational matters" and Hollinger had fraudulently assured

investors since March 1999 that the management services agreements were properly negotiated

by the Company so the fees were a fair value for the cost to Ravelston of providing the services.

¶¶ 133-34.[8] However, unbeknownst to the shareholders, Ravelston and its affiliates did not

provide any purported management, advisory or consulting fees to Hollinger, as the management

services agreements were simply a ruse to divert additional Hollinger funds (totaling

approximately $202 million) to Lord Black and his associates. ¶¶ 2, 134, 141.

Not only were these material facts regarding the management services agreements

concealed from the shareholders, the Defendants made numerous false representations regarding

these agreements. *See generally* ¶¶ 7, 135-63 (detailing this aspect of the fraud). Defendants

falsely represented that the service agreements were negotiated at arms' length and approved by

the Board and Audit Committee, when they were not, and then failed to disclose that executives

at Ravelston and its affiliates (including Argus) personally received payments pursuant to

separate service agreements with Hollinger's subsidiaries. *Id.* As the Company conceded in its

2002 10-K, the agreements "were not the result of arm's length negotiations between

independent parties," certain agreements had been assigned to RMI (which was paid by

---

[8] The misrepresentations regarding the management services agreements were contained in the 1999-2002
Proxy Statements, the May 2001 10-Q and the 2001 10-K, and in Lord Black's statements to the
shareholders at the 2002 annual shareholders meeting where he falsely claimed that he had been "assured
by independent advisors that the [Ravelston Management] fee is at the conservative end of the range of
practice" as Ravelston was being paid "much less" than the "normal cost" for such services. ¶¶ 135-40.

Hollinger), and Hollinger was directly paying executives at Ravelston and affiliates of Ravelston and RMI (such as Amiel Black) pursuant to the management services agreements. ¶¶ 142-44. But even those disclosures were misleading, as it was not until the filing of the Special Committee Report (in August 2004) that investors learned that Moffat, Black-Amiel and other entities "did nothing to earn fees" and that the "enormous management fees" had never even been "presented for approval to either the Audit Committee or the Board." ¶ 147; *see also* ¶¶ 148-49, 152-57.[9] The Special Committee "found no evidence that the entities themselves did anything through anyone" or that "the payments . . . were ever presented for approval to either the Audit Committee or the Board" and thus concluded that "the purported 'management fees' were fraudulent in nature." ¶¶ 146-47. The Special Committee also found that "there was never any meaningful discussion between Ravelston and the Audit Committee relating to the annual fee proposal" as the fee was simply dictated by Radler, and neither the Audit Committee nor the Board ever even discussed the fee proposal prior to February 2000 and even at that meeting, the Board never asked for the basis for the amount of the fees. ¶¶ 151-56. It was not until the 2003 Proxy Statement that the Company made any disclosure of the specific amounts paid to Lord Black, Radler, Atkinson, Boultbee and Colson under the management services agreements, and even then, the disclosure was false because it failed to include in the compensation listed for these individuals any amounts paid as management services fees. ¶¶ 162-63.

---

[9] Also as detailed in the Complaint, in connection with Hollinger's asset sales to CanWest, Ravelston entered into a management services agreement with CanWest for a $4 million annual fee payable by CanWest, plus termination fees (if either party terminated the services agreement), in addition to over $25 million in non-compete fees Ravelston received from CanWest. ¶ 226. Those facts were not disclosed to shareholders, and even when there was a disclosure, it was false and misleading, as it falsely claimed that the management services were for the benefit of Ravelston but Ravelston would not provide any services to CanWest, and it was not (as represented) a temporary arrangement. ¶¶ 227-36.

### D.    Asset Sales To Affiliated Entities

Defendants also misrepresented the Company's asset sales to entities secretly controlled by Lord Black, concealing, for example, that these deals were at fire-sale prices (one at a dollar)[10] and structured to prevent competitive bids from emerging. ¶¶ 8, 164. Hollinger did not disclose these facts, nor that Hollinger's Board had not given prior approval for the deals or engaged in any review or analysis of the properties it was selling, or that the deals were consummated only because Hollinger provided the financing needed by the Black-owned companies to close the deals with Hollinger. *Id.*; *see generally* ¶¶ 165-225 (detailing this aspect of the fraud).

Hollinger sold many of its newspaper asserts to Horizon Publications Inc. ("Horizon"), which Black and Radler secretly established, owned and controlled. ¶ 165. When the Company disclosed its sales of certain community newspapers to Horizon, it did not disclose Horizon's affiliations with Black and Radler, stating only (in the 2000 and 2001 10-Ks) that Horizon was "owned by current and former Hollinger International Inc. executives" and that the sales were "approved by the independent directors of the Company." ¶¶ 171-72. The Board knew, but did not disclose, that Black and Radler owned and controlled Horizon, as the Company vaguely stated in the 2001 and 2002 Proxy Statements that Horizon had "certain members of the Board of Directors and senior management of the Company as shareholders." ¶¶174-75.[11] The disclosures of these asset sales were also false and misleading because there was no disclosure of the $8 million in financing that Hollinger provided to Horizon to close the deal, or that this loan was not approved by the Board. ¶ 170.

---

[10] As Plaintiffs alleged, Hollinger actually paid Horizon to take certain newspaper assets from Hollinger (¶ 187-194) and Horizon purchased other Hollinger assets for only one dollar. ¶¶ 201-11.

[11] As explained in the Complaint, the 2002 Proxy Statement contained the first disclosure that any Board members or executives of Hollinger controlled Horizon. ¶ 181.

The 2001 and 2002 Proxy Statements both reported that sales of community newspapers to Horizon were "unanimously approved by the Audit Committee and independent Directors of the Company as market value transactions." ¶ 173. However, this was false as those directors had conflicts which prevented them from being independent. ¶¶ 189-90. Additionally, as the Special Committee reported, all of the disclosures about the Horizon transactions were misleading because the disclosed sales price "was not negotiated but, was determined through unfair and improper manipulations of data by or under the direction of Radler, an officer, director and major shareholder of both Hollinger and Horizon." ¶ 176.

In another transaction with Horizon, the Company exchanged profitable publications for others owned by Horizon that were worth millions less and were losing money. ¶¶ 178, 183. The Company's representation that this swap transaction had been approved in advance by the Audit Committee and independent directors was false, as the Audit Committee only provided an after-the-fact "ratification" of the consummated deal and neither the Audit Committee nor the Board conducted any review or inquiry into the properties Hollinger would receive in the exchange, nor did they ever obtain a fairness opinion or independent valuation of the properties. ¶¶ 184-85. Also false was the representation in the 2002 Proxy Statement that the transaction was done at "market value." ¶ 185.

The Company's representations regarding its May 2000 sales to Horizon were likewise completely false. Hollinger reported in its 2001 Proxy Statement that the sales were "valued at approximately 2.5 million" but the actual sale was for $1 plus a "150,000 negative working capital adjustment." ¶¶ 187-88. The representation in the 2002 Proxy Statement that the sale was at "market value" was false, as the Board and Audit Committee failed to conduct any investigation or appraisal necessary to make that representation. ¶ 189. In fact, shortly before

-13-

Hollinger completed this sale, a third party offered to buy the assets for $750,000, but that offer was rejected, and Hollinger completed the sale to Horizon for $1, and Horizon resold the assets eighteen months later for a $1 million profit, all of which was concealed from investors. ¶¶ 191-94.

Hollinger sold additional newspapers to Horizon in a transaction that was not approved by the Audit Committee. ¶ 195. Hollinger's disclosures in its 2002 Proxy Statement of this sale for "net working capital" was false as those sales were for $1 as well. ¶ 206. Remarkably, just prior to this sale, a third party signed a letter of intent to buy the newspapers for $1.25 million, and later increased the offer to $4 million, but Hollinger rejected these offers so it could enrich Lord Black and Radler by selling the assets to Horizon (which they owned and controlled) for only $1. ¶¶ 202-04. The Company falsely stated that that sale, as well as others to Horizon, had been "unanimously approved by the Audit Committee and the independent Directors of the company as market value transactions" (¶ 206), but that was completely false. ¶¶ 207-11.

Hollinger separately misrepresented its asset sales to Bradford Publishing Company ("Bradford"). The Company's disclosures of its sales to Bradford (in the 2001 and 2003 Proxy Statements and the 2000-2002 10-Ks) were false and misleading because they did not disclose that Black and Radler owned and controlled Bradford and that the deals were consummated only because Hollinger provided Bradford with the financing needed by Bradford to close the deals. ¶¶ 212. Additionally, the Company did not inform shareholders that the Audit Committee failed to conduct any inquiry or analysis of the fairness of the purchase price of the properties sold to Bradford or Bradford's ability to repay the note provided by Hollinger. ¶¶ 220-21. In fact, when Radler presented the deal to the Audit Committee, he revealed that the Company had not shopped the newspapers to any third party and that the price had already been established by

Lord Black, but the Audit Committee simply rubber-stamped the proposed transaction. ¶¶ 218, 223.

### E.    Undisclosed Compensation and Perquisites

The Company also failed to disclose the compensation paid to Lord Black, Radler and other Ravelston executives through their share of the management services fees, incentive payments, bonuses, and perquisites , in the form of staff, housing, personal expenses, personal use of corporate aircraft, historical memorabilia, charitable gifts, and dividend payments. ¶¶ 235-74. As set forth in the Special Committee Report, Hollinger paid for Black's housing and living expenses and other extravagances, including tens of thousands of dollars for a birthday party for Amiel Black, shopping trips, automobiles, travel, Black's purchase of memorabilia of President Franklin D. Roosevelt (for $9 million, stored at Black's various residences), but never disclosed any of these corporate payments as compensation paid to Black or Radler. ¶¶ 241-268.

### F.    Circulation Inflation

Hollinger throughout the Class Period artificially inflated its reported circulation figures for its newspapers, particularly the CHICAGO SUN TIMES, by 25% or more. ¶¶ 1, 12, and 276. It was not until June 15, 2004 that investors learned of this aspect of the fraud, when Hollinger announced that its Audit Committee was conducting an internal review of practices that resulted in an overstatement of circulation figures over the past several years. ¶¶ 275-98. Accordingly, the Company's Class Period disclosures of operating and circulation revenue (in the 1999-2001 10-Ks and May, August and November 2000 10-Qs, and November 2001 and March 2002 10-Qs) were all false and misleading, as they were propped up by a widespread and coordinated effort at the Company to inflate its circulation figures through illicit means. ¶¶ 275-98, 486.

### G.    The Truth Emerges

The price of Hollinger stock, which traded at $10.08 on the first day of the Class Period, and rose to a Class Period high of $17.06 on August 24, 2000, dropped to close at $9.85 on December 11, 2002, when the Company's Senior Notes were downgraded. ¶ 325. During this period of time, each of the Company's partial, though misleading, disclosures of the fraud drove the stock down: on May 14, 2001, Hollinger stock closed at $15.80; following the disclosure of some of the non-compete payments, the stock fell to $15.66 on May 15, 2001 and further to $12.86 on August 14, 2002 (upon the filing of the August 2001 10-Q); following additional corrective disclosures, the Company's stock went from $13.75 on April 1, 2002 to $13.40 on April 2, 2002, and then ultimately dropping to $11.77 on May 23, 2002 (the date of the shareholder meeting). ¶ 325. Further revelations of the fraud after the Class Period drove the stock down to $9.96 on December 10, 2002 and $9.85 on December 11, 2002. ¶ 326.

After the end of the Class Period, the Company finally revealed that its Class Period disclosures were all themselves false and misleading and tempered by the Company's false representations that certain deals and payments had received the scrutiny and approval of the Audit Committee and full Board, when that was not true. In mid-November 2003, it was reported that Hollinger was the subject of an SEC investigation; members of the audit committee of Hollinger Inc. resigned; Lord Black and Radler resigned from their executive posts at Hollinger; Boultbee was fired; Black and Radler agreed to repay what they had stolen from the Company; and Hollinger announced that its prior disclosures regarding the non-compete payments were all false and misleading. ¶¶ 299, 303, 305-06. In January 2004, the SEC filed an action against Hollinger and Lord Black, and additional litigation against Lord Black commenced in Delaware Chancery Court. ¶¶ 308, 311. In August 2004, the Special Committee filed its Report with the SEC and in the SEC's action against Black detailing the fraud, and

-16-

Hollinger said it would have to restate its financials as a result of the improper payments to Lord Black and others. ¶ 322. As a result of these disclosures, and the Company's measures to stop the fraudulent activity, take corrective action (including filing lawsuits against Lord Black and others) and oust Lord Black and others who had implemented and benefited from the fraud, the price of Hollinger's stock began to rise. Hollinger's stock price continued to rise after the Class Period as the market reacted favorably to this news, until on June 15, 2004 the Company disclosed that it had been fraudulently inflating the circulation figures at its newspapers. In response to that news, the stock dropped, going from $17.82 on June 15, 2004 to $16.10 on June 16, 2004, and further dropped to $15.71 on July 26, 2004, following additional news articles about the circulation figure scheme.

## ARGUMENT

### A.    Standards On A Motion To Dismiss

"In the securities context, Rule 12(b)(6) dismissals are difficult to obtain because the cause of action deals primarily with fact-specific inquiries." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1118 (10th Cir. 1997) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988)). The purpose of a Rule 12(b)(6) motion for failure to state a claim is to test the sufficiency of the allegations in the complaint, not to decide the merits of plaintiffs' factual allegations. *GE Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). While the Private Securities Litigation Reform Act of 1995 ("PSLRA") raised the standard for pleading a defendant's scienter, the statute did not alter the standards applicable to a Rule 12(b)(6) motion to dismiss. *In re Guidant Corp. Sec. Litig.*, No. 1:03-0892, 2004 U.S. Dist. LEXIS 22809, at *21 (S.D. Ill. Nov. 8, 2004) ("The PSLRA did not shift or otherwise modify these burdens."). As the Seventh Circuit has confirmed in post-PSLRA federal securities fraud cases, when deciding a motion to dismiss, a trial court should not weigh facts or accept innocent explanations for

-17-

defendants' misconduct at the pleading stage, but instead must accept as true all well-pleaded facts alleged in the complaint, and draw all reasonable inferences from those facts in favor of the plaintiff. *Kauthar SDN BHD v. Sternberg*, 149 F.3d 659, 669-670 (7th Cir. 1998); *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 608 (7th Cir. 1995). The Court cannot dismiss the complaint for failure to state a claim "unless [it is] sure, beyond a doubt, that the plaintiff cannot prove any set of facts that would entitle him to relief." *Marks v. CDW Computer Ctrs.*, 122 F.3d 363, 367 (7th Cir. 1997); *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997). *See also Conley v. Gibson*, 355 U.S. 45-46 (1957); *Kennedy v. National Juvenille Det. Ass'n*, 187 F.3d 690, 695 (7th Cir. 1999) (dismissal appropriate only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief). Additionally, while Rule 9(b) requires "all averments of fraud" to be "stated with particularity," "malice, intent, knowledge, and other condition of mind of a person may be averred generally." *In re Guidant Corp. Sec. Litig.*, 2004 U.S. Dist. LEXIS 22809, at *24.

The only issue at this stage of litigation is not who will ultimately prevail, but whether Plaintiffs are entitled to put forth evidence in support of their claims. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Caremark, Inc.*, 113 F.3d at 648. As set forth below, Plaintiffs have sufficiently pled the allegations against each of the Defendants, and so are entitled to conduct discovery of facts in support of their claims.

**B.    Plaintiffs Plead With Sufficient Particularity That Defendants' Statements Concerning The Company's Financial Results And Conditions Were False And Misleading When Made**

**1.    Defendants' Disclosures About Hollinger's Asset Sales, Management Services Agreements And Circulation Figures Were False And Misleading**

Plaintiffs allege with great particularity that each of the Defendants' Class Period statements referenced in ¶¶ 61-132 of the Complaint concerning the disclosure of Hollinger's

asset sales were false and misleading as Defendants materially misrepresented the terms of these transactions (including the amount of the asset sales) and failed to disclose the improper theft of millions of dollars of Company funds (approximately 95% of Hollinger's net income) by Lord Black and his co-conspirators, Radler, Boultbee and Atkinson, by way of the non-competition agreements. ¶¶ 1, 61-132. The disclosures were false and misleading also because they did not disclose that the assets were sold to entities secretly controlled by Black, Radler and others affiliated with Hollinger and that the deals were purposely structured to prevent other non-related entities from bidding on the assets. ¶ 8, 164. Defendants also failed to disclose that Hollinger's Board had not given prior approval for these deals or engaged in any review or analysis of the properties being sold. ¶¶ 1, 5, 10, 164, 172-76, 179-99, 208, 217, 220-21. Likewise, Defendants failed to disclose that the deals were consummated with financing provided by Hollinger. ¶¶ 8, 164, 170, 176, 214-17, 220, 222. Thus, Black actually purchased Hollinger assets for himself using monies borrowed from Hollinger. ¶¶ 165-225.[12]

When Hollinger actually admitted in April 2002 that some non-compete payments had been made, Defendants claimed that the payments were required by the buyers at closing and that the Audit Committee and the full Board had approved the payments, but that was completely false. ¶¶ 62-63, 82-84, 105-15, 129-32. Additionally, Hollinger did not disclose the full amount of the payments or that any payments had been made to Hollinger Inc., which was also controlled by Lord Black. *Id.* ¶¶ 116-17. It was not until November 17, 2003 that the Company

---

[12] Defendants had an affirmative obligation to disclose all of this information, because all of it was material and, in addition, once Defendants spoke on these issues, they had a duty to tell the entire truth regarding these issues. *Ackerman v. Schwartz*, 947 F.2d 841, 848 (7th Cir. 1991) (if a party "chooses to speak it must tell the truth about material issues"); *In re Westell Techs., Inc. Sec. Litig.*, 2001 U.S. Dist. LEXIS 17867, at *24 (N.D. Ill. Oct. 30, 2001) (a duty to disclose non-public material information also arises when "disclosure is needed to make a prior statement not misleading.") (emphasis added; citation omitted); *Kaufman v. Motorola, Inc.*, No. 95 CV 1069, 1999 U.S. Dist. LEXIS 6303, at *24 (N.D. Ill. Apr. 16, 1999) ("incomplete disclosures implicate a duty to disclose any additional information needed to rectify misleading statements.").

properly identified the amount of the non-compete payments and admitted that its prior disclosures were "incomplete or inaccurate" and had never been authorized or approved by either the Audit Committee or the full Board. ¶ 91.

Likewise, each of Defendants' Class Period statements referenced in paragraphs 133-63 and 226-234 of the Complaint concerning the management service agreements with Ravelston and other related entities[13] was false and misleading as no services were actually provided to Hollinger pursuant to these agreements. ¶¶ 6, 133-63, 226-34, 146, 227. Additionally, Defendants falsely represented that the service agreements were negotiated at arms' length and approved by the Board and Audit Committee, when they were not. ¶¶ 7, 134-46. Defendants also failed to disclose that executives at Ravelston and its affiliates received personal payments pursuant to separate service agreements with Hollinger's subsidiaries. *Id.* It was not until August 2004 that the market learned that these entities "did nothing to earn fees" and that the "enormous management fees" had never even been "presented for approval to either the Audit Committee or the Board." ¶ 147; *see also* ¶¶ 148-49, 152-57.[14]

Finally, during the Class Period, Defendants misrepresented the Company's reported newspaper circulation figures by approximately 25%. ¶¶ 275-78. Defendants fraudulently inflated the circulation results of several Hollinger newspapers, including the Chicago Sun-Times. ¶¶ 275-98. As a result of this unlawful practice, Hollinger's financial statements, in particular, the revenue and profit figures, were artificially inflated. ¶¶ 276, 279-83, 291.

---

[13] These related entities included Ravelston's subsidiaries, RMI, Argus, Moffat and Black-Amiel, which was owned, controlled and managed by Lord Black's wife, Amiel Black.

[14] Also as detailed in the Complaint, in connection with Hollinger's asset sales to CanWest, Ravelston entered into a management services agreement with CanWest for a $4 million annual fee payable by CanWest, plus termination fees (if either party terminated the services agreement), in addition to over $25 million in non-compete fees Ravelston received from CanWest. ¶ 226. Those facts were not disclosed to shareholders, and even when there was a disclosure, it was false and misleading, as it falsely claimed that the management services were for the benefit of Ravelston. Moreover, Ravelston would not provide any services to CanWest, and it was not (as represented) a temporary arrangement. ¶¶ 227-36.

## 2.    Hollinger's Financial Statements Were Materially False And Misleading

Hollinger's financial statements were materially false and misleading during the Class Period. Hollinger has admitted, in its November 2003 10-Q and related announcement, and in other actions against Hollinger, that its prior disclosures were false. First, Hollinger failed to disclose the true nature and extent of Hollinger's related-party transactions as required by GAAP as set forth in Statement of Financial Accounting Standard No. 57 and as required by SEC regulations as set forth in Item 303 of Regulation S K. ¶¶ 333-51, 364-70.[15]

Second, Hollinger falsely represented that its internal controls were effective when in fact the company failed to maintain adequate internal controls to insure that payments were properly approved before they were made and that public filings were accurate as required by SEC Regulations as set forth in Section 13(b)(2) of the Exchange Act. Indeed, the SEC has alleged in the complaint it filed against Hollinger in the United States District Court for the Northern District of Illinois, docketed as No. 04 C 0036, that "[f]rom at least 1999 through at least 2001, Hollinger International failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP." ¶ 362. As a result of these allegations, the SEC obtained an order permanently enjoining the Company from violating the reporting and internal control provisions of the federal securities laws. ¶¶ 361-63.[16]

---

[15] See In re JDN Realty Corp. Sec. Litig., 182 F. Supp. 2d 1230, 1242 (N.D. Ga. 2002) (failure to properly disclose related party transactions in financial statements violated GAAP and demonstrated that the defendant "knew, or was severely reckless in not knowing, that these disclosures were incomplete and that he was making misrepresentations to . . . shareholders and buyers and sellers in the securities markets").

[16] See In re Spiegel, Inc. Sec. Litig., No. 02 C 8946, 2004 WL 1535844, at *25 (N.D. Ill. July 8, 2004) ("material internal control deficiencies probative of scienter"); see also Staff Accounting Bulletin Topic Immateriality; Statement of Auditing Standard, No. 55; AU 319 (requiring auditors to report deficiencies in internal accounting controls).

Third, Hollinger improperly recognized revenue based upon artificially inflated circulation numbers when the revenue was neither earned nor realizable in violation of GAAP, as set forth in FASB Statement of Concepts No. 5. ¶¶ 83-84; ¶¶ 371-74.[17]

Fourth, on January 18, 2005 – after the filing of the Complaint – Hollinger filed restated audited financial results for the fiscal years ended December 31, 1999, 2000, 2001 and 2002. Through Hollinger's revised and restated financial statements, Defendants have admitted that the financial statements originally issued during the Class Period were false and that the misstatements contained therein were material.[18] Hollinger disclosed that the restated financial results are required to correct accounting improprieties by Lord Black and Radler and other Hollinger executives and certain accounting errors in these periods and to reflect reclassifications arising from the adoption of a new audit standard. The restatement related to the alleged accounting improprieties involved the findings by the Special Committee concerning the improper recording of non-competition payments made to Defendants Black, Radler, Atkinson and Boultbee. The restatement also related to the correction of certain accounting errors, including the following types of corrections: corrections for over-accruals made from 1996 – 2000; correction of equity accounting of a joint venture affiliate of the Company in 2002;

---

[17] See In re Daou Systems, Inc. Sec. Litig., 397 F.3d 704, 715 (9th Cir. 2005) (recognition of revenue before it is earned is a misstatement that states a claim under PSLRA); see also Sutton v. Bernard, No. 00-6676, 2001 WL 897593, at *4 (N.D. Ill. Aug. 6, 2001) (overstatement of revenue, including the recognition of unearned revenue, "can constitute a false and misleading statement of material fact necessary to establish securities fraud").

[18] See In re Telxon Corp. Sec. Litig., 133 F. Supp. 2d 1010, 1027 (N.D. Ohio 2000) ("defendants are not in position to dispute this issue; Telxon, itself, admitted its prior disclosures were materially misstated when it issued the restatements which gave rise to the litigation"), citing In re Peritus Software Services, Inc. Sec. Litig., 52 F. Supp. 2d 211, 223 (D. Mass. 1999) (stating that "after the fact accounting admissions may suffice to show that material misstatements occurred"); In re Orbital Sciences Corp. Sec. Litig., 58 F. Supp. 2d 682, 688 (E.D. Va. 1999) ("company's actual admission that it would have to revise its earnings announcements in order to correct previous inaccuracies" sufficient to plead the falsity of financial statements); see also ABP Opinion No. 20, ¶¶ 7-13 (providing that financial statements should only be restated if there is a change in accounting principles used, a change in the reporting entity, or to correct an error in previously issued financial statements).

correction of US tax benefit on liquidation of Canadian operations; and other corrections of tax accounts.

Finally, in its Restatement, Hollinger admitted that its disclosure controls and procedures were ineffective as of December 31, 2003 in providing reasonable assurance that material information requiring disclosure was brought to management's attention on a timely basis and that the Company's financial reporting was reliable. Because Hollinger has admitted that its Class Period financial statements contained material errors which required restatement, no dispute exists that those financial statements were in fact false and misleading.[19]

### C.    Plaintiffs Adequately Allege A Strong Inference Of Defendants' Scienter

The PSLRA requirement that plaintiffs plead a "strong inference" that defendant acted with fraudulent "scienter" refers to "a mental state embracing intent to deceive, manipulate, or defraud." *Central Cmty. Church of God v. Ent & Imler CPA Group, PC*, No. 1:03-0678, 2004 U.S. Dist. LEXIS 24339, at * 15-18 (S.D. Ind. Nov. 24, 2004) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12). "Scienter 'may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Westell*, 2001 U.S. Dist. LEXIS 17867, at *34 (quoting *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1253 (N.D. Ill. 1997)). The Seventh Circuit has long held that reckless disregard for the truth is sufficient to meet the scienter requirement of Section 10(b). "Reckless conduct may be defined as a highly unreasonable omission . . . an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to

---

[19] *Telxon Corp.*, 133 F. Supp. 2d at 1027; *Peritus Software*, 52 F. Supp. 2d at 223; *Orbital Sciences*, 58 F. Supp. 2d at 688.

the defendant or is so obvious that the actor must have been aware of it." *SEC v. Jakubowski,*
150 F.3d 675, 681 (7th Cir. 1998).

### 1.    Plaintiffs' Allegations Taken As A Whole Constitute Strong Evidence Of Each Individual Defendant's Scienter

In determining whether a plaintiff has established a strong inference of scienter, "a court
should not consider each relevant factual allegation solely in isolation . . . but rather, as a part of
the overall factual picture painted by the complaint." *In re MicroStrategy Inc. Sec. Litig.*, 115 F.
Supp. 2d 620, 631 (E.D. Va. 2000). *See also Bourjaily v. United States*, 483 U.S. 171, 179-80
(1987) (the Court must consider the complaint as a whole because it is a "simple fact[] of
evidentiary life" that "individual pieces of evidence, insufficient in themselves to prove a point,
may in cumulation prove it."). The facts alleged in the Complaint, individually and taken as a
whole, establish Defendants' scienter through their direct roles in the improper transactions and
looting of the Company.

Lord Black, Radler, Atkinson and Boultbee demonstrated their scienter by surreptitiously
executing non-compete agreements that were not required by the buyers of Hollinger's assets or
needed by such buyers (as these individuals were executives at Hollinger), and then pocketing
millions of dollars in non-compete fees carved directly out of the sales proceeds. The scienter of
Black and Radler is further apparent as they established, owned and controlled Horizon and
Bradford which purchased Hollinger's newspaper assets at fire-sale prices (at least two at $1)
structured to prevent competitive bids from emerging and without prior approval of the Audit
Committee or Board. The rest of the director Defendants were equally aware of the fraud as they
approved and/or signed public filings, or allowed the filings to be made, that contained
representations that the Individual Defendants knew were false, such as representations that the
asset sales and management services agreements had been approved by the Audit Committee and

-24-

Board, when that was not true, or that the deals were done at market value, when there was no basis for that representation and the financial terms of the deals were established in advance by Radler and Black. Kipnis actually signed the non-compete agreements on behalf of Hollinger and Hollinger Inc. and ordered the payments to be made directly to Hollinger Inc. and received a bonus for his role in arranging the non-competes. ¶ 79. Lord Black, Radler, Amiel Black, Boultbee, Atkinson and Colson knew about the fraud as they were each officers and/or directors of Hollinger Inc. and/or Ravelston and/or its affiliates which were paid management services fees even though no management, advisory or other services were ever provided to Hollinger. In fact, as explained above, these Individual Defendants were paid directly by Hollinger pursuant to the management services agreements. Burt and Thompson and the other members of the Audit Committee knew that the committee's approval of the management fees was a sham because the committee never requested any documentation or support for the fees proposed by Radler and never even discussed the fees, and thus knew that the representations that the fees were "negotiated" by the independent directors and that the fees were "conservative" in price were false and/or made without any basis whatsoever.

### 2. The Individual Defendants' Knowledge Is Further Inferred From Their Positions At The Company And The Nature Of The Fraud

After the enactment of the PSLRA, most courts have found a "strong inference" of scienter when plaintiffs allege that a defendant must have known about the alleged fraud or false statements because the defendant knew facts or had access to information suggesting that its public statements were not accurate, or even simply because the falsity was so plainly obvious that defendant could not have failed to notice. *Central Cmty.*, 2004 U.S. Dist. LEXIS 24339, at *15-18; *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) ("the fact that the defendants published statements when they knew facts suggesting the statements were inaccurate

or misleadingly incomplete is classic evidence of scienter"); *Chill v. General Electric, Co.*, 101 F.3d 263, 269 (2d Cir. 1996) ("An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness."); *Miller v. Material Sciences Corp.*, 9 F. Supp. 2d 925, 927-28 (N.D. Ill. 1998) (denying motion to dismiss where plaintiff alleged that defendants publicly reported sales and earnings using artificially inflated figures and defendants were aware at the time of substantial evidence that the figures were inflated). Scienter may be established "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Central Cmty.*, 2004 U.S. Dist. LEXIS 24339, at *15-18. Here, in addition to the direct evidence of Defendants' knowledge of and participation in the fraud, Plaintiffs plead additional factual allegations which, taken as a whole, show that each Defendant knew or was extremely reckless in not knowing of the fraudulent scheme, through access to information revealing the fraud, and their positions and connections with the Company and Lord Black.

Each of the Individual Defendants knew about the fraud through their positions as high-level executives, officers and/or directors at Hollinger (¶¶ 15-45), involvement in the day-to-day operations of the Company at the highest levels, access to confidential information regarding the Company (including finances, asset sales to related-parties, and significant contracts such as the asset sales and non-compete agreements and management services agreements), and roles in drafting, producing, reviewing, approving, filing and/or disseminating the materially false and misleading statements and publicly disseminated information. *Id.*; ¶¶ 442-44. These facts, at the very least, support the presumption that the Individual Defendants stood behind the major publications of the Company, and knew these false and misleading statements were being publicly disseminated, but nonetheless approved and ratified these statements and failed to

correct prior misstatements, in violation of the federal securities laws. *Id.* Facts critical to a

business's core operations or important transactions generally are so apparent to a company's

executives that their knowledge may be reasonably attributed to the company and its key

officers. *See, e.g., No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America

West Holding Corp.*, 320 F. 3d 920, 942-43 (9th Cir. 2003) (company's largest shareholders

deemed to have knowledge of company's maintenance problems and communications with FAA

because their officers "served as members of America West's Board of Directors," including

committees and attended up to 71% of Board meetings); *In re Aetna Inc. Sec. Litig.*, 34 F. Supp.

2d 935, 953 (E.D. Pa. 1999) (imputing strong inference of scienter to CEO and CFO because of

their positions in management, the fraud related to core business, and problems were

widespread); *In re Anchor Communications, Inc. Sec. Litig.*, 22 F. Supp. 2d 999, 1005 (D. Minn.

1998) (imputing knowledge to defendants in key positions in the company because the

fraudulent transaction concerned a significant contract of the company of which defendants

should have been aware). As a company's financial statements are considered the

representations of that company's management, the Individual Defendants are liable for the

public statements issued about the Company. ¶¶ 441-45.

### 3. Plaintiffs' Allegations Of "Motive And Opportunity" Are Additional Compelling Evidence Of Defendants' Scienter

Allegations of "motive and opportunity" may provide additional evidence of scienter

under the PSLRA. *See Lindelow v. Hill*, No. 00 C 3727, 2001 U.S. Dist. LEXIS 10301, at *20-

*21 (N.D. Ill. July 19, 2001); *Westell*, 2001 U.S. Dist. LEXIS 17867, at *10. The Complaint in

this case details how each of the Individual Defendants was motivated to engage in the

fraudulent scheme for personal profit, whether directly or indirectly, through their receipt of non-

compete fees or management services fees, their ownership and control of entities receiving the

-27-

management services fees, and their ownership and control of entities (such as Horizon and

Bradford) that purchased Hollinger assets at fire-sale prices. *See, e.g.,* ¶¶ 7, 61, 79, 115-18, 121.

The purported "Independent Directors" were further motivated to participate in the fraud because

they knew that Black controlled Hollinger and its related companies and they wanted to retain

their positions at Hollinger and those related companies, as well as the business that these

"Independent Directors" did with Hollinger.[20] These facts demonstrate each Individual

Defendant's motive and opportunity to participate in the fraudulent scheme.

### 4.    Hollinger's Corporate Scienter Is Adequately Pleaded

Hollinger directly communicated to investors about its financial results through the

Company's SEC filings, and its quarterly and annual reports, and press releases. See ¶¶ 14, 61-

163, 226-234, 275-298, 361-374. A corporate entity like Hollinger is responsible for truthfully

communicating with the marketplace, and under traditional notions of *respondeat superior,*

knowledge is imputed to a corporate defendant where the corporate representatives act on behalf

of the corporate entity as a whole. *Standard Oil Co. of Texas v. United States,* 307 F.2d 120, 127

(5th Cir. 1962); *see also Burzynski v. Aetna Life Ins. Co.,* No. H-89-3976, 1992 U.S. Dist. LEXIS

---

[20]    For example, in addition to holding positions at and being paid by Hollinger and/or Hollinger Inc. and/or Ravelston, Kissinger was an advisor, with Lord Black, of the *National Interest,* a conservative publication in which Hollinger has given $200,000 a year, and sat with Lord Black on the Strategic Advisory Board of Trireme Partners LP, a company in which Hollinger made a $2.5 million investment, and which is the same Company where Perle is the managing partner, and in which Hollinger has a 25% ownership stake. ¶ 34. Kravis, in the past, sat on the Board of Directors of Canadian Imperial Bank of Commerce with Lord Black. ¶ 35. Meitar was from 1992 to 2002 a Director of *Jerusalem Post,* a newspaper owned by Hollinger. ¶ 36. Perle was the head of a Hollinger subsidiary, Hollinger Digital, for which he was paid approximately $300,000 per year, along with over $3 million in incentive bonus compensations he was paid from 2000 to 2001, served as a Board member of Trireme Partners LP and as managing partner of an investment company, Trireme Associates LLC ("Trireme"), which Hollinger has a 25% ownership stake in Trireme and is entitled to 20% of the Trireme Partner LP's profits, and in March 2003 Hollinger invested $2.5 million in Trireme, and has invested over $14 million in venture capital companies operated by other partners of Trireme, while Perle was a Hollinger Director and member of the Board's Executive Committee, a Co-Chairman of Hollinger Digital, and an equity holder in Trireme, was a member of the Trireme Partners LP Strategic Advisory Board with Black. ¶38. Thompson received substantial political contributions from Lord Black. ¶ 41.

21300, at *13 (S.D. Tex. Mar. 31, 1992) ("[T]he knowledge of [the corporate defendant's] agents and employees is imputed to the corporation under the doctrine of 'collective knowledge.'").[21] Thus, the collective knowledge of Hollinger's insiders alleged in the Complaint can and must be imputed to Hollinger, which has independent responsibilities to the investing public. *See U.S. v. Bank of New England, N.A.*, 821 F.2d 844, 855-56 (1st Cir. 1987). In the context of a securities fraud case, it is well-settled that "[a] corporate entity can be vicariously liable under section 10(b) for the fraud of its officers." *See, e.g., In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1088 (N.D. Cal. 2001). Indeed, a corporation's scienter can be shown where "'one or more members of top management knew of material information . . . but failed to stop the issuance of misleading statements'" *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435 (9th Cir. 1995). This is exactly what Plaintiffs have alleged in this case, and Hollinger is therefore independently liable for the false statements of its executives.

### 5.    Plaintiffs Properly Plead That Each Of The Individual Defendants Is Liable Under The Group-Published Presumption

The Individual Defendants argue that they cannot be held liable under Section 10(b) and 20(a) because they did not directly make any misstatement, Director Group Br. at 2-3; Perle Br. at 5; Kipnis Br. at 4; Atkinson Br. at 8-9; Radler Br. at 3-4; or because they made only a few misstatements. Amiel Black Joinder at 5 ("The present Complaint expressly attributes two – and only two – allegedly false and misleading statements to Barbara Black personally ..."); Colson Br. at 15 ("Notwithstanding the size of Plaintiffs' Complaint, it attributes just four statements to

---

[21] Under this theory, "'even though a corporation is incapable of acting except through individual directors and officers, the cumulative knowledge of its directors and officers is imputed to it. . . . [A] corporation's knowledge need not be possessed by a single officer or agent.'" *Nordstrom*, 54 F.3d at 1435 (quoting William E. Knepper & Dan A. Bailey, *Liability of Corporate Officers and Directors*, §1.02, Supp. at 4 (4th ed. 1988 & Supp. 1992)); *see also* William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporation*, § 790, at 24 (Perm. ed. 2002) ("The knowledge necessary to adversely affect the corporation does not have to be possessed by a single corporate agent; the cumulative knowledge of several agents can be imputed to the corporation.").

Dan Colson ....""). This argument must be rejected, as Plaintiffs have alleged that Lord Black,

Andreas, Atkinson, Amiel Black, Boultbee, Burt, Chambers, Colson, Kipnis, Kissinger, Kravis,

Perle, Radler, Strauss, Taubman, Thompson, Weidenfeld and Wexner, each signed many of the

Company's false and misleading SEC filings during the Class Period, and thus these Defendants

are responsible for any false and misleading statements alleged to be in the documents they

signed. ¶¶24, 26-44. Plaintiffs' allegations that each of these Defendants participated in

disseminating misleading information to the public are sufficient to "attribute" false statements

to them. *See Howard v. Everex Sys.*, 228 F.3d 1057, 1061 (9th Cir. 2000) (defendant subject to

liability for signing SEC document); *In re Enron Corp. Sec.*, 258 F. Supp. 2d 576, 587 (S.D. Tex.

2003) (corporate official who signs an SEC filing, "regardless of whether he participated in the

drafting of the document, 'makes' a statement").

   Additionally, the group-published presumption "allows plaintiffs to rely on the

presumption that certain statements of a company, such as financial reports, prospectuses,

registration statements, and press releases are the collective work of those high-level individuals

with direct involvement in the everyday business of the company." *Johnson v. Tellabs*, 262 F.

Supp. 2d 937, 946 (N.D. Ill. 2003) (internal quotations omitted). *See also Asher v. Baxter Int'l,

Inc.*, No. 02-5608, 2005 U.S. Dist. LEXIS 2131, at *27 n.9 (N.D. Ill. Feb. 3, 2005) (holding that

given an officer's level of involvement, plaintiffs are permitted in their pleadings to presume that

public statements of a company are the "collective work" of the Company's upper management).

Thus, "there is of course no question that it is not fatal for any complaint to collectivize

defendants in certain respects." *Lindelow*, 2001 U.S. Dist. LEXIS 10301, at *23 (internal

quotations and citation omitted). As this Court has confirmed, where the alleged

misrepresentations are related to matters that are "fundamental" to the company's operations,

"[n]othing in the Act or in any claimed abolition of a group pleading doctrine renders such allegations insufficient as a matter of law." *Id.* at *24-*25 (internal quotations and citation omitted). *See also Spiegel Inc.*, No. 02 C 8946, 2004 WL 1535844, at *21-23 (collecting cases) (group-published pleading is appropriate, as long as the complaint sets forth facts demonstrating that each defendant may be responsible for the fraudulent statements).[22]

Plaintiffs allege each of the Individual Defendants had knowledge, or was reckless in not knowing, of the fraudulent activities at Hollinger, such as the self-dealing transactions, bogus management services agreements and non-compete payments and overstatement of circulation, as well as what was to be published in the press releases and public reports. ¶¶ 24, 26-44. Furthermore, Plaintiffs allege that the Individual Defendants, as the most senior executives, officers and directors of the Company, each directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential information concerning the Company and its business, operations, finances, asset sales, including the sales of Hollinger assets to related-parties, significant contracts, including the management services agreements, and self-dealing transactions, including the illicit non-compete payments. ¶¶ 430, 441. Plaintiffs further allege that these Defendants were involved in drafting, producing reviewing approving and/or disseminating the materially false and misleading statements alleged in the Complaint, including SEC filings, press releases and other public documents. ¶¶ 430, 434-451.

Finally, Plaintiffs plead a multitude of facts attributing the misstatements and omissions to the Individual Defendants by allowing the publication of statements they knew were false and

---

[22] Importantly, the group-publication presumption was well-established before the PSLRA's enactment. *Wool v. Tandem Computers, Inc.*, 818 F.2d 1440, 1443 (9th Cir. 1987); *GlenFed Inc. Sec. Litig.*, 60 F.3d 591, 593 (9th Cir. 1995). "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation." *Lorillard, Div. of Loew's Theatres, Inc. v. Pons*, 434 U.S. 575, 580-81 (1978).

had the opportunity to prevent the issuance of, but did not do so, and by approving or allowing

transactions to occur which they likewise knew were fraudulent. These allegations at the very

least, support the presumption that the Individual Defendants stood behind the major

publications of the Company. ¶¶ 442, 444. For instance, Plaintiffs allege that the Individual

Defendants held press conferences, met with analysts and/or signed the publicly announced

financial results, subsequently adopting them. ¶¶ 430, 434-451. These particularized facts show

that each of the Individual Defendants can be presumed under the group published doctrine to

have made the misstatements at issue in this case. *See In re NeoPharm, Inc. Sec. Litig.*, 2003

U.S. Dist. LEXIS 1862, at *46 (N.D. Ill. 2003); *Westell*, 2001 WL 1313785, at *10; *Dardick v.*

*Zimmerman*, 149 F. Supp. 2d 986, 987 (N.D. Ill. 2001); *Sutton*, 2001 WL 897593, at *17-18.

### 6.    KPMG

KPMG does not dispute that its audit reports on Hollinger's financial statements for fiscal

years 1999 through 2002 were false and misleading.[23] In fact, KPMG concedes that the

Complaint "contains concrete examples of activities that, if proven, would establish not only

mismanagement and other corporate malfeasance, but truly fraudulent behavior." KPMG Br. at

6. KPMG seeks dismissal of the Section 10(b) claim on the ground that it did not act with

scienter when it issued the false and misleading audit reports.[24] KPMG apparently fails to

---

[23]  While KPMG argues (at 2-3) that it cannot be held liable under Rule 10b-5 for mere aiding and
abetting the misstatements of others, KPMG does not dispute that Plaintiffs' claims are based upon
KPMG's own false statements in its audit opinions. *See* ¶¶ 13, 45, 382-83, 386-90, 401-02, 421, 427, 429
These allegations "clearly specify KPMG's primary responsibility in the fraud." *Spiegel, Inc.* 2004 WL
1535844, at *38.

[24]  Hollinger admitted in its November 2003 10-Q that it will be required to restate its previously issued
financial statements due to inaccuracies the Special Committee discovered involving the amount,
authorization and purpose of payments characterized as non-compete payments made by the Company to
Lord Black, Radler and others. ¶ 359. GAAP provides that financial statements should only be restated
in limited circumstances, such as when there is a change in the reporting entity, when there is a change in
accounting principles used, or to correct an error in previously issued financial statements. *See* APB
Opinion No. 20, ¶¶ 7-13. Hollinger's restatement was not due to a change in the reporting entity or a

understand the numerous factual allegations asserted against it which demonstrate its scienter and from which scienter may and should be inferred, and the law, which supports such an inference. KPMG also ignores its role and responsibilities as Hollinger's outside auditor.

For instance, AICPA Codification of Statements of Auditing Standards, *Due Professional Care in the Performance of Work*, AU §230 required that KPMG exercise professional skepticism in performing its audits and SAS No. 82 required KPMG to consider risk factors such as management's motivation (through compensation) to engage in fraud and the domination of Hollinger by Lord Black, and AICPA Codification of Statements of Auditing Standards, *Consideration of fraud in a Financial Statement Audit*, AU §316 required KPMG to plan and perform its audits to obtain reasonable assurances that Hollinger's financial statements were free of material misstatements, but instead KPMG ignored patently obvious risk factors (including Black's domination of the Board and ownership of companies doing business with Hollinger). As stated by The Committee of Sponsoring Organizations of the Treadway Commission[25]:

> There is a strong need for the auditor to look beyond the financial statements to understand risks unique to the client's industry, management's motivation toward aggressive reporting, and client internal control (particularly the tone at the top), among other matters. As auditors approach the audit, information from a variety of sources should be considered to establish an appropriate level of professional skepticism needed for each engagement.

KMPG simply failed to observe any such standards of professional care and instead jettisoned its GAAS responsibility to "check" Hollinger's financial statements and discarded the trust placed in KPMG by investors. Indeed, in this case the Complaint alleges facts "that cry out, 'how could

---

change in any accounting principle but was required due to errors in previously issued financial statements. Thus, the restatement is an admission by Hollinger that the previously issued financial results, and therefore KPMG's audit certifications of the same statements, were false and misleading.

[25] In 1985, a private-sector initiative known as the Treadway Commission on Fraudulent Financial Reporting (the "Treadway Commission") was formed to study the financial reporting system in the United States. The sponsoring organizations of the Treadway Commission include the American Institute of Certified Public Accountants, The Institute of Internal Auditors, Financial Executives International, Institute of Management Accountants and American Accounting Association.

[KPMG] not have known that the financial statements were false.'" *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 294 (S.D.N.Y. 1999).

Moreover, KPMG's apparent attempt to shift the responsibility for Hollinger's false financial statements to its management overlooks the important obligations that an independent auditor owes to the investing public. As the U.S. Supreme Court stated in *U.S. v. Arthur Young & Co.*, 465 U.S. 805, 808 (1984):

> By certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a public responsibility transcending any employment relationship with the client. The independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to investing public. This 'public watchdog' function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust. To insulate from disclosure a certified public accountant's interpretations of the client's financial statements would be to ignore the significance of the accountant's role as a disinterested analyst charged with public obligations.

### a.    Recklessness Standard

As explained above, in this Circuit, "'reckless disregard for the truth counts as intent' for the purpose of the 10(b) scienter requirement." *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 815, 822 (N.D. Ill. 2000) (quoting *SEC v. Jakabowski*, 150 F.3d 625, 681 (7th Cir. 1998)). Moreover, to adequately plead recklessness against an auditor in a securities fraud case:

> The complaint must support an inference that the auditor's conduct was "highly unreasonable . . ., involving not merely, simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Danis v. USN Communications, Inc.*, 73 F. Supp. 2d 923, 941 (N.D. Ill. 1999) (quoting *In re First Merchants Acceptance Corp. Sec. Litig.*, 1998 WL 781118, at *10 (N.D. Ill. Nov. 9, 1998)). As explained in *Chu*, 100 F. Supp. 2d at 323:

> Recklessness means that "the accounting firm practices amounted to no
> audit at all, or to an egregious refusal to see the obvious, or to investigate
> the doubtful, or that the accounting judgments which were made were
> such that no reasonable accountant would have made the same decisions if
> confronted with the same facts."

(quoting *First Merchants*, 1998 WL 781118, at *10).[26]  The Complaint in this case is replete

with facts from which KPMG's scienter may be inferred.

### b.    Red Flags And GAAP And GAAS Violations

First, KPMG had direct knowledge of the fraud because it was Hollinger's auditor for the

asset sales and related-party deals with Horizon, Bradford and others; in fact, KPMG actually

collaborated with Hollinger management on drafting the disclosures concerning the related party

transactions. ¶ 397.  KPMG thus knew of Black and Radler's ownership and control of Horizon

and Bradford and therefore knew that Hollinger's disclosures of its deals with these entities were

materially false and misleading.

Additionally, KPMG ignored or recklessly disregarded numerous red flags that gave

warnings that Hollinger's financial statements were materially false and misleading. ¶¶ 414-16,

423-27.[27]  As held in *Chu*, 100 F. Supp. 2d at 824, "[a]llegations of obvious 'red flags' or

---

[26]  Plaintiffs find it necessary to set forth these pleading standards as KPMG surprisingly failed to cite to
any decisions in this Circuit on this issue. KPMG Br. at 5.

[27]  These red flags include:

- Due to the unique structure of the company, Hollinger was controlled by a small group of people led
  by Black.

- There was not effective oversight by the board of directors or the Audit Committee.

- Defendant Black and his associates frequently overrode Hollinger's internal controls.

- Hollinger paid for personal expenses for many of the defendants, including paying for apartments,
  automobiles, aircrafts and personal staff for Defendant Black and his associates.

- Black had an open disdain for corporate governance and an open disregard for the sanctity of
  corporate assets.

- There were numerous related-party transactions with an unusual structure and unusual terms,
  including terms actually requiring Hollinger to pay related parties to take the Company's assets.

warning signs that financial reports are misstated, as well as the magnitude of the fraud alleged, can give rise to a strong inference of fraudulent intent." *See also Miller*, 9 F. Supp. 2d at 928 ("Deliberately ignoring 'red flags' such as those alleged here can constitute the sort of recklessness necessary to support Section 10(b) liability"); *In re Health Mgmt., Inc. Sec. Litig.*, 970 F. Supp. 192, 203 (E.D.N.Y. 1997) (allegations of accounting firm's ignorance of red flags presented evidence of fraudulent intent).

Among other red flags was the large number of related party transactions which KPMG knew were causes of concern, as KPMG itself identified the related party transactions, including the management fees and non-compete payments as "key areas of audit focus," but nevertheless ignored or failed to further investigate these transactions. ¶ 421. KPMG also knew about the Company's related party deals with Horizon, Bradford and other entities in which Hollinger's directors and executives, including Lord Black and Radler, were owners, and thus knew that Hollinger's disclosures about these deals were false and misleading. ¶ 420. *See also* ¶¶ 414-19 (identifying GAAS pronouncements which required KPMG to carefully evaluate these transactions). KPMG's failure to take any action, despite its knowledge of the related party deals and Hollinger's false public filings, demonstrates its scienter. *See In re Worldcom Sec. Litig.*, 352 F. Supp. 2d 412, 498 (S.D.N.Y. 2005) ("Among the ["red flags"] acquired during an audit that would prompt a reevaluation of the audit plan are facts that may indicate wrongdoing by management"); *In re Grant Thornton LLP* (SEC Admin. Proc. File No. 3-11377, 1/20/04) (SEC filed administrative charges against auditor alleging misconduct stemming from their inadequate audit concerning disclosure of related party transactions; finding that "[t]he auditors were staring

---

•   Hollinger made numerous misrepresentations in its financial statements some of which the Company attempted to correct in subsequent filings which themselves were false and misleading.

¶¶ 414-16; *see also* AU §316.16-17.

at related party transactions not disclosed by MCA and failed to take appropriate actions"); *In re Complete Mgmt., Inc. Sec. Litig.*, 153 F. Supp. 2d 313, 334, (S.D.N.Y. 2001) ("if Anderson were conducting any kind of audit at all, they would have seen ... the need to investigate further . . . [because] GMMS owner was a significant shareholder of CMI, thereby creating the potential for collusive self-dealing").

Plaintiffs have also alleged a host of GAAP violations by Hollinger and GAAS violations by KMG which provide further strong indicia of KPMG's scienter. ¶¶ 329-74 (GAAP violations); ¶¶ 384-427(GAAS violations). While such violations by themselves may be insufficient to establish scienter, "[t]hey are ... relevant in proving scienter 'when the complaint also identifies 'red flags,' or specific highly suspicious facts and circumstances available to the auditor at the time of the audit, and alleges that these facts were ignored, either deliberately or recklessly.'" *Spiegel*, 2004 WL 1535844, at *39 (quoting *Wafra Leasing Corp. v. Prime Capital Corp.*, 247 F. Supp. 2d 987, 998 (N.D. Ill. 2002); *see also Davis*, 73 F. Supp. 2d at 941-42 (GAAP violations "'when combined with other circumstances suggesting fraudulent intent ... may support a strong inference of scienter'") (quoting *First Merchants*, 1998 WL 781118, at *10).[28]

---

[28] Decisions outside this Circuit also find that allegations of GAAP and GAAS violations support an inference of scienter by an auditor. *See, e.g., Ponce v. SEC*, 345 F.3d 722, 733-34 (9th Cir. 2003) (fact that financial statements violated GAAP and the audit violated GAAS supported finding that the auditor "was reckless in certifying the financial statements"); *In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*, No. 02-5575, 2004 WL 992991, at *34 (S.D.N.Y. May 5, 2004) (denying auditor's motion to dismiss a Section 10(b) claim because "the combination of these two red flags with the numerous GAAS and GAAP violations is sufficient to support an inference of scienter"); *In re Homestore.com Inc. Sec. Litig.*, 252 F. Supp. 2d 1018, 1045 (C.D. Cal. 2003) (presence of red flags, along with GAAP and GAAS violations, supported inference of auditor's scienter); *In re Philip Servs. Corp. Sec. Litig.*, No. 98-0835 (MBM), 2004 WL 1152501, at *10 (S.D.N.Y. May 24, 2004) ("Because the red flags would be clearly evident to any auditor performing its duties, one could reasonably conclude that [the auditor] must have noticed the red flags, but deliberately chose to disregard them . . .") (internal citations and quotations omitted); *In re Complete Mgmt.*, 153 F. Supp. 2d at 334 (S.D.N.Y. 2001) (allegations of deficient audits as result of which auditor did not detect problems or dealt with them inappropriately constituted "combination of red flags" denying auditor's motion to dismiss); *In re Health Mgmt., Inc. Sec. Litig.*, 970 F. Supp. 192, 203 (E.D.N.Y.

KPMG was required by GAAS to assess the risk of material misstatements due to fraud, in particular, to investigate the "red flags" and to carefully review all related-party transactions and ensure that Hollinger made adequate disclosure of and accounting for such transactions, but KPMG did not do so. ¶¶ 418-19. Among other GAAS violations are KPMG's repeated failure to take into account Lord Black's dominance of the Hollinger Board, Hollinger's inadequate internal accounting controls and Lord Black's flaunting of them. ¶¶ 24-25, 411, 422-25. Hollinger's accounting controls were so weak that the SEC obtained an order permanently enjoining Hollinger from further violations of the reporting and internal control provisions of the federal securities laws, finding that:

> [f]rom at least 1999 through at least 2001, Hollinger failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP...

¶ 426. *See also Danis*, 73 F. Supp.2d at 941, 942 n.11 (deficient internal controls probative of auditor scienter); *Wafra Leasing*, 247 F. Supp. 3d at 998 (violations of GAAS "are relevant in proving scienter when the complaint also identifies ... specific, highly suspicious facts at the time of the audit, and alleges that these facts were ignored, either deliberately or recklessly").

---

1997) (allegations that auditor "credulously" accepted management's statements, failed to follow up on analyst's letter which alerted auditor to artificially inflated receivables, and failed to exercise "heightened scrutiny" in response to SEC inquiry, were "red flags" "suggest[ing] that [the auditor] turned a blind eye to [the company's] fraudulent activities, thus creating a 'strong inference' of ... recklessness"); *In re Hamilton Bankcorp, Inc. Sec. Litig.*, 194 F. Supp. 2d 1353, 1359 (S.D. Fla. 2002) (plaintiffs' allegations of GAAP an GAAS violations and "red flags" constituted "an extreme departure from standards of ordinary care"); *Jacobs v. Coopers & Lybrand, LLP*, No. 97-3374, 1999 WL 101772, at *15 (S.D.N.Y. Mar. 1, 1999) (auditor's failure to adhere to GAAS, together with allegations of auditor's knowledge of company's "internal workings," "amount[ed] to a level of recklessness high enough to maintain an action under Section 10(b)").

The simplicity of the accounting violations[29] also supports a strong inference that KPMG's failure to detect them resulted from either conscious fraud or severe recklessness. *See MicroStrategy*, 115 F. Supp. 2d at 636 (the "simplicity of the [GAAP] principles violated . . . lend[s] further probative weight to Plaintiffs' allegations that the GAAP violations in this case raise a strong inference of scienter.").

The widespread scope of the fraud – through numerous related party transactions, numerous improper payments of non-compete payments, and the improper management services agreements – along with the magnitude of the fraud – over $400 million in improper payments made to Lord Black and his cohorts over a period of seven years – also support a finding of scienter. *See Chu*, 100 F. Supp. 2d at 824 (allegations of "magnitude of the fraud alleged [along with other factors] can give rise to a strong inference of fraudulent intent"); *Spiegel*, 2004 WL 1535844, at *41 ("Given the magnitude of Spiegel's financial problems, Plaintiffs' allegations support a strong inference of scienter at this stage of the proceedings"); *Rehm*, 954 F. Supp. 1246, 1256 ("The more serious the error, the less believable are defendants' protests that they were completely unaware of [the Company's] true financial status and the stronger the inference that defendants must have known about the discrepancy").[30] Furthermore, the fact that the

---

[29] Among other GAAP violations, Plaintiffs alleged that Hollinger and KPMG violated FAS No. 57 by making false and misleading disclosures regarding numerous related party transactions, ¶¶ 333-358, including false and misleading reporting of non-compete agreements that diverted $88 million from Hollinger to defendants Lord Black, Radler, Boultbee, Atkinson, and Hollinger Inc., ¶¶ 340-45, millions of dollars in unreasonable management fees paid by Hollinger to defendant Ravelston, ¶ 346, and Hollinger's "sale" at below market rates of numerous assets to Lord Black owned or affiliated entities, ¶¶ 347-50. Plaintiffs also allege that Hollinger and KPMG violated FASB Statement of Concepts No. 5 by reporting artificially inflated advertising revenue based on inflated circulation figures. ¶¶ 371-74. *See also* ¶ 352 (setting forth additional GAAP violations).

[30] The non-Seventh Circuit cases relied on by KPMG are inapposite. *See In re SCB Computer Tech.*, 149 F. Supp. 2d 334, 363 (W.D. Tenn. 2001) (the complaint did nothing more than allege violations of GAAP; there were no suspicious circumstances, and the accounting irregularities were not fully known for three months after concerns were raised by company employees); *Reiger v. PricewaterhouseCoopers*

financial statements that KPMG audited will be restated as to the repetitive and pervasive related

party transactions is further evidence of KPMG's scienter. ¶ 359. *See MicroStrategy*, 115 F.

Supp. 2d at 636 ("by alleging in some detail the magnitude of the restated financials and the

pervasiveness and repetitiveness of MicroStrategy's GAAP violations; ... and the importance of

the contracts involved. ... amplify[ies] the inference of scienter to be drawn from

MicroStrategy's GAAP violations and restatement of financials"); *see also In re AFC*

*Enterprises, Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1372 (N.D. Ga. 2004) ("The issuance of a

restatement may also contribute to the establishment of scienter"); *In re Hayes Lemmerz Int'l,*

*Inc. Equity Sec. Litig.*, 271 F. Supp. 2d 1007, 1018 (E.D. Mich. 2003) ("while mere allegations

of restatements are insufficient by themselves, they can be considered when coupled with [other]

allegations").

### c.    Non-Audit Fees

Second, from 2000-2002 alone, Hollinger paid KPMG over $20 million in fees, 82% of

which was for *non*-audit services such as tax and consulting services. ¶¶ 376-78. While KPMG

argues (at 4) that "the receipt of fees for accounting services" does not establish an inference of

scienter, it is KPMG's receipt of non-audit fees which show its motive to commit fraud to retain

its lucrative relationship with Hollinger.

In *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 345 (S.D.N.Y. 2004), the

auditor, Andersen made the same argument that KPMG makes here – that it had no motive to

risk its professional reputation in exchange for auditing fees.[31] The court disagreed, holding the

complaint "adequately sets forth a motive distinct from mere profit, namely, Andersen's desire to

---

*LLP*, 117 F. Supp. 2d 1003, 1012 (S.D. Cal. 2000) (allegations that PwC failed to review documents
without more raised negligence, not fraud).

[31] This Court may rely on cases from the Second Circuit on this issue. *See Chu*, 100 F. Supp. 2d at 823
("this Court finds the Second Circuit's standard [on scienter] instructive").

build its consulting practice." *Id.* The *Global Crossing* court further noted that "[c]ourts have been especially ready to find motive pleading to survive 12(b)(6) motions in cases where the auditing company plays a dual role with respect to the client." *Id.* (citing *Complete Mgmt.*, 153 F. Supp. 2d at 335 (auditor's receipt of non-audit compensation in excess of $1 million for the class period, coupled with other red flags, established scienter); *MicroStrategy*, 115 F. Supp. 2d at 654 (auditor's receipt of "'substantial financial rewards,' including $188,000 in licensing fees and an undisclosed amount for consulting fees . . . earned by PwC from eight deals" helped establish scienter); *Carley Capital Group v. Deloitte & Touche, LLP*, 27 F. Supp. 2d 1324, 1339 (N.D. Ga. 1998) (the fact that "the Defendant was not just an auditor," but "was heavily involved in the management of Medaphis and had unrestricted access to its financial records and data," helped establish scienter).[32] In numerous other cases, the courts have found that an auditor's independence was compromised, and that scienter could be inferred, from the auditor's receipt of consulting fees which were (as in this case) a multiple of the fees earned for auditing services. *See In re Williams Sec. Litig.*, 339 F. Supp. 2d 1242, 1265 (N.D. Okla. 2003) ("The Complaint sets forth allegations which draw into question Ernst & Young's motive and independence based

---

[32] KPMG's reliance (at 4) on *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990) and *Robin v. Arthur Young & Company*, 915 F.2d 1120, 1127 (7th Cir. 1990) is misplaced on several grounds. First, the Seventh Circuit's belief fifteen years ago that accountants will not risk their reputations for fees will likely be revisted and changed in light of recent and numerous corporate frauds. *See* John C. Coffee, Jr., *Understanding Enron: It's About The Gatekeepers, Stupid.* 57 Bus Law at 1403, 1406-12 (August, 2002) (acknowledging that "During the 1990s, many courts bought this logic hook, line, and sinker," but in the light of real world experience the logic proved utterly false). In reversing a dismissal of a common law fraud claim against an auditor, a New York court expressly took account of the hard truths about auditors recently learned, stating that "it has been widely acknowledged that our society is experiencing a proliferation of frauds perpetrated by officers of large corporations, for their own personal gain, unchecked by the 'impartial' auditors they hired." *Houbigant, Inc. v. Deloitte & Touche LLP*, 303 A.D.2d 92, 98-9 (N.Y. App. Div. 2003) (emphasis added). Second, unlike in *DiLeo* and *Robin*, Plaintiffs allege far more than the "Fees for two years' of audits" or "$90,000" in fees alleged, respectively, in those two cases. *See also In re Rural Cellular Corp. Sec. Litig.*, No. 02-4893, 2004 WL 1278725, at *4 (D. Minn. June 6, 2004) (distinguishing *Global Crossing* because in contrast the auditor for Rural Cellular received a small amount of consulting fees). Third, as set forth below, Plaintiffs plead far more facts to support an inference of scienter in this case than alleged in *DiLeo* and *Robin*.

on the fact that its consulting fees from WMB were far greater than the fees received from WMB for auditing services"); *Enron Corp*, 235 F. Supp. 2d at 706-07 ("Anderson's comprehensive accounting, auditing, and consulting services to Enron necessarily made it intimately privy to the smallest details of Enron's alleged fraudulent activity"). In such cases, an auditor may take on "a vested interest in the performance and profitability" of its client, and consequently "weaken[ ] its ability to rely on its reputation in countering as 'irrational' allegations that it participated in a client's fraud." *MicroStrategy*, 115 F. Supp. 2d at 655.

### d.    Auditor For Related Party

Third, KPMG's scienter may be inferred from its service during the Class Period as auditor of Hollinger Inc., an entity controlled by Lord Black which has no real assets other than its Hollinger stockholdings. ¶¶ 24, 379, 398. Thus, at the same time that KPMG was receiving from Hollinger millions of dollars in non-audit consulting fees, KPMG was being paid by Hollinger Inc., a company controlled by Lord Black and which was paid millions of dollars by Hollinger under the management services agreements and paid millions of dollars in non-compete payments as part of Hollinger's asset sales. ¶¶ 135, 392-93. KPMG's role as auditor for both sides of these deals provides a strong inference that KPMG was at a minimum reckless, if not an actual knowledgeable participant in the fraud. *See Williams*, 339 F. Supp. 2d at 1240-41 (fact that accountant was auditor for both parent and former subsidiary demonstrated accountant's scienter regarding parent's fraudulent transfer of debt obligation to subsidiary); *see also MicroStrategy*, 115 F. Supp. 2d at 655-56 (compromised independence is probative of auditor's scienter).[33]

---

[33] KPMG's reliance (at 6) on *Robin v. Arthur Young & Co.*, is misplaced, as the plaintiffs in that case failed to show how the auditor could have been aware that the offending prospectus was fraudulent as the relevant financial statements were not alleged to be faulty at the time they were audited, and the events that negatively affected the company's financial state occurred subsequent to the audit. 915 F.2d at 1127.

e.    **KPMG Had Access to Hollinger, The Individual Defendants,
And Parties On Both Sides Of The Improper Transactions**

Fourth, KPMG had intimate knowledge of Hollinger's business through KPMG's

virtually limitless access to Hollinger's books and records, transactional documents, and

Hollinger's management and employees, including the Individual Defendants and the Audit

Committee, through telephone calls and meetings at Hollinger's headquarters and divisions.

¶¶ 397, 403. KPMG's assertion that these uncontested facts do not create a strong inference of

scienter is wrong. *See Spiegel*, 2004 WL 1535044, at *37 (finding auditor's scienter based upon

allegations that "Spiegel was a longstanding and 'significant' client of KPMG . . . and KPMG

served Spiegel in various consulting capacities for many years"); *MicroStrategy*, 115 F. Supp. 2d

at 653 (such allegations "provide important information on the context in which PwC conducted

its audits"). Plaintiffs' detailed allegations here are substantially similar to those alleged against

KPMG in *Spiegel,* where plaintiffs established KPMG's scienter through allegations that

"KPMG's personnel were regularly present at Spiegel's corporate headquarters and had

continued access to, and knowledge of, Spiegel's confidential financial and business information

through conversations with Spiegel employees and review of Spiegel's non-public records."

2004 WL 1535844, at *37. *See also Danis*, 73 F. Supp. 2d at 942 (allegations of close contacts

with client sufficient to charge auditor with being aware of internal control problems).

Furthermore, KPMG served as the auditor to Hollinger Inc. and had access to Ravelston's

offices, providing KPMG with an additional level of business intimacy and an even more

complete view of the fraud as the auditor on both sides of some of the fraudulent transactions

conducted by Lord Black and other Individual Defendants. *See MicroStrategy*, 115 F. Supp. 2d

at 653 ("the greater the access to and involvement with MicroStrategy's operations, the more

-43-

support an inference of scienter takes on"); *see also Fidel v. Farley*, 392 F.3d 220 (6th Cir 2004) (same) (citing *MicroStrategy*).[34]

In sum, Plaintiffs have alleged numerous facts and circumstantial evidence demonstrating KPMG's scienter, as well as other facts showing KPMG's motive and opportunity to commit fraud – KPMG wanted to keep its valuable client which was paying KPMG millions of dollars each year in consulting and tax fees, on top of millions paid in audit fees. This monetary benefit establishes a strong motive for KPMG to continue to issue clean audit reports for Hollinger. *See Global Crossing*, 322 F. Supp. 2d at 346 (the auditor "turned a blind eye to the many red flags and continued to issue 'clean' audit opinions in order to generate big fees and increase the compensation of [the auditor's] partners") (internal citations omitted). While any of the allegations described above alone may be insufficient, in this case Plaintiffs have alleged much more. *See In re Nuko Info. Sys., Inc. Sec. Litig.*, 199 F.R.D. 338, 343 (N.D. Cal. 2000) ("motive and opportunity coupled with highly material misrepresentations or omissions may well satisfy the standard"). Taken as a whole, Plaintiffs' allegations more than meet the requirement to establish KPMG's scienter. *See In re Qwest Communications Int'l, Inc. Sec. Litig.*, 2004 U.S. Dist. LEXIS 584, at *78 (D. Colo. Jan. 13, 2004) ("considering the role played by Andersen, the magnitude of the . . transactions, and the nature of the accounting issues presented, the allegations in the Complaint support a reasonable inference that Andersen was aware of these transactions and the accounting issues they presented"); *Paraschas v. YBM Magnex, Int'l, Inc.*, No. 98-6444, 2000 WL 325945, at *10 (E.D. Pa. Mar. 29, 2000) ("the aggregate of allegations against the outside auditors . . . raises strong inferences of scienter").

---

[34] In *Fidel*, cited by KPMG (at 6), the court held that certain facts did not constitute "red flags" that would put the auditor on notice of improper activities because those facts occurred "two years before the audit in question" or "well after the audit report had been issued." 392 F.3d at 229. That is not the case here.

**D.    Plaintiffs Adequately Alleged Damages**

Also without merit is the Black Group's contention that Plaintiffs have failed to adequately allege damages because Hollinger's stock rose in the 90 days following January 16, 2004 (the date the SEC and Special Committee complaints were filed) and in the 90 days following June 15, 2004 (the date the Company made a disclosure regarding its inflation of circulation figures). Black Group Br. at 10. The price of Hollinger's stock rose after the Class Period because the Company stopped the fraud, began corrective measures, and the primary architects of the fraud (including Black and Radler) were ousted from the Company. ¶¶ 299-306.

The Black Group incorrectly applies the PSLRA's 90-day lookback period to determine whether damages are recoverable. The PSLRA states that the 90-day period begins "on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." 15 U.S.C. § 78u-4(e)(1). That date is the end of the class period. *See Gebhardt v. Conagra Foods, Inc.*, 335 F. 3d 824, 827-28 (8th Cir. 2003); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 405 (5th Cir. 2001); *Brown v. Computerized Thermal Imaging Inc.*, 2002 WL 31109563, at *1 (D. Or. Sept. 24, 2002); *In re Williams Sec. Litig.*, 2002 WL 32153476, at *5 (N.D. Okla. July 8, 2002); *In re Microstrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 656-660, n.9 (E.D. Va. 2001); *Chill v. Green Tree Fin. Corp.*, 181 F.R.D. 398, 402 (D. Minn. 1998) (all calculating 90-day lookback from end of class period).

Plaintiffs alleged that as "a direct and proximate result of defendants' wrongful conduct, plaintiffs and other Class members suffered damage in connection with their purchases of Hollinger stock," because once:

> the market had assimilated the truth about defendants' fraud (that was dribbled out to the market beginning in May 2002), and the effect of those disclosures was reflected in the stock price (by December 11, 2002), Plaintiffs and other Class members were significantly damaged by the resulting drop in the value of the Company's stock.

-45-

¶¶ 502-03.  Plaintiffs also allege that "the price of Hollinger's stock was at $10.08 on the first

day of the Class Period (August 13, 1999)," and that throughout the Class Period:

> [the] stock price continued its downward trend as additional negative
> information regarding the defendants' self-dealing reached the market.  On
> the last day of the Class Period, December 11, 2002, the stock price
> dropped a final 1.1% closing at $9.85 on news that the Company's Senior
> Notes were down-graded based upon its intention to further draw down its
> secured bank facility.

¶¶ 399.  Thus, Plaintiffs have alleged that they sustained losses during the Class Period, and as a

result are entitled to those damages that they will later prove at trial.

The Court should also reject the contention that the PSLRA requires separate 90-day

lookback calculations for each of the multiple disclosures that may have occurred during the

Class Period.  The PSLRA contemplates the calculation of only one "90-day period."  15 U.S.C.

§ 78u-4(e)(1).  Additionally, if it is not the end of the Class Period that begins the 90-day

lookback period, then the determination of that date requires an analysis of the many partial

disclosures that were made and presents a factual issue as to which of those dates should start the

90-day lookback period.  In *In re Terayon Communication Sys., Inc.*, the court accepted

plaintiffs' arguments that whether a particular date "was, in fact, the date on which Terayon

finally corrected all of its earlier actionable misstatements or whether information correcting

Terayon's misstatements or omissions occurred gradually (or at all) are questions of fact to be

developed during discovery and analyzed by experts." 2003 WL 21383824, at *3 (N.D. Cal.

Feb. 24, 2003).  The court stated that it:

> concurs with plaintiff – that it is premature for the court to establish with
> certainty the correct application of the bounce-back provision and the
> issue of damages.  Moreover, these issues very well may need to be the
> subject of expert testimony. . . .

*Id.*

That Hollinger's stock price went up after the Class Period does not defeat Plaintiffs'
claims.  As explained above, the Company has admitted that its Class Period disclosures
regarding numerous transactions, the management services agreements, executive compensation,
and Board and Audit Committee actions were materially false and misleading.  The Company's
top executives were stealing from the Company, liberally transferring Company assets to entities
they controlled for essentially no consideration at all, and paying themselves bonuses for
implementing the fraud, while the other directors on the Audit Committee and Board failed to
conduct any review whatsoever of the improper transactions and dealings, ratified those deals
after they had already occurred, and signed and approved public filings which they knew had
falsely proclaimed that the deals were at market value and had been approved by the Audit
Committee and full Board.  No one would have invested in the Company (at its then market
price) had they known those facts, as demonstrated by the drops in price following the
downgrade of Hollinger's Senior Notes and the Company's disclosure of the circulation
inflation.  *See supra* at 15-17 (describing drops in stock price following disclosures).  When
investors discovered after the Class Period that the Company was taking actions to stop and
correct the fraud, starting with the ouster of Black, Radler and Boultbee and the commencement
of litigation against them, the market reacted favorably and the stock began to climb.  Whether
the stock price increased on disclosure of the fraud is a fact question inappropriate for resolution
on a motion to dismiss.  *See In re Compuware Sec. Litig.*, 301 F. Supp. 2d 672, 690-91 (E.D.
Mich. 2004) ("[W]hether loss causation actually exists is an issue of fact inappropriate for
resolution on a motion to dismiss . . . ."); *In re Pss World Med., Inc. Sec. Litig.*, 250 F. Supp. 2d
1335, 1351 (M.D. Fla. 2002) (agreeing with plaintiffs that proof of loss causation should not
typically be resolved on a Rule 12(b)(6) motion as plaintiffs had adequately alleged that their

-47-

financial loss was connected to the defendants' fraudulent conduct); *Zuckerman v. Foxmeyer Health Corp.*, 4 F. Supp. 2d 618, 626 (N.D. Tex. 1998) ("Whether Plaintiffs can prove their allegations of loss causation, the true issue on which Defendants here attempt to dismiss Plaintiffs' claims, is not an appropriate inquiry on a motion to dismiss.").

Finally, the Black Group's citation to *Madigan, Inc. v. Goodman*, 357 F. Supp. 1331, 1333-34 (N.D. Ill. 1973), *overturned by Madigan, Inc. v. Goodman*, 498 F.2d 233, 238 (7th Cir. 1974), is surprising, as that case was overturned *in relevant part* by the Seventh Circuit. Black Group. Br. at 10. Additionally, that case has no application here. The *Madigan* plaintiffs invested in an insurance company that had understated its loss reserves. When the actual loss reserves were disclosed, the shareholders had to make additional capital contributions to keep the insurance company a going concern. The plaintiffs managed to sell their stock at the same price for which they had purchased it, but then sought to recover for consequential damages under the Exchange Act. The district court dismissed the plaintiffs' claims finding that plaintiffs' investment was a wash, and therefore there were no damages for which to bring a claim. The Seventh Circuit disagreed with the district court and found that even if the stock was purchased and sold for the exact price, plaintiffs had a claim for out-of-pocket consequential damages. *Madigan*, 498 F.2d at 238 ("Shareholders who are defrauded under the Securities Exchange Act are entitled to consequential damages."). The Seventh Circuit reasoned that "there is no reason in the policy of the securities laws why their right to recovery should depend on exactly when the loss was realized or on whether the loss was fully reflected in a change in the securities' price." *Madigan*, 498 F.2d at 238. Thus, at a minimum, Plaintiffs are entitled to consequential damages, but, as set forth below, the determination of the amount of damages is a factual issue not appropriate for resolution on a motion to dismiss.

E.     ***Central Bank* Does Not Absolve Defendants From Their
       Primary Participation In The Fraudulent Scheme**

Defendants argue that they cannot be liable under *Central Bank* if they did not directly

make any misstatements, regardless of the role they had in publishing the misstatement.  Colson

Br. at 16-17; Kipnis Br. at 9; Director Group Br. at 2-3; KPMG Br. at 2-3.  This argument is

nonsense for four reasons.

First, these Defendants all made material misstatements, as they signed Hollinger's false

public filings, including (for the Individual Defendants) Hollinger's Forms 10-K (¶¶ 14, 66-67,

69-70, 72-73, 76-77, 82, 96-98, 123-24, 127, 134) and, for KPMG, its certifications contained in

those filings.  ¶¶ 13, 45, 375-429.

Second, Plaintiffs have alleged that the Defendants participated in a fraudulent scheme

for which Defendants can be held liable even if they made no material misstatement. *See In re

Global Crossing*, 322 F. Supp. 2d at 335 ("a cause of action exists under subsections (a) and (c)

for behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent

statement by the defendant"); *SEC v. Zandford*, 535 U.S. 813, 820 (2002) ("neither the SEC nor

this Court has ever held that there must be a misrepresentation about the value of a particular

security in order to run afoul of the Act"); *Lernout & Hauspie*, 236 F. Supp. 2d at 173 ("the

better reading of § 10(b) and Rule 10b-5 is that they impose primary liability on any person who

substantially participates in a manipulative or deceptive scheme by directly or indirectly

employing a manipulative or deceptive device . . . intended to mislead investors, even if a

material misstatement by another person creates the nexus between the scheme and the securities

market").

Third, "[p]rimary liability may be imposed 'not only on persons who made fraudulent

misrepresentations but also on those who had knowledge of the fraud and assisted in its

-49-

preparation.'" *In re Sec. Litig. BMC Software Inc.*, 183 F. Supp. 2d 860 (S.D. Tex. 2001).

"[S]ubstantial participation or intricate involvement in the preparation of fraudulent statements is

grounds for primary liability even though that participation might not lead to the actor's actual

making of the statements." *Howard*, 228 F. 3d at 1061 n.5. *See also Angel Investments, L.L.C.*

*v. Purizer Corp.*, 2002 WL 23822 (N.D. Ill. Jan. 7, 2002) (agency theory of liability remains

viable after *Central Bank*); *MBI Acquisition Partners, L.P. v. Chronicle Publishing Co.*, 301 F.

Supp. 2d 873, 890 (W.D. Wis. 2002) ("construing *Central Bank* to preclude agency liability

would essentially exempt corporations from liability under Rule 10b-5, because such entities can

act only through their agents. The Supreme Court could not have intended such a result.").[35]

Fourth, courts in this Circuit have explained that Rule 10b-5 "only proscribes omissions

that render affirmative statements misleading; thus, incomplete disclosures, or 'half-truths,'

implicate a duty to disclose whatever additional information is necessary to rectify the

misleading statements." *In re Motorola Sec. Litig.*, No. 03-287, 2004 U.S. Dist. LEXIS 18250,

*70-71 (N.D. Ill. Sept. 9, 2004). Here, Plaintiffs' factually detailed allegations demonstrate that

each of the Defendants knew about the fraud and therefore knew that Hollinger's (and Lord

Black's) public statements were materially false and misleading, and so the Defendants had a

duty to correct those misstatements and disclose information required to make the statements not

misleading.

**F.    Plaintiffs' Claims Are Not Precluded By _Santa Fe_**

Defendants contend that the allegations in the Complaint concerning Defendants' failures

to disclose material facts amount to an attempt by Plaintiffs to "bootstrap" a fiduciary duty claim

into a federal securities claim. Director Group Br. at 1, 12; Hollinger Br. at 25. Defendants

---

[35] For example, an accounting firm or member of an audit committee may be found primarily liable under Section 10(b) for "its significant role" in preparing the misrepresentations of its client. *In re Software Toolworks Sec. Litig.*, 50 F.3d 615, 628 n.3 (9th Cir. 1998).

argue that Plaintiffs' allegations, "which constitute *no more* than internal corporate mismanagement," are barred by *Santa Fe*. Director Group Br. at 12, citing *Santa Fe*, 430 U.S. at 478-79. In *Santa Fe*, the Supreme Court declined to recognize a cause of action under Rule 10b-5 because, it determined, the underlying conduct giving rise to the complaint amounted to nothing more than a breach of fiduciary duty without any deception, misrepresentation or nondisclosure at all. *See Santa Fe*, 430 U.S. 462 at 476. In that case, acting without fraud or concealment, a controlling company utilized Delaware's "short form merger" statute to force minority stockholders in a subsidiary to sell back their shares. The latter sued under Section 10(b) asserting a breach of fiduciary duty. Noting the absence of a "manipulative or deceptive device," the Supreme Court held that Section 10(b) is not meant to remedy corporate mismanagement, but rather to promote full disclosure to those who buy or sell securities.

Plaintiffs here allege much more than a mere breach of fiduciary duty – they allege that the Defendants made numerous material misrepresentations of fact and participated in a deceptive scheme. *Santa Fe* clearly contemplated that a breach of fiduciary duty *can*, in fact, give rise to a federal securities cause of action where "the conduct alleged can be fairly viewed as 'manipulative or deceptive' within the meaning of the statute." *Santa Fe*, 430 U.S. 462 at 473-74. *See also Atchley v. Qonaar Corp.*, 704 F.2d 355, 359 (7th Cir. 1983) (courts should not read securities fraud claims too narrowly pursuant to *Santa Fe*; allegations that defendants engaged in deceptive practices and made misleading statements amounted to more than a mere breach of fiduciary duty or corporate mismanagement); *Fry v. UAL Corp.*, 895 F. Supp. 1018, 1045 (N.D. Ill. 1995) (finding *Santa Fe* does not bar Section 10(b) claim where: (1) the fiduciary misconduct itself involves an element of deception, or (2) the defendant is aware of corporate

-51-

mismanagement and makes a material public statement inconsistent with the state of corporate

affairs) (citing *Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir. 1992)).[36]

In fact, the Northern District of Illinois noted in *Fry v. UAL* that the "crucial difference"

between a breach of fiduciary claim that can support a federal securities claim and one that

cannot "is whether there was misrepresentation or omission in the flow of material information."

*Fry*, 895 F. Supp. at 1043 (relying on *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 639 (3d Cir.

1989) (explaining that the "crucial difference" between a breach of fiduciary claim that can

support a federal securities claim and one that cannot "is whether there was misrepresentation or

omission in the flow of material information.")).   Essentially, a complaint does allege an

actionable misrepresentation and Rule 10b-5 claim if it alleges, as is the case here, "that a

defendant was aware that mismanagement had occurred" and made a materially misleading

public statement about the state of corporate affairs or failed to disclose the mismanagement.

*Fry*, 895 F. Supp. at 1044; *see also Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 361

---

[36] *See also Novak v. Kasaks (Novak II)*, 216 F.3d 300, 312 (2d Cir. 2000) (deliberate materially false statements concerning inventory estimates actionable under securities laws); *Estate of Soler v. Rodriguez*, 63 F.3d 45, 56 (1st Cir. 1995) (rejecting view that an otherwise actionable claim under § 10(b) is barred by *Santa Fe* merely because it is based on a failure to disclose conduct that can be remedied through a breach of fiduciary duty claim under state law); *Alley v. Miramon*, 614 F.2d 1372, 1380 (5th Cir. 1980) (*Santa Fe* is not controlling when plaintiff's cause of action is based expressly based on misrepresentations and non-disclosures); *Goldberg v. Meridor*, 567 F.2d 209, 217-18 (2d Cir. 1977) ("We do not read *Green* as ruling that no action lies under Rule 10b-5 when a controlling corporation causes a partly owned subsidiary to sell its securities to the parent in a fraudulent transaction and fails to make a disclosure or, as can be alleged here, makes a misleading disclosure."); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 2004 DNH 154, 2004 U.S. Dist. LEXIS 20733, *8-9 (D.N.H. 2004) (finding *Santa Fe* does not bar § 10(b) claims based on "alleged failure to disclose material information about compensation and related party transactions that must be accurately disclosed to investors pursuant to SEC regulations"); *Kafenbaum v. GTECH Holdings Corp.*, 217 F. Supp. 2d 238, 246 (D. R.I. 2002) (complaint alleging failure to disclose specific information and material misrepresentations in statements issued to the public alleges actionable conduct and not simple mismanagement); *Sonnenberg v. Prospect Park Fin. Corp.*, 1991 WL 329755 (D.N.J. Aug. 20, 1991) (denying insiders' motions to dismiss federal securities law claims because defendants' non-disclosure of the true number and amount of non-performing loans and inflated figures overstating the value of the bank was beyond mere mismanagement); *Hurley v. FDIC*, 719 F. Supp. 27, 30 (D. Mass. 1989) ("The prohibition on individual shareholders bringing a 10b-5 claim based on corporate mismanagement is inapplicable where. . . there are allegations of material misrepresentations and omissions.") (distinguishing *Santa Fe*, 430 U.S. at 474).

(1st Cir. 1994) ("In stating an actionable claim for misrepresentation, . . . plaintiffs must plead more than that defendants acted irresponsibly and unwisely, but that they were aware that 'mismanagement had occurred and made a material public statement about the state of corporate affairs inconsistent with the existence of the mismanagement.'").

Here, Plaintiffs have alleged (like the SEC, Ontario Securities Commission and Hollinger itself) that the Individual Defendants were well aware of the true state of corporate affairs at Hollinger but made material public statements directly contrary to the facts. *See, e.g.,* ¶¶ 430-451. None of these claims, whether asserted here in a class action, by governmental authorities in civil or criminal proceedings, or by the Company itself, are precluded by *Santa Fe*.

## G.    Plaintiffs Adequately State A Claim For Control Person Liability

To state a claim under Section 20(a) of the Act, Plaintiffs must allege: "(1) a primary securities violation; (2) [that] each of the Individual Defendants exercised general control over the operations of [Hollinger]; and (3) [that] each of the Individual Defendants 'possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised.'" *Johnson v. Tellabs, Inc.*, 303 F. Supp. 2d 941, 969 (N.D. Ill. 2004) (quoting *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992)); *see also Motorola*, 2004 U.S. Dist. LEXIS 18250, at *70-71. Because fraud is not an element of controlling person liability, allegations of control are not subject to the PSLRA pleading requirements. *Zurich Capital Mkts., Inc. v. Cogliese*, 332 F. Supp. 2d 1087, 1100-1101 (N.D. Ill. 2004) ("Plaintiffs, however, need not meet the heightened pleading requirements of the PSLRA to establish control person liability."). In any event, "determination of whether an individual defendant is a 'controlling person' under §20(a) is a question of fact that cannot be determined at the pleading stage." *In re Sears, Roebuck and Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) (quoting *Lindelow*, No. 00-3727, 2001 WL 830956, at *9.

*See also Motorola*, 2004 U.S. Dist. LEXIS 18250, at * 115 ("As Lead Plaintiff has adequately

pleaded a primary securities violation against Motorola, the court declines to dismiss Lead

Plaintiff's §20(a) claims against Individual Defendants.").

The Complaint clearly demonstrates how each of the Individual Defendants, through a

complex system of intertwined companies owned by Lord Black, including Ravelston and its

subsidiaries, as well as by virtue of their executive positions, Board membership and/or stock

ownership, had the power to influence and control, directly or indirectly, the decision-making of

Hollinger completely, including the content and dissemination of the various statements which

plaintiffs have alleged were false and misleading. *See* ¶¶ 6-7, 19-45, 519.  In particular, Lord

Black, Amiel Black, Radler, Atkinson, Boultbee and Colson owned and controlled Hollinger Inc.

as well as Ravelston, RMI, Argus, Moffat, Black-Amiel and other entities which owned stakes in

Hollinger Inc. which, in turn, controlled Hollinger.  Each of the Individual Defendants also held

equity stakes in Hollinger itself.  Additionally, each of the Individual Defendants was provided

with or had unlimited access to copies of the Company's internal reports, press releases, public

filings and other statements containing false and misleading misstatements, and had the ability

and power to direct or prevent the issuance of the statements or cause the statements to be

corrected.  ¶ 518.  Moreover, Hollinger Inc., Ravelston and Argus also controlled Hollinger.

¶ 521.  These allegations are sufficient to plead control person liability under Section 20(a).  *See*

*Zurich Capital*, 332 F. Supp. 2d at 1100-1101 (allegations amounting to more than defendants'

titles were sufficient to allege general control over the company); *America West*, 320 F.3d at 945

(upholding control person claims alleging control through stock ownership, board position, and

membership on committees).

**H.**    **Plaintiffs Have Adequately Alleged A Section 18 Claim**

Plaintiffs have alleged two claims under Section 18 of the Exchange Act, 15 U.S.C. § 78r, the first against Hollinger, the Individual Defendants and KPMG relating to the various misstatements and schemes regarding, *inter alia,* the non-compete payments and management services agreements (Count III), and the second against Hollinger and Radler relating to the inflation of circulation figures at the *Chicago Sun Times* (Count IV). These Defendants contend that Plaintiffs' Section 18 claims are untimely and inadequately pled. As demonstrated below, Defendants fail to meet their burden on either of these arguments, and so Plaintiffs' Section 18 claims should be upheld.

**1.**    **The Standard For Moving For Dismissal On Limitations Grounds**

The standard for obtaining dismissal of a complaint on limitations or repose grounds is particularly high. The defendant must show that under no construction of the complaint would the claims be timely; that is, the face of the complaint must show that the claims are time-barred. *See Marks*, 122 F.3d at 367. (We will not dismiss a complaint for failure to state a claim unless we are sure, beyond a doubt, that the plaintiff cannot prove any set of facts that would entitle him to relief."); *766347 Ontario Ltd. v. Zurich Capital Mkts, Inc.*, 274 F. Supp. 2d 926, 932 (N.D. Ill. 2003) (it is defendants' burden to establish an affirmative defense on the face of a complaint); *Trepanier v. Ryan*,. No. 00-2393, 2003 WL 21209832, at *9 (N.D. Ill. May 21, 2003) (stating that claim may be dismissed only if the matter of defense appears plainly on the face of the complaint).

As Plaintiffs have pled facts showing that all of their claims (including those under Section 18) are timely, the Defendants cannot meet their burden of proving that any of Plaintiffs' claims should be dismissed as time-barred. As shown below, the Sarbanes-Oxley Act extended the applicable statute of limitations to a two-year period from the date of notice (and a five-year

period from the date of the violation) in which Plaintiffs must file their claims, and the

Complaint was filed within both of these time periods. Even assuming that the one-year/three-

year periods apply, the Defendants are wrong as to when those periods began to run. Finally, the

determination of the relevant notice date is a factual question inappropriate for resolution on a

motion to dismiss. *Marks,* 122 F.3d at 367 ("Whether a plaintiff had sufficient facts to place him

on inquiry notice of a claim for securities fraud ... is a question fact, and as such is often

inappropriate for resolution on a motion to dismiss under Rule 12(b)(6)"); *Tomera v. Galt,* 511

F.2d 504, 510 (7th Cir. 1975), *overruled on other grounds by, Short v. Belleville Shoe Mfg. Co.,*

908 F.2d 1385 (7th Cir. 1990) (reversing dismissal because "[s]ummarily extinguishing rule

10b-5 claims during pleadings on statute of limitations grounds does not work to this end.

Limitations issues ordinarily require factual determinations and are best left to trial"); *Wafra*

*Leasing Corp. v. Prime Cap. Corp.,* 192 F. Supp. 2d 852, 860 (N.D. Ill. 2002) (inquiry notice is a

question of fact). Therefore, the Court should deny the motions to dismiss to the extent they rely

on statute of limitations arguments.[37]

### 2.    The Two Year Limitations Period Applies To Plaintiffs' Section 18 Claims Under The Sarbanes-Oxley Act

Section 18(c) of the Exchange Act requires that claims under Section 18 be brought

"within one year after the discovery of the untrue statement or the omission, or after such

discovery should have been made by the exercise of reasonable diligence" and within three years

after the violation. 15 U.S.C. § 78r(c). However, these limitations and repose periods were

extended by Section 804 of the Sarbanes-Oxley Act, which provides that "a private right of

action that involves a claim of fraud, deceit, manipulation or contrivance in contravention of a

---

[37] As no Defendant has moved to dismiss any of Plaintiffs' other claims on limitations grounds (*e.g.,* the Section 10(b) claims and the state law claims), they all survive regardless of the Court's ruling on limitations issues.

regulatory requirement concerning the securities laws" must be brought "not later than the earlier of – (1) two years after the discovery of the facts constituting the violation; or (2) five years after such violation." 28 U.S.C. § 1658(b) (2003). As held in *Blaz v. Belfer*, 368 F.3d 501, 503-04 (5th Cir. 2004), *cert. denied*, 125 S. Ct. 97 (2004), "[p]ursuant to the Sarbanes-Oxley Act of 2002 . . ., this statute of repose [in Section 18(c)] has been extended to five years after the conduct accrues." *See also Note, Judicial Action in Retrograde: The Case For Applying Section 804 of the Sarbanes-Oxley Act To All Fraud Actions Under The Securities Laws*, 72 U. Cin. L. Rev. 1043, 1063-64 (2004) (longer limitations periods in Section 804 should apply to Section 18 claims).

Applying Section 804 of the Sarbanes-Oxley Act to Section 18 claims is consistent with Congress' goal in enacting Section 18 (and Section 10(b)) -- to establish civil liability for false or misleading statements filed with the SEC and root out corporate fraud. *See Musick, Peeler & Garret v. Employers Ins. of Wausau*, 508 U.S. 286, 295-96 (1993) (stating goals of Section 18 and Section 10 are the same); *Randall v. Loftsgaarden*, 478 U.S. 647, 664 (1986) ("Congress' aim in enacting the 1934 Act was not confined solely to compensating defrauded investors. Congress intended to deter fraud and manipulative practices in the securities markets, and to ensure full disclosure of information material to investment decisions.") (internal citations omitted). Given that Section 18 "target[s] the precise dangers that are the focus of Section 10(b) . . . to deter fraud and manipulative practices in the securities markets, and to ensure full disclosure of information material to investment decisions," *Musick*, 508 U.S. at 295, it follows logically that the Sarbanes-Oxley Act's limitations periods properly apply to Plaintiffs' Section 18 claim. Indeed, the same facts which form the basis for Plaintiffs' Section 10(b) claims also

support Plaintiffs' Section 18 claims, as both of these claims "involve[] . . . fraud, deceit, manipulation or contrivance." 28 U.S.C. §1658(b) (2003).

Defendants have not cited any case finding that Section 804 of the Sarbanes-Oxley Act does not apply to Section 18 claims, nor do any of the cases cited by Defendants even involve Section 18 claims. *See, e.g., Lawrence E. Jaffe Pension Plan v. Household Int'l*, No. 02-5893, 2004 U.S. Dist. LEXIS 4659, at *40 (N.D. Ill. Mar. 19, 2004) (addressing only 1933 Act claims). Even in those cases where the court declined to apply the extended limitations period of Sarbanes-Oxley to 1933 Act claims, it did so because the claims in those cases, unlike here, did not sound in fraud. *See In re Global Crossing Sec. Litig.*, 313 F. Supp. 189, 196-99 (S.D.N.Y. 2003) (finding plaintiff's Section 11 and 14 claims "do not require any showing of fraudulent intent" and refusing to apply the Sarbanes-Oxley Act's longer limitations and repose periods to claims not based on "fraud, deceit, manipulation or contrivance"); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d at 440-44, 308 F. Supp. 2d 214, 220-21, 224-25 (S.D.N.Y. 2004) (Section 804's longer periods inapplicable to Section 11 and 12(a)(2) claims because those claims did not sound in fraud). In short, the only authority on this issue cited by any of the parties shows that the statute of limitations for Section 18 claims was extended by Section 804 of the Sarbanes-Oxley Act.

### 3.    **Plaintiffs' Section 18 Claims Are Timely**

As alleged in the Complaint, the earliest possible date that Plaintiffs had inquiry notice of the fraud was on November 17, 2003. ¶¶ 79, 91. Plaintiffs initiated this action on February 2, 2004, well within even a one-year limitation period. Defendants contend, however, that Plaintiffs were on notice at an earlier date – KPMG (KPMG Br. at 8) and Hollinger (Hollinger Br. at 22) contend that Plaintiffs were on notice by December 11, 2002, when Hollinger's debt was downgraded, while the Black Group contends, (Black Group Br. at 10), that Plaintiffs were

-58-

on notice by April 2002, when "isolated information about Lord Black's improper dealings began to dribble in to the marketplace." ¶ 14. The failure of the Defendants themselves to agree on a notice date demonstrates that "inquiry notice" is a question of fact, not law. *See Wafra Leasing Corp. v. Prime Capital Corp.*, 192 F. Supp. 2d 852, 860 (N.D. Ill. 2002) (rejecting different inquiry notice dates put forth by defendants); *Wachovia Sec., LLC v. Neuhauser*, No. 04-3082, 2004 WL 2526390, at *5 (N.D. Ill. Nov. 5, 2004) (Hart, J.) (stating claim may not be timely under statute of limitations because all parties conceded to inquiry notice date that showed plaintiff initiated its action beyond limitations period). The Seventh Circuit held that such a determination is inappropriate at a motion to dismiss stage, and reserved for only the "most extreme circumstance." *Marks v. CDW Computer Ctrs., Inc.*, 122 F.3d 363, 368 (7th Cir. 1997) (citation omitted).

Even were this Court inclined to address the notice issue at this stage of the proceedings, it could not rule as a matter of law that Plaintiffs were on notice of their claims prior to November 17, 2003, the date when Hollinger admitted that all prior representations regarding sale agreements and non-compete payments were false, or prior to February 2, 2001 (two years before the Complaint was filed). To determine whether a disclosure constitutes a "storm warning" and thus provides notice, the fact finder must determine when the:

> plaintiff learned, or should have learned through the exercise of ordinary diligence in the protection of one's legal rights, enough facts to enable him by such further investigation as the facts would induce in a reasonable person to sue within a year.

*Fujisawa Pharm. Co., Ltd. v. Kapoor*, 115 F.3d 1332, 1334 (7th Cir. 1997). Suspicious circumstances are not enough— the facts must be "sufficiently confirmed or substantiated" to start the limitations period. *Id.* at 1335. A drop in stock price is insufficient as the Seventh Circuit has rejected the proposition that, on a motion to dismiss, a "conjunction of optimistic

forecasts with a sharp drop in price established inquiry notice as a matter of law." *Wachovia*,

2004 WL 2526390, at 12 (quoting *LaSalle v. Medco Research, Inc.*, 54 F.3d 443, 447 (7th Cir.

1995)).

　　　Moreover, Plaintiffs were entitled to a period of due diligence to determine whether there

was support for any claims against Hollinger and other Defendants. As held in *Law*, 113 F.3d at

785, a plaintiff cannot be charged with inquiry notice until he "learn[s] or should have learned

the facts that he must know to know that he has a claim." *See also Marks*, 122 F.3d at 368-69

(holding "inquiry notice does not begin to run unless and until the investor is able, with the

exercise of reasonable diligence (whether or not actually exercised), to ascertain the information

needed to file suit"). *See also Law v. Medco Research, Inc.*, 113 F.3d 781, 786 (7th Cir. 1997)

(finding that defendant failed to show that a reasonably diligent investor would have brought a

Section 10(b) action before the complaint in *Medco* was actually filed because while company's

suit against its principal owner was a storm warning, it was insufficient to put plaintiffs on

inquiry notice of the Company's knowledge of the problem).

　　　Finally, it is Defendants' burden under Seventh Circuit law to show that on their

proposed "inquiry notice" date a diligent investigation could have turned up the fraud without

Plaintiffs having to resort to legal action. *Marks*, 122 F.3d at 367 ("[N]ot only must the investor

be on notice of the need to conduct further inquiry, but the investor also must be able to learn the

facts underlying the claim with the exercise of reasonable diligence."). *See also Fujisawa*, 115

F.3d at 1336-37 (holding inquiry notice of a Section 18 claim requires more than mere suspicious

circumstances, it requires "suspicious circumstances [that] place the potential plaintiff *in

possession of, or with ready access to, the essential facts* that he needs in order to be able to

sue") (emphasis added) (citing *Law*, 113 F.3d at 785); *Wafra*, 192 F. Supp. 2d at 860 (holding

-60-

that defendants failed to show what plaintiff could have done to discover its claims at the time of

the proposed inquiry date); *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1201-02 (10th Cir. 1998)

(Allowing an investor a period of "reasonable diligence" to investigate suspected fraud "strikes a

balance between two competing policies underlying the securities laws. While we recognize

there is a strong federal interest in requiring plaintiffs to file suit soon after they are put on notice

of their claims, the applicable statute of limitations should not precipitate groundless or

premature suits by requiring plaintiffs to file suit before they can discover with the exercise of

reasonable diligence the necessary facts to support their claims."). Neither Hollinger, the

Director Group, KPMG, or the Black Group even suggest that an investigation in 2002 would

have uncovered the false and misleading statements at issue in the Complaint, and so they failed

to meet their burden on their motions to dismiss.

   This is not such an extreme case where the issue of notice can be resolved as a matter of

law, nor are there any facts alleged which show that Plaintiffs were on notice of fraud by

February 2, 2001 (two years before the Complaint was filed). Even where "corrective"

disclosures were made prior to November 17, 2003, they were still false and misleading and

thereby continued to conceal the fraud. While the Black Group argues that the fraud was

revealed in April 2002, and KPMG and Hollinger contend that there was notice by December 11,

2002, Hollinger has admitted that its disclosures "[p]rior to November 17, 2003 . . .relating to

these [non-compete payments] had been incomplete or inaccurate." ¶¶ 79, 91.[38] Thus, even

where there was any disclosure whatsoever about non-compete payments or management

services agreements, those disclosures, prior to November 17, 2003, were false and misleading,

---

[38] Additionally, if investors had notice of the fraud by either April or December 2002, then so did all of
the Individual Defendants, though they continued to sign and file financial statements and other
documents (including the Proxy Statement and 10-K filed in 2003) without correcting prior misstatements
and containing additional misstatements.

and they were tempered with other information, such as: (1) the non-compete payments had been unanimously endorsed by Hollinger's independent directors, (2) were signed by the Company "to satisfy a closing condition" and (3) were genuine consideration made pursuant to the buyers' requests not to compete with the sold businesses. ¶¶ 83-84. These "words of comfort" substantially tempered any purported "storm warnings" and thus preclude a finding of notice. *See In re DaimlerChrysler AG Sec. Litig.*, 269 F. Supp. 2d 508, 515 (D. Del. 2003) (rejecting limitations defense as defendants were "basically seeking to punish Plaintiffs for trusting their word, a position which I find to be at odds with their role as corporate insiders. When evaluating the mix of information available to them, Plaintiffs had a right to believe in and trust the position of management who knew the terms of the arrangement intimately"). Any other rule would "precipitate premature and groundless suits." *Law*, 113 F.3d at 786.

It was not until a November 18, 2003 *Wall Street Journal* article was published when shareholders learned of the secret affiliations between Hollinger's management and Horizon, a company that was purchasing Hollinger's assets at below market value while failing to disclose the affiliations in Hollinger's SEC filings. ¶ 177. The sham management service agreements were not discovered until March 31, 2003, the date on which Hollinger filed its 2002 Form 10-K which stating that the service fees may not be reasonable because of previously undisclosed conflicts of interest in, and lack of independence of, the Audit Committee that approved these arrangements. ¶ 134. Many other violations, such as the wildly lavish perks Hollinger never disclosed (including homes, jets, cars, house staff, chauffeurs and club memberships), were not discovered until after the Special Committee released its findings on August 30, 2004. ¶¶ 236, 245. In addition, there was no disclosure that circulation figures at the *Sun-Times* were inflated

until June 15, 2004, when Hollinger announced that its Audit Committee was conducting an internal review of that matter. ¶ 290.

That the price of Hollinger's stock dropped on December 11, 2002 or any other date is insufficient to support a finding of notice, especially since numerous other facts, such as Black and Radler's affiliations with Horizon and Bradford, had not been disclosed by that date. *See Wachovia*, 2004 WL 2526390, at 12-13 (no inquiry notice on May 21, 2001, the date that the company lost all value, even if the plaintiff alleged in its complaint that on that date "the scheme came to light," because additional facts, such as the relationships between the defendants and the reason the stock price dropped, were "necessary before . . . [the plaintiff] would be on inquiry notice").

None of the cases cited by Defendants apply here. Defendants argue that Plaintiffs had inquiry notice on the last date of the Class Period (citing *Levine v. NL Indus., Inc.*, 926 F.2d 199, 201-02 (2d Cir. 1991)), but that case was decided on summary judgment, not a motion to dismiss. *Id.* at 200. In *Levine,* the court did not even affirm the district court's dismissal of the Section 10(b) claim because the wrong limitations period was applied. *Id.* at 201 (stating that New York state limitations period applied to Section 10(b) claim brought before Second Circuit adopted the 1 year/3 years limitations period of Section 18). Moreover, the *Levine* court stated that the basis of the claim had been "conspicuously public in nature." *Id.* at 201. Here, Plaintiffs have alleged that the Defendants kept their fraud concealed.

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 273 F. Supp. 2d 351, 381-82 (S.D.N.Y. 2003), is equally distinguishable because there the Court found that plaintiffs had inquiry notice for numerous reasons, including that the action was initiated more than a year after the class period end-date. There were other reasons supporting a finding of notice not present

-63-

here, including: a newspaper article that quoted the analysts describing companies on which he had buy ratings as "pieces of [expletive]" and the issuance of a buy rating during the "substantial" decline in the trading price of the stock. *Id.* Also, the Court noted that the same information that allegedly did not put the plaintiffs' on inquiry notice was enough information to cause the plaintiffs' counsel to initiate another similar lawsuit on behalf of other shareholders within the limitations period (nine months earlier). *Id.* at 381 n.66.

Accordingly, it is not clear when Plaintiffs could first be charged with inquiry notice of fraud at Hollinger, and resolution of that issue should await summary judgment or trial. If the Court is inclined to resolve this factual issue at this stage of the case (but it should not), then the facts show that Plaintiffs first had inquiry notice on November 17, 2003. As that is within two years of the February 2, 2004 date that the Complaint was filed, Plaintiffs' claims are timely under the two year period of Section 804 of the Sarbanes-Oxley Act or even the one year period under Section 18(c), assuming *arguendo*, that the limitations period was not extended by the Sarbanes-Oxley Act.

### 4.    Plaintiffs Have Adequately Alleged Each Element Of Their Section 18 Claims

To make out a claim under Section 18, a plaintiff need only allege: (a) a false or misleading statement by a defendant; (b) of a material fact; (c) contained in a filing with the SEC; and (d) upon which the plaintiff relied in purchasing a security. *Fujisawa Pharm. Co. Ltd. v. Kapoor*, 814 F. Supp. 720, 730, n.11 (N.D. Ill. 1993) (relying on 15 U.S.C. § 78r(a)[39]); *In re*

---

[39]   Specifically, Section 18 of the Exchange Act, 15 U.S.C. § 78r(a) provides:

> Any person who shall make or cause to be made any statement in any application, report, or document filed [with the SEC] . . . which statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact, shall be liable to any person (not knowing that such statement was false or misleading) who, in reliance upon such statement, shall have

*Hayes Lemmerz Int'l, Inc. Equity Sec. Litig.*, 271 F. Supp. 2d 1007, 1024 (E.D. Mich. 2003) (denying officers', directors' and auditor's motions to dismiss Section 18 claim) (citing *Magna Inv. Corp. v. John Does One through Two Hundred*, 932 F.2d 38 (11th Cir. 1991)). No Defendant contends that Plaintiffs failed to sufficiently allege that Hollinger's filings with the SEC, as described in the Complaint, contained false or misleading statements of material facts. It is undisputed then that Plaintiffs have satisfied three of the four elements needed to state a claim for Section 18 liability. Defendants contend only that Plaintiffs failed to adequately plead (1) reliance, individually and on behalf of the class, (2) a misleading statement by Defendants and (3) damages resulting from Defendants' violations of Section 18. As set forth below, these arguments must be rejected, as Plaintiffs have adequately alleged these elements of their Section 18 claims.

### a.    Plaintiffs Adequately Alleged Reliance

Plaintiffs alleged that "KPMG falsely certified in Hollinger's 2000-2002 10-Ks that Hollinger's financial statements complied with GAAP and that KPMG had performed its audits in accordance with GAAS" and that "[i]n connection with their purchases of Hollinger stock, Plaintiffs and other members of the Class read and relied upon each of the Forms 10-K, and the financial statements contained therein, not knowing that they were false and misleading" as well as the "false and misleading statements regarding the sales of Hollinger assets to related parties" and that such "reliance was reasonable, particularly given the clean opinions from the Company's auditor, KPMG." ¶¶ 498-511. Thus, the Court should reject Kipnis' ridiculous argument that Plaintiffs failed to plead that they relied on the misrepresentations in connection

---

purchased or sold a security at a price which was affected by the statement, for damages caused by such reliance . . . .

15 U.S.C. § 78r(a).

with an "actual purchase or sale" of Hollinger stock (Kipnis Br. at 12) and KPMG's argument

that Plaintiffs failed to allege that they read KPMG's audit reports.[40]

The Defendants also claim that the Section 18 claims must be dismissed because reliance

cannot be proved on a class basis, but that is wrong. In *Helfand v. Cenco, Inc.*, 80 F.R.D. 1, *9

(N.D. Ill. 1977), the court held that individual issues of reliance did not prevent class

certification and certified the class under Section 18 and 10(b), as well as state law claims.

Many other courts have permitted Section 18 claims to proceed on a class basis despite

individual issues of reliance. *See Hayes Lemmerz*, 271 F. Supp. 2d at 1026 (denying motion to

dismiss Section 18 claim brought as a class action); *Simpson v. Specialty Retail Concepts*, 149

F.R.D. 94, 102 (M.D.N.C. 1993) (certifying Section 18 class claims, recognizing that reliance

issues will not preclude class certification); *State of Wisc. Inv. Bd. v. Ruttenberg*, Nos. CV-99-

BU-3097-S and CV-99-BU-3129-S, slip op. at 16-18 (N.D. Ala. July 3, 2001); *In re MDC

Holdings Sec. Litig.*, 754 F. Supp. 785, 806-07 (S.D. Cal. 1990) (all certifying Section 18 class

claims); *Gruber v. Price Waterhouse*, 117 F.R.D. 75, 81 (E.D. Pa.1987) (certifying a class

despite reliance issues).[41] Moreover, whether Plaintiffs (or any other class member) can prove

---

[40] In contrast to the situation in *Jacobson v. Peat, Marwick, Mitchell & Co.*, 445 F. Supp. 518, 525 (S.D.N.Y. 1977), cited by KPMG (at 9), where the plaintiff merely pleaded that he "acted in reliance upon the false financial statements," here Plaintiffs alleged that they read the false Forms 10-K. ¶ 501. KPMG's citation to *In re Suprema Specialties Sec. Litig.*, 334 F. Supp. 2d 637 (D.N.J. 2004), is equally misplaced, as the plaintiffs in that case (in contrast to Plaintiffs here) "did not allege actual reliance on the specific misrepresentations themselves," but merely alleged reliance on the documents containing the misstatements. *Id.*

[41] Hollinger and Atkinson rely on only two cases for their proposition that Section 18 claims cannot proceed on a class basis, but neither decision has any meaningful discussion or reasoning. While the court in *In re American Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 794 F. Supp. 1424 (D. Ariz. 1992), dismissed the Section 18 class claims, the limited discussion did not clarify whether the plaintiffs' claim was dismissed because the class contained unidentified members or because they failed to allege reliance for every class member. *Elster v. Alexander*, 76 F.R.D. 440, 442 (N.D. Ga. 1977) abruptly concludes without any analysis that because reliance is an individual issue, there can be no Section 18 class claim. The *Elster* court did not consider any of the other numerous common issues of fact arising from the other three elements of Section 18, nor did the court properly consider (as it should have) the legal issues that predominate over the individual ones in Section 18 claims. This Court disapproved of the *Elster* decision

reliance is an issue to be resolved at trial, and is inappropriate for determination on a motion to dismiss. *See In re Century Bus. Serv. Sec. Litig.*, No. 99-02200, 2002 WL 32254513, at *23 (N.D. Ohio June 27, 2002) (holding reliance issues should not be resolved at the motion to dismiss stage of litigation); *Rizika v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 80-1418, 1981 WL 1619 (D. Md. Jan. 28, 1981) (holding reliance presents "questions of fact which should not be decided on summary judgment"). In short, Plaintiffs have adequately alleged reliance, both individually and on a class-wide basis.

### b.    Plaintiffs Adequately Alleged A False And Misleading Statement By Defendants

Kipnis, Atkinson and the Director Group contend that the Section 18 claim against them must be dismissed because Plaintiffs have not adequately alleged that they directly made any misrepresentations. This defense should be summarily rejected.

Misrepresentations for purposes of a Section 18 claim can be attributed to outside directors who merely sign an SEC filing. *See F.N. Wolf & Co., Inc. v. Estate of Neal*, No. 89-1223, 1991 U.S. Dist. LEXIS 2428, *25-26 (S.D.N.Y. Feb. 25, 1991) (holding that "distinction between insiders and outside directors" plays no part in a Section 18 analysis because a "director [even outside directors] signing a document filed with the SEC . . . 'makes or causes to be made' the statements contained therein" under Section 18); *In re Enron Corp. Sec. Litig.*, 258 F. Supp. 2d 576, 587 (S.D. Tex. 2003) (corporate official who signs SEC filing, "regardless of whether he participated in the drafting of the document, 'makes' a statement"). Moreover, as explained above, under the group published doctrine, misrepresentations can also be attributed to high-level officers whose day-to-day involvement in the management and operations of the company

---

in *Elliott v. ITT Corp.*, 150 F.R.D. 569 (N.D. Ill. 1992), where the Court granted class certification even though the law of different states would apply to the state law claims.

prohibit them from shifting blame to those persons who directly made a misrepresentation. *See Asher v. Baxter Int'l, Inc.*, No. 02-5608, 02-5607, 2005 U.S. Dist. LEXIS 2131, at *27 n.9 (N.D. Ill. Feb. 3, 2005) (holding that given an officer's level of involvement, plaintiffs are permitted in their pleadings to presume that certain statements of a company, such as the financial reports and press releases, are the "collective work" of the Company's upper management). As each of the Individual Directors signed the Forms 10-K at issue here and/or were involved in the day-to-day management and operations of the Company, each of them made a false and misleading statement.

## I.    **Plaintiffs Have Adequately Pled Loss Causation**

Ignoring the well-pled allegations in the Complaint, Defendants argue that Plaintiffs have not adequately pled loss causation because the Complaint does not allege adequately that Defendants' actions caused Plaintiffs' investment loss.[42]  Plaintiffs have done so.

### 1.    **The Standards For Pleading Loss Causation**

Under Seventh Circuit law, to adequately plead loss causation, a plaintiff need only allege "that it was the very facts about which the defendant lied which caused its injuries." *Caremark, Inc.*, 113 F.3d at 648. As issues of loss causation are factual matters often requiring expert testimony,[43] they generally are "not proper to resolve on a motion to dismiss." *In re Sears, Roebuck & Co. ERISA Litig.*, No. 02-C-8324, 2004 WL 407007, at *11 (N.D. Ill. Mar. 3, 2004); *see also Gee v. UnumProvident Corp.*, No. 03-147, 03-MD-1552, 2005 WL 534873, at *13 (E.D. Tenn. Jan. 13, 2005) (same, quoting *Sears*); *Lentell v. Merrill Lynch and Co., Inc.*, No.

---

[42] Only Hollinger and the Black Group make any causation argument, and they do not contend that transaction causation is not established.

[43] *See, e.g., In re Cendant Corp. Sec. Litig.*, 264 F.3d 201, 249-50 (3d Cir. 2001); *In re American Bank Note Holographics*, 127 F. Supp. 2d 418, 426-27 (S.D.N.Y. 2001); *Flecker v. Hollywood Entm't Corp.*, 1997 WL 269488, at *5 (D. Or. Feb. 12, 1997).

03-7948, 2005 WL 107044, at * 11 (2d Cir. Jan. 20, 2005) ("Loss causation is a fact-based

inquiry"); *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d

Cir. 2003) (whether or not "chain of causation" is established "is a matter of proof at trial and not

to be decided on a Rule 12(b)(b) motion to dismiss"); *Aiena v. Olsen*, 69 F. Supp. 2d 521, 535

(S.D.N.Y. 1999) (rejecting defendants' argument that plaintiffs had not alleged that disclosure of

concealed facts caused them loss, because "Defendants ask too much on a Rule 12 motion").

The Seventh Circuit has cautioned that the requirement of pleading loss causation "ought

not to place unrealistic burdens on the plaintiff at the pleading stage." *Caremark*, 113 F.3d at

649. The burden of pleading loss causation in a Rule 10b-5 case is considered a "light one." *In

re Enron Corp. Sec., Deriv., & "ERISA" Litig.*, 310 F. Supp. 2d 819, 86 (S.D. Tex. 2004).

Indeed, "the PSLRA does not affect causation pleadings" and therefore "the allegations must

only meet traditional 'fair notice' standards." *In re Fleming Cos. Inc. Sec. & Deriv. Litig.*, No.

5-03-MD-1530 2004 U.S. Dist. LEXIS 26488, at * 130-31 (S.D. Tex. June 10, 2004); *see also In

re CMS Energy Sec. Litig.*, No. 02-72004 2005 U.S. Dist LEXIS 439, at * 50 (E.D. Mich. Jan. 7,

2005) ("unlike for pleading scienter, there are no heightened pleading requirements for loss

causation").

### 2.    Loss Causation Is Adequately Pled

#### a.    Hollinger's Stock Price Declined
#### Following The Corrective Disclosures

The Complaint alleges three corrective disclosures during the Class Period that, at least

partially, disclosed the fraudulent misrepresentations and omissions. These include (i)

Hollinger's May 15, 2001 10-Q; (ii) Hollinger's April 1, 2002 10-K; and (iii) the December 11,

2002 downgrade of Hollinger's Senior Notes.[44] *See* ¶¶ 10, 14, 77, 82, 84, 124-25, 232, 300. The

price of Hollinger stock *declined* in the period immediately after each of their disclosures: (i) on

May 14, 2001, Hollinger stock closed at $15.80; on May 15, it closed at $15.66; (ii) on April 1,

2002, Hollinger stock closed at $13.75; on April 2, it closed at $13.40;[45] and (iii) on December

10, 2002, Hollinger stock closed at $9.96; on December 11 it closed at $9.85.[46] These facts and

the allegations in the Complaint demonstrate that loss causation was adequately pled. *See Retsky*

*Family Ltd. P'shp v. Price Waterhouse LLP*, No. 97-769, 41998 U.S. Dist. LEXIS 17459, at *39

(N.D. Ill. 1998) ("In the typical case, the plaintiff alleges inflation due to misrepresentation,

disclosure of the misrepresentation, an immediate decline in the market price and loss upon sale

of the shares. Such allegations meet the pleading requirements . . . because it can be inferred

from the market's reaction to disclosure that the decline in the stock price is related to the prior

misrepresentation.").

    In *Greater Pa. Carpenters Pension Fund v. Whitehall Jewellers, Inc.*, No. 04-1107, 2005

U.S. Dist. LEXIS 376, *13 (N.D. Ill. Jan. 7, 2005), as here, the defendants argued that the

plaintiff had failed to show loss causation because the price of the stock did not fall following

---

[44] Additionally, after the Class Period, the disclosures of the circulation scheme drove the price down, going from $17.82 on June 15, 2004 to $16.10 on June 16, 2004, and to $15.71 on June 26, 2004 following additional news about this aspect of the fraud.

[45] There is nothing in the Complaint that suggests that the April 1, 2002, 10-K was filed at the start of the trading day.

[46] This Court can take judicial notice of the time of day in which the December 11, 2002 downgrade disclosure was made as the press release announcing the downgrade was time stamped at 12:38 p.m. Despite the fact that the downgrade occurred on December 11, Defendants contend that for loss causation purposes the Court should assume the disclosure was made on December 9. On December 9, the Company issued a press release indicating that it planned a new debt offering and also planned additional borrowings under an existing credit facility. According to Defendants, because the downgrade was related to the additional borrowings, it was effectively disclosed on December 9. Defendants are wrong. Unlike the December 9 press release, the December 11 downgrade disclosed that Hollinger intended to "draw down significantly from its secured bank facility to refinance existing debt." [cite] There is a substantial difference between announcing a planned borrowing and disclosing that such borrowing is necessary in order to pay off existing debt. Accordingly, the relevant corrective disclosure remains December 11, as alleged in the Complaint.

either of the restatement disclosures. *Id.* The court rejected this argument, noting that the defendants had "partially disclosed some adverse information pertaining to the alleged fraud which caused [the company's] price to decline prior to the . . . restatements." *Id.* The company subsequently "issued a press release announcing some of defendants' insider sales" and the defendants later filed Form 4s relating to their insider sales, and after each event the company's stock price declined again. *Id.* The company later issued a press release announcing lower than expected financial results for the quarter, which again caused the stock price to drop. *Id.* Finally, the defendants issued other partial disclosures of prior misrepresentations and omissions, including a partial disclosure of SEC and Department of Justice investigations, which resulted in another decline in the company's stock price. *Id.* The court held that the plaintiffs adequately pleaded loss causation because the defendants' disclosed the adverse information over a period of time causing the price to decline. *Id.* (viewing the complaint in the light most favorable to the plaintiff, it could reasonably draw the inference that the loss was caused by the alleged fraud at issue). The court relied on *Danis v. USN Communications, Inc.*, 73 F. Supp. 2d 923, 943 (N.D. Ill. 1999), which found that loss causation was adequately plead where the plaintiffs alleged that "the market responded to and 'corrected' the price of USN stock over the better part of a year as bits and pieces of negative information became available and it became apparent that USN was not capable of performing as originally represented." *Id.*

In these cases, as here, loss causation was adequately pled. Defendants in this case should not be permitted to defeat securities fraud claims through a series of selective and misleading disclosures over time of bits of information about their fraud in the hopes of engineering a "soft landing" for Hollinger's stock price.

**b.    Even If The Price Increased On Subsequent Days, That Fact Does Not Warrant Dismissal At This Stage Of The Case**

Defendants argue that Plaintiffs cannot prove loss causation because the price of Hollinger stock increased on the day following the disclosures. Defendants purport to point to the exact time of day that the disclosures were made – arguing that the May 15, 2001 disclosure was made after the markets closed and the April 1, 2002 disclosure was made during the trading day. With respect to the December 11, 2002 disclosure, Defendants go even further and assert that the Court should deem that disclosure to have been made on December 9, 2002, but as shown above, that is not true. Preliminarily, neither Hollinger nor the Black Group in their respective opening briefs provided any evidentiary support whatsoever for their contentions regarding the precise day or time the corrective disclosures were made. Defendants' bald assertions are premised on facts that are neither alleged in the Complaint nor of the type that are amenable to judicial notice, and they are clearly in dispute. Even if true, such facts regarding the precise time of day of the disclosures are irrelevant because the disclosures were themselves fraudulent and the stock could have risen even higher absent such disclosures, but that factual issue is not before the Court.

As this Court is no doubt aware, it may not consider any facts outside the Complaint without converting Defendants' motions to motions for summary judgment. *See Loeb Indus. v. Sumitomo Corp.*, 306 F.3d 469, 479 (7th Cir. 2002) ("Rule 12(b) requires that if the district court wishes to consider material outside the pleadings in ruling on a motion to dismiss, it must treat the motion as one for summary judgment."); *Sears*, 2005 WL 534873, at *1 ("Generally, matters outside the pleading cannot be considered on a motion to dismiss. However, documents attached to defendant's motion may be considered if they are referred to in the plaintiff's complaint and are central to the plaintiff's complaint") (internal citations omitted). Once converted, the

-72-

plaintiffs have a non-discretionary right to respond. *Edward Gray Corp. v. National Union Fire Ins. Co.*, 94 F.3d 363, 366 (7th Cir. 1996) (holding that once motion to dismiss is converted to summary judgment each party is entitled to notice and an opportunity to submit affidavits or other additional forms of proof and that "[t]his requirement of a reasonable opportunity to respond is mandatory, not discretionary").[47] Additionally, the Court may not consider any evidence that the Defendants submit for the first time in a reply brief. *See Northern Contracting, Inc. v. Illinois*, No. 00-C-4515, 2004 WL 422704, at *47 (N.D. Ill. Mar. 3, 2004) (granting "motion to strike those facts improperly referenced for the first time in Plaintiff's reply brief, and will not consider such facts or any exhibits to Plaintiff's reply brief").

Moreover, even accepting Defendants' argument does not, as a matter of law, defeat a claim of loss causation for at least three reasons, each of which raise issues of fact that cannot be decided on a motion to dismiss.

### i. The So-Called Corrective Disclosures Were Themselves False And Misleading And Could Not Reasonably Be Expected To Cause A Decline In The Price Of Hollinger Stock

According to Defendants, because Hollinger stock prices purportedly increased on the trading day following the dissemination of the corrective disclosures, Plaintiffs have failed to meet their burden of pleading loss causation. Defendants, however, misconstrue the import of these disclosures. As explained above (*supra* at 5, 58-9), the Complaint unambiguously alleges that the corrective disclosures relied on by Defendants were themselves false and misleading and were accompanied by "words of comfort" which tempered any disclosure and assured investors

---

[47] While courts may take judicial notice of public documents without converting a motion to dismiss into a motion for summary judgment, courts should not take judicial notice of a public document for purposes of resolving a factual issue in dispute (*i.e.*, the significance of the time of filing). *See Hennessy v. Penril Datacomm Networks*, 69 F.3d 1344, 1354-1355 (7th Cir. 1995) (affirming decision of district court not to take judicial notice of a Form 10-K for purposes of resolving a fact in dispute between parties because "in order for a fact to be judicially noticed, indisputability is a prerequisite").

-73-

that, for instance, the newly disclosed non-compete payments and management services

agreements had received the scrutiny and approval of Hollinger's Audit Committee and full

Board, but as investors would later discover, this was false. Accordingly, it is a factual matter as

to whether the disclosures reasonably could be expected to cause a decline in stock price.

In *Oran v. Stafford*, 226 F.3d 275, 283 (3d Cir. 2000) the court recognized that the:

> Lack of adverse price movement may be traceable to defendant's own
> 'spinning' of [certain] data – which, plaintiffs maintain, itself constituted a
> material misrepresentation. Plaintiffs argue, in effect, that had [defendant]
> not deceptively downplayed the significance of the [] data through its
> sanguine and allegedly misleading statements, investors would have
> realized the import of the information, and share prices would have
> tumbled.

226 F.3d at 283. *See also DaimlerChrysler*, 269 F. Supp. 2d at 515 (D. Del. 2003)

("Reassurances [from management] can dissipate apparent storm warnings"); *In re WorldCom*

*Inc. Sec. Litig.*, 294 F. Supp. 2d 431, 445 (S.D.N.Y. 2003) ("In some cases, despite the presence

of storm warnings, investors are not placed on inquiry notice 'because the warning signs are

accompanied by reliable words of comfort from management.'") (quoting *LC Capital Partners*

*LP v. Frontier Ins. Group*, 318 F. 3d 148, 155 (2d Cir. 2003)). Thus, words of comfort and

misleading corrective disclosures (such as those in this case) can explain a lack of a price drop.

Although the *Oran* court found that, as a matter of law, the defendant's corrective

disclosure was not false or misleading, the same is not true here. As demonstrated above,

Hollinger's corrective disclosures were incomplete and misleading. For this reason, Defendants'

argument that loss causation has not been adequately pled is without merit.

> **ii.     The Precise Day On Which Market Forces
> Received, Digested, And Reflected The Bad
> News Is A Question Of Fact**

Even if the corrective disclosures could be expected to cause a decline in the stock price,

there remains the fact-intensive question as to when the news disclosed in the corrective

disclosures would be reflected in the stock price. In *In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263, 292, (S.D. Tex. Jan. 3, 2005), the court refused to end the Class Period on the day that the corrective disclosure was made because "the precise day on which natural market forces had a reasonable time to receive, digest, and reflect the bad news is, necessarily, a question of fact." *See also In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 378 (S.D.N.Y. 2000) (same). The question as to when the corrective disclosures in this case could have been expected to be reflected in the stock price is similarly a question of fact that cannot be resolved on a motion to dismiss. The fact that it took more than 24 hours for the price of Hollinger stock to decline does not mean that loss causation has not been pled as a matter of law.[48]

Moreover, Defendants ignore the fact that after each corrective disclosure, Hollinger stock declined for many days after the one-day uptick highlighted by the Defendants.[49] Surely, it is not unreasonable to conclude that market forces could take longer to reflect partial and misleading disclosures than accurate ones. Of course, this is a factual matter that may require expert analysis and, thus, cannot be resolved on a motion to dismiss. *See, e.g., In re Ikon Solutions, Inc. Sec. Litig.*, 131 F. Supp.2d 680, 689-91 (E.D. Pa. 2001) (on motion for summary judgment, allowing expert testimony both with respect to whether corrective disclosure obscured the "real problem" with the company and, if so, when the market became aware of fraud).

---

[48] The Seventh Circuit's decision in *Roots P'ship v. Land's End, Inc.*, 965 F.2d 1411, 1419 (7th Cir. 1992) is not to the contrary. There, the Seventh Circuit merely held that a corrective disclosure issued "months" before the plaintiffs purchased the stock would have been reflected in the stock price at the time of purchase. There is a stark contrast between the market having "months" to reflect a disclosure and demanding that the disclosure be incorporated in the price of stock within hours of its dissemination.

[49] The May 15, 2001 10-Q was made public at the close of trading on May 15. On May 17, 2001, Hollinger stock fell approximately 0.4991%; on May 18, Hollinger stock fell 0.2508%; on May 21, 2001 (after the weekend), Hollinger stock fell 0.0629%; on May 22, 2001, Hollinger stock fell 0.4403%; and on May 23, Hollinger stock fell 1.3898%. Similarly, the December 2001 10-K was made public on April 1, 2002. On April 2, 2002, Hollinger stock fell 2.5455%; on April 3, 2002, Hollinger stock fell 1.0448%; on April 4, Hollinger stock fell 0.2262%; on April 5, Hollinger stock fell 0.0756%; and on April 8 (after the weekend), Hollinger stock fell 0.2269%.

Finally, even where corrective disclosures are accurate, courts often look beyond the first trading day when considering issues of loss causation. For example, in *Oran*, 226 F.3d at 283, the court noted that the stock increased in price in the four days following the corrective disclosure. *See also Grimes v. Navigant Consulting, Inc.*, 185 F. Supp. 2d 906, 910 (N.D. Ill. 2002) (same). Here, the price of Hollinger stock *declined* in the days following the misleading and incomplete corrective disclosures. Accordingly, in view of the price declines and giving Plaintiffs the benefit of all inferences, the Complaint adequately alleges loss causation.

### iii.    In The Absence Of The So-Called Corrective Disclosures, Hollinger Stock May Have Increased Even More

Although Defendants rely exclusively on the fact that the price of Hollinger stock increased on one of the days after the false and misleading corrective disclosures were made, they make no attempt to demonstrate that the stock price would not have increased even further in the absence of the corrective disclosures. Moreover, because this question raises factual issues, it cannot be determined on a motion to dismiss.

A stock's failure to increase at the rate it would have in the absence of a corrective disclosure is no different economically than a decline in the price of a stock. Either way, Plaintiffs are harmed by the fraud in the same manner. The logic of this argument was recognized by the Supreme Court at the January 12, 2005 oral argument in *Dura Pharm., Inc. v. Broudo,* No. 03-932, which, as Defendants contend, is slated for decision this term.[50] (A copy of the transcript of the oral argument is attached as Exhibit J to the Declaration of William H.

---

[50] In *Broudo*, the Ninth Circuit held that to adequately plead loss causation, a plaintiff need only allege that the stock's price at the time of purchase was artificially inflated and the reasons for the overvaluation. *Id.* at 939. In this case, Plaintiffs allege far more than that: as set forth above, Plaintiffs allege that the price of Hollinger stock declined after the market became aware of the misrepresentations and omissions.

London.) For example, at the oral argument Justice Ginsburg raised this precise issue suggesting that she saw no difference:

> between not getting as much appreciation as you would have gotten if the correct information had been out there and getting less than you would have gotten. I mean, in both cases the shareholder is affected in some way. It didn't get as much in one case. So you're not distinguishing between those. I think you're agreeing that in both cases the – the discovery of platinum is the shares go up, but they would have gone up much higher [in the absence of a corrective disclosure].

Comment of Justice Ginsburg, Tr., at 10. Similarly, Justice Breyer also suggested that loss causation could be pled where "stock didn't go down but it would have gone up more." Comment of Justice Breyer, Tr. at 28. Because the Complaint does not address whether the price of Hollinger stock would have increased even further in the absence of the corrective disclosures, and the Defendants have presented no evidence on this issue (apparently because that is a matter for experts on summary judgment or at trial), the Complaint cannot be dismissed for failing adequately to allege loss causation.

### J.    Plaintiffs' Claim Under The Illinois Securities Law (Count VII) Is Legally Sufficient And Is Not Barred By Federal Law

Defendants contend (Black Group Br. at 14-18; Argus Br. at 11-12; Atkinson Br. at 15) that Plaintiffs' claim under the Illinois Securities Law of 1953 ("ISL"), 815 ILCS 5/12 *et seq.*, is barred by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), Pub. L. No. 105-353, 112 Stat. 3227 (codified in part at 15 U.S.C. § 78bb), and is in any event legally insufficient under the ISL.[51] Both contentions are incorrect.[52]

---

[51] Plaintiffs do not seek relief under Count VII against Defendant KPMG and therefore make no response to KPMG's submission as to this count. (KPMG Br. at 10-11.)

[52] As noted below, the applicable case law on the disputed points is sparse. If the Court concludes, on its reading of the statutes, that Count VII cannot stand, Plaintiffs would respectfully ask for leave to amend to cure any deficiencies identified.

### 1. The SLUSA Exception For State Pension Plans Applies To Count VII

Defendants note that SLUSA provides for dismissal in some circumstances of state securities law claims, where the plaintiff also asserts similar claims under federal law. Black Group Br. at 14. As Defendants acknowledge, however, "SLUSA contains an exception for certain actions brought by States, political subdivisions and State pension plans." Black Group Br. at 16. *See* 15 U.S.C. § 78bb(f)(3)(B). Indeed, "[a]t a minimum, these provisions clearly evince a policy of special respect for the forum choices of state pension plans with regard to securities claims." *Retirement Sys. of Ala. v. Merrill Lynch & Co.*, 209 F. Supp. 2d 1257, 1269 (M.D. Ala. 2002). The Complaint fairly alleges facts that bring under this express SLUSA exception the ISL claim of two named Plaintiffs that are themselves State pension plans – Teachers and Washington Carpenters – and also (at least potentially) other eligible State pension plans. ¶¶ 537-545. Thus what Defendants term the "SLUSA bar" does not operate to bar Plaintiffs' ISL claim. In contending that Plaintiffs' allegations are "deficient" with respect to the SLUSA exception, Black Group Br. at 17, Defendants misconstrue SLUSA, or misapply the sparse developing case law under this six-year-old statute.

Defendants advance two arguments under SLUSA: first, that the Complaint includes ineligible entities as plaintiffs in the State pension plan "sub-class" under Count VII; secondly, that the Complaint fails to allege facts necessary to include any entity as a plaintiff under the SLUSA exception for State pension plans. Both arguments fail.

### a. The SLUSA Exception Applies Despite The Breadth Of The "Sub-Class"

The SLUSA exception applies by its terms to State pension plans "that are named plaintiffs, and that have authorized participation" in the action. 15 U.S.C. § 78bb(f)(3)(B)(i). Thus the exception clearly applies on its face to two named Plaintiffs, Teachers and Washington

Carpenters, as they are themselves State pension plans. (The Complaint was of course not intended, and should not be read, to treat any individual plaintiff as a "State pension plan.")

Defendants suggest that by including in the literal definition of the Count VII "sub-class" all eligible State pension plans not actually named as plaintiffs in the Complaint, Plaintiffs have somehow deprived themselves of the protection of the SLUSA exception altogether. Black Group Br. at 17. They cite no supporting case law. Indeed, research discloses no case discussing, let alone ruling on, the proper treatment under SLUSA of such unnamed entities. It is by no means obvious that SLUSA must be read to bar Teachers and Washington Carpenters, which are clearly proper plaintiffs, from including as putative plaintiffs all other State pension plans that might later expressly provide the "authorized participation." To protect the rights of all such putative or potential class members, the Court should construe the SLUSA exception as applying to the entire Count VII putative class. Thus, Count VII should not be dismissed on the ground that it would include in the plaintiff class certain entities to which the SLUSA exception does not expressly apply. At a minimum, the Court should allow Plaintiffs to amend to narrow the literal definition of the Count VII class.

### b.    The Complaint Alleges The Pertinent Facts Adequately

Defendants also contend that the Complaint fails to allege adequately that "any of the named plaintiffs fit within the statutory definition of a 'State pension plan.'" Black Group Br. at 17. In fact, the Complaint fairly alleges that Teachers and Washington Carpenters are "State pension plans," as made clear in the very paragraph quoted by Defendants themselves. ¶ 538.

At a minimum, Defendants disregard the well-settled rule that a complaint may not be dismissed for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (*quoted in Cole v. U.S. Capital, Inc.*, 389 F.3d 719, 724 (7th Cir. 2004)).

-79-

Defendants certainly cannot satisfy the *Conley* test on the facts here, even if the Complaint could arguably have alleged more details to support the allegation that Plaintiffs are State pension plans.

### 2.     Count VII States A Claim Under The ISL

None of Defendants' three separate arguments for the legal insufficiency of Plaintiffs' ISL claim serves to establish the inadequacy of the claim – which it is plainly Defendants' burden to establish.[53] The three arguments will be addressed *seriatim*.

### a.     No Compensatory Damages Are Requested

Defendants argue that the ISL claim should be dismissed "to the extent it purports to be a claim for compensatory damages" – apparently meaning a claim for damages beyond the rescissionary damages expressly contemplated under the ISL. Black Group Br. at 17-18. As Plaintiffs seek no such "compensatory damages" under the ISL, but only rescission, this argument can be disregarded entirely.

### b.     There Is No Statutory Requirement Of Direct Involvement In The Sale

Defendants argue that Plaintiffs "cannot seek rescission under Section 13 of the ISL," 815 ILCS 5/13 (the remedy section), because "the Complaint fails to allege that any Defendant sold (or assisted in the sale of) securities to any plaintiff." Black Group Br. at 18. Obviously, this argument has force only to the extent (if any) the ISL requires the plaintiff to allege the direct involvement of the defendant – as seller or seller's assistant – in the very sale whose rescission the plaintiff demands. Yet the only case Defendants cite for this proposition – while using the signal "See, e.g.," to suggest, misleadingly, that they have a slew of others in hand – is an unpublished decision of a federal district judge applying Illinois law, not the decision of an

---

[53] Argus claims that the ISL claim against it fails for the same reasons the § 10(b) claims fail, however, as set forth at length in Sections B-F above, this assertion has no merit. Argus Br. at 12.

Illinois appellate court authoritatively declaring Illinois law. *Kleban v. S.Y.S. Rest. Mgmt., Inc.*, No. 95-2920 1996 U.S. Dist. LEXIS 15269 (N.D. Ill. Oct. 9, 1996). Read closely, the *Kleban* case does not sustain Defendants' contention.[54]

In *Kleban*, an investor in a restaurant sued a franchisor and others, without alleging that the franchisor had made any false or materially misleading statements or was a "control person." 1996 U.S. Dist. LEXIS 15629 at *5-6. The judge disposed of the ISL claim against the franchisor in two sentences:

> This remedy is only available against "the issuer, controlling person, underwriter, dealer or other person by or on behalf of whom said sale was made, and each underwriter, dealer or salesperson who shall have participated or aided in any way in making such a sale . . . ." [Citation omitted.] There are no allegations or inferences that [the franchisor] fits into any of these categories.

*Id.* at *7-8 (emphasis added). In fact, even if the judge's construction of the statute is not unreasonable, her flat statement that the remedy is "only available against" the listed persons is not directly supported by the statutory language, read in full and in context.

The remedy section itself, 815 ILCS 5/13(A), states in pertinent part as follows:

> Every sale of a security made in violation of the provisions of this Act shall be voidable at the election of the purchaser exercised as provided in subsection B of this Section; and the issuer, controlling person, underwriter, dealer or other person by or on behalf of whom said sale was made, and each underwriter, dealer or salesperson who shall have participated or aided in any way in making the sale, and in case the issuer, controlling person, underwriter or dealer is a corporation or unincorporated association or organization, each of its officers and directors (or persons performing similar functions) who shall have participated or aided in making the sale, shall be jointly and severally liable to the purchaser as follows: . . . .

---

[54] Defendants quite properly omitted to cite certain published cases arguably touching on the point in issue, presumably because the pertinent language was only dicta, or concerned an entirely distinct question: the liability *vel non* of a clearing broker acting in a purely ministerial capacity in a sales transaction. *See Carlson v. Bear Stearns & Co.*, 906 F.2d 315 (7th Cir. 1990); *Froelich v. Matz*, 93 Ill. App. 3d 398, 417 N.E. 2d 183 (3d Dist. 1981).

A broad reading of a remedial statute, like this one, *Schuler v. Beers*, 157 Ill. App. 3d 97,

510 N.E.2d 48 (1st Dist. 1987), is of course required to accomplish the purposes of the statute,

under both state and federal law. *See, e.g., Ploog v. HomeSide Lending, Inc.*, 209 F. Supp. 2d.

863 (N.D. Ill 2002). Read broadly, the statutory language clearly does not exclude, and it

therefore allows for, the liability of unlisted persons for conduct "in violation of the provisions

of" the ISL, while the listed persons are to be held "jointly and severally liable to the purchaser"

under a specific procedure as set forth in the statute.

Moreover, the reference in this remedial statute to "each underwriter, dealer or

salesperson who shall have participated or aided in any way in making the sale" should be

construed broadly to include any person who acted in any such capacity in any transaction

whatever, and whose false or misleading statements in fact aided in some way in the making of

the sales in the present case – regardless of whether such person acted in such a strictly sales-

related capacity here. Defendants' statements presumably aided in the making of the sales to

Plaintiffs, so they fit within the statutory language thus construed. *See Benjamin v. Cablevision

Programming Investors*, 114 Ill. 2d 150, 163, 499 N.E.2d 1309, 1316 (1986) (for ISL purposes, a

"sale" includes "any act by which a sale is made").

In short, neither *Kleban*, Defendants' sole case, nor the language of the statute itself, less

than a model of lucidity, can support the outright dismissal of Plaintiffs' ISL claim. At a

minimum, the Court should defer the disposition of the ISL claim while the factual record is

developed in light of the broad reading of the remedial statute.[55]

---

[55] Without quoting any supporting language from the ISL, Defendants assert that "the rescissionary provisions . . . apply *only* to sales bearing some transactional nexus to the State of Illinois." Black Group Br. at 18 (emphasis in original). Plaintiffs disagree, and can satisfy any purported requirement to show a nexus to Illinois, but if the Court adopts such a requirement, Plaintiffs will seek leave to amend.

### K.    Plaintiffs Have Adequately Alleged Claims For Breach Of Fiduciary Duty And Aiding And Abetting Such Breach

In Count VI of the Amended Complaint, Plaintiffs allege that Hollinger and the Individual Defendants breached their fiduciary duties by disseminating materially false and misleading statements and omissions which induced shareholders to retain their Hollinger stock and thereby suffer damages in connection with the retained stock. ¶¶ 524-36. Plaintiffs also allege in Count VIII that KPMG, Hollinger Inc., Ravelston, RMI and Argus aided and abetted these breaches of fiduciary duty by their knowing participation in the scheme and substantial assistance in either preparing Hollinger's false public filings or participating in the improper management service agreements, and thereby caused Plaintiffs damages in connection with retaining their Hollinger stock. ¶¶ 546-57. Defendants claim that Plaintiffs do not have standing to assert these claims and that, even if Plaintiffs have standing, the claims were not adequately pled.[56] Both arguments must be rejected.

### 1.    Plaintiffs' Claims For Breach Of Fiduciary Duty And Aiding And Abetting Such Breach (Counts VI And VIII) Are Direct Claims

The Delaware Supreme Court recently set forth "the law to be applied henceforth in determining whether a stockholder's claim is derivative or direct." *Tooley v Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004). In *Tooley*, the court held that: The analysis must be based *solely* on the following questions:

> [1] Who suffered the alleged harm-- the corporation or the suing stockholder, individually-- and [2] who would receive the benefit of the recovery or other remedy?

---

[56] Only Argus, KPMG and Hollinger contend that Counts VI and VIII are derivative. Hollinger Inc., Ravelston, RMI, Conrad Black, Barbara Black, Boultbee, Colson and Radler all expressly concede that these claims are direct claims and thus that Plaintiffs have standing to assert them. *See* Black Group Br. at 16 ("No derivative claims are asserted."). The remaining Defendants take no position on the matter in their opening briefs and thus also concede Plaintiffs' standing to assert these claims.

*Id.* at 1035. The answers to these questions show that Plaintiffs' claims are direct.

First, Plaintiffs have explained in the Complaint how they suffered damages as a result of retaining their Hollinger stock based upon public filings which the Company has admitted were materially false and misleading. Hollinger claims that Plaintiffs' claims must be derivative because their injuries "would be the same for all shareholders in proportion to their *pro rata* ownership." Hollinger Br. at 27. However, the *Tooley* court explicitly rejected this purported requirement to show a "special injury," finding it "not helpful to a proper analytical distinction between direct and derivative actions." *Id.* at 1035. *See also id.* at 1037 ("Experience has shown that this concept . . . that a suit must be maintained derivatively if the injury falls equally upon all stockholders . . . to be confusing and inaccurate"). In any event, even were this a requirement, the injuries claimed in Counts VI and VIII are distinct from any suffered by Hollinger (which fails to articulate how it may have sustained any purported injury resulting from the misrepresentations and omissions)[57] and even distinct from injuries suffered by shareholders through purchases and sales of Hollinger stock.[58]

Second, Plaintiffs, not Hollinger, will receive the benefit of any recovery for Defendants' misconduct. Hollinger has not articulated how it would be entitled to any recovery for the harm suffered by shareholders who were misled and induced into retaining their Hollinger stock. As explained in *Tooley*, "[a] direct claim may be brought in the name and right of a holder to redress an injury sustained by, or enforce a duty owed to, the holder." *Id.* at 1036 n.9.

---

[57] Hollinger actually benefited from the misrepresentations to the extent its stock price remained artificially inflated due to Plaintiffs' retention of Hollinger stock.

[58] The Supreme Court in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 755 (1975) recognized the distinction between holders and purchasers and sellers, finding that securities holders do not have standing to bring Section 10(b) claims but may have available to them non-derivative state law causes of action. *Id.* at 9 ("Obviously, this disadvantage is attenuated to the extent that remedies are available to non-purchasers and non-sellers under state law.").

Two additional decisions show that Plaintiffs' claims are direct. In *Malone v. Brincat*, 722 A.2d 5 (Del. 1998), as here, the plaintiffs brought individual and class claims for breach of fiduciary duty and aiding and abetting such breach through "intentional [] overstate[ments] [of] the financial condition of [the company] . . . in disclosures to [the company's] shareholders." *Id.* at 7. The court held that "directors who knowingly disseminate false information that results in corporate injury or damage to an individual stockholder violate their fiduciary duty, and may be held accountable in a manner appropriate to the circumstances." *Id.* at 9.[59] The court allowed plaintiffs to replead their claims "to assert any individual cause of action and articulate a remedy that is appropriate on behalf of the named plaintiffs individually, or a properly recognizable class consistent with Court of Chancery Rule 23."[60] *Id.* at 14 (also noting that directors who "deliberately misinform[] shareholders about the business of the corporation" may be subject to "a cause of action for damages").

Similarly, in *Gordon v. Buntrock*, No. 00-303, 2000 WL 556763, at *1 (N.D. Ill. Apr. 28, 2000), the plaintiff brought individual and class claims for breach of fiduciary duty and aiding and abetting such breach, claiming damages suffered by shareholders who lost the value of their stockholdings following the disclosure that the company's financial statements and public filings were false and misleading. Specifically, the plaintiffs sought "damages for being fraudulently induced to hold Waste Management stock, *after* he and the putative class members had purchased the stock." *Id.* at *3. The court held that "holders of stock in Delaware corporations, such as Waste Management, may state valid claims under state common law theories of breach

---

[59] The court explained that the directors had the "fiduciary duty of loyalty and good faith . . . to deal with their shareholders honestly." *Id.* at 10.

[60] The court found that the plaintiffs had not adequately alleged their injuries and had "obliquely . . . claim[ed] an injury to the corporation." *Id.* at 14. In contrast, in this case, Plaintiffs have clearly and explicitly alleged their injuries resulting from Defendants' actions.

of fiduciary duty for nondisclosure against directors, officers, and auditors without running afoul of federal securities laws." *Id.* The court characterized the plaintiffs' claims as permissible "*Malone*-style" claims. *Id.* at *3 (also finding that the claims were not pre-empted by SLUSA). In *Gordon*, as in *Malone*, the court found that class claims for breach of fiduciary duty and aiding and abetting such breach were direct claims. *See also Small v. Fritz Cos., Inc.* 65 P.3d 1255 (Cal. 2003) (recognizing individual holder claim); *Gutman v. Howard Sav. Bank*, 748 F. Supp. 254 (D.N.J. 1990) (same); *Continental Ins. Co. v. Mercadante*, 222 A.D. 181, 183 (N.Y. App. Div. 1927); *Butler v. Watkins*, 80 U.S. 456 (1871); *Rothmiller v. Stein*, 38 N.E. 718 (N.Y. 1894); *Seideman v. Sheboygan Loan & Trust Co.*, 223 N.W. 430 (Wis. 1929); *Fottler v. Moseley*, 60 N.E. 788 (Mass. 1901); *David v. Belmont*, 197 N.E. 83 (Mass. 1935); *Brown-Wales Co. v. Barber*, 184 A. 855 (N.H. 1936). *See also Chinn v. Belfer*, No. 02-00131, 2002 WL 31474189, at *4 (D. Or. June 19, 2002) (remanding holder claims to state court based in part on fact that "[a] number of states have upheld the rights of holders and non-purchasers to seek relief in state court for misrepresentations").

Defendants' reliance on *Manzo v. Rite Aid Corp.*, No. 18541, 2002 WL 31926606 (Del. Ch. Dec. 19, 2002), is misplaced. That decision pre-dates *Tooley* and it applied the "special injury" test, 2002 WL 31926606 at *5, which the *Tooley* court expressly "disprove[d]." 845 A.2d at 1035. The *Manzo* court concluded that the claims were derivative because the plaintiff "experienced an injury suffered by all Rite Aid shareholders in proportion to their *pro rata* share ownership." *Manzo*, 2002 WL 31926606, at *5. Under *Tooley*, this fact, even if true, no longer renders the claim derivative. As explained in *Tooley*, claims are direct where the injuries are distinct from those suffered from the corporation, not other shareholders. *Tooley*, 845 A.2d at 1035-36. The damages suffered by Plaintiffs from their retention of artificially inflated

Hollinger stock is different (and is measured differently) from any harm Hollinger purportedly suffered based upon any Individual Defendants' self-dealing.

The *Manzo* court also noted that, in contrast to Plaintiffs here, the plaintiff in that case in her amended complaint and brief "assert[ed] some sort of contractual right of shareholders to accurate information from the company and from its officers, directors and advisors." *Id.* at *6. Here, Plaintiffs' claims stem not from contract rights, but from the Defendants' fiduciary obligations to Hollinger's shareholders. In short, *Manzo* is completely inapposite.

As Plaintiffs' claims are direct, there is (of course) no requirement to make any demand that the Company pursue any action against the Individual Defendants. Nor does it matter whether or not a derivative action has been filed against those Defendants. In fact, the derivative action to which KPMG refers was initiated against only a few of the named Defendants in this action and the claims asserted in that action are completely different from those raised in Counts VI and VIII. *See Hollinger Int'l, Inc. v. Hollinger, Inc.*, No. 04 C 0698, 2005 WL 589000 (N.D. Ill. Mar. 11, 2005).[61]

### 2.     Plaintiffs Adequately Allege A Claim For Breach Of Fiduciary Duty

As Plaintiffs' Delaware State law claims are based upon breaches of fiduciary duty and aiding and abetting such breaches, not fraud, they are governed by Rule 8(a), not (as KPMG and Argus contend) Rule 9(b). *See Howell v. Motorola, Inc.*, 337 F. Supp. 2d 1079, 1088 (N.D. Ill. 2004) (holding that Rule 8 applies to those breach of fiduciary duty claims not based on common law fraud and distinguishing *Thornton v. Evans*, 692 F.2d 1064 (7th Cir. 1982), which stood for

---

[61] In that case, the plaintiff asserted claims for usurpation of corporate opportunity, breach of fiduciary duty for self-dealing, unjust enrichment and civil conspiracy, as compared to the instant case which involves the knowing and reckless public dissemination of material misrepresentations and omissions about Hollinger and the breach of fiduciary duty by Defendants when they misled investors into retaining their Hollinger shares. While some of the facts may overlap, none of the claims do, and therefore there is no inference to be drawn from what KPMG refers to as the "related action."

the proposition that Rule 9(b) applies to fraudulent breach of fiduciary duty claims). *See also*

*Solomon v. Pathe Communications Corp.*, 672 A.2d 35, 39 (Del. 1996) (applying Delaware

Chancery Court Rule 8(a) to breach of fiduciary duty claims in class action); *Zurich Capital*

*Mrkts. Inc. v. Coglianese*, 332 F. Supp. 2d 1087 (N.D. Ill. 2004) (seemingly applying Rule 8

pleading standard). Plaintiffs' state law claims meet the liberal notice pleading standards set

forth in Rule 8(a) requiring only "a short and plain statement of the claim." Even if Rule 9(b)

applies, Plaintiffs have satisfied that standard through their detailed allegations regarding the

breaches of fiduciary duty which occurred in approving, or allowing to occur, the various

transactions and improper accounting described in the Complaint.[62]

### 3. Plaintiffs Adequately Allege A Claim For Aiding And Abetting A Breach of Fiduciary Duty

Plaintiffs have also adequately pled the elements of their claim for aiding and abetting a

breach of fiduciary duty. To asset this claim, a plaintiff must allege: (1) the existence of a

fiduciary relationship, (2) a breach of that relationship, and (3) "knowing participation" by the

defendant in the fiduciary's breach. *Zirn v. VLI Corp.*, No. 9488, 1989 WL 79963, at *5 (Del.

Ch. July 17, 1989). Only KPMG and Argus contend that Plaintiffs have not adequately alleged

their claims in Count VII, and they concede that the first two elements of the claim are satisfied,

arguing only that Plaintiffs failed to allege "knowing participation."

KPMG claims that Plaintiffs are required, but failed, to plead that KPMG's participation

in the breach of fiduciary duty was "substantial." KPMG Br. at 15. KPMG relies on two cases,

neither of which applied Delaware law: *In re High Strength Steel, Inc.*, 269 B.R. 560, 571

---

[62] Hollinger claims that it cannot be liable under Count VI because it does not owe any fiduciary duty to
Plaintiffs. Hollinger Br. at 27. "[W]hile it is correct that the corporate entity as such is not a fiduciary to
its stockholders and cannot be held liable to them on that basis, the corporation can be held liable in cases
involving fraud *or affirmative misconduct.*" *In re Wheelabrator Tech, Inc. S'holders Litig.*, No. 11495,
1992 WL 212595 (Del. Ch. Sept. 1, 1992) (citing *Gaffin v Teledyne, Inc.*, No. 5786, 1987 WL 18430
(Del. Ch. Oct. 9, 1987)) (emphasis added).

(Bankr. D. Del. 2001) applied Pennsylvania law, and *Witzman v. Lehrman, Lehrman & Flom*,
601 N.W.3d 179, 189 (Minn. 1999) applied Minnesota law. These cases have no precedential
value here.

Rather, the decision in *Zirn*, a Delaware case, sets forth the standard for pleading
"knowing participation" and demonstrates that Plaintiffs have adequately pled their claims. In
*Zirn*, the court upheld the aiding and abetting claim even though the complaint failed to
"specifically allege that [the defendant] 'knowingly participated' in the directors' alleged breach
of their fiduciary duty to the [shareholders]." *Zirn*, 1989 WL 79963, at * 6. The court inferred
knowing participation from allegations that the fiduciaries had a conflict of interest with regard
to the subject matter of an agreement and that the defendant was made aware of this conflict in
the course of negotiating the agreement with the conflicted directors. *Id.* at *7. The court also
based its findings of knowing participation on allegations that the aider and abettor worked
closely with the fiduciaries in drafting the agreement. *Id.*

The allegations here are much stronger than those in *Zirn*. Here, KMPG served as
Hollinger's auditor since 1996 and thus had a close working relationship with defendants.
Hollinger paid KPMG nearly $6.8 million in fiscal year 2000, $7.3 million in fiscal year 2001
and $6.0 million in fiscal year 2002. ¶ 376. KPMG assisted in the preparation of Hollinger's
annual and quarterly statements, reviewed the quarterly financial statements and audited
Hollinger's annual financial statements and the text that accompanied them in the Company's
Form 10-K. ¶ 383. KPMG also reviewed asset sale agreements in the regular discourse of its
auditing and consulting duties. ¶ 391-395. *See Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l
Fund, L.P.*, 829 A.2d 143, 157-58 (Del. Ch. 2003) (finding knowing participation of auditor
which failed to disclose in partnership's annual statement general partner's post-year-end

-89-

withdrawal of its funds from limited partnership even though auditor had previously disclosed similar transactions).

Through this work for Hollinger, as well as through KPMG's services to Hollinger Inc. (where KPMG also served as auditor), KPMG was fully aware of the elaborate corporate network through which money flowed from Hollinger to Lord Black and/or Black-owned and controlled entities, such as Argus, and knew that non-compete fees were being paid to others (including Hollinger Inc.) and that those fees were not disclosed in Hollinger's financial statements. ¶¶ 390-92. KPMG also knew about the fraudulent nature of the management services fees because it had advised Hollinger and its board that those management service fees could not be fully deducted because they were not reasonable. ¶ 386. KPMG also knew that certain defendants had a conflict of interest with regard to various transactions (*e.g.*, the Horizon and Bradford transactions), and therefore knew that the representations that independent directors approved these transactions were false. ¶¶ 393-94. Despite this knowledge, and its disregard of numerous "red flags," KPMG issued unqualified audit opinions on Hollinger's annual financial statements for each year from at least 1999 through 2003. ¶ 396. These facts, which must be accepted on a motion to dismiss, are more than adequate to establish KPMG's "knowing participation" in the breaches of fiduciary duty.

Argus argues that Count VIII should be dismissed as to it because Plaintiffs have failed to present "specific allegations concerning Argus," specifically, any "actions" by Argus. Argus Br. at 15. This argument must be rejected, as Plaintiffs specifically allege that they were "deceived by the Company's misrepresentations that it was receiving services pursuant to management agreements with . . . Argus" for services Argus *knew* it was not providing. ¶¶ 6, 521. In addition, Argus, directly or indirectly through Hollinger Inc., assisted Defendants' diversion of

proceeds from Hollinger's asset sales to Argus' principals. *Id.* Through the management services agreements with Argus, and the transactions between various companies controlled by Lord Black, Lord Black took additional Hollinger funds for himself which were concealed from Plaintiffs. *Id.* Argus knew about these undisclosed transactions because: (i) Argus is owned and controlled by Lord Black's private holding company, Ravelston; (2) Lord Black was, and remains, the CEO of Argus; and (3) several members of Hollinger's board served on Argus' board at the time of the undisclosed self-dealing. ¶¶ 19, 24, 27 & 443. Additionally, Argus benefited from the undisclosed fraud because it owned a 62% interest in the retractable shares of Hollinger Inc., which was a beneficiary of the management services agreements and which controlled Hollinger through its ownership of 30.3% of Hollinger's shares. ¶¶ 19, 23. Quite clearly, the Complaint alleges in detail Argus' knowing participation in the breaches of fiduciary duty.

Finally, KPMG contends that Count VIII must be dismissed because Delaware law does not recognize claims based on "fraud on the market." KPMG apparently does not understand Delaware law on this issue. In *Malone*, 722 A.2d at 13, the court held that "[i]n deference to the panoply of federal protections that are available to investors in connection with the purchase or sale of securities of Delaware corporations, this Court has decided not to recognize a state common law cause of action against the directors or Delaware corporations for 'fraud on the market.'" The decision in *Malone* was limited to claims based on a purchase or sale of securities. In contrast, Count VIII in this case is alleged on behalf of *holders*, and seeks damages based upon the *retention* of Hollinger stock. As in *Gordon,* where the court upheld class claims for aiding and abetting breach of fiduciary duty, the Complaint here seeks "damages caused by the holding of securities and the loss in value which resulted from such holding." *Gordon,* 2000

-91-

WL 556763 at *3. Count VIII is not a "fraud on the market" claim -- it is a "holder" claim by those who were fraudulently induced into retaining their Hollinger shares. Accordingly, KPMG's motion to dismiss Count VIII must be denied.

### 4.     Plaintiffs' Delaware State Law Claims Are Not Preempted By SLUSA

Defendants also argue that Plaintiffs cannot prevail on their state law claims in Counts VI – VIII because they are preempted by SLUSA. Defendants misconstrue SLUSA and the Complaint in this action.

SLUSA provides that "[n]o covered class action based upon the statutory common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging . . . a misrepresentation or omission of material fact in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1)(A). SLUSA does not preempt all state law claims in securities cases. Rather, SLUSA preempts a cause of action if:

> (i) the action is a "covered class action" under SLUSA; (2) the action purports to be based upon state law; (3) the action involves a "covered security" under SLUSA; (4) that the defendant is alleged to have misrepresented or omitted a material fact; and (5) the alleged misrepresentation or omission was made "in connection with" the purchase or sale of the covered security.

*Korsinsky v. Salomon Smith Barney, Inc.*, No. 01-6085, 2002 WL 27775, at *3 (S.D.N.Y. Jan. 10, 2002); *see also Kenneth Rothschild Trust v. Morgan Stanley Dean Witter*, 9 F. Supp. 2d 993, 997-98 (C.D. Cal. 2002).

Even assuming that Defendants can show that the requirements of SLUSA are met here, which they cannot do, SLUSA exempts actions based on "well developed and established laws regarding the fiduciary duty of disclosure of corporate directors with respect to shareholders." *Alessi v. Beracha*, 244 F. Supp. 2d 354, 359 (D. Del. 2003) (holding breach of fiduciary duties on the grounds of false disclosures" is exactly the type of action Congress intended to exempt

from the preemption provisions of SLUSA."). Plaintiffs' claims in Counts VI and VIII fall

within the Delaware law carve-out exceptions to SLUSA.

   Moreover, the requirements for application of SLUSA cannot be met because in Counts

VI and VIII are "holder" claims that are not based at all on any purchase or sale of Hollinger's

shares. Nowhere referenced in those Counts is any mention of any such purchase or sale. ¶¶

524-36, 546-57. Therefore, these holder claims are not preempted by SLUSA. *See Gordon*, WL

556763, at *1, 4 (plaintiff's class claims alleging breach of fiduciary duty and aiding and

abetting such breach were not preempted by SLUSA because the claims were brought on behalf

of holders for the value they "lost [on their retained stockholdings] . . . once the truth was

known"); *Lalondriz v. USA Networks, Inc.*, 68 F. Supp. 2d 285, 286 (S.D.N.Y. 1999) (class

action on behalf of holders of stock alleging breach of fiduciary duty under Delaware law was

not preempted by SLUSA); *Hines*, 1999 WL 1705503, at *6 (finding no preemption where

plaintiff alleged that defendants' breach of fiduciary duty occurred after plaintiff purchased her

stock).[63]

---

[63] *See also Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2005 WL 44434, at *15 (2d Cir.
Jan. 11, 2005) (finding that "such holding claims are not preempted"); *Riley v. Merrill Lynch,
Pierce Fenner & Smith, Inc.*, 292 F.3d 1334, 1345 (11th Cir. 2002) ("SLUSA does not apply to
claims dealing solely with the retention of securities, rather than with purchase or sale"); *Green v.
Ameritrade, Inc.*, 279 F.3d 590, 599 (8th Cir. 2002) (holding that SLUSA did not apply to state
law breach of contract claim ); *Shaev v Claflin*, 2001 WL 548567, at *5 (N.D. Cal. May 17, 2001)
(finding no preemption where "purported injury arose from the mere holding of 3Com stock, and
not from any trading of 3Com securities"); *Falkowski v. Imatron Corp.*, 309 F.3d 1123, 1131 (9th
Cir. 2002) (state law breach of contract claims not preempted by SLUSA); *Norman v. Salomon
Smith Barney Inc.*, 2004 WL 1287310, at 2, 4 (S.D.N.Y. June 9, 2004) ("Regardless of the factual
merits of these claims, they are not securities fraud claims, nor claims that depend on establishing
material misrepresentations or omissions in connection with the purchase or sale of securities,
within the meaning of SLUSA"; claims that financial services firm breached its contractual and
fiduciary duties by making stock recommendations that "it knew to be conflicted and unreliable"
were not preempted by SLUSA).

That Plaintiffs have alleged in separate counts that they purchased securities based on

misrepresentations and omissions does not render their state law holding claims subject to

SLUSA. As explained in *Green v. Ameritrade, Inc.*, 279 F.3d 590, 599 (8th Cir. 2002):

> Misrepresentation claims come in many forms that do not necessarily
> involve any purchase or sale of a security. Green may even plead such a
> claim and escape SLUSA preemption, so long as his state-law claim does
> not require him to prove there was a sale or purchase of a covered security
> in reliance on the misrepresentation.

*See also Dacey v. Morgan Stanley Dean Witter & Co.*, 263 F. Supp. 2d 706, 711-12 (S.D.N.Y.

2003) (where plaintiff brought class action on behalf of subclass of purchasers and a separate

subclass of holders who purchased and held, respectively, based on "misrepresentations and

other alleged breaches of disclosure duties," the court held that the claims of the purchaser class,

but not the holder class, were preempted by SLUSA); *Gray v. Seaboard Sec., Inc.*, 241 F. Supp.

2d 213, 219 (N.D.N.Y. 2003) ("the fact that SLUSA preempts some causes of action in a

complaint does not entitle a defendant to broadly invoke federal preemption against the entire

complaint"; finding certain claims not preempted).

### L.    Plaintiffs Have Standing To Raise Each Of The Claims On Behalf Of The Class

Plaintiffs Teachers, Washington Carpenters and Carlson brought this action on behalf of

themselves and all other purchasers and holders of Hollinger securities during the Class Period

(August 13, 1999 through December 11, 2002). ¶ 15. Pursuant to 15 U.S.C. § 78u-

4(a)(2)(A)(iv), Teachers certified that its last purchase took place on June 29, 2001 and its last

sale took place on June 28, 2002. The Black Group contends that under the Seventh Circuit's

decision in *Roots P'ship*, Plaintiffs do not have standing to raise any securities claim based on statements made after June 29, 2001, the date of Plaintiffs' last purchase of Hollinger stock.[64]

Contrary to this contention, June 28, 2002 (the last sale date), not June 29, 2001 (the last purchase date), is the relevant date in assessing whether Plaintiffs have standing to raise their Rule 10b-5 claims. In *Blue Chip*, the seminal case for determining standing in Rule 10b-5 actions, the Supreme Court held that plaintiffs may bring a rule 10b-5 action so long as they are either purchasers *or sellers* of securities. 421 U.S. at 730-31. Plaintiffs have standing to bring all Rule 10b-5 claims based on misstatements made on or before June 28, 2002, the date of their last sale of Hollinger stock. Since none of Plaintiffs' claims are based on misrepresentations made after June 28, 2002,[65] Plaintiffs have standing to assert a Rule 10b-5 claim on the basis of all misstatements alleged in the Complaint under *Blue Chip*.

Even if June 29, 2001 is the relevant date, Plaintiffs still have standing, despite the Seventh Circuit's decision in *Roots*, which pre-dates the PSLRA and is the primary case upon which the Black Group relies for this argument. *Roots*, 965 F.2d at 1419. Significantly, unlike here, the named plaintiff in *Roots* had no individual claim as the only actionable misrepresentation was made after the lead plaintiff had purchased stock. *Id.* The Seventh Circuit held that the plaintiff could not represent the class, as plaintiff would not even share in any recovery. *Id. See also Feldman v. Motorola, Inc.*, No. 90-5887, 1993 U.S. Dist. LEXIS

---

[64] The Black Group does not dispute that Plaintiffs have "Article III" standing, nor would such an argument have any merit, as Plaintiffs have demonstrated: (1) an injury; (2) a casual link between the defendant's conduct and the injury; and (3) the ability of the court to redress the injury. *Sierakowski v. Ryan*, 223 F.3d 440, 442 (7th Cir. 2000).

[65] The *only* statement alleged by Plaintiffs to be materially false that was made after June 28, 2002 is in Hollinger's 2002 Form 10-K, filed on March 31, 2003 (after the end date of the Class Period), where the Company admitted "that the [management service] payments may not be reasonable, because the Board, and the Audit Committee in particular, had undisclosed conflicts of interest and lacked independence, but failed to admit that no services were actually being rendered for these potentially unfair payments. ¶¶ 134, 142. However, the Complaint makes clear that this 2002 Form 10-K was issued after the end of the Class Period, and therefore is not the basis of Plaintiffs' Rule 10b-5 claims. ¶ 261.

14631 (N.D. Ill. Oct. 14, 1993) ("Having no claim whatsoever, the plaintiff [in *Roots*] could not represent a class that relied on those statements."). The *Roots* decision is not instructive since it did not address whether a plaintiff has standing when fraud-on-the-market and an ongoing scheme (that started before, but continued after, lead plaintiff's last purchase) to defraud investors are alleged. Nor does it address whether a "lead" plaintiff needs to have standing to sue on every claim given the restrictions in the PSLRA on who may act as lead plaintiff (*e.g.*, the party with the largest financial stake). *See Greater Pa. Carpenters Pension Fund*, 2005 U.S. Dist. LEXIS 376, at *24; *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82 (2d Cir. 2004) ("Nothing in the PSLRA indicates that district courts must choose a lead plaintiff with standing to sue on every available cause of action. Rather, because the PSLRA mandates that courts must choose a party who has, among other things, the largest financial stake in the outcome of the case, it is inevitable that, in some cases, the lead plaintiff will not have standing to sue on every claim."); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 257 (S.D.N.Y. 2004) ("a party named 'lead plaintiff' under the PSLRA need not have standing to sue on each, individual claim asserted in the complaint so long as other named plaintiffs have standing to pursue the claims at issue").[66]

Plaintiffs have alleged fraud-on-the-market (¶¶ 455-56), and the Black Group's standing argument has been "repeatedly rejected in fraud-on-the-market cases."[67] In *Danis*, the defendants argued that lead plaintiffs did not have standing to raise Rule 10b-5 claims because they purchased their stock at different times than the other class members and therefore "the prices at which they bought, were influenced by a particular mix of public information existing

---

[66] The other cases relied upon by the Black Group (at 13) are inapposite as they all base their decision on *Roots* which involved facts completely different from those present here. Additionally, this standing issue is appropriate for resolution not here but at class certification.

[67] This could be why no other Defendant raises standing as a defense.

[only] at the times they bought." 189 F.R.D. at 398. The *Danis* court rejected this argument and

found standing because the claims were "typical of those of the class regardless of when they

[lead plaintiffs] purchased [their stock]." Id. at 399 (*relying on Scholes v. Stone, McGuire and*

*Benjamin*, 143 F.R.D. 181, 185 (N.D. Ill. 1992); *In re Scott Paper Co. Sec. Litig.*, 142 F.R.D.

611, 615 (E.D. Pa. 1992); *Alfus v. Pyramid Technology Corp.*, 764 F. Supp. 598, 606 (N.D. Cal.

1991); *Walsh v. Chittenden Corp.*, 798 F. Supp. 1043, 1055 (D. Vt. 1992)). As noted by the

*Danis* court:

> Were the rule otherwise, there could never be a class action in securities
> fraud cases because a representative plaintiff would potentially be needed
> for each day of the class period, since on each day the mix of information
> available to the public would vary.

*Danis*, 189 F.R.D. at 399 (quoting *Feldman*, 1993 U.S. Dist. LEXIS 14631, at *17-18).

Second, Plaintiffs have alleged that Defendants made all of the misrepresentations at

issue (before and after June 29, 2001) as part of the same ongoing scheme to defraud investors.

After June 29, 2001, Defendants in an effort to cover up their earlier fraud disclosed only bits of

information, but those disclosures themselves were material false and misleading and thus part of

the fraudulent scheme. As noted by one court:

> Numerous courts have stated that class representatives do have standing to
> assert claims under § 10(b) which arise from statements made after the
> class representative purchased shares as long as the statements allegedly
> were made in furtherance of a common scheme to defraud.

*Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 13 (D. Mass. 2004) (citing *Upton v. McKerrow*, 887 F.

Supp. 1573, 1577 (N.D. Ga. 1995) (citing numerous cases)). Where the fraud is on-going and

part of a common scheme (*i.e.*, the false statement was made after lead plaintiff's purchase and

was sufficiently similar to statements made before lead plaintiff purchased its stock and so was

part of a common scheme), this Court has permitted lead plaintiffs to represent the entire class.

*See, e.g., Payton v. County of Kane*, 308 F.3d 673, 678-79 (7th Cir. 2002) (adopting Ninth

Circuit's *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461 (9th Cir. 1973), wherein the Court held that if the plaintiffs as a group--named and unnamed-- have suffered an identical injury at the hands of several parties related by way of a conspiracy or concerted scheme, or otherwise "juridically related in a manner that suggests a single resolution of the dispute would be expeditious," the claim could go forward. *Id.* at 679); *see also Weiss v. Winner's Circle*, No. 91-2780, 1995 U.S. Dist. LEXIS 18713, *4-5 (N.D. Ill. Dec. 13, 1995) (standing exists where injuries are "the result of a conspiracy or concerted schemes between the defendant at whose hands the class suffered injury"). For example, in *Abrams v. Van Kampen Funds, Inc.*, No. 01-7538, 2002 U.S. Dist. LEXIS 16022, at *15-16 (N.D. Ill. Aug. 26, 2002), this Court held, in certifying a class,[68] that lead plaintiffs were adequate representatives of the entire class despite the fact that their purchases "related to only four of the six Documents that [were] . . . at issue for the Class Period" and the date of their purchases subjected lead plaintiffs to what the defendants called "unique" defenses. *Id.* (holding lead plaintiffs are adequate representatives of the entire class because individual differences were "not overriding issues" and all claims were based on the same legal theories); *Hicks v. Morgan Stanley & Co.*, No. 01-10071, 2003 U.S. Dist. LEXIS 11972, at *10-11 (S.D.N.Y. July 16, 2003) (rejecting defendants' claim that there was no typicality and adequacy of representation because plaintiff would be litigating on behalf of class members who purchased prior to purchases made by lead plaintiff). Courts do not require lead plaintiff's claims to be identical to every class claim for the lead plaintiff to represent the class. *See Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 185 (N.D. Ill. 1992) (holding "typical" does not mean "identical").

---

[68] As explained in *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d at 14, the standing inquiry overlaps with the certification inquiry, and therefore cases concerning motions for class certification are relevant to the standing issue.

Finally, given the restrictions on who may act as lead plaintiff, lead plaintiffs should not be required to have standing to raise every claim of the class. *See Greater Pa. Carpenters Pension Fund*, 2005 U.S. Dist. LEXIS 376, at *22-23 ("The Court notes that numerous cases exist that distinguish a lead plaintiff under the PSLRA from a named plaintiff for standing purposes.") (*citing to Hevesi v. Citigroup*, 366 F.3d 70, 82 (2d Cir. 2004) ("Nothing in the PSLRA indicates that district courts must choose a lead plaintiff with standing to sue on every available case of action. Rather, because the PSLRA mandates that courts must choose a party who has, among other things, the largest financial stake in the outcome of the case, it is inevitable that, in some cases, the lead plaintiff will not have standing to sue on every claim."); *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 204 (S.D.N.Y. 2003) ("[N]othing in the PSLRA requires that the lead plaintiffs have standing to assert all of the claims that may be made on behalf of all of the potential classes and subclasses of holders of different categories of security at issue in the case."); *In re Initial Pub. Offering Sec. Litig.*, 214 F.R.D. 117, 123 (S.D.N.Y. 2002) ("[B]eing a Lead Plaintiff under the PSLRA is not the same as being a Class Representative under Rule 23")). If conflicts should arise later on (though highly unlikely), the class may be subdivided and named plaintiffs can be appointed for each subdivision.

As for Section 18 claims, the Black Group does not (and cannot) cite to even one case that supports its proposition that Plaintiffs lack standing to raise their Section 18 claims. The additional standing requirements raised in *Blue Chip* do not apply to Section 18 claims.[69] Accordingly, the Court should find that Plaintiffs have standing to raise their Section 10(b) and Section 18(a) claims, including those based on statements made after June 29, 2001.

---

[69] *See supra* at 64-65 (discussing elements of Section 18 claim).

**M.    The Complaint Alleges A Sufficient Basis To
Assert Personal Jurisdiction Over Argus**

Argus seeks dismissal on the grounds that the Complaint fails to establish personal

jurisdiction over it.[70]  This challenge is legally and factually unsustainable.

### 1.    Pleading Standard For Personal Jurisdiction

Where, as here, a defendant brings a motion to dismiss for lack of personal jurisdiction

before discovery has begun, the plaintiff may defeat the motion simply by alleging a mere *prima*

*facie* case. *Zurich Capital Mrkts. Inc. v. Coglianese*, No. 03-7960, 2004 WL 2191596, at *13

("A plaintiff need only make a *prima facie* case that jurisdiction over a defendant is proper").  A

plaintiff need only "allege sufficient facts to support a reasonable inference that defendant is

subject to personal jurisdiction." *Iosello v. Lexington Law Firm*, No. 03-0987, 2003 U.S. Dist.

LEXIS 12509, * 16-17 (N.D. Ill. July 18, 2003) (minimum contacts established based on

"evidence . . . of business transactions").  As stated above, the Court must accept the allegations

in the complaint (including those pertaining to jurisdiction) as true and resolve any conflicts in

the pleadings and affidavits in favor of the plaintiff. *Id.* at *9. *See also Brach's Confections,*

*Inc. v. Keller*, No. 03-2032, 2003 U.S. Dist. LEXIS 16817, at *6 (N.D. Ill. Sept. 24, 2003)

("When reviewing a motion to dismiss, the court takes all jurisdictional allegations in the

complaint as true unless controverted by the defendant's affidavits").[71]

Plaintiffs allege that Argus (and other Defendants) participated in a fraudulent scheme

that included false and misleading misstatements made to United States investors in Hollinger,

---

[70] Defendant Argus does not challenge whether it could be, or has been, properly served, only whether
personal jurisdiction over Argus is permitted under the Fifth Amendment.  Argus Br. at 3.

[71] As Argus conceded, "the court may consider material outside the complaint . . . regarding the personal
jurisdiction allegations," (Argus Br. at 3), and thus the Court may consider those materials referenced
herein and attached hereto as Exhibits A-J. *See Old Republic Ins. Co. v. Ness, Motley, Loadholt,*
*Richardson & Poole, P.A.*, No. 03-5238, 2004 U.S. Dist. LEXIS 5731, at *12 (N.D. Ill. Apr. 5, 2004) ("In
ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), the court may
consider matters outside the pleadings.").

and the improper diversion of Hollinger's assets to Lord Black, Argus and other Defendants, that

caused injury to Plaintiffs and other investors in the United States. (¶¶ 6, 12, 19, 276, 471-78, &

516-23). Where a defendant's activities have an "unmistakably foreseeable effect within the

United States" and "could reasonably be expected to be visited upon the United States

[investors]," exercise of personal jurisdiction over foreign defendants for securities fraud claims

in appropriate. *SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990); *SEC v. Softpoint Inc.*,

No. 95 2951, 2001 WL 43611, at *5 (S.D.N.Y. Jan. 18, 2001). *See also SEC v. Ogle*, No. 99-

609, 1999 U.S. Dist. LEXIS 9955, at *5-6 (N.D. Ill. June 14, 1999) (by engaging in scheme to

defraud defendants could foresee being hauled into United States court). Argus' activities satisfy

these criteria. At a minimum, Plaintiffs' factual allegations, made without benefit of discovery,

suffice to defeat Argus' motion at this time.[72]

### 2.    The Two-Part Jurisdictional Analysis

Section 27 of the Exchange Act, 15 U.S.C. Section 78aa, empowers United States courts

to exercise personal jurisdiction in Rule 10b-5 cases to the full extent permitted by due process.

*Lisak v. Mercantile Bancorp, Inc.*, 834 F.2d 668, 672 (7th Cir. 1987) (holding the Securities

Exchange Act "not only creates personal jurisdiction over anyone within the United States but

also is consistent with the Due Process Clause of the fifth amendment") (citing *SIPC v. Vigman*,

---

[72] If the court determines that Plaintiffs have shown a colorable claim of personal jurisdiction over Argus
but has reservations, Plaintiffs request leave to conduct discovery of Argus limited to issues of
jurisdiction, such as its contacts with the U.S. and the effects in the U.S. of the transactions involving and
agreements in which Hollinger engaged. *Central States*, 230 F.3d at 946-47 (limited discovery permitted
after a colorable showing of personal jurisdiction by plaintiff). Still, at this juncture of the case, Plaintiffs
need satisfy only a "light burden" to be entitled to discovery as to personal jurisdiction. *Alicea v. Lasar
Mfg. Co.*, No. 91-3929, 1992 WL 230203, at *2 (S.D.N.Y. Aug. 31, 1992). "Plaintiffs are entitled to
discovery regarding the issue of personal jurisdiction if they have made a sufficient start, and shown their
position not to be frivolous." *Newbro v. Freed*, No. 03-10308, 2004 WL 691392, at *3 (S.D.N.Y. Mar.
31, 2004). *See also Stratagem Dev. Corp. v. Hereon Int'l N.V.*, 153 F.R.D. 535, 547 (S.D.N.Y. 1994)
(discovery allowed where plaintiff failed to make a prima facie showing of jurisdiction but its position
was not frivolous); *Manhattan Life Ins. Co. v. A.J. Stratton Syndicate*, 731 F. Supp. 587, 593 (S.D.N.Y.
1990) (same).

764 F.2d 1309, 1315 (9th Cir. 1985)); *Mariash v. Morrill*, 496 F.2d 1138, 1143 (2d Cir. 1974));

*Ogle*, 1999 U.S. Dist. LEXIS 9955, at *3 (same). To determine whether the exercise of personal

jurisdiction is proper, the Court must conduct a two-part due process analysis: a "minimum

contacts" inquiry and a "reasonableness" inquiry. *Zurick Capital*, 2004 WL 2191596, at *22.

The "minimum contacts" analysis examines a defendant's contacts with the United States. *Id.* If

the court finds sufficient contacts with the United States, it then assesses the "reasonableness" –

from the forum's perspective – of exercising jurisdiction. *See Fitzsimmons v. Barton*, 589 F.2d

330, 333 (7th Cir. 1979) (reversing dismissal because the trial court's fairness analysis did not

focus on interests of United States in hearing the action, as reflected in the securities laws). As

both tests are easily satisfied here, the Court should reject Argus' jurisdiction arguments.

### a.    The Minimum Contacts Test Is Satisfied

Minimum contacts with the United States can be established under either of two theories:

general or specific jurisdiction. *Old Republic Ins.*, 2004 U.S. Dist. LEXIS 5731, at *15. General

jurisdiction exists where a defendant's contacts with the forum are so "continuous and

systematic" that it can be sued for any claim, irrespective of the relationship of the claim to the

forum-related conduct. *Helicopteros Nacionales de Colombia S.A. v. Hall*, 466 U.S. 408, 415-16

(1984). "Specific jurisdiction exists if the claims arise out of or relate to the defendant's contacts

with the forum." *Zurich Capital*, 2004 U.S. Dist. LEXIS 19432, at *22 (quoting *Helicopteros*,

466 U.S. at 414 n.8).

To assert specific jurisdiction, the Court must find that "the defendant has 'purposefully

directed' his activities at residents of the forum, and the litigation results from alleged injuries

that 'arise out of or relate to' those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462,

472 (1985). As explained in *Iosello*, 2003 U.S. Dist. LEXIS 12509, at *10, in determining

whether there is specific jurisdiction over a defendant sued in Illinois, the court must consider

-102-

whether the defendant "may be subject to jurisdiction based on [its] contacts with Illinois that are directly related to the plaintiff and his claims." "If a relationship between the litigation and forum exists, the plaintiff need only show that the defendant's contacts with the forum reach a 'minimum' threshold." *Clearclad Coatings, Inc. v. Xontal Ltd.*, No. 98-7199 1999 U.S. Dist. LEXIS 13173, *50 (N.D. Ill. Aug. 19, 1999).

Additionally, the Court must examine whether it was foreseeable to Argus that its actions would cause injury in Illinois. *Burger King*, 471 U.S. at 474 (foreseability analysis requires that "'the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there'") (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S. Ct. 559, 567 (1980)); *see also Platt Saco Lowell, Ltd. v. Spindelfabrik Suessen-Schurr, Stahlecker & Gill GmbH*, No. 75-0051W 1980 U.S. Dist. LEXIS 16399, *20 (N.D. Ill. Oct. 9, 1980) (the Court must base its decision on a totality of the circumstances because the "minimum contacts test contemplates a case-by-case evaluation of the defendants' connections with the forum to determine what is fair and reasonable in a particular situation.").

One circumstance making such anticipation reasonable is where a defendant has acted in such a way as to "cause consequences" in the forum state. *Ogle*, 1999 U.S. Dist. LEXIS 9955, at *5. *See also Unifund SAL*, 910 F.2d at 1033 (finding personal jurisdiction where defendants' actions abroad had a clearly foreseeable and direct impact on the United States securities market). Here, Argus' actions caused United States investors to suffer damages in connection with their Hollinger stockholdings. (¶¶ 522-23, 547-57).

In particular, Argus contracted with Hollinger to provide that company (at its Illinois offices) with management and advisory services. Courts in this District have consistently

recognized that foreign defendants that contract with residents of Illinois are subject to the jurisdiction of the state. As held in *Hedge Assocs. v. Ferraz Corp.*, No. 95-4042 1996 U.S. Dist. LEXIS 859, *8-9 (N.D. Ill. Jan. 26, 1996), "contract performance standing alone can be a sufficient basis for jurisdiction," especially where the contract is formed, solicited, negotiated or performed in the jurisdiction. *Id. See also Hoffman v. Sucher*, No. 95-0126, 1995 U.S. Dist. LEXIS 16371, at *8 (N.D. Ill. Nov. 6, 1995) ("personal jurisdiction over an out-of-state resident has been consistently recognized in actions based on contracts to be perform[ed] in Illinois;" personal jurisdiction existed over defendants who never traveled to Illinois but contracted to repay a note in Illinois); *Jacobs/Kahan & Co. v. Marsh*, 740 F.2d 587, 590 (7th Cir. 1984) (contract performance in Illinois is sufficient basis by itself for assertion of personal jurisdiction); *Continental Bank N.A. v. Everett*, 742 F. Supp. 508, 510 (N.D. Ill. 1990), *aff'd*, 964 F.2d 701 (7th Cir. 1992) (finding personal jurisdiction over defendant who was contractually required to make loan payments in Illinois).

Argus makes much of its lack of a physical connection to Illinois. (Argus Br. at 2 Decl. of Peter G. White of 1/24/05). Lack of offices, real estate, resident employees or other tangible signs of a presence in Illinois or the United States, is not dispositive on the issue of whether the Court may exercise specific jurisdiction over Argus. The Complaint alleges conduct in furtherance of the fraud in the United States by Argus. (¶¶ 6, 19, 522-23 & 547-57). Personal jurisdiction in a securities fraud case may be asserted over a defendant with *no* physical contact with the forum if he or she "caus[ed] an effect in the state by an act done elsewhere." *Perez-Rubio v. Wyckoff*, 718 F. Supp. 271, 228 (S.D.N.Y. 1989). *See, e.g., Shanahan v. Vallat*, No. 03-3496, 2004 WL 2937805, at *8 (S.D.N.Y. Dec. 19, 2004) ("These contacts are sufficient to establish specific personal jurisdiction: [foreign] defendants acted with intent to influence a

resident of the United States, and this litigation arises out of Defendants' acts."); *Ogle,* 1999 WL 446857, at *2 (finding personal jurisdiction where complaint alleged defendants' "knowing participation in planning and executing a scheme designed to defraud American investors and securities markets" and finding "irrelevant" contention that defendants had no direct contact with the United States).

In *Ogle,* the SEC brought an action against Canadian defendants who had engaged in a scheme to manipulate the stock price of a United States public company. 1999 U.S. Dist. LEXIS 9955, at *3. The stock was traded on a United States market and the scheme allegedly defrauded thousands of United States investors. *Id.,* at *5. The defendants moved to dismiss for lack of personal jurisdiction because they traded through a Canadian broker and claimed to have no other contacts with the United States. *Id.* The Court rejected that argument outright because "[*defendants'*] knowing participation in planning and executing a scheme designed to defraud American investors and securities markets" was the basis of the Court's personal jurisdiction. *Id.,* at *6.

Thus, even if Argus did not have any physical contacts with the United States, this Court would still have authority to exercise personal jurisdiction based on Argus' non-United States activities that affected United States investors. *Teachers' Ret. Sys.,* 2003 WL 21058090, at *8-9 (foreign partner of international accounting firm subject to personal jurisdiction where plaintiff alleged it was "engaged in a course of conduct with the knowledge that it would affect American investors in the United States."); *SEC v. Foundation Hai,* 736 F. Supp. 465, 469 (S.D.N.Y. 1990) (overseas trading activities of foreign defendants in Unites States-listed securities sufficiently directed toward United States for purposes of liability under Section 10(b)); *see also MTC Elec. Tech. Co. v. Leung,* 889 F. Supp. 296, 400 (C.D. Cal. 1995) ("[W]ithin the rubric of 'purposeful

availment,' jurisdiction may be exercised over a defendant whose only contact with the forum is

the 'purposeful direction' of a foreign act which has an effect in the forum.") (quoting *Calder v.*

*Jones*, 465 U.S. 783(1984)).

Argus argues that "a parent corporation is a separate legal entity from its subsidiaries, and

thus is not automatically subject to jurisdiction based on the conduct of corporations that it

wholly or partially owns, either directly or through successive corporate relationships," relying

on *Central States,*, 230 F.3d at 943. (Argus Br. at 7). But the Seventh Circuit in *Central States*

held that no personal jurisdiction existed because these corporate affiliated observed corporate

formalities and the parent "did not exercise an unusually high degree of control over the

subsidiary," as is the case here. *Id.* at 943.

First, Argus is no mere distant parent of Hollinger. Argus is a holding company that

*solely* invests in Hollinger Inc. and Hollinger Inc.'s subsidiaries, namely Hollinger.[73] Argus is

the controlling shareholder of Hollinger Inc., holding 62% of the shares of the Retractable

Common Shares. ¶ 23. As such, Argus' "principal source of revenue is dividend income from

the investment in Hollinger" and Argus' "future financial obligations is [sic] dependant on

continuing to receive cash dividends on the Hollinger Inc. retractable common shares."[74] In fact,

Argus and Hollinger Inc. are so intertwined that under Canadian law, the two companies are

required to prepare and file consolidated financial statements.[75] However, since the initiation of

litigation against Hollinger and its affiliates, Hollinger Inc. has not been able to prepare its

---

[73] See Canadian filings *available at* http://www.sedar.com/ Argus Corporation Limited, Annual
Information Form, dated May 19, 2000 (attached as Exhibits A-E).

[74] See Canadian filings *available at* http://www.sedar.com/ Argus Corporation Limited, Annual Report
Excerpt: Management Discussion and Analysis, dated May 16, 2003 (Exhibits A-E).

[75] See Canadian filings *available at*
http://www.sedar.com/csfsprod/data46/filings/00644485/00000001/C%3A%5Csedarpdf %5Carg0514.pdf
(Exhibits A-E).

financial statements, leaving Argus, in turn, unable to prepare its financial statements.[76] Furthermore, Canadian authorities consider Argus a "related party for purposes of the Inspection" they are conducting related to the same violations alleged by Plaintiffs.[77]

Second, Argus and Hollinger are connected in many other ways. As stated above, Argus and Hollinger have entered into a management services contract pursuant to which Argus provided Hollinger with strategic advice, planning and financial services which all served to benefit Hollinger at its principal place of business in Illinois. ¶¶ 6, 133.

Additionally, Argus' corporate filings all contain references to, and information about, Hollinger.[78] Argus and Hollinger share more than a few members on their boards of directors and they have many corporate executives in common. Throughout the Class Period, the majority of Argus' board of directors also served as directors for both Hollinger and Hollinger Inc.,[79] and all officers at Argus also served as executives at Hollinger and/or Hollinger Inc.[80] All of these board members and executives traveled to New York for Hollinger's annual shareholder meetings and repeatedly and systematically conducted business in the United States. ¶¶ 106.

While (as Argus contends) a parent-subsidiary relationship alone is not enough to establish jurisdiction over a parent whose subsidiary had contacts with the United States, the relationship between the companies can "translate into jurisdiction over the parent despite the maintenance of separate corporate identities." *Avery Dennison Corp. v. UCB SA and UCB Films PLC*, No. 95-6351, 1997 U.S. Dist. LEXIS 2931, at *8 (N.D. Ill. Mar. 14, 1997). *See also*

---

[76] *Id.*

[77] See Canadian filing *available at* http://biz.yahoo.com/bw/050304/45572_1.html (Exhibit H).

[78] *See generally* Argus' Annual Reports (Exhibits A-E).

[79] During the Class Period, Argus' directors have included: Amiel Black, Lord Black, Colson, Atkinson, Boultbee, Radler and White.

[80] During the Class Period, Argus' officers have included: Lord Black, Atkinson, Boultbee, Radler, White, Frederick A. Creasey, Tatiana Samila, Claire F. Duckworth and Sherrie L. Ross.

*Integrated Bus. Info. Service Ltd. v. Dun & Bradstreet Corp.*, 714 F. Supp. 296, 300 (N.D. Ill. 1989). Courts will typically find jurisdiction over the parent "where the degree of relationship between the parent and the subsidiary is so significant that it justifies the exercise of jurisdiction." *Avery Dennison*, 1997 U.S. Dist. LEXIS 2931, at *9. Here, the numerous interconnections between Argus and Hollinger support the exercise of personal jurisdiction over Argus. In fact, these interconnections, especially Argus' provision of management and advisory services for Hollinger, show that Hollinger in effect served as Argus' agent in the United States. *See In re Musicmaker.com Sec. Litig.*, No. 00-2018, 2001 U.S. Dist. LEXIS 25118, at *27 (C.D. Cal. June 4, 2001) ("A subsidiary functions as its parent corporation's agent in a manner sufficient to form a basis for personal jurisdiction if the subsidiary 'performs services that are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services.'" Court asserted jurisdiction over the parent because it used the subsidiary as an agent); *Chan v. Society Expeditions, Inc.*, 39 F.3d 1398, 1405 (9th Cir. 1994) ("courts have permitted the imputation of contacts where the subsidiary was either established for, or is engaged in, activities that, but for the existence of the subsidiary, the parent would have to undertake itself") (internal citations omitted).

Third, where, as here, the non-resident controls a resident in the forum, courts have found that control person liability supports a finding of personal jurisdiction. *See San Mateo County Transit Dist. v. Dearman, Fitzgerald and Roberts, Inc.*, 979 F.2d 1356, 1358 (9th Cir. 1992) ("Even lower is the standard for personal jurisdiction, which exists if the plaintiff makes a non-frivolous allegation that the defendant controlled a person liable for the fraud."); *McNamara v. Bre-X Minerals, Ltd.*, 46 F. Supp. 2d 628, 636 (E.D. Tex. 1999) (finding control person liability

-108-

serves as a basis for finding personal jurisdiction in a case involving the securities laws, and that is required is for plaintiff to make prima facie showing of control person liability) (numerous citations omitted). Similarly, courts have subjected a control person to the jurisdiction of a particular state based on whether he or she "knew, or was in a position to know, about the allegedly fraudulent practices that [gave] rise to the action." *Derensis v. Coopers & Lybrand Chartered Accountants*, 930 F. Supp. 1003, 1014 (D. N.J. 1996) (personal jurisdiction existed over Canadian defendants who had no director contacts with forum but allegedly provided and disseminated financial statements they knew would influence the price of securities traded on NASDAQ); *Itoba Ltd. v. LEP Group, Plc*, 930 F. Supp. 36, 41 (D. Conn. 1996) (personal jurisdiction is appropriate where director of foreign corporation knew or should have known a form he approved would be filed with the SEC and relied upon on by potential investors); *Landry v. Price Waterhouse Chartered Accountants*, 715 F. Supp. 98, 102 (S.D.N.Y. 1989) (personal jurisdiction existed over a foreign defendant charged with control person liability based on his "behind the scenes" role in the subject transaction which he must have known would have an impact on stock trading with the United States).

Here, the facts show that Argus was a control person of Hollinger and was in a position to know, based on the interlocking officers, directors and owners and the management services agreements, about the fraud. ¶¶ 6, 19, 23- 24, 27, 29, 32, 38, & 518- 519.

b.    **The Reasonableness Inquiry Is Satisfied**

It is "reasonable" to compel Argus to litigate Plaintiffs' claim in this forum. Courts employee a five-factor test in assessing whether the assertion of personal jurisdiction is reasonable: (1) the burden on the foreign entity to litigate here; (2) the interests of the United States as the forum for adjudicating the case; (3) the plaintiffs' interests in obtaining convenient and effective relief; (4) the most efficient interstate resolution of the controversy; and (5) the

availability of relief in another forum. *See Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 113-14 (1987). Contrary to Argus' contention, these factors weigh decidedly in favor of asserting personal jurisdiction over Argus in this action.

It is indisputable that the Court and the United States have a strong interest in enforcing the securities laws against obvious violators like Argus and the other Defendants herein, who were active and willful participants in this fraud. *Ogle*, 1999 U.S. Dist. LEXIS 9955, at *7. ("[T]he United States has a strong interest in enforcing its securities laws to cleanse the securities markets of fraud."). *See also Zurich Capital*, 2004 WL 2191596, at *28 ("The United States has a substantial interest in the enforcement of its securities laws and the protection of investors in the United States securities markets;" jurisdiction over foreign defendants proper where defendants conspired with Illinois entities and caused harm to United States interests) (quoting *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 479 (S.D.N.Y. 2001)).

In addition, Plaintiffs have a strong interest in obtaining convenient and effective relief, for themselves and the Class, as Hollinger's investors have suffered millions of dollars in losses. Moreover, adjudicating this matter in Illinois will not place a substantial burden on Argus. The Court in *Ogle* made clear that the burden on the Canadian defendants are minimized by modern conventions and would be insignificant in comparison to the Court's interest in prosecuting securities fraud. *Ogle*, 1999 U.S. Dist. LEXIS 9955, at *7 (citing *SEC v. Carillo*, 115 F.3d 1540, 1547 (11th Cir. 1997) (noting that modern methods of communication and transportation have ameliorated the burden of litigating in a foreign state)). Likewise in *Aristech Chem. Int'l v. Acrylic Fabricators*, 138 F.3d 624, 628-29 (6th Cir. 1998), the court held that a Canadian defendant did not face a high burden in adjudicating a case in Kentucky because "only a short plane flight separates Ontario from Kentucky," "the distance between Ontario and Kentucky is

not overly burdensome" and "a Canadian defendant litigating in the United States finds a judicial

system 'rooted in the same common law traditions' as that of Canada." *Id.* (quoting *Theunissen*

*v. Matthews*, 935 F.2d 1454, 1462 (6th Cir. 1991). *See also Sculptchair, Inc. v. Century Arts,*

*Ltd.*, 94 F.3d 623, 632 (11th Cir. 1996) (holding that "modern methods of transportation and

communication have significantly ameliorated" the burden on a Canadian corporation litigating

in the United States) (internal citations omitted). Litigating all the claims here would be the most

efficient manner to resolve Plaintiffs' claims, as Hollinger is headquartered here, KPMG is

located here, and most of the Individual Defendants are located here or have transacted business

in this forum. ¶¶ 38, 41 & 45. Even when the burden is serious on a foreign defendant who

must defend itself in the United States, the interests of the forum and the plaintiff will usually

outweigh that burden. *Morris Material Handling, Inc. v. KCI Konecranes PLC*, 334 F. Supp. 2d

1118, 1126 (E.D. Wis. 2004). The courts in this District, and the remedies provided Plaintiffs in

the Exchange Act, support assertion of jurisdiction here.

　　In short, numerous facts and the law support the assertion of personal jurisdiction over

Argus.

## CONCLUSION

For all of the above reasons, each of the Defendants' motions to dismiss should be denied

in their entirety.

Dated:  March 29, 2005                         Respectfully submitted,


                                               By: _John C. Kairis (cws)_
                                               GRANT & EISENHOFER, P.A.
                                               Jay W. Eisenhofer
                                               John C. Kairis
                                               1201 N. Market Street, Suite 2100
                                               Wilmington, DE 19801
                                               (302) 622-7000
                                               (302) 622-7100 (facsimile)

                                               *Attorneys for Lead Plaintiff*
                                               *Teachers' Retirement System of Louisiana and Co-*
                                               *Lead Counsel for the Plaintiff Class*

                                               LERACH COUGHLIN STOIA & ROBBINS LLP
                                               Darren J. Robbins
                                               Travis E. Downs, III
                                               Scott H. Sahan
                                               401 B. Street, Suite 1700
                                               San Diego, CA 92101
                                               Telephone:  (619) 231-1058
                                               Facsimile:  (619) 231-7423

                                               *Attorneys for Plaintiff Washington Area Carpenters*
                                               *Pension and Retirement Fund and Co-Lead Counsel*
                                               *for the Plaintiff Class*


                                               MUCH SHELIST FREED DENENBERG
                                               AMENT & RUBENSTEIN, P.C.
                                               Carol V. Gilden
                                               191 North Wacker Drive - Suite 1800
                                               Chicago, Illinois 60606-1615
                                               Telephone:  (312) 521-2000
                                               Facsimile:  (312) 521-2100

                                               *Liason Counsel for the Plaintiff Class*

## CERTIFICATE OF SERVICE

I, Carol V. Gilden, hereby certify that on January 9, 2007, I electronically filed the foregoing Refiling of Previously Filed Plaintiffs' Omnibus Answering Brief [D.I. 212] in Opposition to the Motions to Dismiss the Third Amended Complaint Filed by Defendants Argus Corporation Inc., KPMG LLP and Richard N. Perle with the Clerk of the Court using the CM/ECF system which will send notification of such filing to registered parties. I also certify that on January 9, 2007, I served via First Class Mail the parties named below.


/s/ Carol V. Gilden
Carol V. Gilden

The following are those who are currently on the list to receive e-mail notices for this case via the CM/ECF system:

**Douglas Alan Albritton**
dalbritton@freebornpeters.com

**Robert M. Andalman**
randalman@sonnenschein.com NDIL_ECF@sonnenschein.com

**Karl Richard Barnickol**
karl.barnickol@kattenlaw.com marisa.morado@kattenlaw.com,ecfdocket@kattenlaw.com

**William Butler Berndt**
berndt@sw.com ddjones@sw.com;central@sw.com

**Sharon M. Blaskey**
sblaskey@willkie.com

**Lisa Maria Cipriano**
lcipriano@eimerstahl.com

**Donald A Corbett**
CorbettD@dsmo.com

**Brian L. Crowe**
bcrowe@shefskylaw.com sfdocket@shefskylaw.com

**Jonathan M. Cyrluk**
cyrluk@stetleranduffy.com edocket@stetleranduffy.com

**Adam B. Deutsch**
adeutsch@eimerstahl.com
tlarson@eimerstahl.com;fharvey@eimerstahl.com;adreyer@eimerstahl.com

**Jay Stephen Dobrutsky**
jdobrutsky@burkelaw.com jpowell@burkelaw.com;bmears@burkelaw.com

**Cary E. Donham**
cdonham@shefskylaw.com sfdocket@shefskylaw.com

**Travis E Downs, III**
travisd@lerachlaw.com

**Joseph J. Duffy**
jduffy@stetlerandduffy.com edocket@stetlerandduffy.com;bdorgan@stetlerandduffy.com

**Michael Anthony Duffy**
maduffy@kirkland.com fsramek@kirkland.com

**Nathan P. Eimer**
neimer@eimerstahl.com

**Timothy D. Elliott**
telliott@rathjewoodward.com

**James R. Figliulo**
jfigliulo@fslegal.com

**Michael D. Freeborn**
mfreeborn@freebornpeters.com

**Alan Scott Gilbert**
agilbert@sonnenschein.com NDIL_ECF@sonnenschein.com

**Veronica Gomez**
gomez@sw.com ddjones@sw.com;central@sw.com

**Robert S. Grabemann**
grabemann@mbslaw.com ef-mbs@mbslaw.com

**Michael Thomas Graham**
mgraham@fslegal.com

**John F. Hartmann**
jhartmann@kirkland.com

**Daniel T. Hartnett**
hartnett@mbslaw.com ef-mbs@mbslaw.com

**Valarie Hays**
valarie.hays@usdoj.gov

**Ted S. Helwig**
ted.helwig@kattenlaw.com patricia.cappuzzo@kattenlaw.com,ecfdocket@kattenlaw.com

**Ian K. Hochman**
ihochman@willkie.com

**Ferris J Hussein**
ferris.hussein@kattenlaw.com

**Vanessa G. Jacobsen**
vjacobsen@eimerstahl.com erogers@eimerstahl.com

**David C. Jacobson**
djacobson@sonnenschein.com cborkowski@sonnenschein.com;NDIL_ECF@sonnenschein.com

**Christine M. Johnson**
cjohnson@eimerstahl.com

**Stephanie D. Jones**
sjones@fslegal.com

**Andrew George Klevorn**
aklevorn@eimerstahl.com

**Leigh R. Lasky**
lasky@laskyrifkind.com

**Paula Enid Litt**
litt@sw.com central@sw.com,miner@sw.com

**Royal B. Martin**
martin@mbslaw.com ef-mbs@mbslaw.com

**Lisa S. Meyer**
lmeyer@eimerstahl.com

**Marvin Alan Miller**
mmiller@millerfaucher.com

**Gordon B. Nash, Jr**
gnash@gcd.com DOCKETMAIL@GCD.COM

**Douglas J. Pepe**
dpepe@josephnyc.com

**Douglas Michael Ramsey**
dramsey@shefskylaw.com sfdocket@shefskylaw.com

**Sara Kristine Rankin**
srankin@kirkland.com

**Ronald S. Safer**
rsafer@schiffhardin.com edocket@schiffhardin.com

**Peter A. Silverman**
psilverman@fslegal.com

**David B Singer**
dsinger@fhslc.com

**Allan T. Slagel**
aslagel@shefskylaw.com sfdocket@shefskylaw.com

**Gregory L. Stelzer**
gstelzer@fslegal.com

**William Gibbs Sullivan**
sullivan@mbslaw.com ef-mbs@mbslaw.com

**Miki Vucic Tesija**
mtesija@foley.com

**Stephen C. Voris**
svoris@burkelaw.com

**John Friedrich Zabriskie**
jzabriskie@foley.com

**Manual Notice List**

The following is the list of attorneys who will be receiving a copy of the attached filing via First Class Mail:

**Alex J Bourelly**
Baker Botts LLP
The Warner
1299 Pennsylvannia Avenue, N.W.
Washington, DC 20004-2400

**John C Kairis**
**Jay W. Eisenhofer**
Grant & Eisenhofer
1201 N. Market Street
Suite 2100
Wilmington, DE 19801

**Martin Flumenbaum**
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064

**Gregory P Joseph**
Gregory P. Joseph Law Offices LLC
805 Third Avenue
31st Floor
New York, NY 10022

**Sandra M Lipsman**
Gregory P Joseph Law Offices LLC
805 Third Avenue
New York, NY 10022

**Richard A. Rothman**
Weil, Gotshal & Manges
767 Fifth Avenue
New York, NY 10153

**Martin L Seidel**
Cadwalader, Wickersham and Taft
One World Financial Center
New York, NY 10281

**Ira Lee Sorkin**
**Donald A. Corbett**
Dickstein Shapiro Morin & Oshinsky LLP
1177 Avenue of the Americas
New York, NY 10036

**Marc A Topaz**
Schiffrin & Barroway, LLP
280 King of Prussia Road
Radnor, PA 19087

**Eric H. Sussman**
**Thomas D. Shakeshaft**
Assistant United States Attorneys
219 S. Dearborn Street
Chicago, IL 60604